**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION SECURITIES LITIGATION | No. 2:16-cv-06509-WHW-CLW<br>Hon. William H. Walls<br><br>**<u>CLASS ACTION</u>**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**Jury Trial Demanded** |

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................2

II.     JURISDICTION AND VENUE ..........................................................................7

III.    PARTIES ...............................................................................................................8

     A.      Lead Plaintiffs.............................................................................................8

     B.      Defendants ..................................................................................................9

IV.     SUMMARY OF THE FRAUD ...........................................................................10

     A.      Cognizant's Success as an Outsourcing Business Was Driven by Its Use of Indian "Special Economic Zones" to Lower the Company's Taxes and Costs.....10

     B.      Planned Changes to Indian Tax Law Put Increased Pressure on Cognizant to Obtain SEZ Licensing for Its Facilities As Quickly As Possible During the Class Period ........................................................................................15

     C.      Defendants Underscored the Benefits of Cognizant's SEZ Licenses As a Key Driver of Its Financial Performance, While Assuring Investors that Cognizant Did Not Make Improper Payments to Foreign Officials ....................18

          1.      Defendants Highlighted that Cognizant's SEZ Operations Were a Crucial Driver of Its "Strong" Financial Performance .............................18

          2.      Defendants Assured Investors That Cognizant Did Not Make Improper Payments to Foreign Officials, and Maintained a System of Internal Controls to Prevent Such Payments ........................................20

     D.      In Truth, Cognizant Bribed Indian Government Officials to Procure Valuable SEZ Licensing ..........................................................................30

     E.      The Truth Is Finally Revealed .................................................................34

     F.      Cognizant Has Admitted that the Company's Class Period Representations Were False and that Senior Management "May" Have Participated in Making Improper Payments to Indian Officials ...................................37

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD AND ANALYST AND MARKET REACTIONS THERETO ...................................41

     A.      Cognizant Highlighted the Benefits It Received from Its SEZ Licenses in India Without Disclosing that the Company Was Involved in a Bribery Scheme to Obtain and Perpetuate Those Benefits ................................43

          1.      February 27, 2015:  2014 Form 10-K ......................................43

          2.      May 4, 2015: Q1 2015 Form 10-Q ...........................................44

          3.      August 6, 2015:  Q2 2015 Form 10-Q .....................................45

          4.      November 5, 2015: Q3 2015 Form 10-Q .................................46

          5.      February 25, 2016:  2015 Form 10-K ......................................47

6. May 6, 2016:  Q1 2016 Form 10-Q ....................................................48

7. August 5, 2016:  Q2 2016 Form 10-Q ............................................49

B. Cognizant Emphasized Its Legal Compliance and Internal "Anti-Corruption" Controls While Specifically Denying Any "Incident" of "Corruption" During 2014 or 2015 ........................................................50

1. Defendants' False Statements in the Anticorruption Policy ....................51

2. Defendants' False Statements in the 2014 Sustainability Report .............53

3. Defendants' False Statements in the Code of Conduct............................54

4. Defendants' False Statements in the 2015 Sustainability Report .............56

C. Cognizant Touted Its Ability to Deliver Low-Cost Services to Clients Through Legitimate Means, and Attributed the Company's Financial Results to Legitimate Business Factors and Conditions ........................................58

1. February 27, 2015:  2014 Form 10-K .......................................................59

2. May 4, 2015:  Press Release and Form 8-K............................................59

3. May 4, 2015:  Q1 2015 Form 10-Q .........................................................60

4. May 4, 2015:  Q1 2015 Earnings Conference Call ..................................61

5. August 5, 2015:  Q2 2015 Earnings Conference Call..............................63

6. August 6, 2015:  Q2 2015 Form 10-Q .....................................................64

7. November 4, 2015:  Q3 2015 Earnings Conference Call .........................66

8. November 5, 2015:  Q3 2015 Form 10-Q.................................................67

9. February 8, 2016:  Q4 2015 Earnings Conference Call...........................68

10. February 25, 2016:  2015 Form 10-K .......................................................70

11. May 6, 2016:  Q1 2016 Form 10-Q ........................................................71

12. May 6, 2016:  Q1 2016 Earnings Conference Call ..................................72

13. May 24, 2016:  J.P. Morgan Technology, Media and Telecom Conference ................................................................................................74

14. August 5, 2016:  Q2 2016 Form 10-Q .....................................................75

15. August 5, 2016:  Q2 2016 Earnings Conference Call..............................76

16. September 6, 2016:  Citi Global Technology Conference ........................77

D. Cognizant Overstated Earnings by Capitalizing Bribes that Should Have Been Expensed ........................................................................................78

E. SOX Certifications Executed Throughout the Class Period ................................79

VI. ADDITIONAL SCIENTER ALLEGATIONS ................................................81

VII. LOSS CAUSATION ........................................................................................87

VIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE ................................................93

IX.  CONTROL PERSON ALLEGATIONS.............................................................94

X.  INAPPLICABILITY OF SAFE HARBOR .......................................................96

XI.  CLASS ACTION ALLEGATIONS ................................................................98

XII.  PRAYER FOR RELIEF ...............................................................................103

XIII.  JURY DEMAND .........................................................................................104

Lead Plaintiffs Union Asset Management Holding AG ("Union"), Amalgamated Bank, as Trustee for the LongView Collective Investment Funds ("Amalgamated"), and the Fire and Police Pension Association of Colorado ("Colorado Fire and Police," and with Union and Amalgamated, "Lead Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, by their undersigned attorneys, allege the following against Cognizant Technology Solutions Corporation ("Cognizant" or the "Company") and the Individual Defendants (defined below), upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Lead Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts is based upon the investigation conducted by and through their counsel, which included, among other things, the review and analysis of:  (i) transcripts, press releases, news articles, and other public statements issued by or concerning Cognizant and the Individual Defendants;  (ii) research reports issued by financial analysts concerning the Company; (iii) reports filed publicly by Cognizant with the U.S. Securities and Exchange Commission ("SEC"); (iv) Cognizant's corporate website; (v) interviews with former Cognizant employees; and (vi) other publicly available information.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Lead Plaintiffs bring this federal securities class action on behalf of themselves and on behalf of a class consisting of all persons and entities who purchased, or otherwise acquired, the common stock of the Company from February 27, 2015, through and including September 29, 2016 (the "Class Period"), subject to certain exclusions addressed in paragraph 245 below (the

"Class").[1]   The defendants in this action are Cognizant; Francisco D'Souza ("D'Souza"), Cognizant's Chief Executive Officer ("CEO"); Karen McLoughlin ("McLoughlin"), Cognizant's Chief Financial Officer ("CFO"); and Gordon Coburn ("Coburn"), Cognizant's President until his resignation on September 27, 2016 (collectively, the "Defendants").   Lead Plaintiffs' and the Class's claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule l0b-5 promulgated thereunder.

## I.    INTRODUCTION

1.      This securities fraud action arises from a series of material misstatements and omissions made by Cognizant's senior executives that concealed a bribery scheme at the core of the Company's business.   As the Company has now acknowledged, the bribery scheme was perpetrated by Cognizant's "senior management," including its former President, Defendant Coburn, whom analysts described as "a leading face of [Cognizant] to the investment community."

2.      Cognizant provides information technology and business process ("IT") outsourcing.   Although headquartered in the United States, the Company's principal operations are based in India and spread throughout several large campuses.   This was key to the Company's profitability:   Cognizant leveraged the lower labor, tax, and other business costs of its Indian operations in order to provide IT services to its global clients at highly competitive prices.

3.      One of the principal ways Cognizant cut its own costs, and in turn delivered lower cost services to clients, was by locating its Indian campuses in "Special Economic Zones" or "SEZs."   Companies operating from within SEZs are guaranteed a number of highly lucrative

---

[1] References to "paragraph _" or "¶ _" are to paragraphs in this Amended Class Action Complaint for Violations of the Federal Securities Laws.

benefits, including numerous tax exemptions and holidays, easing of various customs and labor regulations and procedures, and heightened access to credit, infrastructure, and other resources. In order to develop or operate a facility within an SEZ, however, businesses are required to secure licenses from India's government.  Given the extraordinary value that flows to license-holders, SEZ licenses are highly sought-after.

4. The pressure Cognizant faced to obtain these valuable licenses increased significantly at the start of the Class Period, when the Indian central government indicated it would soon begin to eliminate the availability of tax benefits for new operations.  Thus, during the Class Period, Cognizant aggressively expanded its SEZ operations, constructing or expanding four of its ten massive "global delivery centers," each housing thousands of employees, in SEZs.  In at least one case, Cognizant was able to secure SEZ licensing for its facilities, despite the fact that the same governmental authority had refused to license the Company's direct competitors to operate in the very same zones.

5. Cognizant profited enormously from the SEZ status of its Indian operations – a fact that the Company touted throughout the Class Period.  For instance, when Cognizant reported its "strong performance in 2015" to investors, it stated that the tax benefits it derived from its SEZ licenses increased the Company's net income by $201.4 million (more than 14%) and increased diluted EPS by $0.33 per share (more than 12%).  Cognizant also assured investors it would continue to grow its investment in SEZ facilities as a central part of its business strategy, stating, by way of example, that "[w]e have constructed and expect to continue to locate most of our newer development facilities in SEZs."

6. At the same time that Defendants reported strong financial results driven in substantial part by the valuable benefits the Company received from its SEZ licenses, they also

reassured investors that Cognizant was not paying bribes to foreign officials in order to obtain the licenses, and was taking concrete steps to ensure compliance with applicable anticorruption laws.  Cognizant's compliance with anticorruption laws, and its maintenance of appropriate controls to ensure continued compliance, was particularly important to investors because the risk of corruption was especially high in India.

7.      Recognizing the significance of anticorruption compliance to investors, Cognizant issued annual "Sustainability Reports" during the Class Period, in which it assured investors it had conducted thorough audits of anticorruption compliance and had discovered "***no incidents***" of corruption.  Likewise, the Company disseminated to investors "Cognizant's Core Values and Standards of Business Conduct" (the "Code of Conduct") and "Cognizant Technology Solutions FCPA, UK Bribery Act and Anticorruption Policy" (the "Anticorruption Policy").  In both of these public documents, Cognizant assured investors that it did not make improper payments to foreign officials, and that it had implemented a rigorous control system in order to ensure compliance with anticorruption laws, including the Foreign Corrupt Practices Act ("FCPA").  For instance, in the Code of Conduct, Cognizant stated, "***We do not corruptly give or offer, directly or indirectly, anything of value to a government official to obtain or maintain business or any other advantage for the Company***."[2]  Likewise, in filings with the SEC throughout the Class Period, Cognizant assured investors that the internal controls the Company had implemented to detect such improper payments were "effective."  ¶ 210.

8.      Buoyed by Defendants' statements touting the financial success of Cognizant's SEZ operations and assurances that its licenses were legitimately obtained, Cognizant's stock price rose during the Class Period.  Cognizant's stock price increased from $46.50 per share at

---

[2] *Cognizant's Core Values and Standards of Business Conduct* 9 (2015) [hereinafter 2015 Code of Conduct].

the start of the Class Period to a Class Period high of more than $68 per share – an increase of more than 46%.

9.      Unfortunately for investors, Defendants' statements were materially false and misleading.  Contrary to its public pronouncements, Cognizant has now admitted that, between 2010 and 2015, it made at least $6 million in "improper payments" to Indian officials in order to obtain the permits for its Indian facilities.  Worse yet, Cognizant has further acknowledged that the Company's "senior management," including Defendant Coburn, perpetrated the bribery scheme, including by overriding the Company's internal financial controls to facilitate the corrupt payments.  Moreover, the Company has conceded that, in order to disguise the nature and purpose of these improper payments, Cognizant improperly booked them as legitimate capital expenditures (i.e., investments in physical assets) in the Company's publicly reported financial statements – accounting chicanery that overstated the Company's investments in its SEZ facilities and its net income.

10.      Notably, Lead Plaintiffs' investigation has revealed that the Company's internal auditors reported evidence of these improper payments to Cognizant's senior managers during the Class Period.  A former Cognizant audit executive reported that in the fall of 2014, Cognizant conducted its first FCPA compliance audit in at least two years.  As detailed herein, that audit uncovered evidence that payments related to procuring SEZ licensing were being made to government personnel and that these payments were being improperly classified in Cognizant's internal systems.  These troubling findings were reported during the Class Period to senior Cognizant audit and compliance executives.

11.      Cognizant's scheme to secure SEZ licenses through corrupt payments to Indian officials, and the intimate involvement of senior Company management in that scheme, was

concealed from investors until September 30, 2016.  On that day, Cognizant shocked investors by announcing that its Board of Directors ("Board") was "conducting an internal investigation into whether certain payments relating to facilities in India were made improperly and in possible violation of the U.S. Foreign Corrupt Practices Act and other applicable laws."  Cognizant also announced that Coburn – the Company's President, who had held numerous senior executive positions during his seventeen-year career at Cognizant – had suddenly resigned amidst the corruption investigation.

12.     Analysts and investors were stunned by Cognizant's September 30, 2016 disclosures.  For example, Argus analysts downgraded Cognizant, characterizing the "announced resignation of the company's president amid a corruption investigation in India" as "blockbuster news."  ¶ 77.  These analysts observed that "given that a top executive has resigned . . . we see risks that the illegal practices could be extensive and long-lived."  *Id.*  In response to these disclosures, Cognizant's stock price swiftly declined.  The Company's stock price fell more than 13%, or $7.29 per share, from $55.00 to $47.71 on the year's highest trading volume by far (over 53 million shares).  This one-day decline, by itself, eradicated $4.4 billion in shareholder value.

13.     Since September 30, 2016, Cognizant has admitted that multiple members of its senior management were deeply involved in the bribery scheme, and, thus, a number of its statements to investors during the Class Period were false and misleading.  On November 7, 2016, Cognizant admitted that "certain members of ***senior management may have participated in or failed to take action to prevent the making of potentially improper payments by either overriding or failing to enforce the controls established by the Company*** relating to real estate and procurement principally in connection with permits for certain facilities in India."  ¶ 67. Further confirming that Defendant Coburn was involved in the scheme, Cognizant also admitted

that the senior executives involved in the improper payments were "no longer with the company or in the senior management position."   ¶ 87.   In light of this misconduct, Cognizant also admitted that, contrary to its representations:  (i) the Company's internal controls were materially deficient during the Class Period; and (ii) it improperly accounted for the corrupt payments in its public financial reports by recording them as investments in physical assets.   Likewise, Cognizant has acknowledged that its representation in its publicly filed credit agreement that the Company was compliant with anticorruption laws – a statement that parallels those made in the Sustainability Reports, Anticorruption Policy, and Code of Conduct – was "materially incorrect." ¶ 89.

14.     The misconduct at issue in this case continues to have a significant negative impact on Cognizant.  By the end of 2016, the Company had "incurred $27 million in costs related to" the investigation of the wrongdoing alleged herein "and related lawsuits."  Moreover, the Company's investigation is ongoing.  This misconduct also has triggered significant government scrutiny, as both the SEC and the U.S. Department of Justice ("DOJ") are investigating the improper payments to Indian officials at the core of this case.

## II.     JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Cognizant's principal executive office is located within this District at Glenpointe Centre West, 500 Frank W. Burr Blvd., Teaneck, New Jersey 07666, and many of the acts and practices complained of herein occurred in substantial part in this District.

17.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.     Lead Plaintiffs

18.     On February 3, 2017, this Court appointed Union, Amalgamated, and Colorado Fire and Police to serve as Lead Plaintiffs in this action pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *See* ECF No. 20.

19.     Lead Plaintiff Union Asset Management Holding AG is the parent holding company of the Union Investment Group.  The Union Investment Group, based in Frankfurt-am-Main, Germany, was founded in 1956, and is one of Germany's leading asset managers for retail and institutional clients, with more than €292 billion in assets under management as of December 30, 2016.  As set forth in the certification filed with this Court (ECF No. 11-6), Union's funds purchased Cognizant common stock during the Class Period and were damaged by Defendants' conduct as alleged herein.

20.     Lead Plaintiff Amalgamated is a New York State chartered, FDIC insured, commercial bank that was established in 1923 by the Amalgamated Clothing Workers of America and remains the only union-owned bank in the United States.  Amalgamated, through its Trustee Committee, serves as trustee to the LongView Collective Investments Funds ("LongView").  As set forth in the certification filed with this Court (ECF No. 11-6), Amalgamated purchased Cognizant common stock for the benefit of LongView during the Class Period and was damaged by Defendants' conduct as alleged herein.

21.     Lead Plaintiff Colorado Fire and Police is a public pension fund established in 1980 for the purpose of providing retirement benefits for police officers and firefighters

throughout the State of Colorado.  As of December 31, 2015, Colorado Fire and Police held over $4 billion in net assets.  As set forth in the certification filed with this Court (ECF No. 11-6), Colorado Fire and Police purchased Cognizant common stock during the Class Period and was damaged by Defendants' conduct as alleged herein.

### B.      Defendants

22.     Defendant Cognizant is a U.S. multinational corporation headquartered in Teaneck, New Jersey.  The Company's common stock is listed and trades actively on the NASDAQ stock market under the ticker symbol "CTSH."   With approximately 200,000 employees, Cognizant is an IT outsourcing company that provides digital, technology, consulting, and operations services around the world.  Cognizant is organized around and reports the operations of its business according to four industry-orientated business segments.  For the year ended December 31, 2016, the distribution of the Company's revenues across these segments was as follows:      Financial Services (39.8%), Healthcare (28.7%), Manufacturing/Retail/Logistics (19.7%), and Other (11.8%).

23.     Defendant D'Souza became Cognizant's CEO in 2007 and served as CEO throughout the Class Period.  D'Souza joined Cognizant as a co-founder in 1994, the year it was started as a division of The Dun & Bradstreet Corporation.  D'Souza also served as Cognizant's President from 2007 to 2012 and Chief Operating Officer from 2003 to 2006.  D'Souza has publicly described his three best features as follows:  "I am hands-on; I like to hear directly from clients and employees; I'm determined."[3]

---

[3] Uttara Choudhury, *Cognizant's Francisco D'Souza Better Than Tim Cook and Larry Page?*, Tech2 (Mar. 20, 2013, 9:47 AM), http://tech.firstpost.com/news-analysis/cognizants-francisco-dsouza-better-than-tim-cook-and-larry-page-213283.html.

24.     Defendant McLoughlin became Cognizant's CFO in 2012 and served as CFO throughout the Class Period.  McLoughlin oversees the Company's worldwide Financial Planning & Analysis, Accounting & Controllership, Tax, Investor Relations, Treasury, Internal Audit and Enterprise Risk Management functions.  McLoughlin also served as Senior Vice-President, Enterprise Transformation and Financial Planning & Analysis from 2010 to 2012, and was responsible for the Company's worldwide financial planning and analysis, enterprise risk management and enterprise transformation functions.

25.     Defendant Coburn served as Cognizant's President from February 6, 2012, until his abrupt resignation on September 27, 2016, which was publicly disclosed by the Company on September 30, 2016.  Coburn served as the Chief Financial and Operating Officer of Cognizant from January 1, 2007 to February 6, 2012.  Coburn also served as the Company's Executive Vice President from December 2003 through December 2006.  From November 1999 to December 2003, he served as the Company's Senior Vice President.

