# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION SECURITIES LITIGATION | **OPINION**<br><br>No. 2:16-cv-06509 WHW-CLW |

**Walls, Senior District Judge**

Plaintiffs Union, Amalgamated, and Colorado Fire and Police bring this class action against Defendants Cognizant Technology Solutions Corporation, Francisco D'Souza, Karen McLoughlin, and Gordon Coburn alleging that they violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated under Section 10(b), by making materially incomplete, false, and misleading statements that concealed a bribery scheme. Defendants move to dismiss Plaintiffs' amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Defendants also move to strike certain allegations of Plaintiffs' amended complaint under Federal Rule of Civil Procedure 12(f). The Court decides these motions without oral argument. Fed. R. Civ. P. 78. Defendants' motion to strike is denied, Defendants' motion to dismiss is granted in part and denied in part.

## PROCEDURAL AND FACTUAL BACKGROUND

Except where noted, all facts are taken from Plaintiffs' amended complaint. ECF No. 38.
Defendant Cognizant Technology Solutions Corporation ("Cognizant") is a multinational
corporation headquartered in Teaneck, New Jersey. Am. Compl. ¶ 22. Cognizant's common
stock is listed and trades actively on the NASDAQ stock market under the ticker symbol
"CTSH." *Id.* Cognizant is an outsourcing company that provides digital, technology, consulting,
and operation services around the world. *Id.*

D'Souza, McLoughlin, and Coburn (the "Individual Defendants") were executives at
Cognizant. Defendant Francisco D'Souza was Chief Executive Officer ("CEO") during the
relevant period, having taken the position in 2007. *Id.* ¶ 23. Defendant Karen McLoughlin served
as Chief Financial Officer ("CFO") during the relevant period, having taken the position in 2012.
*Id.* ¶ 24. McLoughlin oversees, among other things, Cognizant's Internal Audit and Enterprise
Risk Management functions. *Id.* Defendant Gordon Coburn served as President from February
2012 until his resignation on September 27, 2016. *Id.* ¶ 25.

Plaintiffs are Union Asset Management Holding AG ("Union"), Amalgamated Bank, as
Trustee for the LongView Collective Investment Funds ("Amalgamated"), and the Fire and
Police Pension Association of Colorado ("Colorado Fire and Police," and with Union and
Amalgamated "Plaintiffs"). *Id.* at 1. Plaintiffs bring this class action on behalf of themselves and
on behalf of a class consisting of all persons and entities who purchased, or otherwise acquired,
the common stock of the Company from February 27, 2015, through September 29, 2016 (the
"Class Period").[1] *Id.* at 1–2.

---

[1] Excluded from the class are: Defendants; members of the immediate families of the
Individual Defendants; the Company's subsidiaries and affiliates; any person who is or was an
officer or director of the Company or any of the Company's subsidiaries or affiliates during the

### I.  **Cognizant's India Operations**

Although its current headquarters are located in New Jersey, Cognizant began as an Indian company and maintains its principal operations there. *Id.* ¶ 27. During the operative timeframe, close to 150,000 of Cognizant's 200,000 employees were located in India, many of whom were housed at its ten large IT campuses known as "global delivery centers." *Id.* ¶¶ 27, 30. As part of its effort to lower cost, Cognizant obtained licenses from central and regional Indian governments to construct and operate its facilities in designated Special Economic Zones ("SEZs"). *Id.* ¶ 30. Companies operating within SEZs are entitled to favorable treatment including tax exemptions and holidays, heightened access to credit, and relaxed customs and labor regulations. *Id.* ¶¶ 3, 29–30. These tax breaks and other benefits helped lower operating costs, and Cognizant reported that the tax benefits derived from SEZ licenses increased net income by $201.4 million in 2015. *Id.* ¶¶ 5, 111.

Although the SEZs were beneficial to the companies that operated within them, members of the Indian government were becoming skeptical of their continued value, and in February 2015 the Finance Minister Arun Jaitley indicated that the Indian government might begin to limit the tax benefits available to newly-constructed SEZs. *Id.* ¶ 35. Consistent with the plan of limiting SEZ benefits, India's Central Board for Direct Taxes issued a draft proposal that would phase out SEZ tax benefits for new facilities commencing activities after April 2017. *Id.* ¶ 36. In February 2016 Minister Jaitley presented a final budget plan implementing a policy for phasing out SEZ benefits after April 1, 2020. *Id.* ¶ 36.

---

Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity. Am. Compl. ¶ 245.

Cognizant continued to seek and obtain SEZ licenses after the February 2015 announcement, and constructed or expanded four SEZ-licensed global delivery centers during the Class Period. *Id.* ¶ 31. In September 2015, Cognizant signed agreements to expand its global delivery center in Coimbatore, and its Indian headquarters in Chennai, which together were projected to have the capacity to accommodate approximately 17,000 to 20,000 professionals. *Id.* ¶ 37. In March 2016, Cognizant received approval for an 8,500-employee facility in Hyderabad, and in August 2016 it received approval to construct a SEZ facility on a fifteen-acre plot in Kolkata. *Id.* ¶ 38. The land for the Kolkata facility was purchased from the state government's Housing Infrastructure Development Corporation, which reportedly waived its development fee and ensured that the price of the land "would be 'kept reasonable' to sweeten the deal." *Id.* (quoting *Mamata Government Allots New Town Plot for Company's Third Campus in Calcutta*, Telegraph (India) (Aug 3, 2016), https://telegraphindia.com/1160803/jsp/calcutta/story_100288.jsp). Around the same time, the state government refused to grant licenses to Cognizant's competitors, Wipro and Infosys, which had both been assured by the state's previous administration that their projects would receive SEZ status. *Id.* ¶ 39.

According to Plaintiffs, Cognizant acquired some of these SEZ licenses through a bribery scheme involving members of Senior Management, including company President Defendant Coburn.

## II.    The Class Period

### a.  Cognizant's Statements About SEZ Licenses, the Company's Financial Performance, and Internal Anticorruption Procedures

Cognizant made a series of public disclosures about its business strategy to leverage the benefits of its low-cost Indian facilities. In its annual and quarterly SEC forms, Cognizant

4

reported strong results, and quantified the benefits of utilizing SEZ licenses. As example, the
Company reported that the SEZ facilities "increase[d] net income by approximately $201.4
million . . . and increase[d] diluted PES by $.033" in its 2015 Form 10-K. *Id.* ¶ 111 (quoting
Cognizant, *2015 Annual Report*, at 4, 92). The Company also made statements about its intent to
continue to build and operate its newer facilities in SEZs and continue to make capital
expenditures to grow those operations. *Id.* ¶ 42.

    The company also made statements regarding the sources of its financial success during
those years, both in its SEC filings and in direct statements to investors. The Company listed
sources of its success such as "[s]olid performance across all of our business segments";
"[s]ustained strength in the North American market"; "[c]ontinued penetration of the European
and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on
discretionary projects"; "[e]xpansion of our service offerings, including Consulting, IT IS, and
BPS services"; "[i]ncreased penetration at existing consumers"; and "[c]ontinued expansion of
the market for global delivery of IT services and BPS." *Id.* ¶ 43.

    In addition to the statements about its low-cost India facilities and overall financial
success, Cognizant also made public statements about its anticorruption controls and compliance
measures. Cognizant's Code of Conduct stated: "We do not corruptly give or offer, directly or
indirectly, anything of value to a government official to obtain or maintain business or any other
advantage for the company," and also specified procedures designed to vet payments to foreign
officials. *Id.* ¶ 52, 53 (citing *Cognizant's Core Values and Standards of Business Conduct* 9
(2015)). Similar statements appear it Cognizant's Anticorruption Policy. *Id.* ¶ 54.

    Cognizant publicly endorsed these anticorruption controls in a series of certifications by
Defendants D'Souza and McLoughlin stating that based on their evaluation, there were no

"significant deficiencies and material weaknesses in the design or operation" of its internal controls, and that based on their knowledge Cognizant's SEC Filings were free from material misstatements and omissions. *Id.* ¶¶ 61, 210. Cognizant also referred to its Code of Conduct in its 2014 Annual Report and stated on its website that it "employs rigorous internal controls to ensure our commitment to ethical behavior, proper risk management, and exemplary corporate conduct." *Id.* ¶¶ 56, 62. One of the critical elements of accounting controls prescribed by the FCPA is "tone at the top." *Id.* ¶ 58. Tone at the top refers to senior management's commitment to legal and ethical compliance and accurate reporting. *Id.*

During this time and throughout these statements, Cognizant stated its earnings and publicly filed financial statements providing capitalized expenses and expenses.

The amended complaint alleges that these statements drove Cognizant's stock price up, rising from $46.50 per share at the start of the Class Period to a Class Period high of more than $68 per share. *Id.* ¶ 63.

### b. Cognizant's Alleged Bribery Scheme

The amended complaint alleges that Cognizant engaged in a long-standing bribery scheme to secure SEZ licenses, making millions of dollars in improper payments to Indian government officials. *Id.* ¶ 65. Plaintiffs allege that this scheme involved Defendant Coburn and other senior management, who overrode the company's internal controls to facilitate the bribery. *Id.* ¶ 66. These payments were then booked as capital expenditures rather than operating expenses, disguising the payments and inflating the reported investments in SEZ Facilities. *Id.*

The amended complaint provides statements from unidentified former employees in support of its allegations. The amended complaint provides the statements of Former Employee 1 ("FE1"), Cognizant Manager, Internal Audit & Sox Compliance from November 2014 through

December 2015. FE1 oversaw an audit of Cognizant's India operations which ran from September 2014 to May 2015, and reported that it was apparent that no FCPA compliance audit had been performed in at least two years. *Id.* ¶ 68.

According to FE1, the audit also found evidence that Cognizant was making improper payments to Indian government personnel to acquire SEZ licenses. Specifically, FE1 discovered invoices from a contractor seeking reimbursement for payments for SEZ licenses. These payments were made to a private entity rather than the local government, and FE1 discovered that government-affiliated individuals held key positions in this private entity. Although the invoices showed that the payments were related to SEZ licenses, Cognizant recorded them as "lease payments." *Id.* ¶¶ 69–70. FE1 discovered the payments "fairly easily," but had difficulty investigating them further because he was given inconsistent answers about their purpose when he tried to speak about them with Cognizant personnel.

The audit also revealed deficiencies in Cognizant's internal controls. Contrary to the company's Anticorruption Policy, transactions involving government personnel were not being flagged for vetting or reviewed by the legal department. *Id.* ¶ 71. Further, Cognizant employees were not receiving adequate training in FCPA compliance. FE1 found that training materials were in English rather than in the employees' native language and were not specific to the trainee's country or position. FE1 also reported that completion rates were low. *Id.* ¶ 72. The amended complaint also has the statements of Former Employee 2 ("FE2"), a "highly placed audit executive." FE2 reported that his staff had no FCPA-specific training, and that no FCPA training manuals even existed. *Id.*

FE1 reported the findings of the 2015 audit to Abraham Verghese, Associate Vice President of Audit for inclusion in a formal audit report. The findings were then sent in an email

(on which FE1 was copied) from Verghese to Misty Pederson, Assistant Vice President of Global Compliance & Ethics. FE1 stated that the final audit report "would have been disseminated to senior executives," and that summary audit findings would have been distributed to the Board's Audit Committee as well as Defendants D'Souza and McLoughlin. *Id.* ¶ 73.

According to the amended complaint, company president Defendant Coburn was directly involved in the bribery scheme. The amended complaint provides statements of Former Employees 3 and 4 ("FE3" and "FE4") to support this assertion. FE3, Cognizant's "Infrastructure Team Lead," stated that Coburn was the "responsible authority" for overseeing Cognizant's India leases. FE4, Cognizant's "Associate Director - Strategic Sourcing" stated that Coburn "used to take a special interest" in real estate transactions. *Id.* ¶ 74. Additionally, Coburn resigned shortly before Cognizant announced that it was commencing an internal investigation.

### c. Public Disclosure of Internal Investigation

On September 30, 2016, Cognizant filed an 8-K form with the SEC stating that it was conducting an internal investigation regarding payments relating to facilities in India to determine whether the payments were made improperly and in possible violation of the FCPA. *Id.* ¶ 75 (quoting Cognizant Tech. Sols. Corp., Current Report (Form 8-K), at Item 8.01 (Sept. 30, 2016)).

The form also announced the resignation of Defendant Coburn. *Id.* Analysts indicated that they "believe[d] Coburn may have resigned as a direct result of this investigation," and that the "quick-handed nature of his dismissal seems to indicate a link to the FCPA investigation. *Id.* ¶¶ 79, 81. Analysts further speculated that they "d[id not] believe [Coburn] will receive any severance." *Id.* ¶ 78. (some alterations in original).

On September 30, 2016, following the public filing, Cognizant's stock price fell 13%, from $55.00 to $44.71. *Id.* ¶ 82.

### III. Post-Class Period Developments

Cognizant has made a series of public disclosures following the September 30, 2016 8-K filing regarding the alleged bribery scheme. On November 7, 2016, Cognizant filed its third quarter 10-Q, which stated that "senior management may have participated in or failed to take action to prevent the making of potentially improper payments by either overriding or failing to enforce the controls established by the Company relating to real estate and procurement principally in connection with permits for certain facilities in India." *Id.* ¶ 84. The 10-Q also stated that because the payments had been booked as capital expenditures, "$5.0 million in payments . . . may have been recorded improperly." *Id.* ¶ 86. The form also acknowledged that the alleged bribery scheme rendered statements in Cognizant's credit agreement incorrect, which they were required to amend. *Id.* ¶ 89.

On an earnings call on November 7, 2016, Defendant D'Souza acknowledged that members of senior management "may have been aware of or participated in the matters under investigation," but that "those who may have been involved are no longer with the company or in the senior management position" *Id.* ¶ 87. According to the amended complaint, this statement implicated Defendant Coburn as one of the perpetrators. *Id.* ¶ 88.

On an earning call on February 8, 2017, Cognizant disclosed that it had discovered another $1 million in improper payments, bringing the total to $6 million. *Id.* ¶ 90. In its 2016 10-K Annual Report, Cognizant disclosed that the bribery scheme had begun back in 2010, and stated that "the members of senior management who may have participated in or been aware of

9

the making of the identified potentially improper payments . . . were no longer with the Company . . . ." *Id.* ¶ 91.