26.     Defendants D'Souza, McLoughlin, and Coburn are collectively referred to herein as the "Individual Defendants."  Defendant Cognizant and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV.     SUMMARY OF THE FRAUD

### A.     Cognizant's Success as an Outsourcing Business Was Driven by Its Use of Indian "Special Economic Zones" to Lower the Company's Taxes and Costs

27.     As noted above, Cognizant is a leading provider of IT outsourcing services, with its principal operations in India.  Cognizant began as an Indian company headquartered in Chennai.  While the Company later moved its headquarters to the United States, the bulk of Cognizant's operations remained in India.  During the Class Period, more than 150,000 of Cognizant's approximately 200,000 employees, nearly 75% of the Company's workforce, were

located in India.  The Company housed its Indian employees on ten campuses in cities across India, including in Chennai, Coimbatore, Kolkata, and Hyderabad.

28.     As with many other India-centric IT outsourcing companies, Cognizant's success was driven in significant part by its "global delivery model," which leveraged the lower labor, tax, and other business costs of its Indian operations to provide IT development and maintenance for international clients at highly competitive prices.  Throughout the Class Period, Cognizant and its senior executives repeatedly told investors that the Company's business strategy revolved around a "dual mandate":  helping clients achieve operational efficiency by reducing their IT costs and redeploying those savings into new digital technologies.  As McLoughlin told investors at an August 12, 2015 investor conference, "[W]e're seeing clients continue to look for partners who can execute on this dual mandate.  So help me drive down my costs of my current operations . . . and take those dollars and really deploy them into meaningful digital transformation. . . . [We] think that will continue to be a driver of growth as we move forward."[4]

29.     Defendants repeatedly cited Cognizant's success in delivering cost savings to clients as key to its execution of this dual mandate.  For example, at a September 6, 2016 investor conference, D'Souza stated, "we've been very successful at, while maintaining our margins, being able to achieve the cost of ownership that the clients want."[5]  Accordingly, providing clients with global IT cost arbitrage opportunities was a foundational element of Cognizant's business model.  And, on its website, Cognizant told investors that its presence in

---

[4] Tr. of Oppenheimer Tech., Internet & Commc'ns Conf. at 1 (Aug. 12, 2015).

[5] Tr. of Citi Global Tech. Conf. at 9 (Bloomberg Sept. 6, 2016).

India, in particular, was "a crucial piece of [that] global business strategy"[6] because of the cost savings that centralizing operations in India produced.

30.     To cut its costs and, in turn, provide IT services at lower costs to clients, Cognizant constructed and operated its Indian facilities in designated SEZs.  Licenses to develop and/or operate within SEZs are awarded by Indian central and regional governments.  Companies who receive these licenses are guaranteed a plethora of lucrative benefits, including numerous tax exemptions and holidays, easing of various customs and labor regulations and procedures, and heightened access to credit, infrastructure, and other resources.  According to a publication issued by India's Department of Commerce, incentives for businesses operating within an SEZ include:

- Duty free import/domestic procurement of goods for development, operation and maintenance of SEZ units.

- 100% Income Tax exemption on export income . . . for first 5 years, 50% for next 5 years thereafter and 50% of the ploughed back export profit for next 5 years.

- Exemption from minimum alternate tax . . . .

- External commercial borrowing by SEZ units up to US $500 million in a year without any maturity restriction through recognized banking channels.

- Exemption from Central Sales Tax.

- Exemption from Service Tax.

- Single window clearance for Central and State level approvals [i.e., a centralized approval process for obtaining regulatory approval, greatly reducing transaction costs].

---

[6] *About Cognizant - India*, Cognizant, https://www.cognizant.com/india (last visited Mar. 22, 2017).

- Exemption from State sales tax and other levies as extended by the respective State Governments.[7]

Moreover, businesses operating within SEZs are entitled to "self-certify" compliance with applicable regulatory regimes, including labor and customs laws and regulations, and have access to expedited dispute resolution mechanisms.  Again, these benefits work to reduce greatly the transaction costs for firms operating in SEZs.  Additional tax benefits are extended to companies that develop SEZs, including exemption from custom/excise duties and dividend distribution tax.

31.    Cognizant built and operated in India at least ten "global delivery centers" (large IT campuses that housed thousands of employees) and aggressively pursued SEZ licensing for those facilities.  Notably, Cognizant constructed or expanded at least four of its ten SEZ-licensed Indian global delivery centers during the Class Period:  those located in Kolkata, Coimbatore, Hyderabad, and the Company's Indian headquarters in Chennai.

32.    Building and expanding SEZ-licensed facilities was key to the Company's performance in multiple ways.  First, building and expanding SEZ facilities increased Cognizant's ability to drive revenue:  the more employees the Company could put to work at its SEZ facilities, the more revenue it would book.  Accordingly, analysts repeatedly focused on the Company's headcount and "utilization rates," i.e., the extent to which employees' time was being billed to client projects.  For instance, in a July 25, 2016 report, Deutsche Bank analysts stated, "the company continues to focus on retention efforts and we believe headcount remains

---

[7] Department of Commerce, Government of India, *Special Economic Zones in India*, http://www.sezindia.nic.in/about-fi.asp.

an important leading indicator and expect headcount growth to accelerate ahead of revenue acceleration."[8]

33.     Second, as noted above, the SEZ status of Cognizant's Indian operations allowed the Company to reduce massively its tax and operating costs, which also was critical to its financial performance.  Indeed, as noted previously and detailed further below, in reports filed with the SEC throughout the Class Period, Cognizant reported that the tax benefits, alone, that it derived from its SEZ licenses increased the Company's net income by hundreds of millions of dollars.  Cognizant acknowledged that these benefits materially impacted the Company's financial condition, and that "[c]hanges in Indian tax laws" that "would reduce or deny SEZ tax benefits could have a material adverse effect on our business, results of operations and financial condition."[9]

34.     Third, the enormous tax and operating cost savings Cognizant generated through the SEZ status of its Indian operations also gave Cognizant a significant competitive advantage among its outsourcing peers, and were therefore instrumental in helping the Company garner new business through the delivery of lower cost IT services to its US and European clients.  As discussed above, Defendants emphasized that clients' interest in cutting IT costs was a primary driver of demand for Cognizant's services.  During the Company's August 5, 2016 earnings call, Coburn told investors that cost-cutting "remains absolutely essential to almost every client"[10] of

---

[8] Bryan Keane, Research Analyst et al., *Guidance Revision Coming?* 6 (Deutsche Bank AG July 25, 2016).

[9] *See, e.g.*, Cognizant Tech. Sols. Corp., Annual Report (Form 10-K), at 27 (Feb. 25, 2016).

[10] Tr. of Q2 2016 Earnings Call at 4 (Bloomberg Aug. 5, 2016).

the Company, and Cognizant's SEC filings listed "competitive pricing of services" as among the "principal competitive factors affecting the markets for our services."[11]

> ### B.   Planned Changes to Indian Tax Law Put Increased Pressure on Cognizant to Obtain SEZ Licensing for Its Facilities As Quickly As Possible During the Class Period

35.     During the Class Period, looming changes to Indian tax law that would phase out tax benefits for SEZs established after April 2017 put increased pressure on Cognizant to obtain valuable SEZ licensing for its Indian operations as quickly as possible.  In February 2015, India's Finance Minister, Arun Jaitley, sent signals that the government could move to limit tax benefits for newly constructed SEZs.  In a speech on February 28, 2015, Minister Jaitley made sweeping criticisms of India's "regime of [corporate tax] exemptions," which he said "led to pressure groups, litigation, and loss of revenue."[12]  Minister Jaitley expressed a keen interest in lowering India's general corporate tax rate, which he characterized as higher than the rate "prevalent in other major Asian economies," and eliminating "various kinds of tax exemptions and incentives for corporate tax payers" to pay for the tax cut.[13]

36.     In November 2015, India's Central Board for Direct Taxes ("Central Board") put even greater pressure on Cognizant to move as expeditiously as possible to obtain valuable SEZ permitting for new operations when it, consistent with Minister Jaitley's February 2015 speech, issued a draft proposal phasing out SEZ tax benefits for the development of new facilities commencing activities after April 1, 2017.  A few months later, in February 2016, Minister

---

[11] *See, e.g.*, Cognizant Tech. Sols. Corp., Annual Report (Form 10-K), at 12 (Feb. 27, 2015) [hereinafter 2014 Form 10-K].

[12] Puja Mehra, *Changes in Corporate Tax Regime to Reduce disputes:  Jaitley*, Hindu (Mar. 2, 2015, 00:28 IST), http://www.thehindu.com/news/national/changes-in-corporate-tax-regime-to-reduce-disputes-jaitley/article6948860.ece?utm_source=RSS_Feed&utm_medium=RSS&utm_campaign=RSS_Syndication.

[13] *Id.*

Jaitley, on behalf of the Ministry of Finance, presented a final budget plan implementing a policy for phasing out SEZ tax exemptions after April 1, 2020, consistent with the Central Board's proposal and the Minister's speech the prior year.[14]

37.     Given the enormous pressure it faced to obtain SEZ licensing prior to the phasing out of tax benefits for new operations, Cognizant embarked on an SEZ development spree during the Class Period.  As discussed above, Cognizant built or expanded at least four of its ten SEZ-licensed Indian global delivery centers during the Class Period.  In early September 2015, Cognizant signed agreements with the Tamil Nadu state government to expand its major global delivery center in Coimbatore and its Indian headquarters in Chennai.  As reported by *India Today* on September 10, 2015, Cognizant's vice chairman and former CEO, Lakshmi Narayan, highlighted the ambitious scope of the planned campus expansions, stating, "[w]hen complete, the centres will have a capacity to accommodate approximately 17,000 to 20,000 professionals."[15]

38.     Shortly thereafter, in March 2016, Cognizant received approval from the Telangana state government to construct a massive SEZ facility in the state's capital, Hyderabad, that would house 8,500 employees.  Just a few months later, in August 2016, Cognizant received approval to construct an SEZ facility in Kolkata, West Bengal, occupying a sprawling fifteen-acre plot.  *The Telegraph* (of India) reported on August 3, 2016, that the development was

---

[14] Shrimi Choudhary, *Corp Tax Cut Takes Last Budget Forward*, Daily News & Analysis (Mar. 1, 2016).

[15] *Cognizant to Invest Rs 1,000 cr in TN in Next 5 Yrs*, India Today (Sept. 10, 2015, 21:25 IST), http://indiatoday.intoday.in/story/cognizant-to-invest-rs-1000-cr-in-tn-in-next-5-yrs/1/470681.html.

expected to house 10,000 Cognizant employees.[16]   As part of the deal, government officials waived its development fee.[17]   Moreover, sources reported that the state government's Housing Infrastructure Development Corporation, which sold the land to Cognizant, had ensured that the price of the land "would be 'kept reasonable' to sweeten the deal."[18]

39.     Notably, while Cognizant received SEZ licensing for its Kolkata facilities, the state government had refused to grant licenses to the Company's competitors, including Wipro Limited and Infosys Limited.  Both Wipro and Infosys had purchased fifty acres of land apiece in the region based on the previous state administration's assurances that their projects would receive SEZ status – a promise the new state government had declined to honor.  In an August 5, 2016 article, the *Times of India* reported that, in the wake of the government's grant of SEZ licensing to Cognizant, several other IT outsourcing companies called on the state's IT Minister, Bratya Basu, "to evince interest in contributing more to the state's technological ecosystem."[19] While Minister Basu met with several business leaders, his meeting with Cognizant's Senior Vice President of Infrastructure Service, Nachiket Deshpande, reportedly took "significantly more time than the other chat sessions."[20]

---

[16] *Mamata Government Allots New Town Plot for Company's Third Campus in Calcutta*, Telegraph (India) (Aug. 3, 2016), https://www.telegraphindia.com/1160803/jsp/calcutta/story_ 100288.jsp.

[17] *Id.*

[18] *Id.*

[19] *Tech Bosses Meet Kolkata's IT Minister Bratya Basu*, Times of India (Aug. 5, 2016, 8:39 AM IST);     http://timesofindia.indiatimes.com/city/kolkata/Tech-bosses-meet-Kolkatas-IT-minister-Bratya-Basu/articleshow/53551377.cms.

[20] *Id.*

**C.    Defendants Underscored the Benefits of Cognizant's SEZ Licenses As a Key Driver of Its Financial Performance, While Assuring Investors that Cognizant Did Not Make Improper Payments to Foreign Officials**

40.    As detailed below, throughout the Class Period, Defendants repeatedly emphasized that the Company's SEZ facilities were a critical driver of its strong financial performance.  At the same time, Defendants also assured the investing public that they had legitimately obtained the SEZ licenses, stating that Cognizant did not make any payments to government officials to obtain anything of value, and that the Company maintained a system of rigorous internal controls precisely to prevent such payments.  As investors would ultimately learn, these statements were materially false and misleading.

**1.    Defendants Highlighted that Cognizant's SEZ Operations Were a Crucial Driver of Its "Strong" Financial Performance**

41.    During the Class Period, Defendants consistently reported what they described as "strong" financial results, even when the IT outsourcing industry was facing headwinds.  When reporting these results, Defendants repeatedly highlighted the benefits the Company received from the SEZ status of its Indian operations during the Class Period.  For instance, in its 2014 Annual Report, Cognizant reported that 2014 saw "strong growth on the top line," and explained that its financial results were driven in significant part by its SEZ facilities, stating that "the effect of the income tax holidays granted by the Indian government was to reduce the overall income tax provision and increase net income by approximately [$183 million] . . . and increase diluted EPS by $0.30."[21]  In reporting on its "strong performance" in its 2015 Annual Report, Cognizant again emphasized that its results were driven significantly by its Indian SEZ operations, reporting that these facilities had "increase[d] net income by approximately

---

[21] Cognizant, *2014 Annual Report*, at 3, 126.

18

$201.4 million . . . and increase[d] diluted EPS by $0.33," a material increase over the prior year.[22]

42.     Defendants also highlighted to investors that expanding Cognizant's SEZ facilities was a key part of its business strategy.  For instance, in the Company's SEC filings, Defendants repeatedly stated that "[w]e pursue an international strategy that includes expanded infrastructure investments in India," "[w]e have constructed and expect to continue to operate most of our newer development facilities in SEZs," and Cognizant would continue to "[l]ocate most of our new development center facilities in tax incentivized areas" in response to the most significant trends and risks it was seeing in its business.[23]  Defendants also assured investors that Cognizant was continuing to pursue this strategy by making significant capital expenditures to grow and expand its SEZ operations.  For instance, in its second quarter 2016 Form 10-Q, Cognizant stated that, "[a]s of June 30, 2016, we had outstanding fixed capital commitments of approximately $184.0 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers."[24]

43.     In addition to emphasizing the positive financial impact of the Company's SEZ operations, Defendants also made statements attributing Cognizant's financial success to a number of other ostensibly legitimate business factors and conditions.  For example, in its SEC filings, Cognizant repeatedly set forth the "key drivers of our revenue growth," which included numerous legitimate factors such as "[s]olid performance across all of our business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on

---

[22] Cognizant, *2015 Annual Report*, at 4, 92.

[23] *Id.* at 92, 58, 47.

[24] Cognizant Tech. Sols. Corp., Quarterly Report (Form 10-Q), at 19 (Aug. 5, 2016).

discretionary projects"; "[e]xpansion of our service offerings, including Consulting, IT IS, and

BPS services"; "[i]ncreased penetration at existing customers"; and "[c]ontinued expansion of

the market for global delivery of IT services and BPS." *See, e.g.*, ¶¶ 141, 145.  Defendants also

made specific statements on earnings calls and at investor conferences in which they further

attributed Cognizant's success to a variety of legitimate factors, such as:

- On a May 4, 2015 earnings call, D'Souza stated that the Company's performance "was driven by strong organic growth in our core business coupled with solid in-line performance in the TriZetto business."[25]

- On Cognizant's May 6, 2016 earnings call, Coburn stated that Cognizant's strong global results were "driven primarily by strength in key markets such as India, Australia and the Middle East where we're seeing good traction with clients' adoption of digital technologies."[26]

- At a May 24, 2016 investor conference, Coburn touted Cognizant's ability to deliver low cost services to clients as a key driver of growth and profitability.  For example, Coburn stated that Cognizant was satisfying customer demand for cost savings by "bring[ing] best practices to our clients for our traditional services, constantly lower[ing] their cost of ownership while maintaining our margin. . . . We're very good at that."[27]

44.     At the same time that Defendants were reporting strong financial results driven by

Cognizant's SEZ strategy, they were reassuring investors that Cognizant was not bribing foreign

officials, and that the Company was taking concrete steps to ensure compliance with anti-

corruption laws.  As discussed below, these statements were material to investors.

### 2.     Defendants Assured Investors That Cognizant Did Not Make Improper Payments to Foreign Officials, and Maintained a System of Internal Controls to Prevent Such Payments

45.     The FCPA prohibits both direct and indirect payments to "any officer or

employee of a foreign government," including employees of state-owned enterprises, in order to

---

[25] Tr. of Q1 2015 Earnings Call at 2 (Bloomberg May 4, 2015).

[26] *Id.*

[27] Tr. of J.P. Morgan Glob. Tech., Media & Telecom Conf. at 3 (May 24, 2016).

influence their official "act[s] or decision[s]" or to "secur[e] any improper advantage."[28] Companies can, and often do, face FCPA liability based on improper payments made by their agents or other business partners.

46.     The penalties, including criminal penalties, that may be imposed for violations of the FCPA's anti-bribery provisions are severe.[29]  Corporate violators, in particular, may face multi-million dollar fines and disgorgement of up to twice the benefit obtained through the corrupt payment.  The Attorney General or the SEC may bring civil actions seeking fines against both corporate and individual violators.

47.     In recent years, both the DOJ and the SEC have significantly increased enforcement of the FCPA.[30]  In 2010, the SEC's Enforcement Division created a specialized unit to further enhance its enforcement of the FCPA.[31]  That same year, the DOJ brought forty-eight enforcement actions and the SEC brought twenty-six.[32]  Furthermore, the DOJ and the SEC "have worked to create a network of international cooperation in the global war against bribery

---

[28] 15 U.S.C. § 78dd-1.

[29] *See, e.g.*, *Clayco Petrol. Corp. v. Occidental Petrol. Corp.*, 712 F.2d 404, 408 (9th Cir. 1983) ("The Act provides for severe criminal penalties including fines and imprisonment." (citing 15 U.S.C. §§ 78dd-2(b), 78ff)).

[30] Cortney Thomas, *The Foreign Corrupt Practices Act:  A Decade of Rapid Expansion Explained, Defended, and Justified*, 29 Rev. Litig. 439, 439-40 (Winter 2010) (noting "exponential increase" in FCPA enforcement by DOJ and SEC beginning in early 21st century).

[31] Press Release, U.S. SEC, SEC Names New Specialized Unit Chiefs and Head of New Office of Market Intelligence (Jan. 13, 2010), https://www.sec.gov/news/press/2010/2010-5.htm.