## IV.     The Complaint and Amended Complaint

Lead Plaintiffs claim that they purchased Cognizant common stock at artificially inflated prices and were thereby damaged when the stock price declined after the truth was disclosed. *Id.* ¶¶ 19–21, 224–25. On October 5, 2016, original Plaintiff Shane Park, filed a class action complaint against Cognizant, D'Souza, and McLoughlin, alleging that Defendants had engaged in a scheme to commit securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, promulgated under Section 10(b), by making untrue statements of material facts and failing to disclose necessary material facts regarding improper payments regarding Cognizant's Indian facilities and the effectiveness of Cognizant's internal controls and financial reporting. Compl. ¶ 19, ECF No. 1. The complaint also alleged that Defendants D'Souza and McLoughlin were jointly and severally liable under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) for the material misstatements and omissions. *Id.* ¶ 47.

On February 3, 2017, the Court appointed Lead Plaintiffs and consolidated all related actions under the current caption. ECF No. 20. On April 17, 2017, Plaintiffs filed an amended complaint asserting claims against Coburn as a Defendant under Section 10(b) and 20(a), and asserting additional factual claims. ECF No. 38.

## V.     The Statements at Issue

The amended complaint sets out a number of statements that Plaintiffs allege are false and misleading. Those statements fall into five categories: a) statements highlighting the benefits of SEZ licenses; b) statements emphasizing legal compliance and anti-corruption controls; c)

statements touting Cognizant's low-cost services and attributing its financial results to legitimate business factors; d) overstatements of earning resulting from improperly recording bribes as capital expenditures; and e) SOX certifications.

### a. Statements highlighting the benefits of SEZ licenses

The amended complaint alleges that Defendants highlighted the tax benefits and regulatory benefits they received from operating in SEZs. The complaint asserts that these statements were materially false and misleading because those benefits were obtained in material part through a bribery scheme. *Id.* ¶ 95.

In its Annual 2014 Form 10-K, filed February 27, 2015, Cognizant stated: "Our Indian subsidiaries . . . are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the Indian government for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years." *Id.* ¶ 96. This statement also appeared in the company's' Q1 2015 Form 10-Q, filed May 4, 2015; Q2 2015 Form 10-Q, filed August 6, 2016; Q3 2015 Form 10-Q, filed November 5, 2015; 2015 Form 10-K, filed February 25, 2016; Q1 2015 Form 10-Q, filed May 6, 2016; and Q2 2016 Form 10-Q, filed August 5, 2016. *Id.* ¶¶ 101, 104, 107, 110 115, 118. The amended complaint asserts that it was materially false and misleading to tout the income and tax benefits received from the Indian government when those benefits were obtained through a bribery scheme. *Id.* ¶ 99.

The 2014 Form 10-K also quantified SEZ benefits, stating that the effect of the tax benefits in 2014, 2013, and 2012 was to "increase net income by approximately [in thousands] $182,973, $146,326, and $151,789, respectively, and increase diluted EPS by $0.30, $0.24, and $0.25, respectively." *Id.* ¶ 97. Substantially identical statements also appeared in Cognizant's 2015 Form 10-K, filed February 25, 2016. *Id.* ¶ 110. The amended complaint alleges that it was

materially false and misleading to state that the SEZ facilities increase net income and increase diluted EPS when the benefits were obtained through a bribery scheme. *Id.* ¶ 99.

The 2014 Form 10-K also reported Cognizant's fixed capital investment in these projects, stating that it "had outstanding fixed capital commitments of approximately $20,452 [in thousands] related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers." *Id.* ¶ 98. Substantially identical statements also appeared in Cognizant's 2015 Form 10-K, filed February 25, 2016; Q1 2016 Form 10-Q, filed May 6, 2016; and Q2 2016 Form 10-Q, filed August 5, 2016. *Id.* ¶¶ 112, 115, 118. The amended complaint alleges that its reported fixed capital commitments were materially false and misleading because the figure included at least $4.1 million in bribes paid to government officials. *Id.* ¶ 99.

In its 2014 Form 10-K, Cognizant additionally stated "[w]e have constructed and expect to continue to locate most of our newer development facilities in SEZs." *Id.* ¶ 98. This statement also appeared in the company's' Q1 2015 Form 10-Q, filed May 4, 2015; Q2 2015 Form 10-Q, filed August 6, 2016; Q3 2015 Form 10-Q, filed November 5, 2015; 2015 Form 10-K, filed February 25, 2016; Q1 2015 Form 10-Q, filed May 6, 2016; and Q2 2016 Form 10-Q, filed August 5, 2016. *Id.* ¶¶ 101, 104, 107, 112, 115, 118. The amended complaint alleges that it was misleading for Cognizant to state that it would locate its newer development facilities in SEZs when it was obtaining those licenses through a bribery scheme. *Id.* ¶ 100.

### b. Statements emphasizing legal compliance and anti-corruption controls

The amended complaint alleges that Defendants emphasized legal compliance and its anti-corruption controls. The complaint asserts that these statements were materially false and

misleading because Cognizant and its senior management were engaged in a bribery scheme at the time the statements were made. *Id.* ¶ 95.

In its Anticorruption Policy, Cognizant stated that it would "never pay, promise, offer, or authorize a briber or anything of value to a government official," or "permit, allow, authorize, (or turn a 'blind eye' to) a Company third party's representative payment, promise, authorization of a bribe or anything of value to a government official or any other individual in order to win business or obtain improper advantages for the company." *Id.* ¶ 123. Substantially similar statements appear in its revised 2015 Code of Conduct. *Id.* ¶ 134. The amended complaint alleges that these statements were misleading because the Company and its representatives paid bribes to Indian officials in order to secure SEZ licensing for its India operations, with the knowledge and participation of senior management. *Id.* ¶ 52.

The Anticorruption Policy also states that Cognizant would "consult with our Legal Department before offering or giving anything of value . . . to a government official," "ensure that entries into the Company's books and record are accurate, and that all Company internal controls and procedures are maintained and followed when making payments from the Company," and "comply with, and enforce, all the Company's requirements for documentation of expenses and payment requests." *Id.* ¶ 123. The amended complaint alleges that it was misleading because (1) the company's books and records were misstated; (2) senior management actually overrode the Company's internal controls; and (3) Company policies concerning "documentation of expenses," including flagging payments to foreign officials and vetting them with the Legal Department were not followed. *Id.* ¶ 126.

Cognizant's Anticorruption Policy also announced that its employees and business partners and third-party representatives would "receive appropriate training from the Company"

regarding compliance with anticorruption laws. *Id.* ¶ 124. Similar statements appear in the 2014 and 2015 Sustainability Report, which quantified the hours of training and employees trained. *Id.* ¶ 129, 136. The amended complaint alleges that these statements were misleading because, as reported by Cognizant's former employees, adequate training was not provided. *Id.* ¶ 128.

The Anticorruption Policy further provides that "periodic audits of compliance shall be performed by each business unit in coordination with our legal department." *Id.* ¶ 124. The amended complaint asserts that this was misleading because the Company failed to perform any such audit before 2014 and failed to act when the 2014 audit uncovered evidence of bribes. *Id.* ¶ 128.

Cognizant's 2014 and 2015 Sustainability Reports provide "no incidents [of corruption] reported in 2014." *Id.* ¶ 129, 136. The amended complaint asserts that this was misleading because (1) the Company's President and other members of senior management were involved in the bribery scheme and thus, were aware of such corruption; (2) the 2015 audit findings providing evidence of bribery had already been reported; and (3) senior management overrode and/or failed to enforce the internal controls designed to detect and prevent such bribes. *Id.* ¶ 130.[2]

The 2015 Sustainability Report also states that "Cognizant treats reports of misconduct seriously," *id.* ¶ 136, which the amended complaint asserts is misleading because the Company's senior management overrode and/or failed to enforce Cognizant's internal financial controls in order to facilitate the bribery scheme. *Id.* ¶ 138.

---

[2] The 2015 Sustainability Report also provides "no incidents [of significant risk related to corruption] reported in 2015," which the amended complaint asserts is misleading for the same reason. *Id.* ¶ 137.

In its Code of Conduct, Cognizant states that it does not "[g]et involved with middlemen and/or the bribing of government officials while procuring or leasing land and infrastructure." *Id.* ¶ 132. The amended complaint asserts that this was misleading because Cognizant was engaged in a scheme to bribe Indian government officials in exchange for SEZ licenses for the Company's facilities in India. *Id.* ¶ 135.[3]

In a statement attached to the revised 2015 Code of Conduct, D'Souza states that "[w]e do not cut corners, bend the rules, or look for shortcuts—and we have a zero-tolerance policy toward those who do." *Id.* ¶ 133. The amended complaint asserts that this was misleading because senior management officials overrode and/or failed to enforce Cognizant's internal financial controls in order to operate the bribery scheme. *Id.* ¶ 135.

### c. Statements touting Cognizant's low-cost services and attributing its financial results to legitimate business factors

The amended complaint alleges that Defendants touted their ability to deliver low-cost services through legitimate means, and attributed Cognizant's financial success to legitimate business factors and conditions. The complaint asserts that these statements were materially false and misleading because Cognizant's performance was driven, in material part, by its bribery scheme. *Id.* ¶ 140.

In its 2014 Form 10-K, filed February 27, 2015, Cognizant stated its increase in revenue, and stated that 'key drivers of our revenue growth in 2014" were "[s]olid performance across all of our business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets";

---

[3] The revised 2015 Code of Conduct also states that Cognizant complies with "all applicable anti-corruption laws," which "means, in part, that we comply with all applicable anti-corruption laws, rules, and regulations wherever we conduct business." *Id.* ¶ 134. The amended complaint asserts that this is misleading for the same reason. *Id.* ¶ 135.

"[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including Consulting, IT IS, and BPS services"; "[i]ncreased penetration at existing customers"; and "[c]ontinued expansion of the market for global delivery of IT services and BPS." *Id.* ¶ 141. Similar statements appear in Cognizant's Q1 2015 Form 10-Q, filed May 4, 2015; Q2 2015 Form 10-Q, filed August 5, 2015; Q3 2015 Form 10-Q, filed November 5, 2015; 2015 Form 10-K, filed February 25, 2016; Q1 2016 Form 10-Q, filed May 6, 2016; and Q2 2016 Form 10-Q, filed August 5, 2015. *Id.* ¶¶ 145, 162, 170, 179, 182, 196. The amended complaint asserts that this is misleading because Cognizant's financial performance was driven, in material part, by its bribery scheme. *Id.* ¶ 142.

In a May 4, 2015 press release and Form 8-K, Cognizant stated that its "strong revenue performance this quarter versus our guidance was driven primarily by organic growth of our core business . . . ." *Id.* ¶ 143. Defendant D'Souza made a similar statement on a Q1 2015 Earnings Conference Call. *Id.* ¶ 149. The amended complaint alleges that this was misleading because the Company's financial performance was driven, in material part, by its bribery scheme. *Id.* ¶ 114.

Cognizant's Q1 2015 Form 10-Q stated that "the revenue growth from our Rest of World customers in 2015 was primarily driven by the Indian, Japan, Australia, Hong Kong, and Singapore Markets." *Id.* ¶ 146. Similar statements appear in Cognizant's Q2 2015 Form 10-Q, Q3 2015 10-Q, 2015 Form 10-K, Q1 2016 Form 10-Q, Q1 2016 Earnings Call on May 6, 2016, and Q1 2016 10-Q. *Id.* ¶¶ 163, 171, 180, 183, 186, 197. The amended complaint alleges that this was misleading because Cognizant's financial performance was driven, in material part, by its bribery scheme. *Id.* ¶ 147.

On an August 5, 2015 Q1 2015 Earnings Conference Call, Defendant Coburn stated that "[g]rowth was driven primarily by strength in key markets such as India and the Middle East."

*Id.* ¶ 148. Defendant Coburn made a similar statement on the Q2 2015 Earnings Conference Call, Q4 2015 Earnings Conference Call, and Q1 2016 Earnings Conference Call. ¶¶ 157, 173. The amended complaint alleges that this was misleading because Cognizant's financial performance was driven, in material part, by its bribery scheme. *Id.* ¶ 150.

      In a November 4, 2015 Q3 2015 Earnings Conference Call, Defendant Coburn stated that "[w]he continue to do very well and take market share on the maintenance side. . . . And we – Cognizant just has this incredible track record of delivering very high quality services, while continuously delivering productivity and efficiency." Coburn also stated that "we're probably better positioned than most others in the market in terms of lowering cost of ownership on maintenance."[4] *Id.* ¶ 166. Defendant D'Souza stated that "I would say that the bulk of the productivity that we drive in the core business is through traditional means of driving productivity and efficiency that includes process kinds of things like Lean and Six Sigma and so on, and also more traditional tools in automation." *Id.* The amended complaint alleges that this was misleading because Cognizant's efforts to lower costs were accomplished in part by bribes paid to Indian government officials in exchange for SEZ licenses. *Id.* ¶168.

      On the call, Defendant Coburn also stated that "we're going to continue with the strategy that we've been executing successfully on, which is making long-term organic investments is the key – the core of our business." *Id.* ¶ 167. The amended complaint alleges that this was misleading because Cognizant's performance was driven, in part, by bribes paid to Indian government officials in exchange for SEZ licenses. *Id.* ¶ 169.

---

     [4] Coburn made a similar statement on May 24, 2016 at a J.P. Morgan Technology, Media and Telecom Conference, stating that Cognizant responds to consumer demand by "bringing best practices to our clients for our traditional services, constantly lower[ing] their cost of ownership while maintaining our margin. So that's one piece of work. We're very good at that." *Id.* ¶ 194.

On a May 6, 2016 Q1 Earnings Conference Call, Defendant D'Souza described a strategic initiative, stating that it is "to help clients achieve new levels of efficiency and effectiveness in their core transaction processing operations by building platform-based solutions and industry utilities . . . By applying a series of levers including process optimization, digitization and large-scale efficiencies, we're able to bring clients levels of effectiveness which they would have been unable to reach on their own." *Id.* ¶ 185. The amended complaint asserts that this was misleading because Cognizant's ability to deliver cost savings was driven, in material part, by its scheme to obtain SEZ licensing by bribing Indian government officials. *Id.* ¶ 187.

On an August 5, 2016 Q2 2016 Earnings Conference Call, Defendant Coburn stated that:

[T]he drive for getting continued efficiencies from existing IT infrastructures to be able to fund innovation projects remains absolutely essential to almost every client. . . . Our strong vertical presence and investments in building sharply focused industry-specific platforms allow clients to obtain these efficiencies by shifting from buying a service to buying an outcome. These trends will continue to open opportunities for us over the coming years.

*Id.* ¶ 199. The amended complaint asserts that this was misleading because the Company's ability to deliver cost savings to its clients was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials. *Id.* ¶ 201.