[32] Covington & Burling LLP, *Significant Developments and Trends in Anti-Corruption Enforcement* 1 (Jan. 2011), http://www.cov.com/files/Publication/5ff26ab9-61cf-46f4-ba8a-aa46 3a65f9fe/Presentation/PublicationAttachment/437b6d49-f6c1-4b3a-b2ad-be89b9337322/Signific ant%20Developments%20and%20Trends%20in%20AntiCorruption%20Enforcement.pdf.

and corruption."[33]  As commentators remarked: "With the recent burst of enforcement activity and the sharp increase in fines and penalties collected, everyone doing business abroad must now pay particular attention to the FCPA."[34]  Gibson Dunn's "2016 Year-End FCPA Update" noted that:

> 2016 was a precedent-setting year for the Foreign Corrupt Practices Act ("FCPA").   After several years of consistent enforcement numbers, the Department of Justice ("DOJ") and Securities and Exchange Commission ("SEC") produced what arguably is the most significant year of enforcement in the statute's 39-year history.  With 53 combined enforcement actions, more than $2 billion in corporate fines levied by U.S. enforcers and billions more by foreign regulators in coordinated prosecutions, early returns on the DOJ's FCPA Pilot Program, and an increasingly clear intersection between the FCPA and Dodd-Frank's whistleblower provisions, there is much to discuss.[35]

48.     Because Cognizant's operations are principally located outside of the United States, the Company's compliance with anticorruption laws, and its maintenance of appropriate controls to ensure continued compliance, was critical to investors.  This was particularly true of Cognizant's Indian business, not only because it comprised the vast majority of the Company's operations and was crucial to Cognizant's success, but because, as *Forbes* reported on February 11, 2016, corruption watchdogs ranked India as one of the world's most corrupt countries during the Class Period.[36]

---

[33]  Tom Fox, *Global Anti-corruption Enforcement Numbers Going Up*, Compliance Week (Feb. 14,       2017),       https://www.complianceweek.com/blogs/tom-fox-tom-fox/global-anti-corruption-enforcement-numbers-going-up#.WMf5Xm_yvcs.

[34]  Robert C. Blume & Ryan V. Caughey, Commentary, *The FCPA:  Overview, Enforcement Trends and Best Practices*, 13 Andrews Sec. Litig. & Reg. Reporter 1, 1 (Nov. 3, 2009).

[35]   Gibson,  Dunn  &  Crutcher  LLP,  *2016  Year-End  FCPA  Update*  1  (Jan. 3,  2017), http://www.gibsondunn.com/publications/documents/2016-Year-End-FCPA-Update.pdf.

[36]  Ronak D. Desai, *India Remains One of the Most Corrupt Countries in the World*, Forbes (Feb. 11,  2016  4:11  PM),  https://www.forbes.com/sites/ronakdesai/2016/02/11/india-remains-one-of-the-most-corrupt-countries-in-the-world/#590d3498155f.

49.     Indeed, U.S. companies' Indian operations have become an increasingly prominent target of federal regulators' FCPA enforcement programs.  As commentators have explained, over the past decade "both the DOJ and the SEC have targeted misconduct in India across a wide range of industries from manufacturing and construction to oil and information technology."[37]  For example:

- Anheuser-Busch InBev paid $6 million in September 2016 "to settle charges that it violated the [FCPA] and impeded a whistleblower who reported the misconduct.  The company's India minority-owned joint venture used third-party sales promoters to make improper payments to government officials in India to increase sales and production."[38]

- In 2016, government officials proposed that Wal-Mart Stores Inc. "pay at least $600 million to resolve probes by the [DOJ] and the [SEC] into whether it bribed government officials" in foreign markets, including India.[39]

- In 2012, Tyco International paid $26 million to settle FCPA violations when a "German subsidiary paid third parties to secure contracts" and payments were "recorded as commissions."[40]

- In 2011, "London-based liquor manufacturer Diageo plc paid more than $16 million to settle FCPA-related offenses it committed in several countries, including India.  According to the SEC, Diageo paid

---

[37] Jeremy B. Zucker, Darshak S. Dholakia & Hrishikesh N. Hari, *Anti-bribery Compliance in India:  Both Sword and Shield* 3 (Dechert LLP Nov. 2016), https://www.dechert.com/files/Uploads/Documents/Lit%20-%20General/White%20Paper%20-%20Anti-Bribery%20Compliance%20in%20India%20FINAL%20-%2011-16.pdf.

[38] Richard L. Cassin, *Anheuser-Busch InBev Pays SEC $6 Million for India FCPA Offenses and Impeding Whistleblower*, FCPA Blog (Sept. 28, 2016, 12:08 PM), http://www.fcpablog.com/blog/2016/9/28/anheuser-busch-inbev-pays-sec-6-million-for-india-fcpa-offen.html.

[39] Tom Schoenberg & Matt Robinson, *Wal-Mart Balks at Paying $600-Million-Plus in Bribery Case*, Bloomberg (Oct. 6, 2016, 2:24 PM), https://www.bloomberg.com/news/articles/2016-10-06/wal-mart-said-to-balk-at-paying-600-million-plus-in-bribe-case.

[40] Foley & Lardner LLP, *Anti-Bribery and Foreign Corrupt Practices Act Compliance Guide for U.S. Companies Doing Business in India* 4 (2016).

$1.7 million in bribes to Indian government officials 'responsible for purchasing or authorizing the sale of its beverages in India.'"[41]

- In 2010, Pride International paid $56.1 million as a result of a payment made for a "favorable administrative judicial decision regarding customs issues."[42]

50.     In particular, FCPA lawyers have stated that some of the "key high risk areas" for conducting business in India include "[o]btaining licenses and permits"; "[l]and acquisition"; "[s]etting up plants and operations"; and "[c]ustoms and taxes" – precisely the subject areas at issue here.[43]

51.     Given these facts, throughout the Class Period, Cognizant repeatedly acknowledged that noncompliance with anticorruption laws, and failure to implement adequate control systems to monitor and enforce compliance, could have serious negative consequences for the Company.  In reports filed with the SEC during the Class Period Cognizant stated:

> Among other anti-corruption laws and regulations, we are subject to the United States Foreign Corrupt Practices Act, or FCPA, which prohibits improper payments or offers of improper payments to foreign officials to obtain business or any other benefit, and the U.K. Bribery Act.  Violations of these laws or regulations could subject us to criminal or civil enforcement actions, including fines and suspension or disqualification from government contracting or contracting with private entities in certain highly regulated industries, *any of which could have a material adverse effect on our business, results of operations and financial condition*.[44]

52.     Accordingly, Cognizant assured investors that it did not make improper payments to foreign officials, and that it implemented a rigorous control system in order to ensure

---

[41] Ronak D. Desai, *Complying with U.S. Anti-Corruption Laws While Conducting Business in India*, Forbes (Oct. 30, 2015, 1:14 PM), https://www.forbes.com/sites/ronakdesai/2015/10/30/ensuring-foreign-corrupt-practices-act-compliance-while-conducting-business-in-india/#5de6a740183a.

[42] Foley & Lardner LLP, *supra* note 40, at 4.

[43] Anthony Campanelli, *Managing Corruption Risks in India* 4 (Deloitte LLP 2014).

[44] *See, e.g.*, 2014 Form 10-K, *supra* note 11, at 28.

compliance with anticorruption laws, including the FCPA. Cognizant published, and disseminated to investors on its website, its Code of Conduct. In it, Cognizant again acknowledged the importance of compliance with anticorruption laws and the maintenance of adequate controls to monitor that compliance, stating that "anti-corruption law violations come with severe legal penalties to the company, its executives and the individuals involved in such actions."[45] Thus, in a section entitled, "Preventing Corrupt Activities," Cognizant stated that the Company did not make improper payments to government officials to obtain any business or other advantage: "*We do not corruptly give or offer, directly or indirectly, anything of value to a government official to obtain or maintain business or any other advantage for the Company*."[46]

53.     Cognizant's Code of Conduct also represented that the Company would take several specific actions to vet payments to foreign officials and ensure their legitimacy, stating that any such payments would receive "pre-approval from our Legal Department," and that all such payments would be appropriately "reported and documented as part of the FCPA's and other laws' books and records requirements."[47]

---

[45] 2015 Code of Conduct, *supra* note 2, at 10.

[46] *Id.* at 9.

[47] *Id.* at 10.

54.    In addition, the Code of Conduct directed investors to the Anticorruption Policy, which Cognizant published and disseminated to investors through its website.[48]    The Anticorruption Policy set out certain proscriptions on conduct to which the Company purported to adhere, and set forth affirmative preventative actions that the Company purported to take. Pursuant to the Anticorruption Policy, Cognizant assured investors that the Company would:

- "never pay, promise, offer or authorize a bribe or anything of value to a government official or any other individual in order to obtain business for the Company or to secure an improper advantage for the Company";

- "conduct risk assessments, in consultation with our Legal Department, for certain activities involving officials in high-risk countries for corrupt practices";

- "ensure that entries into the Company's books and records are accurate, and that all Company internal controls and procedures are maintained and followed when making payments from the Company"; and

- "comply with, and enforce, all the Company's requirements for documentation of expenses and payment requests . . . consistent with our Core Values and Standards of Business Conduct on transparency."[49]

55.    Cognizant also publicly assured investors that it was taking a number of additional concrete steps to ensure Company compliance with anticorruption laws.   In the Anticorruption Policy, Cognizant told investors, among other things, that its Legal Department would review "red flag" transactions, including those transaction involving a government-related counterparty, and that "[p]eriodic audits of compliance shall be performed by each business unit in coordination with our Legal Department" in order to "[m]onitor [a]nd [a]udit [c]ompliance [w]ith [the] Anticorruption Policy."[50]

---

[48] Cognizant published the same Anticorruption Policy annually, including each year from 2011 through 2017.

[49] Cognizant, *Cognizant Technology Solutions FCPA, UK Bribery Act and Anticorruption Policy* 2 (2011).

[50] *Id.* at 3, 5, 7.

56.     Cognizant touted both its Anticorruption Policy and its Code of Conduct in SEC filings throughout the Class Period.  For example, Cognizant's 2014 Form 10-K stated, "we make available our code of business conduct and ethics entitled 'Cognizant's Core Values and Standards of Business Conduct' free of charge through our website.  We intend to disclose any amendments to, or waivers from, our code of business conduct and ethics that are required to be publicly disclosed pursuant to rules of the SEC and the NASDAQ Global Select Market by posting it on our website."[51]

57.     In SEC filings throughout the Class Period, Cognizant also assured investors that it maintained an adequate system of internal accounting controls, as mandated by the FCPA and the Sarbanes-Oxley Act ("SOX").  The FCPA imposes accounting requirements that operate as a complement to, and a means of enforcing, its anti-bribery provisions.  Specifically, the FCPA requires issuers to keep books and records that accurately and fairly describe their transactions, and to develop and maintain an adequate system of internal accounting controls, in order to track payments and prevent bribery.  SOX mandates, in part, that internal controls must be designed so as to "ensure that material information relating to the company . . . is made known to" officers responsible for certifying the accuracy of the company's public reports.

58.     A critical element of the internal accounting controls prescribed by the FCPA is called "tone at the top."  "Tone at the top" refers to senior management's commitment to legal and ethical compliance and accurate reporting, expressed as a function of management initiatives, policies, and, most importantly, management's conduct.  SOX also recognizes the primacy of "tone at the top" as a control mechanism in, among other things, its rules making a company's senior management ultimately responsible for the quality of an issuer's disclosure

---

[51] 2014 Form 10-K, *supra* note 11, at 17.

controls and financial reporting.  Regulators and auditors likewise recognize "tone at the top" as a key internal control mechanism.  For example, the *Resource Guide to the U.S. Foreign Corrupt Practices Act*, jointly issued by the DOJ and the SEC, emphasizes that an issuer's implementation of "an appropriate tone at the top" is a key factor in assessing the seriousness of an FCPA violation.[52]

59.     Similarly, then-SEC Commissioner Cynthia Glassman stated in an April 2003 speech on the SEC's implementation of SOX:

> [T]he ultimate effectiveness of the new corporate governance rules will be determined by the "tone at the top."  Adopting a code of ethics means little if the company's chief executive officer or its directors make clear, by conduct or otherwise, that the code's provisions do not apply to them. . . . Corporate officers and directors hold the ultimate power and responsibility for restoring public trust by conducting themselves in a manner that is worthy of the trust that is placed in them.[53]

60.     Accordingly, Cognizant's maintenance of adequate internal control systems, including its "tone at the top," was critically important to investors because it ensured that the Company adhered to the Code of Conduct and Anticorruption Policy it purported to practice, and that the Company's public disclosures were accurate.

61.     In connection with Cognizant's SEC filings throughout the Class Period, and pursuant to SOX, Defendants D'Souza and McLoughlin signed certifications representing to investors that Cognizant's internal reporting controls were "effective" and were designed to "provide reasonable assurance regarding the reliability" of Cognizant's financial reports; that

---

[52] Criminal Div., U.S. DOJ & Enf't Div., U.S. SEC, *A Resource Guide to the U.S. Foreign Corrupt Practices Act* 55 (Nov. 14, 2012), https://www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf   https://www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf[hereinafter    "*Resource Guide*"].

[53] Cynthia A. Glassman, Commissioner, SEC, SEC Implementation of Sarbanes-Oxley:  The New Corporate Governance (Apr. 7, 2003), https://www.sec.gov/news/speech/spch040703cag.htm.

Cognizant's SEC filings were free from material misstatements and omissions, and "fairly present[ed], in all material respects, the financial condition and results of operations of the Company"; and that there were no "significant deficiencies and material weaknesses in the design or operation" of Cognizant's internal controls that had not been disclosed.  ¶ 210.

62.     On Cognizant's website, the Company also touted the rigorousness of its internal controls, stating "Cognizant employs rigorous internal controls to ensure our commitment to ethical behavior, proper risk management and exemplary corporate conduct.  Our internal controls are maintained by an effective and far-reaching corporate governance system implemented by our senior leadership team and overseen by an independent Board of Directors."[54]  Based on these statements, the Company assured investors that they could take comfort in the conduct of its management and the accuracy and completeness of its public disclosures.

63.     The cumulative effect of the statements summarized above was to drive Cognizant's stock price significantly higher throughout the Class Period.  Specifically, Defendants' statements caused Cognizant's stock price to rise from $46.50 per share at the start of the Class Period to a Class Period high of more than $68 per share – an increase of more than 46%.

64.     Unfortunately for investors, as detailed below, Defendants' statements to investors concealed a bribery scheme that went to the core of Cognizant's SEZ operations and involved the highest levels of Cognizant management.  This undisclosed bribery scheme rendered a host of Defendants' statements to investors materially false and misleading, including their statements:  touting the significant benefits Cognizant received from its SEZ operations;

---

[54]  Internal Controls, Cognizant, https://web.archive.org/web/20150104185219/http:/www.cognizant.com/company-overview/internal-controls (last visited Mar. 24, 2017).

representing that the Company did not bribe foreign officials and took concrete steps to ensure FCPA compliance; assuring investors that the Company maintained reliable internal controls; and attributing the Company's performance to additional legitimate factors.

**D.      In Truth, Cognizant Bribed Indian Government Officials to Procure Valuable SEZ Licensing**

65.     Unbeknownst to investors, to secure the valuable SEZ licenses Cognizant repeatedly touted, the Company engaged in a long-standing bribery scheme through which it made several million dollars worth of improper payments to Indian government officials.  As discussed below, Cognizant has admitted that, between 2010 and 2015, it made at least $6 million (over 400 million Indian rupees) in payments "relating to Company-owned facilities in India" that "may" have been "improper[] and in possible violation of the [FCPA]." *See, e.g.*, ¶¶ 11, 75, 91, 226.

66.     Cognizant further admitted that, in its publicly reported financial statements, it improperly booked these payments as capital expenditures rather than operating expenses, which are deducted dollar-for-dollar against the Company's bottom line as they are spent.  This had the effect of disguising the illicit payments as legitimate capital investments and inflating the Company's reported investments in its SEZ facilities, as well as its net income.

67.     Notably, Cognizant also has admitted that the bribery scheme was carried out by "senior management," and that its officers actually ***overrode*** the Company's internal controls to facilitate the bribery scheme.  Specifically, the Company ultimately admitted in its November 7, 2016 third quarter Form 10-Q that "certain members of ***senior management*** may have participated in or failed to take action to prevent the making of potentially improper payments by either ***overriding or failing to enforce*** the controls established by the Company relating to real estate and procurement principally in connection with permits for certain facilities in India."  As

detailed below, chief among the senior management who carried out the scheme is Defendant Coburn.

68.     Former Cognizant employees have corroborated the Company's admissions. Former Employee 1 served as a Cognizant Manager, Internal Audit & SOX Compliance from November 2014 through December 2015.  Former Employee 1 was tasked with overseeing an FCPA compliance audit of Cognizant's Indian operations, which began in September 2014 and was completed in May 2015.  Notably, notwithstanding the Company's representations that it conducted "periodic audits of [FCPA] compliance," Former Employee 1 reported that it was apparent based on the absence of prior-period audit documentation that an FCPA compliance audit had not been performed in at least two years prior to 2015.   Former Employee 2, Cognizant's Assistant Vice President, Internal Audit from 2007 through 2012 and the Company's Chief Audit Executive, stated that no FCPA-specific audits were performed during his/her tenure at Cognizant.

69.     Former Employee 1 further reported that the 2015 audit found evidence that payments related to procuring SEZ licensing were being made to Indian government personnel and that these payments were being improperly classified in Cognizant's internal systems. Specifically, Former Employee 1 explained that Cognizant coordinated its land and facility procurement through a contractor.  Former Employee 1 reported that the 2015 audit turned up several invoices from this contractor that explicitly sought reimbursement for payments for licenses to operate in SEZs in Bangalore and elsewhere.  While the local government had the power to grant SEZ licenses in the area, the payments were made to what appeared to be a private, non-governmental entity.  Upon investigating, Former Employee 1 discovered that key positions in the ostensibly private entity were held by government-affiliated individuals.

70.     While, as set forth above, the invoices made the purpose of the payments explicit (i.e., for SEZ licenses), Former Employee 1 stated that Cognizant internally recorded the payments as "lease payments."  When Former Employee 1 interviewed Cognizant personnel, including a Director of Procurement and Director of Accounts Payable (individuals who were senior managers) about these transactions, he/she was unable to get a "straight cooperative answer," and, instead, was met with "inconsistent responses and no backup to support what they were saying."  According to Former Employee 1, the personnel interviewed were all saying something different, particularly about the purpose of the payments, and the inconsistency "raised a big red flag."  Former Employee 1 stated that the team would "speak to three people" about the purpose of the payments and "get three different answers."  Although Former Employee 1 could not recall the amount of the payments in question, he/she stated that the payments would have had to have been significant enough to be selected for auditing.  Notably, Former Employee 1 reported that the audit team discovered these payments "fairly easily," by running a few searches through the Company's electronic database.

71.     Former Employee 1 also reported that the 2015 audit turned up several "high risk" problems in Cognizant's internal controls.  *First*, as described above, the audit revealed that numerous payments to Indian government-affiliated personnel had been improperly classified as lease payments or otherwise characterized in a way that was inconsistent with the nature of the actual transaction.  *Second*, as stated in the Company's published Anticorruption Policy, all transactions involving government personnel were to be authorized by Cognizant's legal department.  Former Employee 1, however, discovered that proper authorization was not being obtained for payments to government officials.  *Third*, and relatedly, Former Employee 1 discovered that there were deficiencies in the Company's disclosure controls, as payments to

government officials were not being properly flagged as such for further vetting, as per the Company's anticorruption and internal control policies.