On the same conference call, Defendant McLoughlin attributed Cognizant's financial success to "a slightly lower tax rate and stronger operating margins," which the amended complaint asserts was misleading because the Company's financial performance was driven, in material part, by its scheme to obtain SEC licensing by bribing Indian government officials. *Id.* ¶¶ 201, 202.

On September 6, 2016 at a Citi Global Technology Conference, Defendant Coburn stated "I will reduce your cost of ownership, because I'm going to bring in automation. I'm going to

bring in different tools of productivity, go more offshore whatever, pull the different levers, clients are very open to that discussion." *Id.* ¶ 207. He went on to say that "we've been very successful at, while maintaining our margins, being able to achieve the cost of ownership that the clients want." *Id.* the amended complaint asserts that this was misleading because the Company's ability to deliver cost savings to its clients, while maintaining margins, was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials. *Id.* ¶ 208.

### d. Overstatements of earnings resulting from improperly recording bribes as capital expenditures

The amended complaint asserts that Cognizant overstated its earnings by incorrectly booking the bribery payments as capital expenditures rather than booking them as expenses. *Id.* ¶ 209. Of the $4.1 million of capitalized expenses, $1 million was expensed as depreciation and amortization, leaving $3.1 million overstated on Cognizant's earnings and investment in physical assets, and understated in expenses. *Id.* The amended complaint asserts that Cognizant has admitted these over- and understatements. *Id.*

### e. SOX certifications

In connection with each quarterly and annual report filed by Cognizant, Defendants D'Souza and McLoughlin signed SOX Certifications, as required by Section 302 of SOX. In them, Defendants D'Souza and McLoughlin certified that they had designed and evaluated effective internal and disclosure controls:

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function): a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information and b) any fraud, whether or

> not material, that involves management or other employees who have a significant
> role in the registrant's internal control over financial reporting.

*Id.* ¶ 210. The amended complaint alleges that this was materially false and misleading when

made because Cognizant admitted material weaknesses existed in its internal controls, including

"tone at the top," as senior management participated in making corrupt payments by overriding

and/or failing to enforce the Company's internal financial controls. *Id.* ¶ 211.

Defendants D'Souza and McLoughlin also certified that "Based on my knowledge, this

report does not contain any untrue statement of a material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such

statements were made, not misleading with respect to the period covered by this report." *Id.* ¶

210. The amended complaint alleges that this was materially false and misleading when made

because the SEC filings to which the certifications were appended contained numerous

materially false and misleading statements and omissions. *Id.* ¶ 212.

## VI.    Defendants' Motions to Dismiss and Motion to Strike

On June 6, 2017, Defendant Coburn filed a motion to dismiss the amended complaint for

failure to state a claim under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private

Securities Litigation Reform Act ("PSLRA"). Def. Coburns' Mot. Dismiss, ECF No. 41-1.

Defendant Coburn argues that Plaintiffs failed to allege any material misstatement or omission,

failed to allege scienter, and failed to state a claim of control person liability under Section 20(a).

The same day, Defendants Cognizant, D'Souza, and McLoughlin ("Cognizant

Defendants") also filed a motion to dismiss the amended complaint under FRCP 12(b)(6).

Cognizant Mot. Dismiss, ECF No. 42. Cognizant Defendants contended that Plaintiffs failed to

allege material misrepresentations, scienter, or control person liability as to Defendants D'Souza

and McLoughlin.

On July 21, 2017, Plaintiffs filed an omnibus motion opposing both motions to dismiss. Pls.' Opp., ECF No. 46. Defendant Coburn and Cognizant Defendants both filed replies on September 5. Coburn Reply, ECF No. 50; Cognizant Reply, ECF No. 51.

On September 5, while the motions to dismiss were pending, Cognizant Defendants filed a motion to strike the allegations attributed to Former Employee 1. Defs.' Mot. Strike, ECF No. 52. Cognizant Defendants argued that they had identified FE1, and that he had disavowed the allegations attributed to him. Cognizant Defendants provided a declaration of Grayson Stratton, outside counsel for Cognizant. Plaintiffs filed an opposition on October 2, to which Cognizant Defendants replied on October 10. Pls.' Strike Opp., ECF No. 58; Defs.' Strike Reply, ECF No. 59.[5]

## MOTION TO STRIKE

Defendants move to strike paragraphs 68–73 of Plaintiffs' Amended Class Action Complaint because they are unreliable. Defendants argue that these paragraphs should be stricken because they are based on statements of a former employee, Mr. Hawes, who has repudiated the statements attributed to him in the amended complaint. Defs.' Strike Br. at 2. In support, Defendants have provided a declaration of Defendant's counsel Mr. Grayson Stratton, stating that he spoke with Mr. Hawes on the phone and Mr. Hawes disavowed certain statements attributed to him, and stated that others were taken out of context. Stratton Decl. ECF No. 52-2. The declaration also states that they attempted to meet with Mr. Hawes in person to execute his

---

[5] To ease readability, the Court only distinguishes between Defendant Coburn and the Cognizant Defendants when discussing arguments involving both Defendants separately. Otherwise, Cognizant Defendants will be referred to simply as "Defendants."

own declaration regarding the allegations, but that Mr. Hawes changed his mind and declined to meet.

In the alternative, Defendants move for an order granting limited discovery to allow them to depose Mr. Hawes.

Under Federal Rule of Civil Procedure 12(f), a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "A court possesses considerable discretion in disposing of a motion to strike under Rule 12(f)." *Wiseberg v. Toyota Motor Corp.*, No. 11-3776 (JLL), 2012 WL 1108542, at \*13 (D.N.J. Mar. 30, 2012) (quoting *Kim v. Baik*, No. 06-3604, 2007 WL 674715, at \*5 (D.N.J. Feb 27, 2007)). Motions to strike are "disfavored and are usually denied 'unless the allegations have no relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case." *Id.* (quoting *Kim*, 2007 WL 674715, at \*5); *see* Alan Wright, Arthur Miller et al., Fed. Prac. & Proc. Civ. § 1382 (3d ed.) ("[T]here appears to be general judicial agreement, as reflected in the extensive case law on the subject, that [motions to strike] should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action.").

Defendants argue that statements in the complaint attributed to Former Employee 1 (FE1) should be struck because they are unreliable. Defs.' Strike Br. at 10. Defendants argue that unreliable statements are "both 'immaterial' and 'impertinent' matter and, therefore, may be stricken under Rule 12(f)." *Id.* (citing *Porter v. Fairbanks Capital Corp.*, No. 01 C 9106, 2003 WL 21210115, at \*7 (N.D. Ill. May 21, 2003)). Defendant claims that given the heightened pleading requirements of the PSLRA, courts have found repudiated statements by confidential

witnesses to be unreliable. *Id.* (*citing City of Livonia Emps. Ret. Sys. v. Boeing Co.*, No. 09 C

7143, 2011 WL 824604, at *5 (N.D. Ill. Mar. 7, 2011)).

In response, Plaintiffs counter that motions to strike "cannot be based on factual

assertions extraneous to the complaint," and that Defendant impermissibly relies on matters

outside the pleadings. Pls.' Strike Opp. at 26, ECF No. 58. Plaintiffs also asserts that the Third

Circuit "does not recognize 'unreliability' as a basis for striking allegations under Rule 12(f)."

*Id.* at 28.

The Court finds that Defendants have not shown that the statements attributed to FE1

"have no relation to the controversy and may cause prejudice to one of the parties," or that they

may "confuse the issues in the case." *Wiseberg*, 2011 WL 1108542 (quotations omitted). FE1 is

alleged to have served as "Manager, Internal Audit & SOX compliance from November 2014

through December 2015." Am. Coml. ¶ 68. Statements from an employee with oversight

capacity of internal audit and compliance during the Class Period would be particularly relevant

because this person would have access to information about Defendants' internal controls and

reporting.

Further, the statements in the complaint attributed to FE1 are central to Plaintiffs' claims.

The complaint alleges that FE1 "reported that it was apparent based on the absence of prior-

period audit documentation that an FCPA compliance audit had not been performed in at least

two years prior to 2015." *Id.* The complaint further alleged that FE1 reported that "payments

related to procuring SEZ licensing were being made to Indian government personnel and that

these payments were being improperly classified in Cognizant's internal systems." *Id.* ¶ 69. The

complaint describes FE1's involvement in an audit in 2015 which "turned up several 'high risk'

problems in Cognizant's internal controls." *Id.* ¶ 71. The 2015 audit provides the basis for much of Plaintiff's scienter allegations, and is therefore not "immaterial" or "impertinent."

In *In re Par Pharmaceutical Securities Litigation*, No. 06-cv-3226, 2009 WL 3234273, at *11 (D.N.J. Sept. 30, 2009), the defendant moved to strike paragraphs of the complaint attributed to a confidential witness, claiming that they misrepresented the witness' statements. The defendants provided a declaration of the witness claiming she had been misquoted by the plaintiff. *Id.* The court denied the motion to strike, and instead struck the witness declaration, expressing concern with the defendant's tactics in contacting a witness despite the PSLRA's discovery stay. The court further stated that it "[did] not want to establish mechanisms whereby discovery must be conducted every time confidential informants are utilized, forcing the Court to reconcile competing facts to determine whether allegations in a complaint should be struck." *Id.* at 12. Other courts have similarly refused to strike allegations attributed to confidential witnesses as the pleading stage when presented with declarations of those witnesses that are supposedly inconsistent with the allegations in the complaint. *See, e.g., Dep't of Treasury of the State of N.J. v. Cliffs Nat'l Res., Inc.*, No. 1:14 CV 1031, 2015 WL 6870110, at *4 (N.D. Ohio, Nov. 6, 2015) (refusing to strike paragraphs attributed to confidential witnesses when defendant offered declaration of witnesses repudiating the allegations); *Halford v. ArtiCure, Inc.*, No. 1:08cv867, 2010 WL 8973625, at *3 (S.D. Ohio, Mar. 28, 2010) ("When presented with confidential witnesses who were later identified and provided conflicting affidavits or declaration, court are reluctant to strike the original statements by the confidential witness."). Unlike in those cases, Defendant here was unable to even produce a declaration from FE1, providing only an attorney declaration.

Defendants' claim that the Stratton Declaration renders the statements "immaterial" is

unpersuasive. The Defendant relies on language in *In re Millennial Media, Inc. Securities Litigation*, No. 14-Civ. 7923(PAE), 2015 WL 3443918, at *5 (S.D.N.Y. May 298, 2015), that "[n]umerous reported decisions have recounted claims by [confidential witnesses] that . . . complaints inaccurately attributed facts and statements to them." That line is mere *obiter dictum* because the plaintiffs had voluntarily dismissed their claims. *See id.* ("Because plaintiffs have elected to dismiss this lawsuit, the Court has no occasion to rule on the propriety of counsel's practice with respect to quoting persons designated as CWs."). Further, the court there was provided with affidavits by the confidential witnesses themselves, not the hearsay of defendant's attorneys. The other cases cited by Defendants are inapplicable because they involve either fraud on the court, *see City of Livonia Emps.' Ret. Sys. v. The Boeing Co.*, No. 09 C 7143, 2011 WL 824604 (N.D. Ill. Mar. 7, 2011) *affirmed in part and vacated in part by City of Livonia Emps. Ret. Sys. v. Boeing Co.*, 711 F.3d 754, 760 (7th Cir. 2013) (characterizing the lower court's finding as "fraud on the court"), or anonymous internet comments that were prejudicial and irrelevant, *see Wiseberg*, 2012 WL 11085742, at *13; *Porter v. Fairbanks Capital Corp.*, No. 01 C 9106, at *7 (N.D. Ill. May 21, 2003).

In the alternative, Defendant moves for limited discovery to depose FE1. Def. Br. at 12. Defendant relies on a footnote from an unpublished summary order from the Second Circuit, *Campo v. Sears Holding Corp.*, 371 F. Appx. 212, 216 n.4 (2d Cir. 2010), which noted approvingly the district court's order permitting the defendant to depose a confidential witness referenced in the complaint.

Plaintiff responds that the footnote in *Campo* is dicta, because the plaintiff had waived the argument that the order was improper. Plaintiff further argues that "*Campo* has never been

cited by any court in this Circuit, has been criticized by other courts, and is contrary to the bedrock principles repeatedly endorsed by the Third Circuit. *See* Pl. Br. at 39.

Defendant has not cited any authority from within the Third Circuit endorsing the practice of deposing certain witnesses during the pleading stage, but courts within this district have rejected it. *See Par Pharm.*, 2009 WL 3234273, at *12 (declining to allow plaintiff to engage in limited discovery, striking affidavit provided by defendant, and noting that defendant was free to file a Rule 11 motion if "discovery in the normal course reveals that factual contentions have indeed been alleged in bad faith"); *see also, e.g., In re Cell Therapeutics, Inc.*, No. C10-414MJP, 2010 WL 4791808, at *2 (W.D. Wash. Nov. 18, 2010) (collecting cases rejecting the *Campo* approach, noting that the "neither the Federal Rules nor the [PSLRA] supports the practice [endorsed in *Campo*]"). The Court similarly declines to endorse this novel procedural mechanism.

The motion to strike is denied, and the court will not grant limited discovery to depose FE1.

## MOTION TO DISMISS

Defendants argue that the Amended Complaint fails to adequately allege a violation of Section 10(b) or 20(a). Defendant contends that Plaintiffs fail to allege any material false or misleading statement, and further assert that the Amended Complaint fails to allege that any Defendant acted with scienter.

### Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotations and alterations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief." *Id.* at 679.

In considering the plaintiff's claims, the Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint. *See Sentinel Trust Co. v. Universal Bonding Ins. Co.*, 316 F.3d 213, 216 (3d Cir. 2003); Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1357 at 299 (3d ed. 2014). "A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 256 n.5 (3d Cir. 2004) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).[6]

A court may also consider and take judicial notice of matters of public record. *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007); *Buck v. Hampton Tp. School Dist.*, 452 F.3d 256,

---

[6] "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 255 n.5 (3d Cir. 2004).

260 (3d Cir. 2006). Such matters of public record may include prior judicial proceedings, *McTernan v. City of York, Penn.*, 577 F.3d 521, 526 (3d Cir. 2009), filings with the SEC, *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014), and other documents deemed to be public records by law, *Del. Nation v. Pennsylvania*, 446 F.3d 410, 414 n.6 (3d Cir. 2006).