72.     *Fourth*, contrary to Defendants' statements in the Anticorruption Policy, Former Employee 1 stated that Cognizant employees did not receive adequate FCPA compliance training.  Specifically, Former Employee 1 noted that training materials were in English, rather than the language native to the employees being trained.  Moreover, the training materials were generic, and were not specific to either the country in which employees operated or the specific positions they held.  Unsurprisingly in light of these deficiencies, Former Employee 1 noted that the completion rate for compliance training was low.  Corroborating Former Employee 1's reports, Former Employee 2, a highly placed audit executive, stated that his/her staff had no FCPA-specific training and that no FCPA training manuals even existed.

73.     Former Employee 1 reported the findings of the 2015 audit described above to Cognizant's Associate Vice President of Audit, Abraham Verghese ("Verghese"), for inclusion in a formal final audit report.  Former Employee 1 further reported that he/she was included on emails in which Verghese raised these findings with Cognizant's Assistant Vice President of Global Compliance & Ethics, Misty Pederson ("Pederson") – one of Cognizant's most senior compliance executives.[55]  Former Employee 1 stated that the final audit report would have been disseminated to senior Cognizant executives including Pederson, Bhavna Sharma (Senior Manager, Internal Audit), and Steve Casari (Vice President Enterprise Risk Management & Internal Audit).  Former Employee 1 also stated that summary audit findings, at a minimum,

---

[55]  Pederson's biography on the business networking website LinkedIn stated that she is "[r]esponsible for developing, sustaining, measuring, and communicating programs that ensure Cognizant associates are committed to compliance with all local laws and [the Company's] Code of Conduct."

would have been distributed to the Audit Committee of Cognizant's Board, which had approved the plan to conduct the FCPA audit, as well as D'Souza and McLoughlin.

74.     As discussed above, Cognizant has admitted that its "senior management" "participated" in the Company's bribery scheme by, among other things, overriding internal controls related to real estate permitting or refusing to enforce these controls.  There is ample evidence that Coburn, the Company's President and former CFO, "participated" in Cognizant's scheme.  Former Employee 3, Cognizant's Infrastructure Team Lead from July 2015 through January 2016, stated that Coburn was the "responsible authority" for overseeing Cognizant's leases in India.  Former Employee 4, Cognizant's Associate Director - Strategic Sourcing from September 2011 through March 2015, stated that Coburn was "involved directly" in real estate transactions; "[h]e used to take a special interest."  Moreover, Coburn, who had served as a senior Cognizant executive for seventeen years, suddenly resigned when the Board's corruption investigation was announced.

### E.     The Truth Is Finally Revealed

75.     On September 30, 2016, Cognizant shocked investors by announcing, in a Form 8-K filed with the SEC, that its Board was "conducting an internal investigation into whether certain payments relating to facilities in India were made improperly and in possible violation of the U.S. Foreign Corrupt Practices Act and other applicable laws."[56]

76.     In that same filing, Cognizant also announced that Coburn, whom analysts had described as "a leading face of CTSH to the investment community," a "key executive," and "a major contributor to the development of the company's strategy since its inception," had resigned amidst the Board's corruption investigation and was being replaced as President by

---

[56] Cognizant Tech. Sols. Corp., Current Report (Form 8-K), at Item 8.01 (Sept. 30, 2016) [hereinafter 2016 Form 8-K].

then-CEO of IT Services Rajeev Mehta.  Analysts noted the abruptness of Coburn's departure, pointing out that he had "been attending/participating at recent investor conferences."[57]

77.    Analysts and investors were shocked by Cognizant's September 30, 2016 disclosures.  For example, in a September 30, 2016 report, Argus analysts downgraded Cognizant, characterizing the "announced resignation of the company's president amid a corruption investigation in India" as "***blockbuster news***."[58]  These analysts observed that "[g]iven that a top executive has resigned, . . . we see risks that the illegal practices could be extensive and long-lived.   Additional agencies such as DoJ and SEC could conduct investigations of their own, and this matter could overhang the CTSH shares [for] a significant amount of time."[59]  In a September 30, 2016 report, RW Baird analysts expressed deep concern that illegal payments made to procure SEZ permitting could have profoundly adverse consequences for Cognizant, noting that, "[w]hile we haven't seen this in the past, we consider possible outcomes to include reputational damage – could hurt revenue growth via client loss/limited client wins, fines and potential limits on operations in certain areas."[60]

78.    In a September 30, 2016 report, Jefferies analysts similarly expressed shock at the Company's "two surprising announcements" concerning the Board's investigation into FCPA violations and Coburn's resignation, specifically noting that Coburn's "***sudden departure was***

---

[57] *Cognizant Gags Staff, Steps up Graft Probe*, Times of India (Oct. 3, 2016, 4:00 AM IST), http://timesofindia.indiatimes.com/business/india-business/Cognizant-gags-staff-steps-up-graft-probe/articleshow/54646587.cms.

[58] Jim Kelleher, CFA, *Change in Rating:  Downgrading to HOLD on Corruption Probe* 1-2 (Argus Research Co. Sept. 30, 2016).

[59] *Id.* at 1.

[60] Jochelle Mendonca, *Cognizant Investigating Improper Payments Paid in India; Informs DOJ, SEC*, ETtech (Oct. 1, 2016, 09:51 IST), http://tech.economictimes.indiatimes.com/news/corporate/cognizant-investigating-improper-payments-paid-in-india-informs-doj-sec/54607942.

*not anticipated in our opinion*."[61]   The report further noted that "we don't believe [Coburn] will

receive any severance."[62]

79.     That same day, Evercore ISI published a report opining that Defendant Coburn's

resignation may have been "as a direct result of this investigation":

> This morning Cognizant announced that Gordon Coburn, President, resigned and
> [has] been replaced with Rajeev Mehta, CEO of [Cognizant] IT Services.   In
> conjunction, [Cognizant] is conducting an internal investigation into whether
> certain payments relating to licenses and permits on a small number of its 12
> owned facilities in India were made improperly and in possible violation of the
> [FCPA] and other applicable laws.   While not specified, **we believe Gordon
> Coburn may have resigned as a direct result of this investigation** and
> potentially other issues [Cognizant] may be facing given a weak discretionary
> spending environment in the Company's large Financial Services and Healthcare
> verticals.[63]

80.     Morgan Stanley analysts likewise stated in a September 30, 2016 report that

"investors may assume a connection" between Coburn's resignation and the announcement of

the FCPA investigation, "given the timing" of the two events.[64]

81.     Finally, Morningstar issued a September 30, 2016 report emphasizing that

Cognizant's "unexpected" announcement had "surprised the market" and was "clearly a black

eye for the company and could potentially provide dark clouds" over the "reputation of the

firm's consulting franchise."[65]   A few days later, on October 3, another Morningstar report

noted:   "Given that Coburn had been with the company for over 20 years and president since

---

[61]  Jason Kupferberg, Equity Analyst, *Surprise Management Departure and Possible FCPA
Violation* 1 (Jefferies Group LLC Sept. 30, 2016).

[62] *Id.*

[63] David Togut, CFA et al., *Nibble on Bad News* 1 (Evercore ISI Sept. 30, 2016).

[64] Brian Essex, CFA et al., *CTSH Quick Comment* 2 (Morgan Stanley Sept. 30, 2016).

[65]  Brian Colello, CPA, *Cognizant's Shares Remain Undervalued as the Firm Investigates
Possible Corruption Violations* 1 (Morningstar Equity Research Sept. 30, 2016).

2012, **the quick-handed nature of his dismissal seems to indicate a link to the FCPA investigation**."[66]

82.    On September 30, 2016, in response to the Company's disclosures, Cognizant's stock price swiftly declined.  The Company's stock price fell more than 13%, or $7.29 per share, declining from $55.00 to $47.71 on the year's highest trading volume.

   **F.    Cognizant Has Admitted that the Company's Class Period Representations Were False and that Senior Management "May" Have Participated in Making Improper Payments to Indian Officials**

83.    Since the end of the Class Period, Cognizant has acknowledged that: (1) Cognizant's "senior management" "may have participated in" making $6 million dollars worth of corrupt payments to Indian government officials to procure permits relating to the Company's Indian facilities including by, among other things, "overriding" the very internal controls designed to detect and prevent such misconduct; (2) the Company's prior reported financial results were misstated because millions of dollars in bribes were improperly reported as "capital expenditures" (i.e., legitimate expenditures to build or maintain physical facilities); (3) Defendants' representations about Cognizant's compliance with anticorruption laws and the adequacy of its internal controls were both false; and (4) senior management knew that the Company's internal controls were inadequate to detect and prevent the bribery scheme.

---

[66] Andrew Lange, Equity Analyst, *Cognizant in Possible Violation of Foreign Corrupt Practices; Scant Detail, Stock Still Undervalued* 1 (Morningstar Equity Research Oct. 3, 2016).

84.     On November 7, 2016, Cognizant filed its third quarter results on Form 10-Q with

the SEC.  In that filing, the Company admitted that Cognizant's "senior management may have

participated" in making – or had allowed to be made – corrupt payments to procure licenses for

the Company's Indian facilities:

> During the closing process for the third quarter of 2016, based on the results of the internal investigation to date, we concluded that as of December 31, 2015 and in subsequent interim periods, ***we did not maintain an effective control environment.  Specifically, we did not maintain an effective tone at the top as certain members of senior management may have participated in or failed to take action to prevent the making of potentially improper payments by either overriding or failing to enforce the controls established by the Company relating to real estate and procurement principally in connection with permits for certain facilities in India***. . . .
>
> As a result of the foregoing, ***we have determined that a material weakness existed as of December 31, 2015, and continues to exist in subsequent interim periods, in our internal control over financial reporting***.[67]

85.     Accordingly, Cognizant admitted in that Form 10-Q that its senior management

was deeply involved in the bribery scheme and that its prior statements concerning the integrity

of its internal controls were false.  Cognizant was forced to correct the certifications in its 2015

Form 10-K and first and second quarter 2016 Forms 10-Q – that "our disclosure controls and

procedures and internal controls over financial reporting were effective" – to state the opposite,

instead – "that [those controls] as of December 31, 2015 were ineffective."[68]

86.     The Company further admitted that it had misstated its prior financial results to

conceal Cognizant's bribery scheme.  Specifically, to hide the purpose and nature of these

payments, the Company had mis-booked many of the improper payments as capital expenditures

– investments in physical assets that may be depreciated – rather than operating expenses, which

---

[67] Cognizant Tech. Sols. Corp., Quarterly Report (Form 10-Q), at 7 (Nov. 7, 2016) [hereinafter Q3 2016 Form 10-Q].

[68] *Id.*

are deducted dollar-for-dollar against the Company's bottom line as they are spent.   The Company stated:

> To date, the investigation has identified a total of approximately $ 5.0 million in payments that may have been recorded improperly.   During the three months ended September 30, 2016, we recorded an out-of-period correction related to $ 3.1 million of such payments that were previously capitalized that should have been expensed.   The remaining $1.9 million of such payments remains under investigation.   The recorded correction resulted in an increase of selling, general and administrative expenses of $ 3.1 million, a reduction in depreciation and amortization expense of $ 0.4 million, and a reduction in property and equipment, net of $ 2.7 million.[69]

87.     On November 7, 2016, Cognizant held its Q3 2016 earnings conference call with analysts and investors.   During this call, D'Souza reiterated that the Company's senior management was involved in the scheme.   He further stated that the members of senior management who participated in the scheme were no longer with the Company:

> [W]e discovered in the course of the investigation that certain members of senior management may have been aware of or participated in the matters under investigation.   Any such conduct would be inconsistent with our core values. Based on the results of the investigation to-date, those who may have been involved are no longer with the company or in the senior management position.[70]

88.     D'Souza's statement leaves little doubt that Coburn, the Company's former President, was personally involved in the bribery scheme.   As noted above, at the time D'Souza made this statement, Coburn was "no longer with the Company" because he had suddenly and surprisingly "resigned" just three days before the Company disclosed the investigation into the improper payments.

89.     Cognizant also has acknowledged that its representations in its credit agreement with a commercial bank syndicate that the Company was compliant with anticorruption laws was

---

[69] *Id.* at 26-27.

[70] Tr. of Q3 2016 Earnings Call at 2 (Bloomberg Nov. 11, 2016).

"materially incorrect."[71]  Specifically, in its 2014 credit agreement, which the Company publicly

filed with the SEC on November 20, 2014, Cognizant represented that:

> [Cognizant], its Subsidiaries and their respective directors, officers and
> employees, and to the best knowledge of [Cognizant,] its affiliates and agents,
> have not engaged in any activity or conduct which would violate any applicable
> Anti-Corruption Laws, and are in compliance with Anti-Corruption Laws and
> applicable Sanctions and are not engaged in any activity that would reasonably be
> expected to result in [Cognizant] being designated as a Sanctioned Person.[72]

In its third quarter 2016 Form 10-Q, Cognizant acknowledged that the existence of the bribery

scheme rendered this statement false and that the Company was therefore forced to secure a

waiver of default from the syndicate and amend its credit agreement.[73]  Specifically, this

statement was amended to read, in pertinent part, "to the best knowledge of the Borrower, its

affiliates and agents, . . . *except for the Disclosed Matters*, [Cognizant has] not engaged in any

activity or conduct that would violate any applicable Anti-Corruption Laws," with the Disclosed

Matters defined as the Company's September 30, 2016 disclosure about the bribery scheme.[74]

90.     On February 8, 2017, in connection with its fourth quarter 2016 earnings call,

Cognizant provided another update to its ongoing investigation of corrupt payments made to

Indian officials.  The Company disclosed that it had discovered another $1 million in improper

payments, bringing the total amount of bribes paid to $6 million.[75]

91.     On March 1, 2017, Cognizant filed a Form 10-K with the SEC, which disclosed

that the bribery scheme had been ongoing since at least 2010.  Specifically, the 2016 Form 10-K

---

[71] Q3 2016 Form 10-Q, *supra* note 67, at 12, 42, 53.

[72] Cognizant Tech. Sols. Corp., Current Report (Form 8-K), Ex. 10.1 at 52-53 (Nov. 20, 2014).

[73] *See* Q3 2016 Form 10-Q, *supra* note 67, at 12.

[74] *Id.* at Ex. 10.1.

[75] Tr. of Q4 2016 Earnings Call at 7-8 (Bloomberg Feb. 8, 2017).

stated: "To date, the investigation has identified a total of approximately $6 million in payments made between 2010 and 2015 that may have been recorded improperly."[76]

92.     The 2016 Form 10-K also demonstrated that the bribery scheme was widespread and involved multiple members of senior management and other Company employees.  Under "Remediation Plans," the 2016 Form 10-K reiterated that multiple members of senior management were involved with the bribery scheme and acknowledged that additional Cognizant employees may be disciplined:

> [T]he members of senior management who may have participated in or been aware of the making of the identified potentially improper payments and failed to take action to prevent the making of the identified potentially improper payments were no longer with the Company or in a senior management position as of December 31, 2016.  Additional personnel actions have been taken with respect to other employees and further actions may be required.[77]

93.     The Company further acknowledged that the cost of the scandal was ongoing and severe, stating:  "In 2016, we incurred $27 million in costs related to the FCPA investigation and related lawsuits.  We expect to continue to incur expenses related to these matters in 2017 and future periods."[78]

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD AND ANALYST AND MARKET REACTIONS THERETO [79]

94.     During the Class Period, Defendants made numerous statements regarding Cognizant's business and results of operations that were materially false and misleading in light

---

[76] Cognizant Tech. Sols. Corp., Annual Report (Form 10-K), at 37 (Mar. 1, 2017) [hereinafter 2016 Form 10-K].

[77] *Id.* at 58.

[78] *Id.* at 37.

[79] In this section, Defendants' statements that are ***bolded and italicized*** are alleged to be false and misleading.  Other statements are included to provide context, including those that are **bolded** (but not italicized) for emphasis.

of the Company's misconduct, namely, the undisclosed bribery scheme.  **First**, in the Company's SEC filings, Defendants informed investors of the financial benefits Cognizant received from its SEZ licenses without revealing that the Company was engaged in a bribery scheme in order to obtain and perpetuate those benefits.  The Company also reported the investments it made in its SEZs – figures that were overstated because they included several million dollars worth of illicit payments to Indian government officials.  **Second**, Defendants claimed that Cognizant had established robust policies and procedures to ensure legal and ethical compliance, including extensive training and "risk analysis" functions to assess and prevent "corruption."  Based on these representations, Defendants specifically stated that "no" "confirmed incidents" of "corruption" had been "reported in 2014" or "in 2015."   Defendants also stated that "no incidents" of "significant risks" of "corruption" had been reported "in 2015."   These representations were materially false and misleading in light of the facts that (1)  Cognizant was involved in a bribery scheme in India; (2) the scheme was facilitated by senior management, including the Company's President, overriding or failing to enforce the much-hyped internal controls; and (3) Cognizant has admitted that, in truth, its internal controls were materially deficient.  **Third**, Defendants represented that Cognizant's financial performance and ability to deliver low-cost services were due to legitimate business factors without revealing that the Company was achieving its success, at least in part, through bribes to Indian government officials.  **Fourth**, Defendants overstated Cognizant's earnings during the Class Period by incorrectly booking its bribe payments as capital expenditures when, in fact, those payments should have been booked as operating expenses and charged against the Company's net income.  **Finally**, the Company reported in its SEC filings that its internal controls were "effective" when, as the Company has now admitted, those controls and its "tone at the top" were materially

defective due to senior management's overriding the controls or knowingly allowing them to be breached in order to facilitate the bribery scheme.

**A.     Cognizant Highlighted the Benefits It Received from Its SEZ Licenses in India Without Disclosing that the Company Was Involved in a Bribery Scheme to Obtain and Perpetuate Those Benefits**

95.     During the Class Period, Defendants repeatedly highlighted the "significant" tax benefits and "relaxed . . . regulatory restrictions" that Cognizant received from the Indian government because many of its operations were located in India's SEZs.   Defendants emphasized that these benefits materially "increase[d] net income."   These statements were materially false and misleading when made because Cognizant obtained those benefits in material part through the scheme to bribe Indian officials for SEZ permits.

**1.     February 27, 2015:  2014 Form 10-K**

96.     On February 27, 2015, Cognizant filed its 2014 Form 10-K with the SEC, which was signed by D'Souza and McLoughlin (and others).   The 2014 Form 10-K described the "income tax holiday benefits" that Cognizant's "Indian subsidiaries" had received from the "Indian government" as follows:

> ***Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the Indian government for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years***.  Changes in Indian tax laws that would reduce or deny SEZ tax benefits could have a material adverse effect on our business, results of operations and financial condition.

97.     The 2014 Form 10-K quantified the "effect of the income tax holidays granted by the Indian government" as follows:

> For the years ended December 31, 2014, 2013, and 2012, the effect of the income tax holidays granted by the Indian government was to reduce the overall income tax provision and ***increase net income by approximately[in thousands] $182,973,***

*$146,326, and $151,789, respectively, and increase diluted EPS by $0.30, $0.24, and $0.25, respectively*.