Fed. R. Civ. P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." "The purpose of Rule 9(b) is to provide notice of the 'precise misconduct' with which defendants are charged" in order to give them an opportunity to respond meaningfully to a complaint, "and to prevent false or unsubstantiated charges." *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998), *abrogation on other grounds recognized in Forbes v. Eagelson*, 228 F.3d 471 (3d Cir. 2000). To satisfy Rule 9(b), plaintiffs must "plead with particularity the 'circumstances' of the alleged fraud." *Rolo*, 155 F.3d at 658. Rule 9(b) "requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' – that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006) (quoting *In re Rockefeller Center Prop. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)). Plaintiffs "need not, however, plead the 'date, place or time' of the fraud, so long as they use an 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Rolo, 155* F.3d at 658 (citing *Seville Indus. Mach. v. Southmost Mach.*, 742 F.2d 786, 791 (3d Cir.1984)). The Third Circuit has cautioned that courts should "apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Id.* (citing *Christidis v. First Pennsylvania Mortg. Trust*, 717 F.2d

96, 99 (3d Cir. 1983)). A plaintiff who alleges securities fraud must "allege facts that give rise to a strong inference of scienter." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995); *Burlington Coat Factory*, 114 F.3d at 1418. A plaintiff may establish this strong inference "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Burlington Coat Factory*, 114 F.3d at 1418 (quoting *Acito*, 47 F.3d at 52).

The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2), specifically addresses the scienter requirement of a § 10(b) claim. It requires that a complaint which asserts a § 10(b) claim must "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading' . . . and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. § 78u-4(b)(2)). The plaintiff must plead facts demonstrating that defendants had "a mental state embracing intent to deceive, manipulate, or defraud." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 243 (3d Cir. 2013) (quoting *Tellabs*, 551 U.S. at 319). In determining whether the plaintiff has established an inference of scienter "that is cogent and at least as compelling as any opposing inference of nonfraudulent intent," the Court must "weigh the plausible nonculpable explanations for the defendant's conduct against the inferences favoring the plaintiff" and look at "whether *all* of the facts alleged, taken collectively, give rise to a strong influence of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Inst. Inv. Group v. Avaya, Inc.*, 564 F.3d 242, 267-68 (3d Cir. 2009) (quoting *Tellabs*, 551 U.S. at 323-24) (emphasis in original). This scienter requirement mirrors the "strong inference" requirement of the Second

Circuit under Rule 9(b), see *Tellabs*, 551 U.S. at 322; H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. 41, 41 (1995), reprinted in 1995 U.S.C.C.A.N. 740, 740; S. Rep. 98, 104th Cong., 1st Sess. 15 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 694, but with one significant difference: under the PSLRA, "'motive and opportunity' may no longer serve as an independent route to scienter." *Avaya*, 564 F.3d at 277. Instead, "a plaintiff properly pleads scienter by alleging facts that 'constitute circumstantial evidence of either reckless or conscious behavior.'" *Gold v. Ford Motor Co.*, 577 F. App'x 120, 123 (quoting *Avaya*, 564 F.3d at 276-77). Recklessness, in turn, is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Avaya*, 564 F.3d at 267 n.42.

When considering the allegations of confidential witnesses, the Third Circuit has held that a court must evaluate the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya*, 564 F.3d at 263 (quoting *California Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004)). If the allegations do not satisfy these "*Chubb* factors," the Court must "discount them steeply." *Id.* However, if the allegations are adequately particularized, they will be considered. *Id.*

## I. Section 10(b)

Section 10(b) of the Exchange Act and the regulations promulgated under it "prohibit fraud in connection with the sale of securities." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010). Rule 10b-5 "provides the framework for a private cause of action for violations

involving false statements or omissions of material fact." *Weiner v. Quaker Oats Co.*, 129 F.3d

310, 315 (3d Cir. 1997) (citing 17 C.F.R. 240.10b-5). The Third Circuit has held that

> Parties injured by securities fraud may bring a private cause of action under [Section 10(b) and Rule 10b-5], which requires proof of six elements: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) in connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation;' (5) economic loss; and (6) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss."

*Aetna*, 617 F.3d at 277 (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir.

2007)). When plaintiffs bring a claim under a "fraud on the market" theory, the court makes

rebuttable presumptions "(1) that the market price of a security actually incorporated the alleged

misrepresentations, (2) that the plaintiff actually relied on the market price of the security as an

indicator of its value, and (3) that the plaintiff acted reasonably in relying on the market price of

the security." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 178-79 (3d Cir. 2000) (citing *Zlotnick*

*v. TIE Communications*, 836 F.2d 818, 822 (3d Cir. 1988)).

The Court will first consider whether the amended complaint sufficiently alleges a

material misrepresentation or omission. Then, if necessary, the Court will determine whether the

amended complaint alleges sufficient facts to give rise to a strong inference of scienter.

### a. Material Misrepresentation or Omission

To state a claim under Rule 10b–5, "a plaintiff must show that the defendant made a

materially false or misleading statement or omitted a fact necessary to make a statement not

misleading." 17 C.F.R. § 240.10b–5(b)5; *Marion v. TDI, Inc.*, 591 F.3d 137, 152 (3d Cir. 2010).

"Materiality depends on the significance the reasonable investor would place on the withheld or

misrepresented information." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). This requirement

is satisfied when there is "a substantial likelihood that the disclosure of the omitted fact would

have been viewed by the reasonable investor as having significantly altered the 'total mix' of

information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (internal citations omitted).

Materiality requires a "delicate assessment of the inferences a 'reasonable shareholder' would draw from a set of facts." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976); *ED Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 875 (3d Cir. 2000). In the Third Circuit, "the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock." *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005). While fact-specific assessments of this kind are "peculiarly ones for the trier of fact," *TSC Indus., Inc.*, 426 U.S. at 450, some statements may be so facially insignificant to a reasonable investor that they are inactionable "puffery." *City of Edinborough Council v. Pfizer, Inc.*, 754 F.3d 159, 172 (3d Cir. 2014). For that reason, courts have held that "vague and general statements of optimism 'constitute no more than "puffery" and are understood by reasonable investors as such.'" *In re Advanta Corp. Sec. Litig*, 180 F.3d 525, 538–39 (3d Cir. 1999) *abrogated on other grounds, as recognized in City of Edinborough Council*, 754 F.3d at 172, (quoting *Burlington Coat Factory*, 114 F.3d at 1428 n.14).

Although omissions can give rise to liability, Section 10(b) and Rule 10b–5 "do not create an affirmative duty to disclose any and all material information." *Matrixx*, 563 U.S. at 44. Disclosure is required "only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Id.* (quoting 17 C.F.R. § 240.10b–5(b)). Further, "[s]ome statements, although literally accurate, can become through their context and manner of presentation, devices which mislead investors." *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, Nos. 05-1151(SRC), 05-2367 (SRC), 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011) (quoting *McMahon & Co. v. Wherehouse Ent't*, 900 F.2d 576, 579 (2d Cir.

1990)). To ensure that investors are not misled by statements that are deceptive although literally true, "[o]nce a defendant makes an affirmative statement or characterization about its business, it puts that subject 'in play' and assumes a duty, under the securities laws, to speak truthfully about that subject." *Id.* (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992)); *see Matrixx* 563 U.S. at 45 ("Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under those provisions by controlling what they say to the market."); *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 472 (E.D. Pa. May 15, 2014) (finding omission material when the information "bore directly" on the issue about which the company made favorable public statements).

The Amended Complaint contains five categories of statements: a) statements highlighting the benefits of SEZ licenses; b) statements emphasizing legal compliance and anti-corruption controls; c) statements touting Cognizant's low-cost services and attributing its financial results to legitimate business factors; d) overstatements of earning resulting from improperly recording bribes as capital expenditures; and e) SOX certifications. The Court will address them in turn.

### i. Statements Highlighting the Benefits of SEZ Licenses

Defendants argue that the statements about the benefits of SEZ licenses and future investment in SEZ licenses were not false and misleading. Cognizant Br., at 16, ECF No. 42-1. Defendants contend that the amended complaint fails to allege the existence of the underlying misconduct – a bribery scheme involving SEZ licenses. Defendants assert that Plaintiffs do not allege facts showing that the "improper payments" referenced in Cognizant's September 30, 2016 8-K were made to obtain SEZ licenses "as opposed to sewer permits, building permits, occupancy permits, or other permits." Cognizant Reply, at 4 ECF No. 51.

Plaintiffs respond that the amended complaint sufficiently alleges a connection between the "improper payments" and the SEZ licenses. Pls.' Opp. at 44–45. Plaintiffs accordingly argue that once Cognizant chose to tout the benefits of the SEZ licenses, it had a duty to disclose that the licenses were the subject of bribery. *Id.* (quoting *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016)).

The Court finds that the amended complaint adequately alleges that Cognizant engaged in a bribery scheme to acquire SEZ licenses. Cognizant stated in its third quarter 2016 10-Q that senior management "failed to take action to prevent the making of improper payments . . . principally in connection with permits for certain facilities in India." Am. Compl. ¶ 84. According to the amended complaint, Cognizant sought and obtained SEZ licenses for its global delivery centers, which house thousands of employees and are central to Cognizant's India operations. *Id.* ¶¶ 31, 37–39. Plaintiffs allege with specificity that the SEZ licenses were key to Cognizant's India facilities because they increased revenue, reduced tax and operating cost, and allowed it to compete more aggressively for new business. *Id.* ¶¶ 32–37. Further, Cognizant was given favorable treatment by state government in obtaining SEZ licenses over its competitors. *Id.* ¶ 39. Moreover, FE1 discovered certain red flag payments specifically involving SEZ license acquisition during the 2015 audit. *Id.* ¶¶ 69, 70.

Considering the *Chubb* factors, FE1's report that he identified red flag payments related to SEZ licenses will be credited. *See Avaya*, 564 F.3d at 263 (weighing confidential witness statement by considering the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia"). FE1's "basis of knowledge" was his employment as Manger of Internal Audit & SOX

compliance. Am. Compl. ¶ 68. Further, FE1's statement that he discovered red flag payments related to SEZ licenses is corroborated by Cognizant's announcement that improper payments were made in relation to permits. FE1's statements are also coherent and plausible. The amended complaint alleges that Cognizant relied on SEZ licenses to keep operating costs down and, therefore, would have a motive to acquire them quickly before the Indian government scaled back their availability.

In light of these allegations, the Court finds that Plaintiffs have adequately alleged a bribery scheme to acquire SEZ licenses. At the motion to dismiss stage, Plaintiffs "need only allege 'enough facts to state a claim for relief that is plausible on its face.'" *Matrixx*, 563 U.S. at 45, n.12 (quoting *Twombly*, 550 U.S. at 570). Taken together, the amended complaint plausibly alleges that the "permits" referenced in Cognizant's 2016 10-Q were SEZ licenses.

To the extent that the Cognizant Defendants contend that the improper payments are not material because they involve only a "small number" of Cognizant's Indian facilities and $6 million over six years, the argument is rejected. A bribery scheme involving Cognizant senior management affecting its core India operations would "significantly alter the total mix of information made available" to investors. *Matrixx*, 563 U.S. at 38.

Having found that Plaintiffs have adequately alleged a material bribery scheme, the Court also finds that Cognizant's statements touting the benefits of SEZ licenses were misleading. By highlighting the benefits of the SEZs, Cognizant put the underlying bribery at play. *See In re Par Pharm., Inc., Sec. Litig.*, 733 F. Supp. 668, 678 (S.D.N.Y. 1990) (finding statements touting company's ability to obtain FDA approval materially misleading because it failed to disclose that the approvals were obtained through bribery). Cognizant stated in SEC disclosures that its "Indian subsidiaries . . . are eligible for certain income tax holiday benefits granted by the Indian

government for export activities conducted within Special Economic Zones, or SEZs." Am.

Compl. ¶¶ 101, 104, 107, 110 115, 118. It made statements quantifying the SEZ tax benefits on

the company's net income, and indicating its intent to locate newer development facilities in

SEZs. *Id.* at ¶¶ 97, 101, 104, 107, 110, 112, 115, 118. A reasonable investor would view these

benefits differently if he was aware that they were obtained through illegal conduct that could

subject Cognizant to liability under the FCPA and the corresponding negative goodwill and cost

of an internal investigation. Even if the statements were literally true, they became "through their

context and manner of presentation, devices which mislead investors." *In re Merck & Co.*, 2011

WL 3444199, at *9.[7]

### ii. Statements Emphasizing Legal Compliance and Anti-Corruption Controls

The amended complaint alleges that Defendants made statements emphasizing their legal

compliance and anti-corruption controls. These statements appear in Cognizant's Anticorruption

Policy, Code of Conduct, and 2014 and 2015 Sustainability Reports. The amended complaint

asserts that these statements were materially false and misleading because Cognizant and its

senior management were engaged in a bribery scheme at the time the statements were made. *Id.* ¶

95.

Defendants first argue that the none of the statements in the Anticorruption Policy, Code

of Conduct, and Sustainability Reports is actionable because they are "inherently aspirational."

---

[7] While the parties do not address them in their briefs, the same is true for Cognizant's statements about its outstanding capital commitments related to India real estate development. Am Compl. ¶¶ 98, 112, 115, 118. Because the figures included approximately $4.1 million in illegal payments, the statements are false. Further, the statements are misleading because they fail to disclose that the supposedly beneficial capital commitments actually exposed Cognizant to significant future expenses.

Cognizant Br. at 17. Defendants further argue that even if they are actionable, the statements are not false and misleading.

### 1. *Code of Conduct and Anticorruption Policy*

The Court finds that the statements in the Code of Conduct and Anticorruption Policy are not materially false and misleading. "Because a code of ethics is inherently aspirational, it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 755 (S.D.N.Y. 2017); *see In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 658–59 (S.D.N.Y. 2017) (quoting this passage); *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 28–29 (S.D.N.Y. 2016) (same); *see also Emps. Ret. Sys. of the City of Providence v. Embraer*, No. 16 Civ. 5277 (RMB), 2018 WL 1725574, at *9 (S.D.N.Y. Mar. 30, 2018); *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *10 (S.D.N.Y. Mar. 28, 2018); *Fries v. Northern Oil. and Gas, Inc.*, 285 F. Supp. 3d 706, 717–18 (S.D.N.Y. 2018). These statements were made in aspirational documents outlining the company's policies for best corporate practices, not as affirmative guarantees that every employee would adhere to these practices in all cases. Therefore, the statements are not rendered false by the failure of certain employees to adhere to company policy. As the Ninth Circuit explained, "[s]uch a code expresses opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations." *Retail Wholesale & Dept. Store Union Local 388 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (citing *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 686 (D. Colo. 2007)); *see Bondali v. YumA Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015) ("[The defendant's] statement is not actionable because it was a statement of aspiration made in [the defendant's]

corporate Code of Conduct rather than an assertion of objective fact made in a public filing or press release."); *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009), *aff'd* 442 F. App'x 672 (3d Cir. 2011) (finding statements contained in Code of Ethics cannot be materially false and misleading).