98.     Cognizant also reported that, "*[a]s of December 31, 2014, we had outstanding fixed capital commitments of approximately $20,452 [in thousands] related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers*."   The 2014 Form 10-K further stated, "*[w]e have constructed and expect to continue to locate most of our newer development facilities in SEZs*."

99.     The above statements made in the 2014 Form 10-K were materially false and misleading when made.  It was materially false and misleading for Cognizant to tout the "income tax holiday benefits" that the Company received from the "Indian government" when, in fact, the Company was obtaining those benefits through the bribery scheme detailed herein.  Similarly, it was materially false and misleading for Cognizant to state that the SEZ facilities meaningfully "*increase net income* . . . *and increase diluted EPS*" when the Company was obtaining such benefits through the bribery scheme detailed herein.  It also was materially false and misleading for Cognizant to state that it had "*outstanding fixed capital commitments of approximately $20,452 [in thousands] related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers*," when that figure included at least $4.1 million in bribes paid to government officials.

100.     It also was misleading for Cognizant to state that it would "locate most of our newer development facilities in SEZs," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme detailed herein.

## 2.     May 4, 2015:  Q1 2015 Form 10-Q

101.     On May 4, 2015, Cognizant filed its Q1 2015 Form 10-Q with the SEC that was signed by Defendants D'Souza and McLoughlin and stated, in part: "*Our Indian subsidiaries,*

*collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years*."  Cognizant also reported that, in response to the factors and risks affecting its business and operating results, the Company planned to "*[l]ocate most of our new development center facilities in tax incentivized areas*."

102.    The above statements made in the Q1 2015 Form 10-Q were materially false and misleading when made.  It was materially false and misleading for Cognizant to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" it had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein.

103.    It also was misleading for Cognizant to state that it would "[l]ocate most of our new development center facilities in tax incentivized areas," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

### 3.     August 6, 2015:  Q2 2015 Form 10-Q

104.    On August 6, 2015, Cognizant filed a Form 10-Q with the SEC that was signed by Defendants D'Souza and McLoughlin and that stated, in part:   "*Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years*."  Cognizant also reported that in response to the environment of factors affecting its business and operating results, the Company planned to "*[l]ocate most of our new development center facilities in tax incentivized areas*."

105.    The above statements made in the Q2 2015 Form 10-Q were materially false and misleading when made.  It was materially false and misleading for Cognizant to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" it had received, when, in fact, Cognizant was obtaining such benefits through the bribery scheme detailed herein.

106.    It also was misleading for Cognizant to state that it would "[l]ocate most of our new development facilities in tax incentivized areas," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

### 4.    November 5, 2015:  Q3 2015 Form 10-Q

107.    On November 5, 2015, Cognizant filed a Form 10-Q with the SEC that was signed by Defendants D'Souza and McLoughlin and that stated, in part:   "***Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years***."  Cognizant also reported that in response to the environment of factors affecting its business and operating results, the Company planned to "***[l]ocate most of our new development center facilities in tax incentivized areas***."

108.    The above statements made in the Q3 2015 Form 10-Q were materially false and misleading when made.  It was materially false and misleading for Cognizant to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" it had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein.

109.    It also was misleading for Cognizant to state that it would "[l]ocate most of our newer development facilities in SEZs," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

### 5.    February 25, 2016:  2015 Form 10-K

110.    On February 25, 2016, Cognizant filed a 2015 Form 10-K with the SEC that was signed by Defendants D'Souza and McLoughlin, among others.  The 2015 Form 10-K touted the "income tax holiday benefits" that Cognizant's "Indian subsidiaries" had received from the "Indian government":

> ***Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the Indian government for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years***.  [If enacted, proposed changes in Indian tax laws] that would reduce or deny SEZ tax benefits could have a material adverse effect on our business, results of operations and financial condition.

111.    The 2015 Form 10-K quantified the "effect of the income tax holidays granted by the Indian government" as follows:

> ***For the years ended December 31, 2015, 2014 and 2013, the effect of the income tax holidays granted by the Indian government was to reduce the overall income tax provision and increase net income by approximately $201.4 million, $183.0 million and $146.3 million, respectively, and increase diluted EPS by $0.33, $0.30 and $0.24, respectively***.

112.    Cognizant also reported that, "***[a]s of December 31, 2015, we had outstanding fixed capital commitments of approximately $76.4 million related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers***."  The 2015 Form 10-K also stated, "***We have constructed and expect to continue to operate most of our newer development facilities in SEZs***."

113.    The above statements made in the 2015 Form 10-K were materially false and misleading when made.  It was materially false and misleading for Cognizant to tout the

"significant tax incentives" from the "Indian government" and related "benefits realized by us from Indian operations" it had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein.  Similarly, it was materially false and misleading for Cognizant to state that the SEZ facilities meaningfully "*increase net income* . . . and *increase diluted EPS*" when the Company was obtaining such benefits through the bribery scheme detailed herein.  It also was materially false and misleading for Cognizant to state that it had "*outstanding fixed capital commitments of approximately $76.4 million related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers*," when that figure included at least $4.1 million in bribes paid to government officials.

114.    It also was misleading for Cognizant to state that it would "continue to operate most of our newer development facilities in SEZs," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

### 6.    May 6, 2016:  Q1 2016 Form 10-Q

115.    On May 6, 2016, the Company filed a Form 10-Q with the SEC that was signed by Defendants D'Souza and McLoughlin and that stated, in part:  "*Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years*."  Cognizant also reported that in response to the environment of factors affecting its business and operating results, the Company planned to "*[l]ocate most of our new development center facilities in tax incentivized areas*."  Cognizant also reported that, "*[a]s of March 31, 2016, we had outstanding fixed capital commitments of approximately $76.2 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers*."

116.    The above statements made in the Q1 2016 Form 10-Q were materially false and misleading when made.  It was materially false and misleading for Cognizant to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" it had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein.  It also was materially false and misleading for Cognizant to state that it had "outstanding fixed capital commitments of approximately $76.2 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers" when that figure included at least $4.1 million in bribes paid to government officials.

117.    It also was misleading for Cognizant to state that it would "[l]ocate most of our new development center facilities in tax incentivized areas," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

### 7.        August 5, 2016:  Q2 2016 Form 10-Q

118.    On August 5, 2016, the Company filed a Form 10-Q with the SEC that was signed by Defendants D'Souza and McLoughlin and that stated, in part:  "***Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years***."  Cognizant also reported that in response to the environment of factors affecting its business and operating results, the Company planned to "***[l]ocate most of our new development center facilities in tax incentivized areas***."   Cognizant also report that, "***[a]s of June 30, 2016, we had outstanding fixed capital commitments of approximately $184.0 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers***."

119.    The above statements made in the Q2 2016 Form 10-Q were materially false and misleading when made.  It was materially false and misleading for Cognizant to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" it had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein.  It also was materially false and misleading for Cognizant to state that it had "outstanding fixed capital commitments of approximately $184.0 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers" when that figure included at least $4.1 million in bribes paid to government officials.

120.    It also was misleading for Cognizant to state that it would "[l]ocate most of our new development center facilities in tax incentivized areas," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

**B.    Cognizant Emphasized Its Legal Compliance and Internal "Anti-Corruption" Controls While Specifically Denying Any "Incident" of "Corruption" During 2014 or 2015**

121.    During the Class Period, Defendants stated that Cognizant did not offer payments to government officials to obtain anything of value.  Defendants further stated that Cognizant had established robust policies and procedures to ensure legal and ethical compliance, including extensive training and "risk analysis" functions to assess and prevent "corruption."  Based on these representations, Defendants specifically stated that "no" "confirmed incidents" of "corruption" had been "reported in 2014" or "in 2015."  Defendants also stated that "no incidents" of "significant risks" of "corruption" had been reported "in 2015."  As explained below, these statements were materially false and misleading when made because Cognizant and its "senior management" were engaged in the bribery scheme detailed above.

50

### 1.    Defendants' False Statements in the Anticorruption Policy

122.    Throughout the Class Period, Cognizant published and disseminated its Anticorruption Policy to investors through its website.

123.    The Anticorruption Policy stated that the Company would:

- "*never pay, promise, offer or authorize a bribe or anything of value to a government official or any other individual in order to obtain business for the Company or to secure an improper advantage for the Company*";

- "*never permit, allow, authorize (or turn a 'blind eye' to) a Company third-party's representative payment, promise, offer or authorization of a bribe or anything of value to a government official or any other individual in order to win business or obtain improper advantages for the Company*";

- "*consult with our Legal Department before offering or giving anything of value, even of nominal value (e.g., for meal or dinner, or sports tickets), to a government official or to someone who is in a position to influence a government official or a third-party representative, as governed by our Core Values and Standards of Business Conduct regarding gifts and entertainment*";

- "*ensure that entries into the Company's books and records are accurate, and that all Company internal controls and procedures are maintained and followed when making payments from the Company*"; and

- "*comply with, and enforce, all the Company's requirements for documentation of expenses and payment requests, particularly those payments related to the Company's sales, marketing, and business development efforts, consistent with our Core Values and Standards of Business Conduct on transparency*."

124.    The Anticorruption Policy further assured investors that Cognizant was taking a number of additional concrete steps to ensure the Company's compliance with anticorruption laws.  Among other things, Cognizant told investors that all employees involved in procurement and contracting, as well as "*[k]ey business partners and third-party representatives*," would "*receive appropriate training from the Company*" regarding compliance with anticorruption laws.  The Company also represented that its Legal Department would review "red flag"

transactions, including those transaction involving a government-related counterparty. Moreover, Cognizant stated that "*periodic audits of compliance shall be performed by each business unit in coordination with our Legal Department*" in order to "*[m]onitor and [a]udit [c]ompliance [w]ith [the] Anticorruption Policy*."

125.    The above statements made by Cognizant in the Anticorruption Policy were materially false and misleading when made.  It was misleading for Defendants to state that the Company would "never pay, promise, offer or authorize a bribe or anything of value to a government official or any other individual" in order to  "to secure an improper advantage for the Company," or permit a Company "representative" to do so, when as alleged above, the Company and its representatives paid bribes to Indian officials in order to secure SEZ licensing for Cognizant's Indian operations, with the knowledge and participation of senior Company management.

126.    It was further misleading for Defendants to represent that the Company had established and followed a robust and comprehensive system of FCPA compliance mechanisms when in fact, Defendants knowingly eschewed compliance with the FCPA and the Company's Anticorruption Policy because they were engaged in a scheme to bribe Indian government officials.  Among other things, it was misleading for Defendants to represent that the Company would "ensure that entries into the Company's books and records are accurate, and that all Company internal controls and procedures are maintained and followed," and that Cognizant would "comply with, and enforce, all the Company's requirements for documentation of expenses and payment requests" when, as alleged above:  (1) the Company's books and records were misstated, as the improper payments to Indian officials were inappropriately recorded and inappropriately capitalized in the Company's financial statements; (2) senior management

actually overrode the Company's internal controls and thus Cognizant did not maintain an appropriate "tone at the top"; and (3) Company policies concerning "documentation of expenses," including flagging payments to foreign officials and vetting them with Cognizant's Legal Department, were not followed.

127.    It also was misleading for Defendants to state that Cognizant employees and "[k]ey business partners and third-party representatives" with procurement-related responsibility would "receive appropriate training from the Company" regarding compliance with anticorruption laws when, as reported by numerous former Cognizant employees, adequate training was not provided.

128.    Finally, it was misleading for Defendants to tout Cognizant's "periodic audits" to "[m]onitor and [a]udit [c]ompliance [w]ith [the] Anticorruption Policy" when:  (1) the Company failed to undertake any such audit for years prior to 2014; and (2) the Company's first FCPA compliance audit undertaken at the end of 2014 had uncovered evidence of bribes and several "high risk" problems in Cognizant's internal controls, yet these findings were not acted upon.

## 2.    Defendants' False Statements in the 2014 Sustainability Report

129.    In June 2015, Cognizant published and disseminated to investors through its website its 2014 Sustainability Report.  In this report, Cognizant stated that it had performed thorough audits of anticorruption compliance and had discovered "***no incidents***" of corruption. Moreover, the Company claimed that it provided "role based anti-corruption training" to Cognizant employees:

**SO 3 Training on Anti-Corruption.**

*In 2014, we introduced role based anti-corruption training to supplement the anti-corruption provisions of the general ethics training our employees received.  We delivered 331,114 hours of Code of Ethics training through eLearning in 2014.  We also delivered live Code of Ethics trainings to targeted audiences of over 18,000 associates in India and the Philippines.  Our formal*

*learning was supplemented in 2014 by education campaigns featuring games, quizzes and prizes.*

*Additionally, our Enterprise Risk Management group conducts annual risk analysis surveys covering all business units and corporate functions to assess the likelihood of various risks including corruption.*

**SO4 Actions taken in response to incidents of corruption.**

*<u>No incidents reported in 2014</u>.*[80]

130.     The above statements in Cognizant's 2014 Sustainability Report were materially false and misleading when made.  It was misleading for Defendants to state that "no incidents" of "corruption" had been reported in 2014, when, among other things:  (1) the Company's President and other members of senior management were involved in the bribery scheme detailed herein, and thus, were aware of such corruption; (2) the 2015 audit findings providing evidence of the Company's bribery already had been reported to senior Cognizant personnel at the time this report was published; and (3) Cognizant's senior management participated in making the corrupt payments by overriding and/or failing to enforce the Company's internal financial controls designed to detect, report, and prevent such bribes.

131.     It was further misleading for Defendants to state that extensive "anti-corruption training" had been provided to Cognizant employees, when, as reported by former Cognizant personnel, no adequate anticorruption compliance training was provided to Company personnel.

### 3.      Defendants' False Statements in the Code of Conduct

132.     From the start of the Class Period until approximately May 30, 2015, Defendants published and disseminated Cognizant's Code of Conduct to investors through Cognizant's website.  The Code of Conduct stated that the Company does not "*[g]et involved with*

---

[80] Cognizant, *2014 Sustainability Report – Building New Tomorrows*, at 55.

*middlemen and/or the bribing of government officials while procuring or leasing land and infrastructure*."[81]  The Code of Conduct further stated:

**We must not:**

- Accept or permit any member of our immediate family to accept any gifts, gratuities or other favors from any customer, supplier or other person doing or seeking to do business with the Company, other than items of nominal value or items that do not exceed local social and/or business customs.

- Give gifts outside of standard business practices in hopes of influencing a business decision.

- Give Company funds or assets for gifts, gratuities or other favors to government officials.

- **Bribes and Kickbacks**

  Bribes and kickbacks are criminal acts, strictly prohibited by law.  As Cognizant Associates we must never offer, give, solicit or receive any form of bribe or kickback anywhere in the world.[82]

133.    On or around July 5, 2015, Cognizant published a revised version of its Code of Conduct.  This document remains on the Company's website and contains a message from Defendant D'Souza:

I have said many times that the easy way is not the Cognizant way.  We do not cut corners, bend the rules, or look for shortcuts—and we *have a zero-tolerance policy toward those who do*.[83]

134.    The revised Code of Conduct further states, in explicit terms, that the Company complies with "all applicable anti-corruption laws":

*This means, in part, that we comply with all applicable anti-corruption laws, rules, and regulations wherever we conduct business.*

---

[81] *Cognizant's Core Values and Standards of Business Conduct*, at 16 (2013).

[82] *Id.* at 29.

[83] *Cognizant's Core Values and Standards of Business Conduct* (2015).

***We do not corruptly give or offer, directly or indirectly, anything of value to a government official to obtain or maintain business or any other advantage for the Company***.[84]

135.    The above representations in Cognizant's Codes of Conduct were materially false and misleading when made.  It was misleading for Defendants to state that the Company was "comply[ing] with all applicable anti-corruption laws," did "not corruptly give or offer, directly or indirectly, anything of value to a government official to obtain or maintain business or any other advantage for the Company," and did not "[g]et involved with middlemen and/or the bribing of government officials while procuring or leasing land and infrastructure," because, as alleged above, Cognizant was engaged in a scheme to bribe Indian government officials in exchange for SEZ licenses for the Company's facilities in India.  It was further misleading for Defendants to state that the Company had "a zero-tolerance policy toward those who" fail to comply with Cognizant's anticorruption policies because, as the Company has admitted, its own senior management officials overrode and/or failed to enforce Cognizant's internal financial controls in order to facilitate the bribery scheme.

### 4.    Defendants' False Statements in the 2015 Sustainability Report

136.    In August 2016, Cognizant published its 2015 Sustainability Report.  This report stated:

**G4-56 The organization's values, principles, standards and norms of behavior such as codes of conduct and codes of ethics.**

As a global business, Cognizant is committed to complying with the laws of the countries in which we operate. . . .

. . . .

***Cognizant treats reports of misconduct seriously***.  All reports are reviewed by the Chief Compliance Officer, who appoints a responsible person as appropriate to conduct an informal inquiry or a formal investigation.  If a violation of our

---

[84] *Id.*

Standards has occurred, appropriate disciplinary action will be taken against individuals involved as permitted by local laws.  Additional steps will be taken if an alleged violation involves an Executive Officer or Board Member.

Today's dynamic global marketplace demands that we achieve the highest standards of behavior.  It is therefore critical that all of us at Cognizant make business decisions that align with our ethical principles.  ***This means, in part, that we comply with all applicable anti-corruption laws, rules, and regulations wherever we conduct business***.[85]

. . . .

### SUB-CATEGORY: SOCIETY

**Aspect:  Anti-corruption**

**G4-SO3 Total number and percentage of operations assessed for risks related to corruption and the significant risks identified**

***There were no incidents reported in 2015***.

### G4-SO4 Communication and training on anti-corruption policies and procedures

We delivered 689,288 hours of Code of Ethics training through eLearning in 2015.  We also delivered live Code of Ethics trainings to targeted audiences of over 203,947 associates in India.  Our formal learning was supplemented in 2015 by education campaigns featuring games, quizzes and prizes.  The percentage of Associates completing the online Code of Ethics training was 94%.  Anti-Corruption training was provided for 500 hours and delivered for selected associates in Administration, Procurement, Sales & Marketing, Finance and other support Functions.

Additionally, our Enterprise Risk Management group conducts annual risk analysis surveys covering all business units and corporate functions to assess the likelihood of various risks including corruption.

### G4-SO5 Confirmed incidents of corruption and actions taken

***There were no incidents reported in 2015***.[86]

137.    It was misleading for Defendants to state that Cognizant had performed a

thorough audit of the Company's anticorruption compliance and that "[t]here were no incidents

---

[85] Cognizant, *2015 Sustainability Report – Helping People Navigate the Digital Shift*, at 50.

[86] *Id.* at 60.

reported in 2015" of "corruption," or even "significant risks" of "corruption," and that "we comply with all applicable anti-corruption laws, rules, and regulations wherever we conduct business," when, among other things:  (1) the Company's President and other members of senior management were involved in the bribery scheme detailed herein, and thus, were aware of such corruption; (2) the 2015 audit findings providing evidence of the Company's bribery had already been reported to senior Cognizant personnel at the time this report was published; and (3) Cognizant's senior management participated in making the corrupt payments by overriding and/or failing to enforce the Company's internal financial controls designed to detect, report and prevent such bribes.

138.    Additionally, it was misleading for Defendants to state that "Cognizant treats reports of misconduct seriously" and that "Cognizant is committed to complying with the laws of the countries in which we operate," because the Company's senior management overrode and/or failed to enforce Cognizant's internal financial controls in order to facilitate the bribery scheme.