As the court in *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 685–86 (D. Colo. 2007) explained, corporations are effectively required to adopt a code of conduct under SEC regulations and NASDAQ rules. *See* 17 C.F.R. § 229.406(a)–(b) (2012) (requiring registrants to adopt a code of ethics or explain why they have not done so, and requiring the code to promote "compliance with applicable governmental laws, rules and regulations"). Because adoption of a code of conducts is effectively mandatory, "all public companies—whether run by crooks or angels—will adopt such a code." *Andropolis*, 505 F. Supp. 2d at 686. Investors therefore gain no information about a corporation by its adoption of such a code.

Allowing claims to proceed on the basis of code of conduct violations would be overbroad; any instance of corporate misconduct would violate a company's compliance policy. Given the near-universal adoption of codes of conduct, and the breadth their proscriptions, allowing securities plaintiffs a cause of action every time a code of conduct is violated would "turn all corporate wrongdoing into securities fraud." *Retail Wholesale & Dept. Store Union Local 338 Ret. Fund*, 845 F.3d at 1276. This would essentially read out the requirement that plaintiffs demonstrate a "material misrepresentation" in any case involving corporate misconduct, which is clearly inconsistent with the heightened pleading standards of the PSLRA.

For these reasons, the Court rejects Plaintiffs' argument that statements within Cognizant's Code of Conduct and Anticorruption Policy can be the basis for securities liability.

Because these are internal documents directing employees about how they should aspire to conduct themselves, rather than a guarantee that employees are in fact complying, they are incapable of being false. Plaintiffs do not allege that Defendant made any public statements touting its Code of Conduct or ensuring investors that every employee within the company was adhering to their policies.[8]

Plaintiffs' reliance on *In re Eletrobras Securities Litigation*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) is unpersuasive. There, defendant corporation was facing extensive press inquiries about alleged corruption. In response to these press inquiries, the corporation "repeatedly emphasized and reasserted the strength of its internal controls and its commitment to transparency and ethical conduct," and made reference to its Code of Ethics. *Id.* The court held that these statements were actionable, reasoning that these references were "made specifically in response to damaging media reports about bribery and bid-rigging at [the corporation]." *Id.*; *see also Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (finding statements touting code of conduct and emphasizing compliance actionable when "made repeatedly in an effort to reassure the investing public about the Company's integrity").

The circumstances here are starkly different. First, the statements in *Eletrobras* were public statements to investors about the Code of Ethics, not statements within the Code itself. Second, the statements were made in response to pointed press inquiries in an effort to assuage investor concern about alleged bribery. Courts have consistently limited the reasoning of *Eletrobras* and *Petrobras* to their facts. *See, e.g., Embraer*, 2018 WL 1725574, at *8 n.6 (distinguishing *Eletrobras* because the statements there were made "repeatedly in an effort to

---

[8] The reference in its 2014 Annual Report to the existence of a Code of Conduct, Am. Compl. ¶ 56, does not bring this case within *Eletrobras*, 245 F. Supp. 3d at 463.

reassure the investing public about the company's integrity"); *Fries*, 285 F. Supp. 3d at 718

(distinguishing *Petrobras* because there were "no allegations in the [complaint] showing that

Defendants made such assurances [of general integrity]); *In re Braskem S.A. Sec. Litig.*, 246 F.

Supp. 3d at 757 (distinguishing *Petrobras*). Here, there are no allegations that Defendant was

facing public scrutiny for the alleged bribery scheme, or that the statements were "made in an

effort to reassure the investing public about the [c]ompany's integrity." *Eletrobras*, 245 F. Supp.

3d at 463.

The other cases cited by Plaintiffs are also unpersuasive because they involve statements

about compliance made directly to investors, not statements appearing in an internal document

outlining company policy. *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 277

(S.D.N.Y. 2012) (statements appearing in Forms 10-K and Annual Reports); *In re Moody's*

*Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508 (S.D.N.Y. 2009) (statements in Code of Conduct as

well as Forms 10-K and Annual Reports); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d

221, 239 (S.D.N.Y. 2006) (statements appeared in "press release accompanying an

announcement of a new leadership team" and "announcing new co-directors").[9] Unlike those

cases, the statements at issue here were not representations about the current state of the

company's compliance. Further, Plaintiffs have not alleged that the statements were made in an

effort by Defendant to gain a competitive advantage or otherwise "distinguish itself from other

institutions." *Lapin*, 506 F. Supp. 2d at 240.

---

[9] Plaintiffs also cite *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 742 (9th Cir. 2008). That case involved statements in a merger agreement that were attached to a Form 10-K, not statements in a code of conduct. More importantly, the Ninth Circuit has since held that statements in a code of conduct are inactionable when squarely confronted with the question. *See Retail Wholesale & Dept. Store Union Local 338 Ret. Fund*, 845 F.3d at 1276.

Plaintiffs also argue that the statements are actionable because they are "particularized" and "reflect the Company's current state of affairs." Pls.' Opp. at 30. Plaintiffs point out that in its Code of Conduct, Cognizant states "we **do not** corruptly give or offer . . . anything of value to a government official to obtain or maintain business," and that "**we comply** with all applicable anticorruption laws, rules, and regulations." *Id.* (emphasis in original). However, those statements are not any more particularized or specific than those held to be inactionable in by the Sixth and Ninth Circuits. *See Retail Wholesale & Dept. Store Union Local 338 Ret. Fund*, 845 F.3d at 1276 ("**we make ethical decisions**" (emphasis added)); *Bondali*, 620 F. App'x at 490 ("any product suspected to be unsafe **must immediately** be pulled from distribution" (emphasis added)); *see also Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d at 755 ("[b]ribes, kickbacks and payoffs to government officials, suppliers and other[s] are strictly prohibited," and "[n]o waivers of the provisions of the code of ethics are permitted"). Moreover, the purpose of a Code of Conduct is to promote ethical conduct and legal compliance from within the company. Punishing companies whose Codes are especially specific and concrete would make little sense, as it would disincentivize compliance measures designed to prevent misconduct from occurring.

Consequently, the statements in the Code of Conduct and Anticorruption Policy are not materially false and misleading.

### 2. *Sustainability Reports*

Unlike the Code of Conduct and Anticorruption Policy, the Court finds statements in the Sustainability Reports to be materially false and misleading. The 2014 Sustainability Report states that Cognizant "delivered 333,114 hours of Code of Ethics training through eLearning in 2014," and "delivered Code of Ethics trainings to targeted audiences of over 18,000 associates in India and the Philippines." Am Compl. ¶ 129. The 2014 Sustainability Report gave further detail

NOT FOR PUBLICATION

about its training programs, and went on to state that "our Enterprise Risk Management group conducts annual risk analysis surveys covering all business units and corporate functions to assess the likelihood of various risks including corruption." The 2014 Report also stated that there were "no incidents [of corruption] reported." *Id.* ¶¶ 129, 136. The 2015 Sustainability Report also stated that there were "no incidents [of corruption] reported," and additionally that "no [significant risks related to corruption] reported." *Id.* ¶ 136. These are not aspirational statements of company policy, but statements of fact and representations about the current state of affairs that are capable of falsity and upon which a reasonable investor may rely.

The Court finds that Plaintiffs have adequately alleged that the statements in the Sustainability Reports about anticorruption training were materially false and misleading. At the time that Cognizant was making statements highlighting its anticorruption training, it was allegedly engaged in a bribery scheme involving members of senior management. These statements are misleading for this reason alone. *See Petrobras*, 116 F. Supp. 3d at 380–81 (finding statements regarding effectiveness of internal controls misleading because company was engaged in extensive corruption at the time of the statements).

Further, Plaintiffs have put forth additional allegations demonstrating the falsity of specific statements in the Sustainability Reports. The Sustainability Reports reported that there were "no incidents [of corruption] reported" and "no [significant risks related to corruption] reported." Am. Compl. ¶¶ 129, 136. These statements were made in August 2016 June 2015, after the conclusion of the 2015 Audit wherein FE1 discovered red flag payments made in connection with SEZ licenses. FE1 considered the payments to be suspicious enough to warrant further investigation, and upon such investigation, was met with unsatisfactory answers from Cognizant employees. *Id.* ¶ 70. FE1 then reported the findings of the audit to his superior, and

the information was further emailed to Misty Pederson (not a named Defendant), one of Cognizant's most senior compliance executives. *Id.* ¶ 73. It is plausible that these payments constituted "corruption" or a "risk of corruption," and that FE1 "reported" them to the person to whom he was instructed to report. Because the 2015 Audit had been completed before either of the Reports was published, it is plausible that this reporting occurred before the statements were made.

Plaintiffs have also adequately alleged that the statements about anticorruption training were false and misleading. Plaintiffs have provided the statements of two former employees, both of whom experienced firsthand the alleged deficiencies in Defendant's anticorruption training. In the 2014 Report, Cognizant stated that it had "introduced role based anticorruption training to supplement the anti-corruption provisions of the general ethics training." In contrast, FE1 stated that the training materials provided to Cognizant employees were not specific to the positions they held. *Id.* ¶¶ 72, 129. Defendant also touted its extensive training programs, referencing "live Code of Ethics trainings to targeted audiences of over 18,000 associates in India and the Philippines." *Id.* ¶ 129. However, FE1 stated that training materials were in English rather than the employees' native language, were not specific to their country, and that completion rate for compliance training was low. *Id.* ¶ 72. FE2 stated that his staff had no FCPA-specific training, and that no FCPA training manuals even existed. *Id.*

These accounts by Cognizant's former employees render Cognizant's statements misleading. Implicit in Cognizant touting of its training program was an assurance that the training program could actually be effective at the ground level. Widespread training programs will not help prevent misconduct if employees cannot understand the materials, or if materials

are not being distributed at all. Similarly, the value of widespread training efforts would be greatly diminished if employees were not actually completing the training.

Defendant argues that the "anecdotal experiences" of FE1 and FE2 do not contradict the statements describing Cognizant's training across all of its 260,000 employees. Defs.' Br. at 18–20. The Court rejects this argument because Plaintiffs have provided these former employee statements to comply with the requirements of the PSLRA. It would be quite harsh to on the one hand impose upon securities plaintiffs a heightened requirement of specificity, and on the other disregard their allegations as overly idiosyncratic. The statements of the former employees adequately demonstrate the alleged deficiencies in Defendant's anticorruption training.

The Court must also consider "the detail provided by [FE2], the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya*, 564 F.3d at 263. Here, the basis of FE2's knowledge is his position of employment. The statements regarding training deficiencies are corroborated by FE1's similar experiences, and by the existence of the alleged bribery scheme. While there is not a great amount of detail in FE2's statements, this Court still finds the statements reliable enough to be considered. However, even without FE2's statements, the Court would still find that the FE1's statements alone are sufficient to render the statements about compliance training materially false and misleading.

    iii. **Statements Touting Ability to Deliver Low-Cost Services Through Legitimate Means, Attributing Financial Success to Legitimate Business Factors and Conditions**

The amended complaint alleges that Defendants touted their ability to deliver low-cost services through legitimate means, and attributed Cognizant's financial success and revenue

growth to legitimate business factors and conditions. The amended complaint asserts that these statements were materially false and misleading because Cognizant's performance was driven, in material part, by its bribery scheme. *Id.* ¶ 140.

Defendant Coburn argues that none of his statements is materially false or misleading. Defendant Coburn contends that his statements did not trigger a duty to disclose the alleged bribery scheme because he never made an affirmative statement about SEZ licenses, improper payments to Indian officials, Cognizant's policies for preventing such payment, or any related topic. Coburn Br., at 18, ECF No. 41-1. Defendant Coburn further asserts that his statements were inactionable puffery because they were vague, general, and expressions of opinion.

Cognizant Defendants argue that the amended complaint does not allege a relationship between Cognizant's revenue growth and any potentially improper means and any improper payments. Cognizant Br. at 23. Cognizant Defendants similarly contend that statements about its IT services are not misleading because the amended complaint does not allege any relationship between the statements and any potentially improper payments.

Rule 10b–5 requires disclosure of material information "only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b)5. "Once a defendant makes an affirmative statement or characterization about its business, it puts that subject 'in play' and assumes a duty . . . to speak truthfully about that subject." *In re Merck & Co.*, 2011 WL 3444199, at *9. Like any other aspect of its business, a company may trigger a duty to disclose material facts by making statements about its revenue and earnings. *See Shapiro*, 964 F.2d at 282.

However, "[f]actual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)." *Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 102

(3d Cir. 2007); *Advanta*, 180 F.3d at 538, *abrogated on other grounds, as recognized in City of Edinborough Council*, 754 F.3d at 172 (citing *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir. 1994)). Similarly, absent an allegation that the data are false, "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) (quoting *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 & n.3 (6th Cir. 1997)).

Plaintiffs contend that a company has a duty to disclose any improper or illegal businesses that contribute to a company's success "when a company puts at issue the cause of its success." Pls.' Opp. at 33. In Plaintiffs' view, by speaking about the source of its success, a company triggers an obligation to disclose to avoid liability under Section 10(b). *Id.* at 36. While certain district courts have articulated such a rule, *see Steiner v. Medquist, Inc.*, No. 04-5487 (JBS), 2006 WL 2827740 (Sept. 29, 2006 D.N.J.); *In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp 2d. 388 (S.D.N.Y. 2005); *In re Providan Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814 (E.D. Pa. 2001), the Third Circuit has not. In *Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 101–02 (3d Cir. 2007), the defendant bank had stated that "the strong performance of Commerce Capital Markets was led by the public finance division," and that "the unique Commerce business model continues to produce strong top-line revenue growth driven by strong deposit growth which significantly increases our net interest income and net income." *Id.* The court found that this did not create a duty to disclose the alleged bid-rigging scheme which fueled the growth of these deposits, reasoning that the statements did not put the integrity of the bank's practice "at play." Instead, the statements were all unactionable "factual recitations of past earnings" and puffery. *Id.*; *see also Boca Raton Firefighters and Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) ("Whatever the scope of the responsibility not to

make statements that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated corporate earnings."); *Sanofi*, 155 F. Supp. 3d at 404 (finding "accurate statements of past earnings and growth" not actionable without a closer connection to the alleged misconduct).

Not only is Plaintiffs' proposed rule inconsistent with Third Circuit precedent, it is also overbroad. Because every company will at some point publicly reference the sources of its revenue, Plaintiffs' approach would rewrite the statute to impose an affirmative duty to disclose all material information that affects revenue. Such a duty runs counter to the clear command from the Supreme Court that Section 10(b) and Rule 10b–5 "do not create an affirmative duty to disclose any and all material information," *Matrixx*, 563 U.S. at 44–45, and that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5," *Basic*, 485 U.S. at 239 n.17. If Congress wanted to create a regime of mandatory disclosure of all known misconduct, it would have done so more clearly.