139.    It was further misleading for Defendants to tout the anticorruption training provided to Company personnel, when, as described above, no adequate anticorruption compliance training was provided.

C.    Cognizant Touted Its Ability to Deliver Low-Cost Services to Clients Through Legitimate Means, and Attributed the Company's Financial Results to Legitimate Business Factors and Conditions

140.    Throughout the Class Period, Defendants attributed Cognizant's financial results to a variety of legitimate "key" business factors and conditions.  Defendants also touted Cognizant's ability to achieve "organic growth" in its "core business" of IT and business process outsourcing by lowering client costs through the Company's supposedly legitimate operations in India.  Defendants also repeatedly attributed Cognizant's revenue growth from its "Rest of World customers" primarily to its supposedly legitimate Indian operations.  As explained below,

these statements were materially false and misleading when made because, unbeknownst to investors, Cognizant's performance, including its ability to deliver cost savings to its clients, was driven, in material part, by the Company's scheme to bribe Indian officials in order to secure SEZ permits for its Indian operations.

### 1.    February 27, 2015:  2014 Form 10-K

141.    In Cognizant's 2014 Form 10-K, filed February 27, 2015, and signed by, among others, D'Souza and McLoughlin, Defendants stated, "***In 2014, our revenue increased to $10,262.7 million compared to $8,843.2 million in 2013***."  Cognizant's 2014 Form 10-K further stated that the "***key drivers of our revenue growth in 2014***" were:  "***[s]olid performance across all of our business segments***"; "***[s]ustained strength in the North American market***"; "***[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets***"; "***[i]ncreased customer spending on discretionary projects***"; "***[e]xpansion of our service offerings, including Consulting, IT IS, and BPS services***"; "***[i]ncreased penetration at existing customers***"; and "***[c]ontinued expansion of the market for global delivery of IT services and BPS***."

142.    The above statements in Cognizant's 2014 Form 10-K were materially false and misleading when made.  It was misleading for Defendants to attribute Cognizant's revenue growth to legitimate business factors and conditions, including the "[e]xpansion of our service offerings" and "[c]ontinued expansion of the market for global delivery of IT services and BPS," when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

### 2.    May 4, 2015:  Press Release and Form 8-K

143.    On May 4, 2015, Cognizant issued a press release, also incorporated in the Form 8-K filed with the SEC on the same date, setting forth its financial results for Q1 2015.  The

press release quoted Defendant McLoughlin as attributing Cognizant's "strong" financial performance to the "organic growth of our core business": "*Our strong revenue performance this quarter versus our guidance was driven primarily by organic growth of our core businesses* and is a reflection that our strategy and offerings are resonating with our clients."

144.    The above statements made by Defendant McLoughlin in the May 4, 2015 press release and the Form 8-K were materially false and misleading when made.  It was misleading for Defendants to attribute Cognizant's "strong" financial performance to legitimate business factors and conditions, including the "organic growth" of the Company's "core business," when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

### 3.    May 4, 2015:  Q1 2015 Form 10-Q

145.    On May 4, 2015, the Company filed its Q1 2015 Form 10-Q with the SEC.  As noted above, that filing was signed by D'Souza and McLoughlin.  In the Form 10-Q, Cognizant stated, "*For the three months ended March 31, 2015, our revenue increased to $2,911.4 million compared to $2,422.3 million for the three months ended March 31, 2014*." Cognizant's 1Q 2015 Form 10-Q further stated that the "*key drivers of our revenue growth during the three months ended March 31, 2015*" were:  "*[o]ur November 2014 acquisition of TZ US Parent, Inc., or TriZetto*"; "*[s]olid performance across all of our business segments*"; "*[s]ustained strength in the North American market*"; "*[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets*"; "*[i]ncreased customer spending on discretionary projects*"; "*[e]xpansion of our service offerings, including consulting, infrastructure services, and business process services*"; "*[i]ncreased penetration at existing customers*"; and "*[c]ontinued expansion of the market for global delivery of IT services and business process services*."

146.    Cognizant's Q1 2015 Form 10-Q further reported that, "*[t]he revenue growth from our Rest of World customers in 2015 was primarily driven by the India*, Japan, Australia, Hong Kong, and Singapore markets and include[d] a negative currency impact of 5.8%."

147.    The above statements made in the Q1 2015 Form 10-Q were materially false and misleading when made.  It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and "penetration of the Rest of World . . . markets," when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.  It also was materially false and misleading for Defendants to attribute Cognizant's financial performance to revenue growth "from our Rest of World customers in 2015," including India, when the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

### 4.    May 4, 2015:  Q1 2015 Earnings Conference Call

148.    Also on May 4, 2015, Cognizant hosted its Q1 2015 earnings conference call, during which Defendant Coburn stated:  "Finally, we saw good traction in the rest of the world which was up 7.6% sequentially after a 2.8% negative currency impact.  *Growth was driven primarily by strength in key markets such as India and the Middle East*."

149.    Also during the call, Defendant D'Souza stated:  "*Our sequential growth was well ahead of our previous guidance and was driven by strong organic growth in our core business coupled with solid in-line performance in the TriZetto business*."

150.    The above statements made by Defendants Coburn and D'Souza during the Q1 2015 earnings conference call were materially false and misleading when made.  It was

misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including "strong organic growth in our core business coupled with solid in-line performance in the TriZetto business" and "strength in key markets such as India" when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

151.    The market readily believed Defendants.   Analysts repeated management's statements attributing Cognizant's "strength" to India.   For example, on May 4, 2015, UBS published a report stating:   "Cognizant provides a mix of application management and application development solutions **using an on-site/offshore business model centered on its India-based development centers**."[87]

152.    On May 4, 2015, William Blair and Company, L.L.C. published a report stating: "**Significant growth in the rest of the world geography was driven by India** and the Middle East."[88]

153.    Consistent with the positive statements made by Coburn and D'Souza regarding Cognizant's strong organic growth driven by strength in key markets such as India, Cognizant's stock price increased from an opening price of $58.65 per share on May 1, 2015, to a closing price of $62.78 per share on May 4, 2015, an increase of approximately 7%.

154.    In June 2015, analysts continued to discuss Cognizant's cost-cutting measures in India.   On June 10, 2015, Wells Fargo Securities published an analyst report stating:   "An article

---

[87] Steven Milunovich, CFA et al., *Global Research:   Impressive Start, Yet Multiple Remains Above the Comfort Zone* 2 (UBS Securities LLC May 4, 2015).

[88] Anil Doradla et al., *With TriZetto Synergies Ahead of Schedule, 2015 Guidance Could Prove Conservative* 2 (William Blair & Co., L.L.C. May 4, 2015).

in the India press (Economic Times) indicates that [Cognizant] is 'taking a series of steps to rein in costs and meet its operating margin target' according to their sources."[89]

155.    On June 30, 2015, Jefferies published an analyst report stating:

[Cognizant] seemed confident in maintaining operating margins in the target range.  Following an Indian news media article speculating that [Cognizant] is undertaking cost-cutting measures to maintain its operating margins, [Cognizant] management indicated that it remains confident in maintaining its adjusted operating margins in the 19-20% target range and is not undertaking any out of the ordinary cost rationalization measures.[90]

156.    On July 27, 2015, Deutsche Bank Markets Research published an analyst report stating:  "[Rest of world] was up . . . with **growth being driven primarily by strength in key markets such as India** and the Middle East."[91]

**5.    August 5, 2015:  Q2 2015 Earnings Conference Call**

157.    On August 5, 2015, Cognizant held its Q2 2015 earnings conference call with analysts and investors.  During the call, Defendant Coburn stated:  "Finally, we saw continued strong traction in the Rest of World, which was up 10.7% sequentially.  ***Growth was driven primarily by strength in markets such as India*** and Australia."

158.    The above statement made by Defendant Coburn during the Q2 2015 earnings call was materially false and misleading when made.  It was misleading for Coburn to attribute Cognizant's financial performance to legitimate business factors and conditions, including strength in markets such as India, when, in fact, the Company's financial performance was

---

[89] Ed Caso, CFA, *CTSH:  Article Says Moving to Control Expense Growth* 1 (Wells Fargo Securities LLC June 10, 2015).

[90] Jason Kupferberg, Equity Analyst, *Flash Note:  Jefferies NASDAQ 2015 Investor Conference Takeaways* 1 (Jefferies Group LLC June 30, 2015).

[91] Bryan Keane, Research Analyst et al., *Cognizant:  HNET Loss Creates Void; Trimming FY16 Estimates* 11 (Deutsche Bank AG July 27, 2015).

driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

159.    Analysts again reacted positively to Defendants' statements.  On August 5, 2015, Société Générale published a report noting that "Cognizant is picking up momentum in newer geographies like India and Australia where it had little presence even two years ago."[92]

160.    Also on August 5, 2015, SIG Susquehanna Financial Group, LLLP published an analyst report stating:  "Rest of the world also rose 10.7% sequentially, driven by strong demand in India and Australia."[93]

161.    Consistent with Defendants' statements regarding Cognizant's strong growth "driven primarily" by strength in key markets such as India, and analysts' positive reactions to those statements, Cognizant's stock price increased from an opening price of $63.06 per share on August 4, 2016, to a closing price of $67.34 per share on August 5, 2016, an increase of nearly 7%.

### 6.    August 6, 2015:  Q2 2015 Form 10-Q

162.    On August 6, 2015, Cognizant filed its Q2 2015 Form 10-Q with the SEC.  As noted above, that filing was signed by Defendants D'Souza and McLoughlin.  Cognizant's Q2 2015 Form 10-Q stated, "***For the three and six months ended June 30, 2015, our revenue increased to $3,085.1 million and $5,996.5 million compared to $2,517.1 million and $4,939.4 million for the three and six months ended June 30, 2014, respectively***."  Cognizant's Q2 2015 Form 10-Q further stated that the "***key drivers of our revenue growth during the three months ended June 30, 2015***" were:  "***[o]ur November 2014 acquisition of TZ US Parent, Inc.,***

---

[92] Mukul Garg, Equity Analyst et al., *Cognizant:  On Track to Deliver Another Good Year, Retain Buy* 1 (Société Générale Group Aug. 5, 2015).

[93] James E. Friedman, *Cognizant:  Good Results Despite HNT Merger* 1 (Susquehanna Financial Group, LLLP Aug. 5, 2015).

or TriZetto"; "[s]olid performance across all of our business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including consulting, infrastructure services, and business process services"; "[i]ncreased penetration at existing customers"; and "[c]ontinued expansion of the market for global delivery of IT and business process services."

163.    The Company in its Q2 2015 Form 10-Q further reported:  "*Revenue grew 30.0% from our Rest of World customers in the second quarter of 2015 . . . and was primarily driven by the India* and Australia markets."  Cognizant further noted:  "*The revenue growth from our Rest of World customers in the first half of 2015 grew 27.0% . . . and was primarily driven by the India*, Australia and Japan markets."

164.    The above statements made in the Q2 2015 Form 10-Q were materially false and misleading when made.  It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and revenue growth from "Rest of World customers," such as India, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

165.    On October 15, 2015, Cantor Fitzgerald published an analyst report stating: "[Cognizant] continued to expand in other key regional markets, including India, Singapore, Australia, Japan and Hong Kong, with revenues increasing 23.6% over the prior year."[94]

---

[94] Joseph Foresi, *Initiating with a BUY; Expecting Solid Performance to Continue* 7 (Cantor Fitzgerald Oct. 15, 2015).

7.   **November 4, 2015:  Q3 2015 Earnings Conference Call**

166.   On November 4, 2015, Cognizant held its 2015 third quarter earnings call with analysts and investors.   During this call, Defendants Coburn and D'Souza responded to an analyst's question about pressure on revenue growth in its "traditional" IT and business operations outsource business based in India.   Defendants responded by stating that Cognizant continued to "take market share on the maintenance side" by "lowering cost" to help customers "become more efficient":

> [**Analyst**]:  The question really is, **what sort of pressure are you seeing on revenue growth on the traditional side?** . . . And how does it change your notion of revenue visibility and impact on margins?
>
> [**Coburn**]:  . . . I think you're right that **clients are trying to fund spending on innovation and on digital by optimizing the cost on run the business, which a lot of that is the traditional outsourcing**.  And you've seen that in our numbers now for many quarters, where our technology and consulting business is growing faster than the outsourcing business.
>
> But let's be clear.  *We continue to do very well and take market share on the maintenance side.  What customers are looking for is they're interested in how can we become more efficient, lower their cost of ownership on maintenance, so they can free up those dollars to move elsewhere.  And we – Cognizant just has this incredible track record of delivering very high quality services, while continuously delivering productivity and efficiency*.
>
> *So I think we're probably better positioned than most others in the market in terms of lowering cost of ownership on maintenance* . . . .
>
> . . . .
>
> . . . [**D'Souza**]:  . . . *I would say that the bulk of the productivity that we drive in the core business is through traditional means of driving productivity and efficiency that includes process kinds of things like Lean and Six Sigma and so on, and also more traditional tools in automation*.

167.   Also, during this call, Coburn stated, "*We're going to continue with the strategy that we've been executing successfully on, which is making long-term organic investments is the key – the core of our business*."

168.     The above statements made by Defendants Coburn and D'Souza during the Q3 2015 earnings conference call were materially false and misleading when made. Specifically, it was materially false and misleading for D'Souza to attribute the Company's success in its "core business" to legitimate business factors and conditions, such as lowering cost through "traditional means of driving productivity and efficiency," when, in fact, Cognizant's efforts to lower costs were accomplished in part by bribes paid to Indian government officials in exchange for SEZ licenses.

169.     Similarly, it was materially false and misleading for Coburn to state that the Company's "core" "strategy that we've been executing successfully on" was "making long-term organic investments," when in fact, Cognizant's strategy and financial performance were driven in part by bribes paid to Indian government officials in exchange for SEZ licenses for the Company's facilities in India.  It also was materially false and misleading for Coburn to state that the Company's ability to "take market share" was driven by legitimate factors, such as its ability to lower "cost of ownership" and the Company's "incredible track record of delivering very high quality services, while continuously delivering productivity and efficiency," when Cognizant's performance was driven, in part, by bribes paid to Indian government officials in exchange for SEZ licenses.

### 8.     November 5, 2015:  Q3 2015 Form 10-Q

170.     On November 5, 2015, the Company filed a Form 10-Q with the SEC.  As noted above, that filing was signed by Defendants D'Souza and McLoughlin.  Cognizant's Q3 2015 Form 10-Q stated, "*For the three and nine months ended September 30, 2015, our revenue increased to $3,187.0 million and $9,183.5 million compared to $2,581.0 million and $7,520.5 million for the three and nine months ended September 30, 2014, respectively*." Cognizant's Q3 2015 Form 10-Q further stated that the "*key drivers of our revenue growth*

*during the three months ended September 30, 2015*" were: "*[o]ur November 2014 acquisition of TZ US Parent, Inc., or TriZetto*"; "*[s]olid performance across all of our business segments*"; "*[s]ustained strength in the North American market*"; "*[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets*"; "*[i]ncreased customer spending on discretionary projects*"; "*[e]xpansion of our service offerings, including consulting, infrastructure services, and business process service*"; "*[i]ncreased penetration at existing customers*"; and "*[c]ontinued expansion of the market for global delivery of IT and business process services*."

171.    Cognizant's Q3 2015 Form 10-Q further reported: "***Revenue grew 31.0% from our Rest of World customers in the third quarter of 2015 . . . and was primarily driven by the India***, Singapore and Australia markets."

172.    The above statements made in the Q3 2015 Form 10-Q were materially false and misleading when made.  It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and penetration of the Rest of World markets, such as India, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

### 9.    February 8, 2016:  Q4 2015 Earnings Conference Call

173.    On February 8, 2016, Cognizant held its 2015 fourth quarter earnings call with analysts and investors.  During this call, Coburn stated:

> Finally, we saw continued strong traction in the rest of the world, which was up by 6.8% sequentially and 34% year over year.  ***Growth was driven primarily by strengths in key markets such as India, Singapore and the Middle East where we're seeing good traction with clients' adoption of digital technologies***.

174.    The above statement made by Defendant Coburn during the Q4 2015 earnings conference call was materially false and misleading when made.  It was misleading for Coburn to attribute Cognizant's financial performance to legitimate business factors and conditions, including strength in "key markets such as India" where it had seen "good traction with clients' adoption of digital technologies," when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

175.    Following the Q4 2015 earnings call, numerous analysts cited Coburn's statement emphasizing growth driven by the Indian market.  For example, on February 8, 2016, Evercore ISI published a report stating:   "[Cognizant] generated revenue growth of 19% for North America, while Rest of World revenue advanced 34% led by India, Singapore and the Middle East given strong demand for digital technologies."[95]

176.    Also on February 8, 2016, Barclays published a report stating:   "**Rest of World**: RoW grew 6.8% Q/Q and 34% Y/Y.  Growth was primarily driven by strengthen in key markets including India, Singapore, and the Middle East."[96]

177.    Nomura published a report on February 8, 2016, stating:   "Growth in the ROW was driven by strength in markets such as India, Singapore, and the Middle East."[97]

178.    That same day, Oppenheimer published an analyst report stating:   "Rest of World (~6% of revenue) led all geographic segments with strong 6.8% Q/Q growth to ~$179M, driven by strength in India, Singapore, and the Middle East."[98]

---

[95] David Togut, CFA et al., *Cognizant:  Attractive Entry Point Given Soft Outlook* 1 (Evercore ISI Feb. 8, 2016).

[96] Darrin D. Peller et al., *Wide Range Underscores Macro Uncertainties; Continue to See Strong Growth as Underappreciated* 4 (Barclays Capital Inc. Feb. 8, 2016).

[97] Ashwin Mehta et al., *Cognizant:  Guidance Disappoints* 4 (Nomura Int'l Feb. 8, 2016).

### 10.   February 25, 2016:  2015 Form 10-K

179.   On February 25, 2016, the Company filed a Form 10-K with the SEC that was signed by Defendants D'Souza and McLoughlin, among others.   In that filing, Cognizant reported revenue of ***$12,416 million***, an increase over the previous year's revenue of $10,262.7 million.   Cognizant's 2015 Form 10-K further stated that the "***key drivers of our revenue growth***" during the three months ended March 31, 2015 were:   "***[o]ur November 2014 acquisition of TZ US Parent Inc., or TriZetto***"; "***[s]olid performance across all of our business segments***"; "***[s]ustained strength in the North American market***"; "***[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets***"; "***[i]ncreased customer spending on discretionary projects***"; "***[e]xpansion of our service offerings, including consulting, infrastructure services, and business process services***"; "***[i]ncreased penetration at existing customers***"; and "***[c]ontinued expansion of the market for global delivery of IT and business process services***."

180.   Cognizant's 2015 Form 10-K further reported, "In 2015, revenue from our Rest of World customers grew 29.9%, after a negative currency impact of 9.2%.  In 2014, revenue from our Rest of World customers grew 23.6%.  In 2015 and 2014, ***growth was primarily driven by the India***, Singapore, Australia, Japan and Hong Kong markets."