Like any other statement, public announcement of past earnings and sources of revenue create a duty to disclose other material information to the extent necessary to make those statements not misleading. 17 C.F.R. § 240.10b–5(b)5. This is most likely to occur when the public statement has a close connection to the underlying misconduct. *See Sanofi*, 155 F. Supp. 3d at 403 ("The critical consideration . . . in determining whether a corporation must disclose mismanagement or uncharged criminal conduct is whether the alleged omissions . . . are sufficiently connected to the defendants' existing disclosures to make those public statements misleading." (citations and internal quotation marks omitted)). As example, if a company "address[es] the quality of a particular management practice" by characterizing it as "adequate," "conservative," "cautious" and the like, the subject is in play and the defendant has a duty to

speak truthfully. *Shapiro*, 964 F.2d at 282. Similarly, a statement crediting a company's revenue increase to its "customer-focused approach" is misleading if the revenue increase actually reflected fraudulent practices wherein the customers were was truly increased by misleading and defrauding customers. *Providan*, 152 F. Supp. 2d at 819, 824.

Plaintiffs allege three categories of statements; forms filed pursuant to SEC regulations, statements by Defendant Coburn, and statements by Defendants McLoughlin and D'Souza.

### 1. *SEC Forms*

Cognizant's statements in its SEC-required forms are inactionable puffery and statements of accurate historical data. In its 2014 Form 10-K, filed February 27, 2015, Cognizant stated its increase in revenue, and stated that 'key drivers of our revenue growth in 2014" were "[s]olid performance across all of our business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including Consulting, IT IS, and BPS services"; "[i]ncreased penetration at existing customers"; and "[c]ontinued expansion of the market for global delivery of IT services and BPS." Am. Compl. ¶ 414; *see id.* ¶¶ 145, 162, 170, 179, 182, 196.

In a May 4, 2015 press release and Form 8-k, Cognizant stated that its "strong revenue performance this quarter versus our guidance was driven primarily by organic growth of our core business . . . ." *Id.* ¶ 143. Cognizant's Q1 2015 Form 10-Q stated that "the revenue growth from our Rest of World customers in 2015 was primarily driven by the Indian, Japan, Australia, Hong Kong, and Singapore Markets." *Id.* ¶ 146.

Plaintiffs do not allege that the statements are inaccurate, and the Court finds that they are not adequately related to the bribery scheme to render them misleading. The statements do not

reference licenses, tax benefits, permits, or anything else related to the alleged bribery scheme that would be rendered misleading by the omission. *See Sanofi*, 155 F. Supp. 3d at 403 (requiring that the alleged omissions be "sufficiently connected to defendants' existing disclosures to make those public statements misleading"). The reference to India as one of several markets does not put "at play" the propriety of Cognizant's acquisition of government licenses.

As none of the statements triggered a duty to disclose anything about the alleged bribery scheme, they are not false and misleading.

### 2. *Statements by Defendant Coburn*

Coburn's statements all constitute inactionable puffery, or accurate statements of historical fact. As example, on an Earnings Call on November 4, 2015, Coburn stated "[w]e continue to do very well and take market share on the maintenance side. . . . And we – Cognizant just has this incredible track record of delivering very high quality services, while continuously delivering productivity and efficiency." Am. Compl. ¶ 166. Similarly, on May 24, 2016 Coburn stated at an investor conference that Cognizant would respond to customer demand by "bringing best practices to our clients for our traditional services, constantly lower[ing] their cost of ownership while maintaining our margin." *Id.* ¶ 194. Vague, general statements of this kind are mere puffery. *See Advanta*, 180 F.3d at 538, *abrogated on other grounds, as recognized in City of Edinborough Council*, 754 F.3d at 172 (finding statements inactionble because they were "vague and general statements of optimism").

Plaintiffs argue that statements such as "strong vertical presence and investments in building sharply focused industry-specific platforms" are at least as material as "customer-focused approach" that was held to be materially misleading in *Providan*. Pls.' Opp. at 40. But the statement in *Providan* were false; the company was not engaged in a "customer-focused

approach," it was defrauding customers through illegal practices. 152 F. Supp. 2d at 825. By contrast, Plaintiffs have not alleged that Cognizant did not have a "strong vertical presence."

Plaintiffs, relying on *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597–98 (7th Cir. 2006) *vacated and remanded sub nom by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), argue that the statements are material because they were made "in direct response to analyst questions." Pls.' Opp. at 41. The case is inapplicable and the argument is rejected. The statements in that case were far more specific than here – the defendant stated that a specific product would "maintain its growth rate," when in reality, he knew sales were declining. Further, the statement was made in response to a specific analyst question about the growth rate of the product. Here, Plaintiffs have not pled any particular facts to support their argument, including the basic fact of what question supposedly prompted the statement at issue. Further, even if the statement were material, it was not misleading. Plaintiffs have not pled any facts to show that analysts would draw any inferences about Cognizant's acquisition of SEZ licenses from its statement that it would bring "best practices to [its] clients," and "lower their cost of ownership."

Plaintiffs' argument that the statements are material because they "masked the existence of a bribery scheme carried out by senior management" also fails. Pls.' Opp. at 41. The question is not whether the omitted information was material; it is whether Defendants had a duty to disclose it. *See Matrixx*, 563 U.S. at 44 ("Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market."). Because Coburn's statements consisted only of puffery and accurate historical fact, such a duty did not exist. Plaintiffs' argument that the statements involved the "core of [Cognizant's] business" fails for the same reason.

### 3. *Statements by Defendants D'Souza and McLoughlin*

The statements by Defendants D'Souza and McLoughlin similarly constitute only inactionable puffery and accurate statements of historical fact. Defendant D'Souza stated on a November 4, 2015 earnings call that "the bulk of the productivity that we drive in the core business is through traditional means of driving productivity and efficiency that includes process kind of things like Lean and Six Sigma and so on, and also more traditional tools in automation." Am. Compl. ¶ 166. D'Souza also stated on a May 6, 2016 earnings call that a strategic initiative is "to help clients achieve new levels of efficiency and effectiveness in their core transaction processing operations by building platform-based solutions and industry utilities . . . . By applying a series of levers including process optimization, digitization and large-scale efficiencies, we're able to bring clients levels of effectiveness which they would have been unable to reach on their own." *Id.* ¶ 185. Terms like "productivity and efficiency" are general and therefore inactionable. As to the specific references to things like "automation," "process optimization," and "Lean and Six Sigma," Plaintiffs have not alleged any facts to show that these statements are inaccurate, or that they would be rendered misleading by omitting facts of the alleged bribery scheme.

Defendant McLoughlin also stated on an August 5, 2016 call that the Company's financial success could be attributed "to a slightly lower tax rate and stronger operating margins." *Id.* ¶ 201. Although the reference to a "lower tax rate" is arguably somewhat related to SEZ licenses, this general statement is not enough to render the statement materially false and misleading.

Because all of the statements are either accurate statements of historical fact, or inactionable puffery, Plaintiffs have not alleged that they were materially false or misleading.

### iv. **Overstated Earnings by Capitalizing Bribes that Should Have Been Expensed**

The amended complaint asserts that Cognizant overstated its earnings by incorrectly booking the bribery payments as capital expenditures rather than booking them as expenses. *Id.* ¶ 209. Of the $4.1 million of capitalized expenses, $3.1 million was overstated on Cognizant's earnings and investment in physical assets, and understated in expenses. *Id.* Plaintiffs contend that the mis-classification was material because it was a deliberate effort by senior management to conceal corrupt payment to Indian officials. Pls.' Opp. at 47.

Defendants argue that the $3.1 million reclassification was immaterial because it represented less than two tenths of one percent of annual net income during the relevant period. Cognizant Br. at 26. Defendants argue that the immateriality of the reclassification is demonstrated by Cognizant's stock price, which rose 5% following the reclassification. *Id.*

The Court finds that the misstatement was material. SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 150 (1999), which has been recognized as persuasive authority in the Second Circuit, provides a nonexclusive list of "qualitative factors" to consider when determining materiality. One such factor is "[w]hether the misstatement involves concealment of an unlawful transaction." Consequently, courts have found financial misstatements to be material, even if the misstatement would not have been independently significant to investors, if the misstatement was a result of attempt to conceal misconduct. *See Indian Public Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 89 (2d Cir. 2016); *Eletrobras*, 245 F. Supp. 3d at 464–65.

This Court agrees. The misstatement occurred because, according to the Amended Complaint, agents of Defendant Cognizant engaged in improper transactions with Indian government officials and concealed the bribes by misbooking the payments as capital expenditures. Consequently, the Amended Complaint alleges that $4.1 million of corrupt

payments were improperly reported as capital expenditures rather than expenses, thereby overstating its earnings. These overstatements would have been important to investors not only because they overstated earnings, but because of the alleged bribery scheme they concealed.

Defendants' reliance on *In re Westinghouse Securities Litigation*, 90 F.3d 696, 714–15 (3d Cir. 1996) is unpersuasive. There, the Third Circuit held that a .54% overstatement was immaterial as a matter of law. Defendants argue that because the overstatement here is less than two tenths of one percent, it is immaterial as a matter of binding Third Circuit precedent. This argument is rejected because in *Westinghouse*, 90 F.3d at 700, the misstatements concealed only the company's losses, and were not being used to disguise misconduct. Accordingly, investors would only be misled if the financial condition was materially worse than the misstatement represented. In contrast, the relevance of the misstatement was not only that it misrepresented earnings, but also that it concealed misconduct. As this Court has already said, the alleged bribery scheme would "significantly alter the total mix of information made available" to investors. *Matrixx*, 563 U.S. at 38.

The Court finds that the financial reports were materially false and misleading.

### v. SOX Certifications

In connection with each quarterly and annual report filed by Cognizant, Defendants D'Souza and McLoughlin signed SOX Certifications, as required by Section 302 of SOX. In them, Defendants D'Souza and McLoughlin certified that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." *Id.* ¶ 210. The amended complaint alleges that this was materially false and misleading when made because the SEC

filings to which the certifications were appended contained numerous materially false and misleading statements and omissions. *Id.* ¶ 212

For statements of opinion, "falsity of the statement is entirely dependent on what [the certifier] knew, not what was objectively true at the time of the statement." *Sanofi*, 155 F. Supp. 3d at 402; *see Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1326–27 (2015); *In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, No. 15-7658 (MAS) (LHG), 2017 WL 1658822, at *14 (D.N.J. Apr. 28, 2017).

The amended complaint does not allege that McLoughlin or D'Douza did not believe these opinions, or that the statement of opinion contained any false embedded statements of facts. Plaintiffs have not alleged that the certifications based on belief were false or misleading when made.

Defendants D'Souza and McLoughlin also certified that they had designed and evaluated effective internal and disclosure controls:

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function): a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information and b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Am. Compl. ¶ 210.

The amended complaint alleges that this was materially false and misleading when made because Cognizant admitted material weaknesses existed in its internal controls, including "tone at the top," as senior management participated in making corrupt payments by overriding and/or failing to enforce the Company's internal financial controls. *Id.* ¶ 211.

As with the statements of belief, this statement is preceded with a qualifier: "based on our most recent evaluation of internal controls over financial reporting." The Amended Complaint does not allege that the disclosure was based on something other than the recent evaluation of internal controls, and does not allege that either Individual Defendant had any reason to believe that the statement was misleading when made.

The SOX certifications are not actionable.

### vi. **Conclusion**

To resay, the Court finds that Plaintiffs have adequately alleged three sets of materially misleading statements. The first is the statements touting the benefits of SEZ licenses. Am. Compl. ¶¶ 96–99, 101, 104, 107, 110, 111, 115, 118. The second is the statements in the 2015 and 2016 Sustainability Reports touting anticorruption compliance and training and stating that no significant risks of corruption were reported. *Id.* ¶¶ 129, 136. The third is financial reports that misstated bribes as capital expenditures. *Id.* ¶ 209. The amended complaint fails to allege that Defendant Coburn uttered any material misstatement, and the claims against him under Section 10(b) are consequently dismissed.

### b. **Scienter**

As explained, the PSLRA requires a complaint alleging a violation of Section 10(b) to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Avaya*, 564 F.3d at 253 (quoting 15 U.S.C. § 78u-4(b)(2)). A "strong inference" of scienter is one "that is cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324.

Defendants argue that the amended complaint does not plead particularized facts supporting a strong inference of scienter. Cognizant Br. at 29.

NOT FOR PUBLICATION

Plaintiffs respond that the Amended Complaint alleges scienter as to Individual

Defendants D'Souza and McLoughlin, the individuals responsible for the statements found to be

material misrepresentations. Plaintiffs further assert that the Amended Complaint charges

scienter to Defendant Coburn, and also alleges scienter to the corporate defendant independent of

any individual defendant.

The Court will address these arguments in turn and finds that, considering Plaintiff's

allegations "collectively rather than individually," *Avaya*, 564 F.3d at 279–80, the facts alleged

give rise to a strong inference of scienter on the part of Defendant Cognizant.

### i. Scienter Allegations as to Defendants D'Souza and McLoughlin

Plaintiffs argue that a strong inference of scienter arises because (1) Cognizant admitted

that senior management was involved in the bribery; (2) the fraud was easily detectible; (3) the

misconduct involved deliberate illegal behavior; (4) SEZ licenses were particularly important to

Cognizant; (5) the misconduct occurred over a long duration; (6) D'Souza and McLoughlin were

aware that Indian facilities face a high risk of corruption; and (7) D'Souza and McLoughlin

certified that they had "evaluated" the company's internal controls. Taken together, these

allegations do not give rise to a strong inference of scienter.

Plaintiffs argue that an inference of scienter arises because Cognizant admitted that senior

management participated in the bribery. Plaintiffs' rely on the November 7, 2016 Form 10-Q

wherein Cognizant acknowledged the involvement of senior management in the alleged bribery

scheme. The 10-Q reads:

> During the closing process for the third quarter of 2016, based on the results of the internal
> investigation to date, we concluded that as of December 31, 2015 and in subsequent interim
> periods, *we did not maintain an effective control environment. Specifically, we did not
> maintain an effective tone at the top as certain members of senior management may have
> participated in or failed to take action to prevent the making of potentially improper
> payments by either overriding or failing to enforce the controls established by the*

*Company relating to real estate and procurement principally in connection with permits for certain facilities in India. . . .*

As a result of the foregoing, *we have determined that a material weakness existed as of December 31, 2015, and continues to exist in subsequent interim periods, in our internal control over financial reporting.*

Am. Compl. ¶ 84 (emphasis in original).