181.   The above statements made in the 2015 Form 10-K were materially false and misleading when made.   It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and "revenue from our Rest of World" customers and growth in the Indian

---

[98] Glenn Greene, CFA et al., *Modest FY16 Guide Reflects Cautious FSI/Healthcare Outlook* 3 (Oppenheimer & Co. Inc. Feb. 8, 2016).

market, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

### 11.    May 6, 2016:  Q1 2016 Form 10-Q

182.    On May 6, 2016, Cognizant filed a Form 10-Q with the SEC.  As noted above, that filing was signed by Defendants D'Souza and McLoughlin.  The Form 10-Q reported revenue for the three months ended March 31, 2016 of *$3,202 million*, an increase over first quarter 2015 revenue of $2,911.4 million.  Cognizant's Q1 2016 Form 10-Q further stated that the "*key drivers of our revenue growth during the three months ended March 31, 2016*" were: "*[s]olid performance across our Financial Services, Manufacturing/Retail/Logistics and Other business segments*"; "*[s]ustained strength in the North American market*"; "*[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets*"; "*[i]ncreased customer spending on discretionary projects*"; "*[e]xpansion of our service offerings, including consulting and digital services*"; "*[c]ontinued expansion of the market for global delivery of IT and business process services*"; and "*[i]ncreased penetration at existing customers*."

183.    Cognizant's Q1 2016 Form 10-Q further reported that "[r]evenue from our Rest of World customers increased 24.9% . . . as compared to the quarter ended March 31, 2015." Cognizant further reported:  "*Revenue from our Rest of World customers grew 24.9% . . . in the first quarter of 2016, and was primarily driven by the India*, Singapore and Australia markets."

184.    The above statements made in the Q1 2016 Form 10-Q were materially false and misleading when made.  It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and penetration of the Rest of World market, and India specifically, when, in

fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

### 12.    May 6, 2016:  Q1 2016 Earnings Conference Call

185.    Also on May 6, 2016, Cognizant held its Q1 2016 earnings call with analysts and investors.  During this call, D'Souza described the Company's "strategic initiative" to "achieve new levels of efficiency" for "clients" in their "core transaction processing operations":

> *The second strategic initiative is to help clients achieve new levels of efficiency and effectiveness in their core transaction processing operations by building platform-based solutions and industry utilities. . . . By applying a series of levers including process optimization, digitization and large-scale efficiencies, we're able to bring clients levels of effectiveness which they would have been unable to reach on their own*.

186.    During this call, Coburn also attributed the Company's strong retail and manufacturing results to "growing" client relationships and Cognizant's ability to "leverage" its technical expertise in "retail, manufacturing and logistics."  Coburn added:  "[T]he rest of the world was up 30 basis points sequentially, and almost 25% year-over-year.  *Growth was driven primarily by strength in key markets such as India*, Australia and the Middle East where we're seeing good traction with client's adoption of digital technologies."

187.    The above statements made by Defendants D'Souza and Coburn during the Q1 2016 earnings call were materially false and misleading when made.  It was misleading for D'Souza to attribute Cognizant's ability to deliver lower cost IT services to clients to wholly legitimate business factors and conditions, such as "applying a series of levers including process optimization, digitization and large-scale efficiencies," when, in fact, Cognizant's ability to deliver cost savings to its clients was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

188.    Likewise, it was misleading for Coburn to attribute Cognizant's financial performance to legitimate business factors and conditions, including "growing" client relationships and Cognizant's ability to "leverage" its technical expertise in "retail, manufacturing and logistics," and growth in the Indian market, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

189.    The market accepted Defendants' statements.  On May 6, 2016, an S&P Capital analyst report stated:  "We think cost-cutting initiatives will be a source of strength for the India-based outsourcing companies in the group."[99]

190.    Also on May 6, 2016, Oppenheimer published an analyst report stating:  "Rest of World revenue (~6% of total revenue) grew a lackluster 0.3% Q/Q to ~$179M, driven by India, Australia, and the Middle East."[100]

191.    That same day, William Blair stated in its analyst report:  "From a geographic point of view, significant growth in the rest of the world was driven by India, Australia, and the Middle East, with management citing especially good traction and opportunity within digital."[101]

192.    Similarly, Barclays published an analyst report on May 9, 2016 stating:  "**Rest of World:  RoW grew 0.3% Q/Q and almost 25% Y/Y.  Growth was primarily driven by**

---

[99] S&P Capital IQ, *Cognizant Technology Solutions Corp.* 3 (Standard & Poor's Financial Services LLC May 6, 2016).

[100] Glenn Greene, CFA et al., *1Q Healthcare/FSI Weakness Puts CTSH in Early FY16 Hole* 4 (Oppenheimer & Co. Inc. May 6, 2016).

[101] Anil Doradla et al., *Events Uneventful – Macro Weakness Affects Banking Segment; Pipeline Commentary Positive* 2 (William Blair & Co., L.L.C. May 6, 2016).

**strength in key markets including India**, Australia, and the Middle East due to adoption of digital technologies."[102]

193.    Consistent with Defendants' statements regarding Cognizant's strong growth "driven primarily" by strength in key markets such as India, and analysts' positive reactions to those statements, Cognizant's stock price increased from an opening price of $57.50 per share on May 5, 2016, to a closing price of $60.55 per share on May 6, 2016, an increase of approximately 5%.

> ### 13.    May 24, 2016:  J.P. Morgan Technology, Media and Telecom Conference

194.    On May 24, 2016, Defendant Coburn attended the J.P. Morgan Technology, Media and Telecom Conference, at which he spoke to analysts and investors.  During the conference, Coburn noted that Cognizant had seen "intense pressure" from its customers "to squeeze costs" and "to reduce cost of ownership."  In this context, Coburn touted Cognizant's ability to respond to the customer demand by "***bring[ing] best practices to our clients for our traditional services, constantly lower[ing] their cost of ownership while maintaining our margin.  So that's one piece of work.  We're very good at that***."

195.    The above statements made by Defendant Coburn during the J.P. Morgan Technology, Media and Telecom Conference were materially false and misleading when made. It was misleading for Coburn to tout Cognizant's ability to "constantly lower [clients'] cost of ownership while maintaining [the Company's] margin," when Cognizant's ability to deliver cost savings to its clients while maintaining its margin was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

---

[102] Darrin D. Peller et al., *In-Line 1Q; Set-Up for 2H Accelaration* 4 (Barclays Capital Inc. May 9, 2016).

### 14.  August 5, 2016:  Q2 2016 Form 10-Q

196.  On August 5, 2016, Cognizant filed a Form 10-Q with the SEC.  As noted above, this public filing was signed by D'Souza and McLoughlin.  The Form 10-Q reported revenue for the three months ended June 30, 2016, of *$3,369.9 million*, an increase over second quarter 2015 revenue of $3,085.1 million.  Cognizant's Q2 2016 Form 10-Q further stated that the "*key drivers of our revenue growth during the three months ended June 30, 2016*" were:  "*[s]olid performance in our Manufacturing/Retail/Logistics and Other business segments*"; "*[s]ustained strength in the North American market*"; "*[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets*"; "*[i]ncreased customer spending on discretionary projects*"; "*[e]xpansion of our service offerings, including consulting and digital services*"; "*[c]ontinued expansion of the market for global delivery of IT and business process services*"; and "*[i]ncreased penetration at existing customers*."

197.  Cognizant's Q2 2016 Form 10-Q further reported:  "*Revenue from our Rest of World customers grew 25.0% . . . in the second quarter of 2016, and was primarily driven by the India*, Singapore and Australia markets."

198.  The above statements made in the Q2 2016 Form 10-Q were materially false and misleading when made.  It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and penetration of the Rest of World market, and India specifically, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

### 15.     August 5, 2016:  Q2 2016 Earnings Conference Call

199.    On August 5, 2016, Cognizant held its Q2 2016 earnings conference call with analysts and investors.  Defendant Coburn again emphasized Cognizant's ability to deliver cost savings to clients and attributed that ability to wholly legitimate elements of the Company's business model:

> *[T]he drive for getting continued efficiencies from existing IT infrastructure to be able to fund innovation projects remains absolutely essential to almost every client. . . . Our strong vertical presence and investments in building sharply focused industry-specific platforms allow clients to obtain these efficiencies by shifting from buying a service to buying an outcome.  These trends will continue to open opportunities for us over the coming years.*

200.    During the same call, McLoughlin attributed the Company's financial success "***to a slightly lower tax rate and stronger operating margins***."

201.    The above statements, made by Coburn and McLoughlin during the Q2 2016 earnings conference call, were materially false and misleading when made.  It was misleading for Coburn to attribute Cognizant's ability to deliver costs savings to clients to wholly legitimate business factors and conditions, including the Company's "strong vertical presence and investments in building sharply focused industry-specific platforms," when, in fact, the Company's ability to deliver cost savings to its clients was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

202.    Similarly, it was misleading for McLoughlin to attribute Cognizant's financial performance to legitimate business factors and conditions, including "a slightly lower tax rate and stronger operating margins," when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

203.    Analysts reacted favorably to these statements.  On August 5, 2016, Evercore ISI published an analyst report stating:  "Meanwhile Rest of World revenue advanced 25% led by Singapore, India, and Australia."[103]

204.    Also on August 5, 2016, Religāre published a report stating:    "Overall, [Cognizant]'s earnings have grown faster than Indian IT."[104]

205.    On that same day, William Blair published a report stating:  "**Revenue**:  From a geographic point of view, significant growth in the rest of the world was driven by Singapore, India, and Australia, while North America grew 8.3% year-over-year, and Europe grew 8.9% year-over-year."[105]

206.    Consistent with Defendants' statements regarding Cognizant's strong growth "driven primarily" by strength in key markets such as India, and analysts' positive reactions thereto, Cognizant's stock price increased from an opening price of $58.22 per share on August 4, 2016, to a closing price of $59.71 per share on August 5, 2016, an increase of approximately 2.5%.

### 16.    September 6, 2016:  Citi Global Technology Conference

207.    On September 6, 2016, Defendant Coburn attended the Citi Global Technology Conference with analysts and investors.  During the conference, Coburn stated:

> In the core business, it is becoming more difficult in the clients' eyes to differentiate yourself.  When I say core business, traditional, application, maintenance.  There, it is fairly easy though to have a conversation with a client if you don't care about the rate card, you care about the cost of ownership.  So let's

---

[103] David Togut, CFA et al., *Outlook Softens but CTSH Inexpensive* 1 (Evercore ISI Aug. 5, 2016).

[104] Rumit Dugar et al., *Cognizant:  Weak Guidance; Gloomy Outlook for Indian IT* 1 (Religāre Capital Markets Ltd. Aug. 5, 2016).

[105] Anil Doradla et al., *Growth Under Pressure; Repatriated Cash Creates Flexibility in Capital Allocation* 2 (William Blair & Co., L.L.C. Aug. 5, 2016).

move away from time and materials pricing to output-based pricing.  *I will reduce your cost of ownership, because I'm going to bring in automation,  I'm going to bring in various tools of productivity, go more offshore whatever, pull the different levers, clients are very open to that discussion*.

*And we've been very successful at, while maintaining our margins, being able to achieve the cost of ownership that the clients want*.

208.    The above statements made by Defendant Coburn during the Citi Global Technology Conference were materially false and misleading when made.  It was misleading for Coburn to tout Cognizant's ability to "reduce your cost of ownership" through "various tools of productivity," such as "automation" and "offshore" operations, when, in fact, the Company's ability to deliver cost savings to its clients, while maintaining margins, was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.  It also was misleading for Coburn to tout Cognizant's "success[]" at cutting clients' IT costs "while maintaining our margins" for the same reason.

### D.    Cognizant Overstated Earnings by Capitalizing Bribes that Should Have Been Expensed

209.    At each reporting period during the Class Period, Cognizant overstated its earnings in its publicly filed financial statements by incorrectly booking the bribery payments it made as capital expenditures when, in fact, those payments should have been booked as expenses and charged dollar-for-dollar against the Company's earnings.  Specifically, the Company has stated that at least $4.1 million in corrupt payments were incorrectly capitalized, i.e., shown as increased assets on the balance sheet.  In truth, as Cognizant has admitted, those payments should have been expensed, i.e., shown as increased expenses on the earnings/profit-and-loss statement.  Of this $4.1 million of capitalized expenses, $1 million was expensed as depreciation and amortization.  Consequently, Cognizant has admitted that, at each quarter during the Class

Period, Defendants overstated Cognizant's earnings and investment in physical assets by at least $3.1 million and understated its expenses by the same amount.

### E. SOX Certifications Executed Throughout the Class Period

210. In connection with each quarterly and annual report Cognizant filed with the SEC during the Class Period, Defendants D'Souza and McLoughlin signed SOX certifications. Pursuant to Section 302 of SOX, and also covered by Sections 304 and 906 of SOX, D'Souza and McLoughlin certified that they had designed and evaluated effective internal and disclosure controls over financial reporting, which assured the reliability of financial reporting, and also that the financial statements fairly and accurately presented the financial condition of the Company. For example, in connection with the Company's Form 10-K filed on February 25, 2016, Defendants D'Souza and McLoughlin certified as follows:

1. I have reviewed this Annual Report on Form 10-K of Cognizant Technology Solutions Corporation;

2. ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known

to us by others within those entities, particularly during the period in which this report is being prepared;

b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   ***The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function)***:

a)   ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

b)   ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.[106]

211.   The SOX certifications signed by D'Souza and McLoughlin during the Class Period were materially false and misleading when made because, as the Company has admitted, Cognizant "did not maintain an effective control environment" as of December 31, 2015.

---

[106] In the other quarterly and annual reports Cognizant filed with the SEC during the Class Period, Defendants D'Souza and McLoughlin executed false SOX certifications, in substantially identical forms as those attached to the 2015 Form 10-K.

Indeed, the Company has admitted that material weaknesses existed in its internal controls, including its "tone at the top," as senior management participated in making corrupt payments by overriding and/or failing to enforce the Company's internal financial controls.

212.    Additionally, the statements described above, ¶ 210, were false and misleading when made because, contrary to the representation that the Company's SEC filings did "not contain any untrue statement of a material fact" or any material omission, the SEC filings to which these certifications were appended contained numerous materially false and misleading statements and omissions, as set forth elsewhere herein.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

213.    Numerous allegations, as set forth above and summarized below, give rise to the strong inference that Defendants knowingly or at least recklessly misled investors by making the materially false and misleading statements described herein.

214.    *First*, the Company has admitted that the misconduct was executed at the highest levels of Cognizant.[107]   As noted above, the Company admitted in its third quarter 2016 Form 10-Q that multiple members of its "***senior management*** may have participated in or failed to take action to prevent the making of potentially improper payments by either ***overriding or failing to enforce*** the controls established by the Company relating to real estate and procurement principally in connection with permits for certain facilities in India."   ¶ 84. Moreover, the Company placed the blame for the bribery scheme squarely on the shoulders of senior management who were "no longer with the Company or in a senior management position," ¶ 92, the most prominent of whom was Coburn, Cognizant's President and former

---

[107] Under applicable law, the cumulative knowledge of Cognizant's senior management team, including the Individual Defendants, is imputed to the Company and supports a finding of corporate scienter.

CFO.  In short, Cognizant's own senior management perpetrated the scheme, a fact which more than adequately demonstrates Cognizant's scienter, and demonstrates that the Individual Defendants acted with either knowledge or, at minimum, severe recklenssess.

215.   *Second*, numerous allegations set forth above give rise to a particularly strong inference that Coburn knew and was actively involved in the bribes Cognizant paid government officials to secure SEZ licenses.  As noted above, Coburn suddenly and unexpectedly resigned in the midst of the Board's investigation into the bribery scheme, shortly before the Company attributed responsibility for the bribery scheme to senior executives who were "no longer with" Cognizant.  There were no signs that Coburn's departure was planned or that he was slowly stepping away from the business to make room for a successor.  To the contrary, at the time Coburn left he was, as shocked analysts noted, still "a leading face of CTSH to the investment community," ¶ 76, and had been actively attending and participating in investor conferences.  Moreover, former Cognizant employees reported that Coburn personally oversaw, and was deeply involved in, Cognizant's Indian real estate transactions.  ¶ 74.  Coburn's oversight over the procurement process for Indian real estate licensing and permitting yields a particularly strong inference of scienter because, as Cognizant's former CFO, he would have been intimately familiar with the Company's controls over financial reporting relating to that process and the appropriate journal entry procedure for booking relating expenditures and payments – and therefore understood how to best override those controls, as the Company has acknowledged occurred.

216.   *Third*, Cognizant's characterizations of the bribery scheme in its admissions to date make clear the misconduct at issue here was intentional.  As noted above, Cognizant has acknowledged that its senior management participated in the bribery scheme by, among other

things, "*overriding* or ***failing to enforce*** the controls established by the Company relating to real estate and procurement principally in connection with permits for certain facilities in India." ¶ 84.   In other words, Cognizant admitted that, in order to facilitate the corrupt payments, members of its senior management team either actively countermanded the very controls that Defendants assured investors the Company adhered to, or knowingly permitted those controls to be breached – acts that are, by definition, intentional.   Moreover, senior management took affirmative steps to conceal evidence of the bribery scheme by improperly booking the corrupt payments as capital expenditures.   Accordingly, Cognizant's admission that senior management consciously participated in or facilitated the corrupt payments to Indian officials, coupled with the fact that they then took specific steps to cover up those payments, provides a strong inference of scienter.

217.   *Fourth*, as discussed above, the evidence within the Company that Cognizant was making improper payments to Indian government officials in exchange for SEZ licensing was manifest and obvious, and was, in fact, reported to senior Cognizant executives.   ¶ 73.   The misconduct here was not complex, novel, or arcane.   Instead, as discussed above, auditors, including Former Employee 1, uncovered paid invoices that explicitly sought reimbursement for payments made to a private entity for SEZ licenses.   Moreover, Former Employee 1 readily discovered that the entity to which the payments were made was government-related.   Additional evidence of impropriety abounded.   Transactions were misclassified and inaccurately characterized in journal entries; among other things, payments for licenses were characterized as "lease payments."   As discussed above, these payments also were inexplicably booked as capital expenditures, rather than expensed.   Additionally, it was evident that internal controls had been circumvented with respect to these corrupt payments:  in contravention of Company policy, the

transactions had neither been flagged as payments to government officials, nor cleared with Cognizant's legal department.   The fact that Former Employee 1 and his/her team readily uncovered evidence of these transactions further demonstrates that the existence of these improper payments would have been easy to discover.   Moreover, as discussed above, Former Employee 1 directly reported the improper payments, along with control deficiencies that allowed them to occur, to Verghese.  *Id.*   Former Employee 1 was included on emails in which Verghese reported the existence of these payments and control deficiencies to one of Cognizant's most senior executives, Pederson, who is responsible for the Company's anticorruption compliance.  *Id.*   Former Employee 1 also stated that summary audit findings, at a minimum, would have been distributed to the Audit Committee of Cognizant's Board of Directors, which had approved the plan to conduct the FCPA audit, as well as to D'Souza and McLoughlin.   In addition, as noted above, multiple members of senior management were involved in the bribes. In short, the evidence of wrongdoing was readily available to anyone who cared to look.