Plaintiffs state that it is "simply not credible for the Individual Defendants to claim that they had no clue what Cognizant's own senior management was doing – over the course of years – in the heart of the Company's business operations." Pls.' Opp. at 58–59. However, Plaintiffs do not argue that "senior management" refers to Defendants D'Souza or McLaughlin. Instead, Plaintiffs ask the Court to infer that because one member of senior management perpetuated the bribery scheme, the rest of senior management must have been aware of it. However, the PSLRA requires the Court to consider the "complaint in its entirety" and take into account "plausible opposing inferences. *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007). The inference that all members of senior management were aware of the misconduct is less compelling than the nonculpable inference – that rogue members of senior management perpetuated misconduct and concealed their actions from D'Souza, McLaughlin, and others. This competing inference is bolstered by the statement in the 10-Q that perpetrators "overr[ode] or fail[ed] to enforce" internal controls that may otherwise have detected the misconduct. Am. Compl. ¶ 84. The nonculpable explanation is also supported by Cognizant's actions following discovery of the payments, by self-reporting to the SEC and initiating an internal investigation. *Id.* ¶ 226. Additionally, the nonculpable explanation is supported by D'Souza and McLaughlin's continued employment at the company after the discovery of the alleged bribery scheme.

Plaintiffs also argue that a strong inference of scienter arises because Cognizant in its 10-Q admits that it engaged in "deliberate illegal behavior." Pls.' Opp. at 66. Plaintiffs rely on

*Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir 2000), which held that "a strong inference of scienter arises where the complaint alleges that *defendants* 'engaged in deliberately illegal behavior.'" (emphasis added). In that case, however, the inference was permissible because the defendants themselves engaged in the illegal conduct. By contrast, Plaintiffs do not allege that D'Souza or McLoughlin personally participated in the bribery scheme.

Plaintiffs next argue that scienter can be inferred from the Individual Defendants' access to information that would have exposed the bribery. Plaintiffs point to the 2015 audit in which FE1 "fairly easily" uncovered potential red flag payments. It is true that easily-discoverable information can contribute to an inference of scienter. *See George v. China Auto Sys., Inc.*, No. 11 Civ. 7533 (KBF), 2012 WL 3205062, at *14 (S.D.N.Y. Aug. 8, 2012). However, the inference here is weak. The complaint alleges FE1 easily uncovered payments to an ostensibly-private entity with government affiliation that were related to SEZ acquisition. It does not allege that there could be no proper reason for such payments, it does not describe the amount of the payments, and it does not explain why D'Souza and McLoughlin would be looking for this type of payment. Further, the nonculpable inference that the perpetrators prevented D'Souza and McLoughlin from uncovering evidence of wrongdoing weighs against the inference that they were aware of, or reckless with regard to, the misconduct.

Plaintiffs similarly argue that McLoughlin and D'Souza had actual knowledge of misconduct because they received a summary audit report detailing the red flag payments. This argument also fails. FE1 does not claim to have any personal knowledge of what was actually included in the final audit report or the summary report that would have been distributed to D'Souza and McLoughlin. Instead, FE1 stated that the findings were emailed to another employee "for inclusion" in the final audit report, which "would have been" disseminated to

some senior executives," and further that a summary report "would have been" distributed to

Defendants D'Souza and McLoughlin. Am. Compl. ¶¶ 68–74. This two-level "would have"

account is entirely speculative. Plaintiffs must plead "particularized facts" to support an

inference of scienter, not conclusory allegations that a single email would have ripened into a

final audit report and then into a summary audit. "[O]missions and ambiguities count against

inferring scienter," and FE1's statement provides no particular facts about the summary audit.

See Tellabs, Inc., 551 U.S. at 326.[10]

Plaintiffs also contend that scienter can be inferred from the importance of SEZ licenses

to Cognizant's business model. The Third Circuit has recognized that under the "core

operations" doctrine, material misrepresentation concerning "core matters" particularly

important to the corporate defendant may give rise to an inference of scienter. See Avaya, 564

F.3d at 271.

The Plaintiffs do not benefit from the "core operations" doctrine. Even if SEZ licenses

were utilized by some of Cognizant's larger India facilities, the licenses themselves are not a

"core operation" of Cognizant's business. In In re Campbell Soup Co. Securities Litigation, 145

F. Supp. 2d 574, 599 (D.N.J. 2001) the court held that "U.S. soup sales" was a "core operation"

of Campbells Soup. Here, the "core operations" would be Cognizant's IT campuses, not the

licenses granting them tax and regulatory benefits. Further, the improper payments here involved

only "a small number of Company-owned facilities." Brown Decl. Ex. B, ECF No. 42-4 (quoting

September 30, 2016 8-K).

---

[10] Plaintiffs' reliance on Eletrobras, 245 F. Supp. 3d at 468 and similar cases is unavailing. In those cases, the plaintiffs alleged that the defendants had actually received an audit report containing the pertinent information – not that the defendants "would have" received a summary of an audit report that "would have" included it.

More importantly, this Court will not infer scienter under the "core operations" doctrine without other particularized facts about specific information conveyed to management. *See Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013) (emphasizing that *Avaya* had "limited precedential value," and rejecting "core operations" argument because the allegedly misleading statements were not made in response to "pointed inquiries from analysts"). The Amended Complaint does not allege that there were "pointed inquiries from analysts" about the propriety of SEZ acquisitions, or that there was any specific information conveyed to D'Souza or McLoughlin about the misconduct. *See In re Amarin Corp. PLC*, No. 13-cv-6663 (FLW)(TJB), 2015 WL 3954190, at *12 (D.N.J. Jun. 29, 2015) ("While it is true that false or misleading statements by key executives regarding a company's lead product or core business practices will weigh in favor of finding a strong inference of scienter, [courts] will not make such an inference absent particularized allegations showing that defendants had ample reason to know of the falsity of their statements." (citations and internal quotation marks omitted)); *Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 556 (D.N.J. 2010) (rejecting core operations doctrine in the absence of "other individualized allegations"); *cf. In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d at 599 (discussing "core operations" doctrine, but going on to state "[m]ore importantly, though, Plaintiffs identify specific circumstances under which Defendants . . . had access to and received [the pertinent] information").

The six-year duration of the alleged bribery scheme also does not give rise to a strong inference that D'Souza and McLoughlin were aware of the misconduct. Any inference that could be drawn from the duration of the misconduct must be commensurate with its scope. *See In re Dell Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 894–95 (W.D. Tx. 2008) ("Th[e fact that the accounting errors covered a four year period] would tend to weigh in favor of inferring scienter.

However, the magnitude of the errors was quite small."). Per Cognizant's statements, only a "small number" of facilities were affected, and the amended complaint does not contain any specific allegations about the number of improperly-acquired SEZ licenses. Any inference that Defendants D'Souza or McLoughlin would have discovered the bribery because of its duration is further weakened by Cognizant's statement that the perpetrators "over[ode] or fail[ed] to enforce" the internal controls that may otherwise have uncovered the misconduct. Am Compl. ¶ 84; Brown Decl. Ex. B; *see City of Roseville Emps.' Ret. Sys.*, 442 F. App'x 672, 675 (3d Cir. 2011) (finding no scienter as to senior management, even though the misconduct occurred over a six-year period and involved an important aspect of the corporation's business). Again, the inference of scienter is outweighed by the nonculpable inference that the perpetrators successfully concealed the misconduct until it was discovered and disclosed in September 2016.

The last argument concerning D'Souza and McLoughlin is that the SOX certifications themselves give rise to an inference of scienter. Pls.' Opp. at 75–76. Plaintiffs argue that scienter can be inferred because the Individual Defendants certified that they had "evaluated the effectiveness" of the company's internal controls, which were ineffective. Again, this argument fails in the overall context of the complaint. There are no particularized allegations about D'Souza or McLoughlin's knowledge, and there is a strong competing inference that the perpetrators of the bribery were successful in concealing their conduct from those who tried to detect it – McLoughlin and D'Souza included. There is an alternative theory to the one proposed by Plaintiffs: "that Defendants undertook the design and evaluation of [the Company's] control, as they certified, and designed the system which, at the point of design and implementation, appeared to be adequate but, eventually, proved to be insufficient." *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 352 (D.N.J. 2007).

Viewing the allegations of the Amended Complaint holistically, the facts alleged do not give rise to a strong inference of scienter as to Defendants D'Souza and McLoughlin. The Section 10(b) claims are consequently dismissed as to these two Individual Defendants.

## ii. **Additional Scienter Allegations**

Having found that neither Defendant D'Souza nor Defendant McLoughlin have been shown by the Amended Complaint to have had scienter at the time the statements were made, the Court now turns to Plaintiffs' additional arguments. Plaintiffs assert that scienter is adequately pled as to Defendant Coburn because he resigned, possibly without severance, shortly after the announcement of the internal investigation. Pls.' Opp. at 59. Plaintiffs also contend that scienter is adequately pled because the company admitted that members of senior management were involved in the alleged bribery scheme, and that the Court may impute the scienter of senior management to the corporation. Plaintiffs assert that there is "no requirement that the same individual who made the alleged misstatement on behalf of a corporation personally possessed the required scienter." *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006).

Defendant Coburn argues that the Amended Complaint fails to adequately allege that he participated in the alleged bribery scheme. Coburn Br. at 24. Cognizant Defendants argue that even if Coburn had the requisite scienter, the amended complaint does not allege that he made any material misstatements. Cognizant Br. at 38.

The Court will first consider whether Plaintiffs have adequately alleged that Defendant Coburn had the requisite scienter. Next, the Court will consider whether the facts of the complaint, taken together, give rise to a strong inference of scienter as to the corporation.

1. *Scienter as to Defendant Coburn*

The Amended Complaint sufficiently alleges that Defendant Coburn was a participant in the bribery scheme and, consequently, that he had actual knowledge that statements touting SEZ licenses, touting compliance procedures, and misrepresenting financial statements were false and misleading. The Amended Complaint contains various allegations regarding Defendant Coburn which, taken together, are sufficient to meet the heightened pleading requirement of the PSLRA and Rule 9(b) as set out by the Supreme Court in *Tellabs*, 551 U.S. 308.

The Amended Complaint contains a series of allegations regarding Coburn's departure as President immediately following the announcement of the bribery scheme. *E.g.*, Am. Compl. ¶¶ 76–81, 88. These allegations say that Defendant Coburn abruptly resigned amidst the corruption investigation. *Id.* ¶ 76. Cognizant announced Coburn's resignation in the same 8-K filing that announced the internal investigation and the possible FCPA violations. *Id.* ¶ 75–76. Following Coburn's resignation, analysts commented that the departure was unexpected and appeared to be related to the internal investigation, and further noted that he did not appear to have received severance. *Id.* ¶¶ 77–81; *see id.* ¶ 77 (noting that analyst referred to Coburn's departure as "blockbuster news"). Three days after Coburn resigned, Defendant D'Souza told investors that "those [members of senior management] who may have been involved [with the bribery] are no longer with the company." *Id.* ¶ 87.

The Amended Complaint also contains statements by two additional confidential witnesses, FE3 and FE4. The Amended Complaint alleges that FE3 served as Cognizant's Infrastructure Team Lead from July 2015 through January 2016, and that he/she stated that Coburn was the "responsible authority" for overseeing Cognizant's leases in India. *Id.* ¶ 74. The Amended Complaint alleges that FE4 served as Associate Director – Strategic Sourcing from

September 2011 to March 2015, and that he/she stated that Coburn was "involved directly" in real estate transactions, and that "[h]e used to take a special interest." *Id.*

This Court finds that the facts alleged give rise to a strong inference of scienter. The resignation of a member of senior management in the midst of an internal investigation can be indicative of scienter. *See Southeastern Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 12-cv-00993, 2016 WL 466958, at *5 (M.D. Pa. Feb. 8, 2016); *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *10.

To be sure, resignation of corporate officers around the time of an internal investigation or the announcement of corporate misconduct alone is not sufficient to give rise to a strong inference of scienter. *In re Hertz Global Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223, at *20 (D.N.J. Apr. 27, 2017) ("The Third Circuit and other courts have found resignations of key officers to be insufficient to show that they acted with the requisite scienter to commit the alleged fraud." (citations omitted)). There are many possible motivations for employees to resign in these circumstances that are not indicative of participation in wrongdoing. Plaintiffs must therefore plead facts to "refut[e] the reasonable assumption that [the defendant's employee] was simply fired because the errors . . . occurred on his watch or because he adequately failed to supervise his department." *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002); *see In re Great Atlantic & Pacific Tea Co., Inc. Sec. Litig.*, 103 F. App'x 465, 470 (3d Cir. 2004) ("Other than a conclusory statement that nine employees were fired as a result of the accounting irregularities, the complaint makes no specific allegations regarding how these employees were involved in the accounting irregularities or whether they knew that the accounting policies violated GAAP . . . .").

Here, Plaintiffs have alleged specific facts to refute the nonculpable explanation. The "reasonable assumption" that Coburn may have resigned because of his performance is rebutted by Cognizant's public admission that members of senior management participated in or failed to uncover the bribery. Three days later, Defendant D'Souza stated that those senior-manager participants had resigned. Further, the resignation was announced in the same public filing that announced the misconduct, not weeks or months after. *Cf. In re Hertz Global Holdings, Inc.*, 2017 WL 1536223, at *20 (finding resignations insufficient evidence of scienter when one employee resigned the day before the announcement, and others resigned weeks or months later).

Former employees have also stated that Defendant Coburn had a special interest in real estate. The Court will consider the statements of the former employees, but will discount them greatly. Considering the *Chubb* factors, neither employee provided any detail about Coburn's involvement in SEZ procurement. There are no corroborative facts about Coburns' involvement or interest in Indian land acquisition, and moreover, nothing connecting his interest in Indian land acquisition in general with the specific improper acquisition of SEZ licenses. Still, even given this discount, the former employees' statements provide further allegations that Defendant Coburn was involved in real estate, adding to the inference that he was a participant in the alleged bribery scheme.