218.   *Fifth*, the duration of the misconduct also supports an inference of scienter.   As alleged above, Cognizant has admitted that it actively bribed Indian officials from at least 2010 to 2015 – a period of six years – to obtain permitting related to its Indian operations.   During this time, Cognizant's "senior management" "overrode" internal control on numerous occasions or allowed them to be breached, in order to facilitate the bribery scheme.   That this bribery scheme lasted for such a significant period of time demonstrates that the fraud alleged herein was not a temporary lapse in otherwise rigorous management oversight, but rather a sustained course of misconduct facilitated by senior executives – which further demonstrates scienter.

219.   *Sixth*, the importance of SEZ licensing to Cognizant's business further supports an inference of scienter.   As discussed above, SEZ licensing was fundamental to Cognizant's

business model, which leveraged the low cost of its Indian operations in order to provide IT Services to clients at highly competitive prices.  The tax benefits alone that Cognizant derived from its SEZ licenses increased the Company's profitability substantially.  For instance, for 2015, the tax savings flowing from Cognizant's SEZ licensing increased the Company's net income by $201.4 million (more than 14%) and increased diluted EPS by $0.33 per share (more than 12%).  Apart from lowering the Company's tax burden, SEZ licensing also increased the Company's profitability by lowering transaction, labor, and regulatory costs.  The importance of SEZ licensing to the Company supports an inference that the Individual Defendants knew of or, at minimum, recklessly disregarded any corrupt payments related to this critical area, and bolsters the numerous former employee reports that Coburn was "involved directly" in this area and took "a special interest" in it.  Moreover, the size of these benefits enhances the inference that when the Indian government publicly disclosed plans to phase out SEZ-related tax benefits for new developments, Cognizant's senior management were focused on the Company's efforts to quickly amass SEZ licensing in an effort to forestall significant damage to Cognizant's bottom line.

220.    *Seventh*, the Company's senior management was well aware that bribery was particularly prevalent in India and that violations of the FCPA posed material risks to the Company, and designed Cognizant's Code of Conduct and Anticorruption Policy with these risks specifically in mind.  As discussed above, Cognizant repeatedly acknowledged during the Class Period that failure to comply with applicable anticorruption laws could have serious negative consequences for the Company.  Moreover, the lion's share of the Company's operations were located in India, a country that corruption watchdogs ranked as "one of the most corrupt countries in the world" during the Class Period.  Coburn, himself, explained that "India . . . is a

very critical and important market for us."[108]  Accordingly, given the importance of India to the Company's success and its bottom line, senior management's keen awareness of FCPA-related risks pertaining to the Company's Indian operations, and the availability of clear, cogent, and uncomplicated evidence that such violations were actually occurring during the Class Period, Defendants' statements were severely reckless, at the very minimum.

221.    In addition to the foregoing, other indices of scienter are:

a.    Defendants made repeated and specific statements during the Class Period to the investing public regarding the significance of India to Cognizant's operations, noting, in particular (and among other things), that its presence in India was "a crucial piece" of the Company's "global business strategy."  *See, e.g.*, ¶¶ 29, 146, 148, 157, 163, 171, 180, 183. Moreover, in addition to the Company's specific Class Period statements emphasizing its rigorous internal control system with regard to anti-corruption laws, *see, e.g.*, ¶¶ 52, 123-24, 134, 136, D'Souza emphasized *pre*-Class Period the quality of the Company's compliance mechanisms in his direct discussions with securities analysts.  For example, during an earnings conference call conducted by the Company in February 2009, D'Souza explained that "customers are looking for partners that demonstrate strong corporate governance controls.  At Cognizant, transparency is essential to our business and every member of the Cognizant team is committed to the highest levels of ethics and integrity."[109]  He added that the Company had the "utmost confidence that we have the systems and controls in place to continue to meet the criteria [imposed by SOX]," further explaining that Cognizant provided "**the best in client**

---

[108] Venkatesha Babu, *Gordon J. Coburn:  Our Strategy Is to Maximize Revenue Growth*, Live Mint (Aug. 25, 2010, 11:32 PM IST), http://www.livemint.com/Companies/HyIeM692lDn ByONSHr6MTM/Gordon-J-Coburn--Our-strategy-is-to-maximize-revenue-growt.html.

[109] Tr. of Q4 2008 Earnings Call (Seeking Alpha Feb. 13, 2009), https://seekingalpha.com/ article/120552-cognizant-technology-solutions-q4-2008-earnings-call-transcript.

**management and corporate governance**."[110]   The specific pronouncements referenced above, regarding India's significance to the Company, and the state of Cognizant's compliance mechanisms, provide strong circumstantial evidence that the Defendants were receiving specific information about such matters.  Alternatively, if the Defendants were not knowledgeable about the matters in which they purported to speak in detail, such recklessness would readily satisfy the scienter requirement.

b.    The SOX Certifications executed by Defendants D'Souza and McLoughlin, ¶ 210, are a particularly strong indicator of scienter because the malfeasance at issue directly implicates the adequacy of the Company's internal control systems.   On November 14, 2012, the DOJ and the SEC released their *Resource Guide*, which explained, "[a]n effective [FCPA] compliance program is a critical component of an issuer's internal controls."[111] As detailed herein, during the Class Period, Cognizant's internal controls were woefully inadequate and, in many respects, virtually non-existent.  Indeed, the Company has now admitted that it "did not maintain an effective control environment" during the Class Period.

222.    When reviewed collectively, as required by applicable law, Lead Plaintiffs' allegations support a strong inference of fraudulent intent on the part of the Defendants or, at the very least, the strong inference that Defendants' conduct was severely reckless.  In either case, scienter has been adequately pled.

## VII.    LOSS CAUSATION

223.    Lead Plaintiffs incorporate by reference the allegations set forth above.  During the Class Period, Defendants publicly disseminated materially false and misleading statements and omitted material facts concerning the Company's operations and its true financial condition.

---

[110] *Id.*

[111] *Resource Guide*, *supra* note 52, at 40.

224.     The conduct alleged herein and the materially false and misleading statements and omissions made during the Class Period concealed the Company's involvement in the bribery scheme described above, and caused Cognizant's common stock to trade at artificially inflated prices, closing as high as $69.76 per share during the Class Period, thereby operating as a fraud on investors in the Company's common stock.

225.     When the truth was disclosed on September 30, 2016, Cognizant's stock price declined significantly as the artificial inflation was removed from the stock price.

226.     On September 30, 2016, Cognizant filed a Form 8-K with the SEC revealing that Defendant Coburn had abruptly resigned from his position as Cognizant's President on September 27, 2016.  Cognizant also disclosed in this Form 8-K that the Company had initiated an internal investigation regarding occurrences of bribery related to its business operations in India:

> The Company is conducting an internal investigation into whether certain payments relating to facilities in India were made improperly and in possible violation of the U.S. Foreign Corrupt Practices Act and other applicable laws. The investigation is being conducted under the oversight of the Audit Committee, with the assistance of outside counsel, and is currently focused on a small number of Company-owned facilities.  The Company has voluntarily notified the United States Department of Justice (the "DOJ") and United States Securities and Exchange Commission (the "SEC") and is cooperating fully with both agencies. The internal investigation is in its early stages, and the Company is not able to predict what, if any, action may be taken by the DOJ, SEC or any governmental authority in connection with the investigation or the effect of the matter on the Company's results of operations, cash flows or financial position.[112]

227.     On this news, the price of the Company's common stock declined $7.29 per share, or more than 13%, from a close of $55.00 per share on September 29, 2016, to close at $47.71 per share on September 30, 2016.  A total of 53,397,250 shares of Cognizant common stock were traded on September 30, 2016, a 987% increase in volume from the 4,911,900 shares traded on

---

[112] 2016 Form 8-K, *supra* note 56, at Item 8.01.

the immediately preceding trading date (September 29, 2016).  This was substantially greater than the 3,956,594 share average daily trading volume of Cognizant shares during the Class Period.



228.   While Cognizant's share price declined by approximately 13.25% on September 30, 2016, the IT Consulting & Other Services Index fell by only $1.98, from $150.12 on September 29, 2016, to $148.14 on September 30, 2016, a decline of 1.31%, demonstrating that the fall in the Company's share price was a direct result of the fraud rather than other factors:[113]



229.   In the Company's most recent Form 10-K filed on March 1, 2017, Cognizant listed the following companies as being in its "Peer Group Index":  Accenture plc., Computer Sciences Corporation, Computer Task Group, Inc., ExlService Holdings Inc., Genpact Limited, Infosys Ltd., Syntel Inc., Wipro Ltd., and WNS (Holdings) Limited.  Those companies' share prices changed as follows between September 29 and September 30, 2016, once again showing

_____

[113] This chart shows the value on September 30, 2016, of $100 invested in Cognizant common stock at its closing price on September 27, 2016, as compared to $100 invested in the S&P 500 IT Consulting & Services Index, a basket of S&P 500 companies in the IT consulting and services industry that includes Cognizant.

that the decline in Cognizant's share price was due to the revelation of Defendants' fraud rather than other, non-fraud-related factors:

| Company | Sept. 29, 2016 Closing Price | Sept. 30, 2016 Closing Price | Percentage Change |
|---|---|---|---|
| **Cognizant** | **$55.00** | **$47.71** | **(13.25%)** |
| Accenture plc | $121.64 | $122.17 | 0.44% |
| Computer Sciences Corporation | $52.25 | $52.21 | (0.08%) |
| Computer Task Group, Inc. | $4.68 | $4.70 | 0.43% |
| ExlService Holdings Inc. | $49.81 | $49.84 | 0.06% |
| Genpact Limited | $23.81 | $23.95 | 0.59% |
| Infosys Ltd. | $15.87 | $15.78 | (0.57%) |
| Syntel Inc. | $41.47 | $41.91 | 1.06% |
| Wipro Ltd. | $9.78 | $9.71 | (0.72%) |
| WNS (Holdings) Limited | $29.69 | $29.95 | 0.88% |

230.    As demonstrated in the table above, of the nine competitors identified by Cognizant, six of them saw a gain in their closing prices between September 29 and September 30, 2016.  Of the three that saw declines in their stock prices, the drops were minor: 0.08% (Computer Sciences Corp.), 0.57% (Infosys Ltd.), and 0.72% (Wipro Ltd.).    The following chart depicts the divergence on September 30, 2016, between Cognizant's stock and the Company's self-selected "Peer Group Index":[114]



---

[114] This chart shows the value on September 30, 2016, of $100 invested in Cognizant common stock at its closing price on September 27, 2016, as compared to $100 invested in the publicly traded companies that Cognizant identified as its competitors in its Form 10-K filed on March 1, 2017.    This Peer Group Index is weighted by relative market capitalization as follows: Accenture plc (49.25%), Computer Sciences Corporation (4.72%), Computer Task Group, Inc. (0.05%), ExlService Holdings Inc. (1.08%), Genpact Limited (3.02%), Infosys Ltd. (23.40%), Syntel Inc. (2.22%), Wipro Ltd. (15.31%), and WNS (Holdings) Limited (0.95%).  *See* 2016 Form 10-K, *supra* note 76, at 33 (comparing performance of $100 investment in Cognizant to $100 investment in a market capitalization-weighted basket of the same nine competitors).

231.    Thus, the September 30, 2016 stock drop was a direct consequence of the market learning the truth and/or the materialization of the risks concealed by Defendants throughout the Class Period.  The timing and magnitude of the price decline in Cognizant's common stock negate any inference that the loss suffered by Lead Plaintiffs and the Class was caused by changed market conditions, macroeconomic, or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  Accordingly, as a result of their purchases of Cognizant common stock during the Class Period, Lead Plaintiffs and the Class suffered economic loss and damages under the federal securities laws.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE

232.    Lead Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon omissions of material fact that Defendants were under a duty to disclose.

233.    In addition, Lead Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory, because Cognizant's common stock traded in an efficient market during the Class Period, as follows:

a.    The Company's common stock was actively traded on the NASDAQ, an informationally efficient market, throughout the Class Period.  Shares were highly liquid during the Class Period, with an average daily volume of 4,033,038 shares traded;

b.    As a regulated issuer, Cognizant filed periodic public reports with the SEC and the NASDAQ;

c.    The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of

93

press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

        d.     The market reacted promptly to public information disseminated by the Company;

        e.     Cognizant's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace; and

        f.     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Cognizant's common stock.

234.    Therefore, the market for Cognizant common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Cognizant's share price.  Under these circumstances, all purchasers of Cognizant common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

## IX.    CONTROL PERSON ALLEGATIONS

235.    By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Cognizant, its business, operations, operational trends, finances, and present and future business prospects.  The Individual Defendants would ascertain such information through the Company's internal corporate documents, conversations, and connections with other corporate officers, bankers, traders, risk officers, marketing experts, employees, attendance at management and Board meetings, including committees thereof, and

through reports and other information provided to them in connection with their roles and duties as the Company officers and/or directors.

236.    It is appropriate to presume that the materially false, misleading, and incomplete information conveyed in Cognizant's public filings, press releases, and public statements, as alleged herein, was the result of the collective actions of the Individual Defendants identified above.  The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

237.    The Individual Defendants were involved in drafting, producing, reviewing, approving, and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company and themselves, and approved or ratified these statements, in violation of the federal securities laws.

238.    As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, and governed by the provisions of the federal securities laws, each of the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Cognizant's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and

accurate information.   The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

239.    The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of Cognizant, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.   The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.   Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein.

240.    The Individual Defendants are all liable as a participant in a scheme, plan, and course of conduct that operated as a fraud and deceit on Class Period purchasers of Cognizant's common stock.

## X.    INAPPLICABILITY OF SAFE HARBOR

241.    Defendants acted with scienter because at the time that they issued public documents and other statements in Cognizant's name they knew, or with extreme recklessness disregarded, the fact that such statements were materially false and misleading or omitted material facts.   Moreover, Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

242.    As set forth in detail throughout this Complaint, Defendants, by virtue of their control over, and/or receipt of, Cognizant's materially misleading statements and their positions with the Company that made them privy to confidential proprietary information, used such

information to artificially inflate the Company's financial results. Defendants were informed of, participated in, and knew of the improprieties and unlawful conduct alleged herein and understood their material effect on the Company's business and future prospects. With respect to non-forward-looking statements and omissions, Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

243. The PSLRA's statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. None of the statements pleaded herein are forward-looking statements and no such statement was identified as a forward-looking statement when made. Rather, the statements alleged herein to be materially false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

244. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants

were actually engaging in the very actions about which they purportedly warned and/or had
actual knowledge of material adverse facts undermining such disclosures.

## XI.   CLASS ACTION ALLEGATIONS

245.   Lead Plaintiffs bring this action on its own behalf and as a class action pursuant to
Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of
all persons and entities who purchased the common stock of Cognizant from February 27, 2015,
through and including September 29, 2016.  Excluded from the Class are:  Defendants; members
of the immediate families of the Individual Defendants; the Company's subsidiaries and
affiliates; any person who is or was an officer or director of the Company or any of the
Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant
has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such
excluded person or entity.

246.   The members of the Class are so numerous that joinder of all members is
impracticable.   During the Class Period, the Company had between approximately
605.87 million and 610.52 million shares of common stock outstanding and actively trading on
the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiffs at this
time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that the
proposed Class numbers in the thousands and is geographically widely dispersed.   Record
owners and other members of the Class may be identified from records maintained by the
Company or its transfer agent and may be notified of the pendency of this action by mail, using a
form of notice similar to that customarily used in securities class actions.

247.   Lead Plaintiffs' claims are typical of the claims of the members of the Class.  All
members of the Class were similarly affected by Defendants' allegedly wrongful conduct in
violation of the Exchange Act as complained of herein.

248.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class.   Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

249.   Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.   The questions of law and fact common to the Class include:

a.     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.     whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

c.     whether and to what extent the market price of Cognizant's common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

d.     whether Defendants acted with the requisite level of scienter;

e.     whether the Individual Defendants were controlling persons of the Company;

f.     whether reliance may be presumed; and

g.     whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

250.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.   Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for

members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**
**Violation of § 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

251.    Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

252.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

253.    As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of Cognizant's common stock; and (iii) cause Lead Plaintiffs and members of the Class to purchase the Company's common stock at artificially inflated prices.

254.    The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

100

255.   As set forth above, Defendants made their materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiffs and the other members of the Class who purchased Cognizant's common stock during the Class Period.

256.   In ignorance of the materially false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for the Company's common stock, Lead Plaintiffs and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period.  But for the fraud, Lead Plaintiffs and members of the Class would not have purchased the Company's common stock at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Cognizant's common stock declined precipitously and Lead Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

257.   By virtue of the foregoing, Defendants are liable to Lead Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5.

### COUNT II
### Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

258.   Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

259.   This Count is asserted pursuant to Section 20(a) of the Exchange Act against each of the Individual Defendants.

260.   As alleged above, Cognizant violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omissions in connection with the purchase and sale of the Company's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.  This fraudulent conduct was undertaken with scienter, and Cognizant is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

261.   As set forth above, the Individual Defendants were controlling persons of Cognizant during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same.

262.   By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

263.   The Individual Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiffs and the other members of the Class who purchased Cognizant's common stock during the Class Period.

264.   In ignorance of the materially false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for the Company's common stock, Lead Plaintiffs and other

members of the Class purchased the Company's common stock at an artificially inflated price during the Class Period. But for the fraud, Lead Plaintiffs and members of the Class would not have purchased the Company's common stock at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of the Company's common stock declined precipitousl,y and Lead Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Cognizant's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth began to be disclosed.

265. By reason of the foregoing, the Individual Defendants are liable to Lead Plaintiffs and the members of the Class as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs respectfully pray for judgment as follows:

A.     Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiffs as class representatives, and appointing Motley Rice LLC and Bernstein Litowitz Berger & Grossmann LLP as class counsel pursuant to Rule 23(g);

B.     Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.     Awarding Lead Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorney's fees and costs incurred by consulting and testifying expert witnesses; and

E.      Granting such other and further relief as the Court deems just and proper.

## XIII.   JURY DEMAND

Lead Plaintiffs demand a trial by jury of all issues so triable.

Dated:  April 7, 2017                    Respectfully submitted,

**LOWENSTEIN SANDLER LLP**

*s/ Michael B. Himmel*
Michael B. Himmel
Michael T.G. Long
65 Livingston Avenue
Roseland, NJ  07068
Telephone:  (973) 597-2500
Facsimile:  (973) 597-2400
Emails:      mhimmel@lowenstein.com
                   mlong@lowenstein.com

*Liaison Counsel for Lead Plaintiffs*

**MOTLEY RICE LLC**
Gregg S. Levin (*pro hac vice*)
William S. Norton (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
Meredith B. Miller (*pro hac vice*)
28 Bridgeside Boulevard
Mt. Pleasant, SC  29464
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9450
Emails:      glevin@motleyrice.com
                   bnorton@motleyrice.com
                   cmoriarty@motleyrice.com
                   mbmiller@motleyrice.com

*Lead Counsel for Lead Plaintiffs*

**BERNSTEIN LITOWITZ BERGER &
     GROSSMANN LLP**
John Rizio-Hamilton (*pro hac vice*)

104

Kurt B. Hunciker (*pro hac vice*)
Abe Alexander (*pro hac vice*)
1251 Avenue of the Americas
New York, NY  10020
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444
Emails:      johnr@blbglaw.com
                  abe.alexander@blbglaw.com

*Lead Counsel for Lead Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 7, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 7, 2017.

*s/ Michael B. Himmel*
Michael B. Himmel