As the District of Delaware has explained, to find a strong inference of scienter "there must be some reason to believe that the resignation was actually connected to the fraud." *City of Roseville Emps.' Ret. Sys.*, 713 F. Supp. 2d 378, 398 (D. Del. 2010), *aff'd* 442 F. App'x 672 (3d Cir. 2011). Here, that connection is provided by Cognizant's public statements implicating senior management in the bribery and announcing their departure three days after Defendant Coburn resigned. Given these circumstances, the inference that Coburn was a participant in the bribery is

"cogent and at least as compelling" as the nonculpable inference that he resigned because of poor performance or unfortunately serendipitous timing. *Tellabs*, 551 U.S. at 324.[11]

### 2. *Scienter as to Defendant Cognizant*

Having found that the Amended Complaint adequately alleges scienter as to Defendant Coburn, the Court must now determine what role, if any, his mental state may serve in establishing scienter as to the corporate defendant. Courts are divided on whether and when scienter is adequately alleged as to a corporation in the absence of scienter allegations as to the individual who made the material misstatement. Some courts, including the Second and Seventh Circuits, have held adopted a theory of "collective" or "corporate" scienter and held that allegations can give rise to a strong inference of scienter as to the corporation even if they do not give rise to an inference of scienter as to the individual who uttered the material misstatement. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *see In re Marsh & Mclellan Co., Inc. Sec. Litig.*, 501 F. Supp. at 482 ("There are sufficient allegations regarding the pervasiveness of the fraud, the conscious misbehavior of the particular corporate employees, and the complicity of the corporate entities to find that [the corporate defendant] was aware of or recklessly disregarded the intentional misconduct . . . ."). The Ninth Circuit has also acknowledged that "in some circumstances, some form of collective scienter might be appropriate." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008). The oft-cited example from the Seventh Circuit is:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the

---

[11] Additionally, in *City of Roseville Emps.' Ret. Sys.*, 713 F. Supp. 2d at 398, the internal investigation was covert at the time of the resignation. The court consequently did not even consider the evidence of the resignation.

announcement was false.

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).

Other courts have held to the contrary, and require a strong inference of scienter as to "the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 366 (5th Cir. 2004); *see Phillips v. Scientific-Atlanta, Inc.,* 374 F.3d 1015, 1017 (11th Cir. 2004).

The Sixth Circuit has taken a "middle ground" approach, and will consider the mental state of "a. the individual who uttered the misrepresentation; b. any agent who authorized, commanded, furnished information for, prepared . . . , reviewed, or approved the statement; and c. any high managerial agent or board member who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance." *In re Omnicare, Inc. Sec. Litig.,* 769 F.3d 455, 476 (6th Cir. 2014).

The Third Circuit has not squarely decided the issue, but addressed it in *City of Roseville Employees' Retirement System. v. Horizon Lines, Inc.,* 442 F. App'x 672, 676 (3d Cir. 2011). There, senior corporate executives had made material misstatements involved a price-fixing scheme which was carried out by company managers in Puerto Rico. The court affirmed the district court's dismissal, reasoning that although "the Puerto Rico managers acted with scienter, . . . they did *not* make material false statements on which plaintiff relied." *Id.* at 674, 676 (emphasis in original). The court went on to say that it need not consider whether scienter could otherwise be pled against the corporation, because "the facts pled here are a far cry from those in *Bridgestone* or in the Seventh Circuit's hypothetical." *Id.* at 676–77. It therefore did not reject or adopt a theory of corporate scienter that would allow liability when scienter was not alleged as to

NOT FOR PUBLICATION

an individual who made the material misstatement. The court indicated that if such a theory were viable, it would be in an instance of pervasive corporate misconduct, or blatantly false statements. *See id.*; *see also Rahman*, 736 F.3d 237, 246 (3d Cir. 2013) (declining to accept or reject "collective or corporate scienter" doctrine, finding standard was not met because plaintiffs failed to allege widespread corporate misconduct or a corporate cover-up).

Under any approach, at the summary judgment stage, "[t]o prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." *Dynex Capital Inc.*, 531 F.3d at 195. The primary difference appears to be that in the narrower approach adopted by the Fifth Circuit, plaintiffs must identify an individual in the complaint who was responsible for the misstatement and also had the requisite mental state. *See Southland Securities*, 365 F.3d at 367 (noting that "the Complaint does not assert that *any particular individual* INSpire director, officer, or employee" acted with scienter). Under the "middle ground" Sixth Circuit approach, a plaintiff may plead scienter as to the individual who made the statement, or an individual who was closely connected to the statement (based on an enumerated list). In the broader approach adopted by the Second, Seventh, and Ninth Circuits, plaintiffs may survive a motion to dismiss even if the individual who acted with scienter remains identified if there is sufficient circumstantial evidence to create a strong inference that such an individual exists.

The Court declines to adopt the narrow approach of the Fifth Circuit. The Fifth Circuit approach allows corporations to "evad[e] liability through tacit encouragement and willful ignorance," *Omnicare*, 769 F.3d at 476, and fails to address instances "where widespread corporate fraud cannot be connected to individual defendants at the pleading stage." *In re Marsh*

*& Mclellan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d at 481–82; *see Sun v. Han*, No. 15-703 (JLL), 2015 WL 9304542, at *12 (D.N.J. 2015) (adopting Second Circuit approach). As the Supreme Court has directed, "strong inference" of scienter does not require plaintiffs to come forward with a "smoking gun." *Tellabs. Inc.*, 551 U.S. at 324.

Under either the "middle ground" approach articulated in *Omnicare*, or the broader "corporate scienter" approach adopted in the Second and Seventh Circuits, this Court finds that Plaintiffs have alleged sufficient facts to give rise to a strong inference of scienter as to the corporate Defendant.

Under the "middle ground" approach of the Sixth Circuit, Defendant Coburn's scienter may be imputed to the corporation because he is a "high managerial agent . . . who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance." *Omnicare*, 769 F.3d at 476; *see City of Monroe Emps. Retirement System v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005) (imputing knowledge of CEO to corporation and finding scienter as to corporation, but dismissing claim against CEO because he had not uttered a misstatement). [12] According to the Amended Complaint, Cognizant touted its SEZ licenses in SEC filings between February 2015 and August 2016, touted its internal compliance measures in Sustainability Reports in June 2015 and August 2016, and misstated its earnings each year during the Class Period. The misstatements were repeated over the course of multiple years in various public filings. While this was occurring, the Amended Complaint alleges that the president of the company was facilitating an ongoing bribery scheme in India, involving misbooking bribes as

---

[12] The *Omnicare* court limited the holding of *Bridgestone*, but upheld the decision because "that case turned on the CEO's knowledge, a person included in part C of our rule." *Omnicare*, 769 F.3d at 476. The Court finds that the Defendant Coburn's scienter may be imputed to the corporate defendant under *Bridgestone*, even as limited by *Omnicare*.

capital expenditures, and concealing his conduct from others within the company. There is a strong inference that as President of the company, Defendant Coburn either had a role in preparing the statements at issue or that, if he did not actually participate in their preparation, he became aware that they misstated earnings and touted SEZ licenses and internal compliance measures, but nevertheless "tolerated the misrepresentation." *Omnicare*, 769 F. 3d at 476; *see Li v. Aeterna Zentaris, Inc.*, No. 3:14-7081, 2016 WL 3583821, at *4 (D.N.J. Jun. 30, 2016) (imputing knowledge of CEO and President to corporation); *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 410–13 (D.N.J. 2004) (imputing knowledge of general counsel to corporation).

Furthermore, this Court finds that Plaintiffs have adequately alleged scienter under the broader approach of the Second, Seventh, and Ninth Circuits. The alleged bribery scheme was widespread throughout the company and involved multiple personnel. The Amended Complaint alleges that the misconduct involved the company President, and by Cognizant's own admission it involved other members of senior management. *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d at 765 & n.14 (citing *In re Marsh & Mclellan Cos.*, 501 F. Supp. 2d at 481) (finding scienter as to corporate defendant when complaint alleged that corporate executives participated in misconduct). The alleged bribery scheme did not involve a limited group of rogue employees perpetuating fraud and concealing it from corporate management, but instead was a pervasive operation extending from senior management itself.

The alleged involvement of senior management and the company President distinguish this case from the cases in which the Third Circuit has declined to adopt or reject the corporate scienter theory. *City of Roseville Employees' Retirement System*, 442 F. App'x 672 involved a price-fixing scheme carried out by the corporation's Puerto Rico division by three individuals referred to by the court as the "Puerto Rico managers." The material misstatements were made

by a different group of defendants referred to as the "senior executives" who were unaware of the misconduct. *Id.* at 673. Similarly, *Rahman v. Kid Brands, Inc.*, 736 F.3d 237 (3d Cir. 2013), involved customs violation carried out by employees at one of the corporate defendant's wholly-owned subsidiaries. In both cases, the Third Circuit found that scienter had not been adequately alleged, leaving open the question of "collective scienter."

Both *City of Roseville* and *Rahman* involved statements made by senior management that were later discovered to be untrue because of the misconduct of rogue employees. Application of collective scienter under those circumstances would be improper; it makes no sense to describe an officer's innocently-made statement as "fraud" merely because another employee was aware of facts rendering the statement misleading.

On the other hand, when there is circumstantial evidence creating a strong inference that someone involved in the making of the misstatement was aware of its falsity, the "collective scienter" theory is appropriate to allow plaintiffs to proceed to discovery. As example, in the Seventh Circuit hypothetical, it is permissible to infer that someone connected to the statement that General Motors sold "zero" SUVs was aware that it was false because the statement is so obviously untrue. *See Makor Issues & Rights, Ltd.*, 513 F.3d at 710; *see Glazer Capital Mgmt.*, 549 F.3d at 744 ("[T]here may be circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication." (emphasis in original)). Similarly, in cases of pervasive fraud, it may be proper to infer that someone making the statement would have been aware of the wrongdoing because it would be readily apparent throughout the company. *See In re Marsh & Mclellan Co., Inc. Sec. Litig.*, 501 F. Supp. 2d at 482.

Here the President's alleged involvement in the misconduct provides such circumstantial evidence. There is a strong inference that someone involved with the making of the 10-K and the Sustainability Reports knew of their falsity. The alleged bribery scheme required multiple employees across the globe and involved the President and other members of senior management. It is highly unlikely that not one of these multiple members of senior management or the President were aware of or participated in the preparation of financial statements, SEC filings, or Sustainability Reports.

The Court emphasizes that corporations may not be held liable for the knowledge of every employee, or even every member of senior management. However, considering the breadth and duration of the alleged bribery scheme, the importance of SEZ licenses to the company, and the alleged involvement of Defendant Coburn and other unnamed members of senior management, there is a strong inference of scienter as to the corporate defendant.

Defendant's motion to dismiss as to Defendant Cognizant is denied.

## II.    Section 20(a)

Section 20(a) of the Exchange Act "imposes joint and several liability on the part of one who controls a violator of Section 10(b)." *Suprema*, 438 F.3d at 284 (citing 15 U.S.C. § 78t). . To maintain a claim under § 20(a), the plaintiffs must establish (1) an underlying violation by a controlled person or entity, (2) that the defendants are controlling persons, and that they were "in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 885 (3d Cir.1975) (citation omitted).[13]

---

[13] The Court notes that there is disagreement between district courts within this circuit as to whether "culpable participation" must be alleged to survive a motion to dismiss. *Compare In re Cendant Corp. Sec. Litig.*, 76 F. Supp. 2d 539, 549 (D.N.J. 1999) (requiring that plaintiffs plead culpable participation), *with In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d at 600 (not requiring culpable participation allegations at pleading stage); *see also Belmont v. MB Inv.*

Having found an underlying violation by Cognizant, the only question is whether the Individual Defendants D'Souza, McLoughlin, and Coburn are "controlling persons" who were "culpable participants" in the fraud.

The Court finds that the Amended Complaint adequately alleges that all three Individual Defendants are "controlling persons" for purposes of Section 20(a) by virtue of their positions as the highest ranking executives of Cognizant.

The Court also finds that the Amended Complaint adequately alleges that Defendant Coburn was a culpable participant, for the reasons that gave rise to a strong inference of scienter. However, the Amended Complaint fails to allege that Defendant D'Souza or McLoughlin were culpable participants. *See Lapin*, 506 F. Supp. 2d at 248–49 (dismissing Section 20(a) claim against individual defendants for failing to plead culpable participation). The Court therefore grants the motion to dismiss the Section 20(a) claims against Defendants D'Souza and McLoughlin, and denies the motion to dismiss as to Defendant Coburn.

### III.     Plaintiffs are entitled to amend their complaint.

If a complaint fails to state a claim upon which relief can be granted, a plaintiff should ordinarily be granted the right to amend his complaint. The Supreme Court has instructed that:

> The grant or denial of an opportunity to amend is within the discretion of the District court, but outright refusal to grant the leave without any justifying reason . . . is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182 (1962). In the Third Circuit, plaintiffs whose complaints fail to state a cause of action are entitled to amend their complaint unless doing so would be inequitable or futile. *Fletcher-Harlee Corp. v. Pote Concrete Contrs., Inc.*, 482 F.3d 247, 252

---

*Partners, Inc.*, 708 F.3d 470, 484 n.20 (3d Cir. 2013) (discussing the disagreement between district courts on the requirement).

(3d Cir. 2007). In *Shane v. Fauver*, 213 F.3d 113 (3d Cir. 2000), the Third Circuit stated:

> [W]e suggest that district judges expressly state, where appropriate, that the plaintiff has leave to amend within a specified period of time, and that application for dismissal of the action may be made if a timely amendment is not forthcoming within that time. If the plaintiff does not desire to amend, he may file an appropriate notice with the district court asserting his intent to stand on the complaint, at which time an order to dismiss the action would be appropriate.

*Shane*, 213 F. 3d at 116 (citing *Borelli v. City of Reading*, 532 F.2d 950, 951 n.1 (3d Cir. 1976)).

Allowing Plaintiff to seek to amend the complaint in this case is appropriate. Plaintiffs have adequately alleged violations of Section 10(b) and Rule 10b-5 as to Defendant Cognizant and Section 20(a) as to Defendant Coburn. Plaintiffs are granted forty-five (45) days to seek to amend their complaint, if they wish.

## CONCLUSION

The Court dismisses the claims based on Cognizant's Code of Conduct and Anticorruption Policy, the statements touting low-cost services and attributing the company's financial results to legitimate business factors, and the SOX certifications. Am. Compl. ¶¶ 122–28, 132–35, 140–208, 210–12. Further, because Plaintiffs failed to allege that Defendant Coburn made any material misstatement, the claims against him under Section 10(b) are dismissed. That dismissal is with prejudice.

Because Plaintiffs have failed to allege scienter or culpable participation on the part of Defendants D'Souza and McLoughlin, the claims against them are dismissed without prejudice.

The Court denies Defendants' motions to dismiss as to the balance of the claims.

Plaintiffs are granted leave to seek to amend their complaint within 45 days of the date of this opinion. An appropriate order follows.

DATE: 8 August 2018

William H. Walls

Senior United States District Court Judge