**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

IN RE COGNIZANT TECHNOLOGY
SOLUTIONS CORPORATION SECURITIES
LITIGATION

No. 2:16-cv-06509-WHW-CLW
Hon. William H. Walls

**CLASS ACTION**

**SECOND AMENDED CLASS
ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS**

**Jury Trial Demanded**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................... 2

II.  JURISDICTION AND VENUE ............................................................. 11

III.  PARTIES ............................................................................................... 11

    A.  Lead Plaintiffs .............................................................................. 11

    B.  Defendants and Dismissed Defendants......................................... 12

    C.  Unindicted Co-Conspirator Non-Parties........................................ 15

IV.  SUMMARY OF THE FRAUD ............................................................. 17

    A.  Cognizant's Success as an Outsourcing Business Was Driven by Its Use of Indian "Special Economic Zones" to Lower the Company's Taxes and Costs.................................................................................... 17

    B.  Planned Changes to Indian Tax Law Put Increased Pressure on Cognizant to Obtain SEZ Licensing for Its Facilities As Quickly As Possible During the Class Period ................................................... 21

    C.  Defendants Underscored the Benefits of Cognizant's SEZ Licenses As a Key Driver of Its Financial Performance, While Assuring Investors that Cognizant Did Not Make Improper Payments to Foreign Officials ..................... 24

        1.  Defendants Highlighted that Cognizant's SEZ Operations Were a Crucial Driver of Its "Strong" Financial Performance ............................ 24

        2.  Defendants Assured Investors That Cognizant Did Not Make Improper Payments to Foreign Officials, and Maintained a System of Internal Controls to Prevent Such Payments ........................................ 27

    D.  In Truth, Cognizant Bribed Indian Government Officials to Procure Valuable SEZ Licensing ................................................................. 36

    E.  The New Facts in the Indictment, SEC Action, and SEC Order Further Establish Cognizant's Bribery Scheme and False Statements to Investors .......... 41

        1.  Defendants Coburn and Schwartz Arranged $2.5 Million in Illicit Payments to Obtain  Permitting Necessary to Create and Operate Cognizant's Largest SEZ Facility ............................................................ 41

2. To Conceal the Illicit Bribery Scheme, Defendants Coburn and Schwartz Made and Caused to Be Made False and Misleading Statements and Omissions in Cognizant's SEC Filings and Sustainability Reports ................................................................. 48

3. Cognizant—acting through its senior executives—executed very similar bribery schemes at other SEZ facilities. ....................... 56

F. The Truth Is Finally Revealed .................................................................. 58

G. Cognizant Has Admitted that the Company's Class Period Representations Were False and that Senior Management Participated in Making Improper Payments to Indian Officials, and Coburn and Schwartz Have Been Indicted and Sued by the SEC for This Misconduct ............................................. 61

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD AND ANALYST AND MARKET REACTIONS THERETO ................................................................. 67

A. Cognizant Highlighted the Benefits It Received from Its SEZ Licenses in India Without Disclosing that the Company Was Involved in a Bribery Scheme to Obtain and Perpetuate Those Benefits .................................... 68

1. February 27, 2015: 2014 Form 10-K ...................................... 68

2. May 4, 2015: Q1 2015 Form 10-Q ......................................... 70

3. August 6, 2015: Q2 2015 Form 10-Q ..................................... 71

4. November 5, 2015: Q3 2015 Form 10-Q ................................. 71

5. February 25, 2016: 2015 Form 10-K ...................................... 72

6. May 6, 2016: Q1 2016 Form 10-Q ......................................... 73

7. August 5, 2016: Q2 2016 Form 10-Q ..................................... 74

B. Cognizant Emphasized Its Legal Compliance and Internal "Anti-Corruption" Controls While Specifically Denying Any "Incident" of "Corruption" During 2014 or 2015 .................................................... 75

1. Defendants' False Statements in the Anticorruption Policy .................... 76

2. Defendants' False Statements in the 2014 Sustainability Report ............ 78

3. Defendants' False Statements in the Code of Conduct............................ 79

4. Defendants' False Statements in the 2015 Sustainability Report ............ 81

ii

    C.     Cognizant Touted Its Ability to Deliver Low-Cost Services to Clients Through Legitimate Means, and Attributed the Company's Financial Results to Legitimate Business Factors and Conditions ........................................ 83

          1.     February 27, 2015: 2014 Form 10-K ....................................................... 84

          2.     May 4, 2015: Press Release and Form 8-K ............................................. 85

          3.     May 4, 2015: Q1 2015 Form 10-Q ......................................................... 85

          4.     May 4, 2015: Q1 2015 Earnings Conference Call ................................... 86

          5.     August 5, 2015: Q2 2015 Earnings Conference Call ............................... 88

          6.     August 6, 2015: Q2 2015 Form 10-Q ..................................................... 89

          7.     November 4, 2015: Q3 2015 Earnings Conference Call .......................... 91

          8.     November 5, 2015: Q3 2015 Form 10-Q ................................................ 93

          9.     February 8, 2016: Q4 2015 Earnings Conference Call ............................ 94

          10.    February 25, 2016: 2015 Form 10-K ...................................................... 95

          11.    May 6, 2016: Q1 2016 Form 10-Q ......................................................... 96

          12.    May 6, 2016: Q1 2016 Earnings Conference Call ................................... 97

          13.    May 24, 2016: J.P. Morgan Technology, Media and Telecom Conference ................................................................................................ 99

          14.    August 5, 2016: Q2 2016 Form 10-Q ................................................... 100

          15.    August 5, 2016: Q2 2016 Earnings Conference Call ............................. 101

          16.    September 6, 2016: Citi Global Technology Conference ....................... 103

    D.     Cognizant Overstated Earnings by Capitalizing Bribes that Should Have Been Expensed ............................................................................................. 104

    E.     SOX Certifications Executed Throughout the Class Period ............................... 105

VI.    ADDITIONAL SCIENTER ALLEGATIONS ................................................. 107

VII.   LOSS CAUSATION ........................................................................................ 117

VIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE ............................. 122

IX.    CONTROL PERSON ALLEGATIONS .......................................................... 123

X.      INAPPLICABILITY OF SAFE HARBOR ................................................................ 126

XI.     CLASS ACTION ALLEGATIONS ........................................................................... 127

XII.    PRAYER FOR RELIEF ........................................................................................... 133

XIII.   JURY DEMAND ...................................................................................................... 134

Lead Plaintiffs Union Asset Management Holding AG ("Union"), Amalgamated Bank, as Trustee for the LongView Collective Investment Funds ("Amalgamated"), and the Fire and Police Pension Association of Colorado ("Colorado Fire and Police," and with Union and Amalgamated, "Lead Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, by their undersigned attorneys, allege the following against Cognizant Technology Solutions Corporation ("Cognizant" or the "Company") and the Individual Defendants (defined below), upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Lead Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts is based upon the investigation conducted by and through their counsel, which included, among other things, the review and analysis of: (i) transcripts, press releases, news articles, and other public statements issued by or concerning Cognizant and the Individual Defendants; (ii) research reports issued by financial analysts concerning the Company; (iii) reports filed publicly by Cognizant with the U.S. Securities and Exchange Commission ("SEC"); (iv) Cognizant's corporate website; (v) interviews with former Cognizant employees; (vi) the Indictment and other documents issued in the action captioned *United States v. Gordon J. Coburn and Steven Schwartz*, Criminal No. 19-120 KM (D.N.J.); (vii) the Complaint and other documents filed in the action captioned *Securities and Exchange Commission v. Gordon J. Coburn and Steven E. Schwartz*, No. 19-cv-05820 (D.N.J.); (viii) the SEC administrative proceeding captioned *In re Cognizant Tech. Solutions Corp.*, Administrative Proceeding No. 3-19000; and (ix) other publicly available information. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Lead Plaintiffs bring this federal securities class action on behalf of themselves and on behalf of a class consisting of all persons and entities who purchased, or otherwise acquired, the common stock of the Company from February 27, 2015, through and including September 29, 2016 (the "Class Period"), subject to certain exclusions addressed in paragraph 329 below (the "Class").[1] The defendants in this action are Cognizant; Gordon Coburn ("Coburn"), Cognizant's President until his resignation on September 27, 2016; and Steven Schwartz, Cognizant's Chief Legal Officer until his departure in November 2016 (collectively, the "Defendants"). Lead Plaintiffs' and the Class's claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule l0b-5 promulgated thereunder.

## I.   INTRODUCTION

1.    This securities fraud action arises from a series of material misstatements and omissions made by Cognizant's senior executives that concealed a bribery scheme at the core of the Company's business. As the Company has now acknowledged, and as criminal and civil actions by the Department of Justice (the "DOJ") and the Securities and Exchange Commission (the "SEC") have corroborated, the bribery scheme was perpetrated by Cognizant's "senior management." The members of Cognizant's senior management who perpetrated the scheme include its former President, Defendant Coburn—whom analysts described as "a leading face of

---

[1] References to "paragraph _" or "¶ _" are to paragraphs in this Second Amended Class Action Complaint for Violations of the Federal Securities Laws. In accordance with the Court's prior Order (ECF No. 66), Plaintiffs do not assert claims against dismissed Defendants Francisco D'Souza ("D'Souza"), Cognizant's Chief Executive Officer ("CEO"), Karen McLoughlin ("McLoughlin"), Cognizant's Chief Financial Officer ("CFO"), or for the dismissed allegedly false and misleading statements. In order to preserve their right to appeal, Plaintiffs hereby stand on their prior allegations regarding all previously dismissed claims, Defendants, and statements. *See U.S. ex rel. Atkinson v. PA Shipbuilding Co.*, 473 F.3d 506, 517 (3d Cir. 2007). Plaintiffs have tailored the "Parties" Section and Counts I and II herein to reflect the Court's Order and their amended allegations, but, for ease of comprehension and readability, have not otherwise excised the allegations relating to the dismissed parties and statements.

[Cognizant] to the investment community"—and the Company's former Chief Legal Officer, Defendant Schwartz, who was responsible for overseeing Cognizant's compliance with anti-corruption laws and signed many of the Company's false and misleading SEC filings during the Class Period.

2.      Cognizant provides information technology and business process ("IT") outsourcing. Although headquartered in the United States, the Company's principal operations are based in India and spread throughout several large campuses. This was key to the Company's profitability: Cognizant leveraged the lower labor, tax, and other business costs of its Indian operations in order to provide IT services to its global clients at highly competitive prices.

3.      One of the principal ways Cognizant cut its own costs, and in turn delivered lower cost services to clients, was by locating its Indian campuses in "Special Economic Zones" or "SEZs." Companies operating from within SEZs are guaranteed a number of highly lucrative benefits, including numerous tax exemptions and holidays, easing of various customs and labor regulations and procedures, and heightened access to credit, infrastructure, and other resources. In order to develop or operate a facility within an SEZ, however, businesses are required to secure licenses from India's government. Given the extraordinary value that flows to license-holders, SEZ licenses are highly sought-after.

4.      The pressure Cognizant faced to obtain these valuable licenses increased significantly at the start of the Class Period, when the Indian central government indicated it would soon begin to eliminate the availability of tax benefits for new operations. Thus, during the Class Period, Cognizant aggressively expanded its SEZ operations, constructing or expanding four of its ten massive "global delivery centers," each housing thousands of employees, in SEZs. In at least one case, Cognizant was able to secure SEZ licensing for its facilities, despite the fact that the

3

same governmental authority had refused to license the Company's direct competitors to operate in the very same zones.

5.     Cognizant profited enormously from the SEZ status of its Indian operations – a fact that the Company touted throughout the Class Period. For instance, when Cognizant reported its "strong performance in 2015" to investors, it stated that the tax benefits it derived from its SEZ licenses increased the Company's net income by $201.4 million (more than 14%) and increased diluted EPS by $0.33 per share (more than 12%). Cognizant also assured investors it would continue to grow its investment in SEZ facilities as a central part of its business strategy, stating, by way of example, that "[w]e have constructed and expect to continue to locate most of our newer development facilities in SEZs."

6.     At the same time that Defendants reported strong financial results driven in substantial part by the valuable benefits the Company received from its SEZ licenses, they also reassured investors that Cognizant was not paying bribes to foreign officials in order to obtain the licenses, and was taking concrete steps to ensure compliance with applicable anticorruption laws. Cognizant's compliance with anticorruption laws, and its maintenance of appropriate controls to ensure continued compliance, was particularly important to investors because the risk of corruption was especially high in India.

7.     Recognizing the significance of anticorruption compliance to investors, Cognizant issued annual "Sustainability Reports" during the Class Period, in which it assured investors it had conducted thorough audits of anticorruption compliance and had discovered "***no incidents***" of corruption. Likewise, the Company disseminated to investors "Cognizant's Core Values and Standards of Business Conduct" (the "Code of Conduct") and "Cognizant Technology Solutions FCPA, UK Bribery Act and Anticorruption Policy" (the "Anticorruption Policy"). In both of

these public documents, Cognizant assured investors that it did not make improper payments to foreign officials, and that it had implemented a rigorous control system in order to ensure compliance with anticorruption laws, including the Foreign Corrupt Practices Act ("FCPA"). For instance, in the Code of Conduct, Cognizant stated, "***We do not corruptly give or offer, directly or indirectly, anything of value to a government official to obtain or maintain business or any other advantage for the Company.***"[2] Likewise, in filings with the SEC throughout the Class Period, Cognizant assured investors that the internal controls the Company had implemented to detect such improper payments were "effective."

8.      Buoyed by Defendants' statements touting the financial success of Cognizant's SEZ operations and assurances that its licenses were legitimately obtained, Cognizant's stock price rose during the Class Period. Cognizant's stock price increased from $46.50 per share at the start of the Class Period to a Class Period high of more than $68 per share – an increase of more than 46%.

9.      Unfortunately for investors, Defendants' statements were materially false and misleading. Contrary to its public pronouncements, Cognizant has now admitted that, between 2010 and 2015, it made at least $6 million in "improper payments" to Indian officials in order to obtain the permits for its Indian facilities. Worse yet, Cognizant has further acknowledged that the Company's "senior management," including Defendant Coburn, perpetrated the bribery scheme, including by overriding the Company's internal financial controls to facilitate the corrupt payments. Moreover, the Company has conceded that, in order to disguise the nature and purpose of these improper payments, Cognizant improperly booked them as legitimate capital expenditures

---

[2] *Cognizant's Core Values and Standards of Business Conduct* 9 (2015) [hereinafter 2015 Code of Conduct].

(i.e., investments in physical assets) in the Company's publicly reported financial statements – accounting chicanery that overstated the Company's investments in its SEZ facilities and its net income.

10.     Notably, Lead Plaintiffs' investigation has revealed that the Company's internal auditors reported evidence of these improper payments to Cognizant's senior managers during the Class Period. A former Cognizant audit executive reported that in the fall of 2014, Cognizant conducted its first FCPA compliance audit in at least two years. As detailed herein, that audit uncovered evidence that payments related to procuring SEZ licensing were being made to government personnel and that these payments were being improperly classified in Cognizant's internal systems. These troubling findings were reported during the Class Period to senior Cognizant audit and compliance executives.

11.     Cognizant's scheme to secure SEZ licenses through corrupt payments to Indian officials, and the intimate involvement of senior Company management in that scheme, was concealed from investors until September 30, 2016. On that day, Cognizant shocked investors by announcing that its Board of Directors ("Board") was "conducting an internal investigation into whether certain payments relating to facilities in India were made improperly and in possible violation of the U.S. Foreign Corrupt Practices Act and other applicable laws." Cognizant also announced that Coburn – the Company's President, who had held numerous senior executive positions during his seventeen-year career at Cognizant – had suddenly resigned amidst the corruption investigation.

12.     Analysts and investors were stunned by Cognizant's September 30, 2016 disclosures. For example, Argus analysts downgraded Cognizant, characterizing the "announced resignation of the company's president amid a corruption investigation in India" as "blockbuster

6

news." These analysts observed that "given that a top executive has resigned . . . we see risks that the illegal practices could be extensive and long-lived." Id. In response to these disclosures, Cognizant's stock price swiftly declined. The Company's stock price fell more than 13%, or $7.29 per share, from $55.00 to $47.71 on the year's highest trading volume by far (over 53 million shares). This one-day decline, by itself, eradicated $4.4 billion in shareholder value.

13.     Since September 30, 2016, Cognizant has admitted that multiple members of its senior management were deeply involved in the bribery scheme, and, thus, a number of its statements to investors during the Class Period were false and misleading. On November 7, 2016, Cognizant admitted that "certain members of *senior management may have participated in or failed to take action to prevent the making of potentially improper payments by either overriding or failing to enforce the controls established by the Company* relating to real estate and procurement principally in connection with permits for certain facilities in India." Further confirming that Defendant Coburn was involved in the scheme, Cognizant also admitted that the senior executives involved in the improper payments were "no longer with the company or in the senior management position." In light of this misconduct, Cognizant also admitted that, contrary to its representations: (i) the Company's internal controls were materially deficient during the Class Period; and (ii) it improperly accounted for the corrupt payments in its public financial reports by recording them as investments in physical assets. Likewise, Cognizant has acknowledged that its representation in its publicly filed credit agreement that the Company was compliant with anticorruption laws – a statement that parallels those made in the Sustainability Reports, Anticorruption Policy, and Code of Conduct – was "materially incorrect."

14.     The misconduct at issue in this case continues to have a significant negative impact on Cognizant. By the end of 2016, the Company had "incurred $27 million in costs related to" the

investigation of the wrongdoing alleged herein "and related lawsuits." Moreover, the Company's investigation is ongoing. This misconduct also has triggered significant government scrutiny, as both the SEC and the U.S. Department of Justice ("DOJ") have investigated the improper payments to Indian officials at the core of this case.

15.     The DOJ and SEC investigations confirm that Cognizant's most senior executives directly participated in a criminal bribery scheme to obtain essential permits for critical SEZ facilities, and that these executives falsified Cognizant's SEC filings and Sustainability Reports in order to facilitate that scheme.

16.     On February 14, 2019, the Department of Justice issued an indictment – returned by a federal grand jury sitting in Newark, New Jersey – of Defendant Coburn, Cognizant's former President, and Defendant Schwartz, Cognizant's former Chief Legal Officer, on 12 criminal counts arising from the bribery scheme and false statements at the heart of this case. *See* Indictment, *United States v. Gordon J. Coburn and Steven Schwartz*, Crim. No. 19-120 KM (D.N.J.) (the "Indictment"). The Indictment also identifies other high-ranking Cognizant employees as co-conspirators in the fraudulent scheme, including Cognizant's former Chief Operating Officer, who on information and belief was Sridhar Thiruvengadam ("Thiruvengadam"), as well as Cognizant's former Vice President of Administration.

17.     The same day that the Indictment was made public, February 15, 2019, the SEC filed a civil action against Coburn and Schwartz alleging violations of the FCPA and securities laws arising from the same bribery scheme detailed in the Indictment and alleged herein. *See SEC v. Gordon J. Coburn and Steven E. Schwartz*, No. 2:19-cv-05820 (D.N.J.) (the "SEC Action").

18.     Separately, the SEC also announced that day that Cognizant had settled claims that it violated the securities laws in connection with ***several*** different bribes paid as part of the

Company's ongoing scheme to obtain licensing for its all-important SEZ facilities.  Cognizant agreed to pay $25 million and undertake a rigorous remediation program that requires the Company to provide the SEC with written compliance reports for the next two years and submit to periodic reviews by the agency. *See In re Cognizant Tech. Solutions Corp.*, Exchange Act Release No. 85149 (the "SEC Order").

19.     The Indictment, SEC Action, and SEC Order are the result of a two-year investigation by the DOJ and SEC, and are based on Cognizant's own internal documents and the accounts of multiple unindicted co-conspirators, including multiple former senior Cognizant executives who participated in the scheme.  Indeed, in a February 13, 2019 letter to Cognizant, the DOJ noted that Cognizant provided it with "all known relevant facts about the misconduct." Based on this evidence, the Indictment, the SEC Action, and the SEC Order describe a significant bribery scheme to secure critical permits for the Company's SEZ campuses in Chennai, Pune, and Siruseri—including permits that were necessary for the construction and operation of the Company's largest SEZ facility, located at 1 SEZ Avenue in Chennai: the Knowledge Industry Township Campus (the "KITS Campus").

20.     As detailed further herein, the Indictment, the SEC Action, and the SEC Order provide new facts evincing that Defendants Coburn and Schwartz orchestrated and approved Cognizant's illicit bribery scheme.  Among other things, Coburn and Schwartz: (1) instructed Cognizant employees to funnel over $2 million in bribes to an Indian government official through a third-party contractor in order to obtain essential SEZ permitting; (2) instructed Cognizant employees to withhold monies owed to the contractor in order to force it to participate in Cognizant's illegal bribery scheme; (3) to further induce the contractor to deliver the bribe, authorized the payment of an additional $500,000 to the contractor; (4) devised a scheme to use

9

phony invoices to disguise the bribes as payment to the contractor for supposedly legitimate cost overruns; and (5) hatched this scheme during multiple international video conference calls, and pointedly instructed their co-conspirators to avoid using email in order to avoid detection.

21.     Defendants Coburn and Schwartz also made, and directly participated in making, false statements concealing this scheme from investors.  Specifically, Coburn and Schwartz intentionally falsified Cognizant's books and records by ordering the creation of fraudulent invoices to hide the bribe payments, which they knew would cause the Company to falsely report the bribes as *bona fide* capital expenditures in its public financial statements.  Moreover, Coburn and Schwartz were responsible for approving the false financial filings disseminated to investors, and took a number of steps to ensure that this false financial information was indeed publicly reported.  Among other things, Coburn and Schwartz signed required sub-certifications to these financial statements and provided the Company's auditors with "management representation letters," in which they falsely stated that they had no knowledge of any fraud involving senior management.  Cognizant could not have filed its false and misleading financial reports with the SEC had Coburn and Schwartz not executed and delivered their false letters and certifications. Significantly, as Cognizant's Chief Legal Officer, Schwartz also personally signed the Company's Forms 8-K that were filed with the SEC—which attached Cognizant's false earnings releases— and thus publicly disclosed the false and misleading financial information to investors.

22.     Coburn and Schwartz also participated in approving and issuing Cognizant's Sustainability Reports issued during the Class Period, which falsely stated that there had been "no incidents" of corruption at the Company. Among other things, Defendants Coburn and Schwartz intentionally furnished false information that was incorporated into these statements—including

10

certifying their personal compliance with the Company's anticorruption policy and maintenance of accurate books and records—none of which were true.

## II.     JURISDICTION AND VENUE

23.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

24.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Cognizant's principal executive office is located within this District at Glenpointe Centre West, 500 Frank W. Burr Blvd., Teaneck, New Jersey 07666, and many of the acts and practices complained of herein occurred in substantial part in this District.

25.      In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.     Lead Plaintiffs

26.      On February 3, 2017, this Court appointed Union, Amalgamated, and Colorado Fire and Police to serve as Lead Plaintiffs in this action pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). See ECF No. 20.

27.      Lead Plaintiff Union Asset Management Holding AG is the parent holding company of the Union Investment Group. The Union Investment Group, based in Frankfurt-am-Main, Germany, was founded in 1956, and is one of Germany's leading asset managers for retail and institutional clients, with more than €292 billion in assets under management as of December 30, 2016. As set forth in the certification filed with this Court (ECF No. 11-6), Union's funds

purchased Cognizant common stock during the Class Period and were damaged by Defendants' conduct as alleged herein.

28.    Lead Plaintiff Amalgamated is a New York State chartered, FDIC insured, commercial bank that was established in 1923 by the Amalgamated Clothing Workers of America and remains the only union-owned bank in the United States. Amalgamated, through its Trustee Committee, serves as trustee to the LongView Collective Investments Funds ("LongView"). As set forth in the certification filed with this Court (ECF No. 11-6), Amalgamated purchased Cognizant common stock for the benefit of LongView during the Class Period and was damaged by Defendants' conduct as alleged herein.

29.    Lead Plaintiff Colorado Fire and Police is a public pension fund established in 1980 for the purpose of providing retirement benefits for police officers and firefighters throughout the State of Colorado. As of December 31, 2015, Colorado Fire and Police held over $4 billion in net assets. As set forth in the certification filed with this Court (ECF No. 11-6), Colorado Fire and Police purchased Cognizant common stock during the Class Period and was damaged by Defendants' conduct as alleged herein.

**B.    Defendants and Dismissed Defendants[3]**

30.    Defendant Cognizant is a U.S. multinational corporation headquartered in Teaneck, New Jersey. The Company's common stock is listed and trades actively on the NASDAQ stock market under the ticker symbol "CTSH." With approximately 200,000 employees, Cognizant is an IT outsourcing company that provides digital, technology, consulting, and operations services

---

[3] As noted above, Plaintiffs are standing on their allegations with respect to dismissed Defendants D'Souza and McLoughlin and fully preserve all appeal rights as to the claims previously asserted against them.  The same is true with respect to the Section 10(b) claim previously asserted against Defendant Coburn.  *See Atkinson*, 473 F.3d at 517.

around the world. Cognizant is organized around and reports the operations of its business according to four industry-orientated business segments. For the year ended December 31, 2016, the distribution of the Company's revenues across these segments was as follows: Financial Services (39.8%), Healthcare (28.7%), Manufacturing/Retail/Logistics (19.7%), and Other (11.8%).

31.    D'Souza became Cognizant's CEO in 2007 and served as CEO throughout the Class Period. D'Souza joined Cognizant as a co-founder in 1994, the year it was started as a division of The Dun & Bradstreet Corporation. D'Souza also served as Cognizant's President from 2007 to 2012 and Chief Operating Officer from 2003 to 2006. D'Souza has publicly described his three best features as follows: "I am hands-on; I like to hear directly from clients and employees; I'm determined."[4]  D'Souza was dismissed as a Defendant in the Court's Order, and Plaintiffs stand on their allegations as to him.

32.    McLoughlin became Cognizant's CFO in 2012 and served as CFO throughout the Class Period. McLoughlin oversees the Company's worldwide Financial Planning & Analysis, Accounting & Controllership, Tax, Investor Relations, Treasury, Internal Audit and Enterprise Risk Management functions. McLoughlin also served as Senior Vice-President, Enterprise Transformation and Financial Planning & Analysis from 2010 to 2012, and was responsible for the Company's worldwide financial planning and analysis, enterprise risk management and enterprise transformation functions.  McLoughlin was dismissed as a Defendant in the Court's Order, and Plaintiffs stand on their allegations as to her.

---

[4] Uttara C*houdhury, Cognizant's Francisco D'Souza Better Than Tim Cook and Larry Page?*, Tech2 (Mar. 20, 2013, 9:47 AM), http://tech.firstpost.com/news-analysis/cognizants-francisco-dsouza-better-than-tim-cook-and-larry-page-213283.html.

33.     Defendant Coburn served as Cognizant's President from February 6, 2012, until his abrupt resignation on September 27, 2016, which was publicly disclosed by the Company on September 30, 2016. During the Class Period, Coburn was Cognizant's second-highest paid executive, earning $7 million in 2015 alone.  As noted in Cognizant's February 8, 2012 press release announcing Coburn's promotion to President, Coburn was responsible for managing "Cognizant's overall P&L"—*i.e.*, its overall profit and loss statements. Coburn also served as the Chief Financial and Operating Officer of Cognizant from January 1, 2007 to February 6, 2012. As Chief Financial Officer, Coburn personally signed numerous correspondence on behalf of Cognizant responding to SEC staff comments on Cognizant's filings, at the end of each of which he explicitly directed SEC staff to contact him or Defendant Schwartz with any further questions. Coburn also served as the Company's Executive Vice President from December 2003 through December 2006. From November 1999 to December 2003, he served as the Company's Senior Vice President.

34.     Defendant Schwartz served as the Company's Executive Vice President, Chief Legal and Corporate Affairs Officer from December 2013 through November 2016. In that role, Schwartz was responsible for managing Cognizant's global legal teams, global government affairs efforts, and global security team. Schwartz also was responsible for overseeing and managing Cognizant's compliance functions, which reported to Schwartz. Schwartz also served as Cognizant's Senior Vice President, General Counsel and Secretary, from July 2007 to December 2013, in which capacity he had global responsibility for managing Cognizant's legal function and served as the Company's Chief Legal Officer. During that time, in correspondence responding to SEC staff comments on Cognizant's financial filings, Defendant Coburn explicitly instructed SEC staff to contact either himself or Schwartz with any questions. Schwartz also served as the

14

Company's Vice President and General Counsel from March 2003 to July 2007; Vice President and Chief Corporate Counsel from April 2002 to March 2003; and prior to that time as Chief Corporate Counsel since joining the Company in October 2001.

35.     Defendants Coburn and Schwartz are collectively referred to herein as the "Individual Defendants." Defendant Cognizant and the Individual Defendants are collectively referred to herein as the "Defendants."

### C.     Unindicted Co-Conspirator Non-Parties

36.     Sridhar Thiruvengadam ("Thiruvengadam") resides in India. From May 2013 to August 2016, he served as the Company's Chief Operating Officer, reporting directly to Defendant Coburn and maintaining direct oversight over "CC#1" (discussed below at ¶37). Thiruvengadam had been with Cognizant since the Company's inception in 1994, becoming a Senior Vice President and Chief People Officer from October 2006 to November 2010; Senior Vice President and Global Head of Managed Services from March 2010 to December 2011; and then Executive Vice President from January 2012 to August 2018. Thiruvengadam is named as an unindicted co-conspirator in the Indictment (where he is described as "CC#2") and as a "Relevant" person in the SEC Action and the SEC Order (where he is described as the "Operations Officer" or "Operations Officer-1," respectively).

37.     "CC#1" refers to Cognizant's Vice President of Administration, responsible for managing infrastructure and real estate development in India. CC#1 reported directly to Thiruvengadam and, in many instances, directly to Defendant Coburn. CC#1 is named as an unindicted co-conspirator in the Indictment, and as a "Relevant" person in the SEC Action and the SEC Order (where he is referred to as the "Real Estate Officer" or "Real Estate Officer-1," respectively).

38.     Larsen & Toubro Ltd ("L&T") is one of the largest Indian multi-national firms and a leading construction company in India. Though headquartered in Mumbai, Maharashtra, India, L&T has offices worldwide, including in Chennai, India. In the past decade, L&T has spoken frequently of its involvement and experience with SEZs (even offering consultancy services in SEZ planning), while also publicly stating in nearly all of its Annual Reports issued between 2010 and 2016 that it performed construction work for Cognizant for its SEZ facilities:

1.     In its 2009-2010 Annual Report, L&T described the "SEZ at Siruseri for Cognizant" as a "major order[] bagged during the year."

2.     In its 2011-2012 Annual Report, L&T attributed "significant growth" in part to having "received orders from IT Giants like . . . Cognizant . . . at Kochi and Chennai locations."

3.     In its 2013-2014 Annual Report, L&T described Cognizant as a "key client[]" and listed "a major IT office facility for Cognizant in Pune" as a "key project commissioned."

4.     In its 2015-2016 Annual Report, L&T included a picture identified in a caption as Cognizant's Chennai facility on the same page as discussion that L&T "has secured prestigious projects" and "[l]eadership has been maintained in the construction of IT parks and office spaces in the country."

39.     Conspicuously, since 2016—when Cognizant finally publicly disclosed the bribery scheme—L&T has not mentioned Cognizant in its annual reports. On February 18, 2019, Indian financial daily newspaper *LiveMint* and the news site *PSU Watch* identified L&T as the "Construction Company" in the Indictment (referred to as the "Contracting Firm" in the SEC Action, and "Contracting Firm-1" in the SEC Order).[5] *The Times of India* also reported on February 19, 2019 that, despite L&T's denial, "Details of construction approvals at precisely the

---

[5] Varun Sood, Cognizant used L&T to bribe govt officials in India, *LiveMint* (Feb. 18, 2019), https://www.livemint.com/companies/news/cognizant-used-l-t-to-bribe-govt-officials-in-india-1550426741937.html; PSU Bureau, L&T Worked Hand-In-Glove With Cognizant To Bribe Government Officials, *PSU Watch* (Feb. 18, 2019), https://psuwatch.com/lt-worked-hand-in-glove-with-cognizant-to-bribe-government-officials/.

same time show L&T was awarded the contract to complete the campus construction,"[6] and *The Economic Times* reported on March 29, 2019 that L&T's "audit committee would get an external expert to probe the bribery allegations that came to light after US-based Cognizant Technology Solutions Corp agreed to pay $25 million to the US Security and Exchange Commission (SEC) to settle such charges in India, where L&T is alleged to have helped the software company."[7]

40.     "CC#3" was, during relevant times, the Department Head for Commercial Buildings at L&T, and resided in India. CC#3 is named as an unindicted co-conspirator in the Indictment.

## IV.    SUMMARY OF THE FRAUD

### A.    Cognizant's Success as an Outsourcing Business Was Driven by Its Use of Indian "Special Economic Zones" to Lower the Company's Taxes and Costs

41.     As noted above, Cognizant is a leading provider of IT outsourcing services, with its principal operations in India. Cognizant began as an Indian company headquartered in Chennai. While the Company later moved its headquarters to the United States, the bulk of Cognizant's operations remained in India. During the Class Period, more than 150,000 of Cognizant's approximately 200,000 employees, nearly 75% of the Company's workforce, were located in India. The Company housed its Indian employees on ten campuses in cities across India, including in Chennai, Coimbatore, Kolkata, and Hyderabad.

---

[6] Cognizant case: DMK seeks CBI probe, *The Times of India* (Feb. 19, 2019), https://timesofindia.indiatimes.com/business/india-business/cognizant-case-dmk-seeks-cbi-probe/articleshow/68058297.cms.

[7] Rachita Prasad, Cognizant bribery: The case that'll either tarnish L&Ts name or burnish its fame, *The Economic Times* (Feb. 18, 2019), https://economictimes.indiatimes.com/tech/ites/cognizant-bribery-a-tough-test-for-lt-brand-image/articleshow/68401708.cms.

42.     As with many other India-centric IT outsourcing companies, Cognizant's success was driven in significant part by its "global delivery model," which leveraged the lower labor, tax, and other business costs of its Indian operations to provide IT development and maintenance for international clients at highly competitive prices. Throughout the Class Period, Cognizant and its senior executives repeatedly told investors that the Company's business strategy revolved around a "dual mandate": helping clients achieve operational efficiency by reducing their IT costs and redeploying those savings into new digital technologies. As McLoughlin told investors at an August 12, 2015 investor conference, "[W]e're seeing clients continue to look for partners who can execute on this dual mandate. So help me drive down my costs of my current operations . . . and take those dollars and really deploy them into meaningful digital transformation. . . . [We] think that will continue to be a driver of growth as we move forward."[8]

43.     Defendants repeatedly cited Cognizant's success in delivering cost savings to clients as key to its execution of this dual mandate. For example, at a September 6, 2016 investor conference, D'Souza stated, "we've been very successful at, while maintaining our margins, being able to achieve the cost of ownership that the clients want."[9]  Accordingly, providing clients with global IT cost arbitrage opportunities was a foundational element of Cognizant's business model. And, on its website, Cognizant told investors that its presence in India, in particular, was "a crucial piece of [that] global business strategy"[106] because of the cost savings that centralizing operations in India produced.

---

[8] Tr. of Oppenheimer Tech., Internet & Commc'ns Conf. at 1 (Aug. 12, 2015).

[9] Tr. of Citi Global Tech. Conf. at 9 (Bloomberg Sept. 6, 2016).

[10] *About Cognizant - India*, Cognizant, https://www.cognizant.com/india (last visited Mar. 22, 2017).

44.     To cut its costs and, in turn, provide IT services at lower costs to clients, Cognizant constructed and operated its Indian facilities in designated SEZs. Licenses to develop and/or operate within SEZs are awarded by Indian central and regional governments. Companies who receive these licenses are guaranteed a plethora of lucrative benefits, including numerous tax exemptions and holidays, easing of various customs and labor regulations and procedures, and heightened access to credit, infrastructure, and other resources. According to a publication issued by India's Department of Commerce, incentives for businesses operating within an SEZ include:

- Duty free import/domestic procurement of goods for development, operation and maintenance of SEZ units.

- 100% Income Tax exemption on export income . . . for first 5 years, 50% for next 5 years thereafter and 50% of the ploughed back export profit for next 5 years.

- Exemption from minimum alternate tax . . . .

- External commercial borrowing by SEZ units up to US $500 million in a year without any maturity restriction through recognized banking channels.

- Exemption from Central Sales Tax.

- Exemption from Service Tax.

- Single window clearance for Central and State level approvals [i.e., a centralized approval process for obtaining regulatory approval, greatly reducing transaction costs].

- Exemption from State sales tax and other levies as extended by the respective State Governments.[11]

Moreover, businesses operating within SEZs are entitled to "self-certify" compliance with applicable regulatory regimes, including labor and customs laws and regulations, and have access to expedited dispute resolution mechanisms. Again, these benefits work to reduce greatly the

---

[11] Department of Commerce, Government of India, *Special Economic Zones in India*, http://www.sezindia.nic.in/about-fi.asp.

transaction costs for firms operating in SEZs. Additional tax benefits are extended to companies that develop SEZs, including exemption from custom/excise duties and dividend distribution tax.

45.     Cognizant built and operated in India at least ten "global delivery centers" (large IT campuses that housed thousands of employees) and aggressively pursued SEZ licensing for those facilities. Notably, Cognizant constructed or expanded at least four of its ten SEZ-licensed Indian global delivery centers during the Class Period: those located in Kolkata, Coimbatore, Hyderabad, and the Company's Indian headquarters in Chennai.

46.     Building and expanding SEZ-licensed facilities was key to the Company's performance in multiple ways. First, building and expanding SEZ facilities increased Cognizant's ability to drive revenue: the more employees the Company could put to work at its SEZ facilities, the more revenue it would book. Accordingly, analysts repeatedly focused on the Company's headcount and "utilization rates," i.e., the extent to which employees' time was being billed to client projects. For instance, in a July 25, 2016 report, Deutsche Bank analysts stated, "the company continues to focus on retention efforts and we believe headcount remains an important leading indicator and expect headcount growth to accelerate ahead of revenue acceleration."[12]

47.     Second, as noted above, the SEZ status of Cognizant's Indian operations allowed the Company to reduce massively its tax and operating costs, which also was critical to its financial performance. Indeed, as noted previously and detailed further below, in reports filed with the SEC throughout the Class Period, Cognizant reported that the tax benefits, alone, that it derived from its SEZ licenses increased the Company's net income by hundreds of millions of dollars. Cognizant acknowledged that these benefits materially impacted the Company's financial condition, and that

---

[12] Bryan Keane, Research Analyst et al., *Guidance Revision Coming?* 6 (Deutsche Bank AG July 25, 2016).

"[c]hanges in Indian tax laws" that "would reduce or deny SEZ tax benefits could have a material adverse effect on our business, results of operations and financial condition."[13]

48.     Third, the enormous tax and operating cost savings Cognizant generated through the SEZ status of its Indian operations also gave Cognizant a significant competitive advantage among its outsourcing peers, and were therefore instrumental in helping the Company garner new business through the delivery of lower cost IT services to its US and European clients. As discussed above, Defendants emphasized that clients' interest in cutting IT costs was a primary driver of demand for Cognizant's services. During the Company's August 5, 2016 earnings call, Coburn told investors that cost-cutting "remains absolutely essential to almost every client"[14] of the Company, and Cognizant's SEC filings listed "competitive pricing of services" as among the "principal competitive factors affecting the markets for our services."[15]

**B.     Planned Changes to Indian Tax Law Put Increased Pressure on Cognizant to Obtain SEZ Licensing for Its Facilities As Quickly As Possible During the Class Period**

49.     During the Class Period, looming changes to Indian tax law that would phase out tax benefits for SEZs established after April 2017 put increased pressure on Cognizant to obtain valuable SEZ licensing for its Indian operations as quickly as possible. In February 2015, India's Finance Minister, Arun Jaitley, sent signals that the government could move to limit tax benefits for newly constructed SEZs. In a speech on February 28, 2015, Minister Jaitley made sweeping criticisms of India's "regime of [corporate tax] exemptions," which he said "led to pressure groups,

---

[13] *See, e.g.,* Cognizant Tech. Sols. Corp., Annual Report (Form 10-K), at 27 (Feb. 25, 2016).

[14] Tr. of Q2 2016 Earnings Call at 4 (Bloomberg Aug. 5, 2016).

[15] *See, e.g.,* Cognizant Tech. Sols. Corp., Annual Report (Form 10-K), at 12 (Feb. 27, 2015) [hereinafter 2014 Form 10-K].

litigation, and loss of revenue."[16] Minister Jaitley expressed a keen interest in lowering India's general corporate tax rate, which he characterized as higher than the rate "prevalent in other major Asian economies," and eliminating "various kinds of tax exemptions and incentives for corporate tax payers" to pay for the tax cut.[17]

50.     In November 2015, India's Central Board for Direct Taxes ("Central Board") put even greater pressure on Cognizant to move as expeditiously as possible to obtain valuable SEZ permitting for new operations when it, consistent with Minister Jaitley's February 2015 speech, issued a draft proposal phasing out SEZ tax benefits for the development of new facilities commencing activities after April 1, 2017. A few months later, in February 2016, Minister Jaitley, on behalf of the Ministry of Finance, presented a final budget plan implementing a policy for phasing out SEZ tax exemptions after April 1, 2020, consistent with the Central Board's proposal and the Minister's speech the prior year.[18]

51.     Given the enormous pressure it faced to obtain SEZ licensing prior to the phasing out of tax benefits for new operations, Cognizant embarked on an SEZ development spree during the Class Period. As discussed above, Cognizant built or expanded at least four of its ten SEZ-licensed Indian global delivery centers during the Class Period. In early September 2015, Cognizant signed agreements with the Tamil Nadu state government to expand its major global delivery center in Coimbatore and its Indian headquarters in Chennai. As reported by *India Today*

---

[16] Puja Mehra, *Changes in Corporate Tax Regime to Reduce disputes: Jaitley*, Hindu (Mar. 2, 2015, 00:28 IST), http://www.thehindu.com/news/national/changes-in-corporate-tax-regime-to-reduce-disputes-jaitley/article6948860.ece?utm_source=RSS_Feed&utm_medium=RSS&utm_campaign=RSS_Syndication.

[17] *Id.*

[18] Shrimi Choudhary, *Corp Tax Cut Takes Last Budget Forward*, Daily News & Analysis (Mar. 1, 2016).

on September 10, 2015, Cognizant's vice chairman and former CEO, Lakshmi Narayan, highlighted the ambitious scope of the planned campus expansions, stating, "[w]hen complete, the centres will have a capacity to accommodate approximately 17,000 to 20,000 professionals."[19]

52.     Shortly thereafter, in March 2016, Cognizant received approval from the Telangana state government to construct a massive SEZ facility in the state's capital, Hyderabad, that would house 8,500 employees. Just a few months later, in August 2016, Cognizant received approval to construct an SEZ facility in Kolkata, West Bengal, occupying a sprawling fifteen-acre plot. *The Telegraph* (of India) reported on August 3, 2016, that the development was expected to house 10,000 Cognizant employees.[20] As part of the deal, government officials waived its development fee.[21] Moreover, sources reported that the state government's Housing Infrastructure Development Corporation, which sold the land to Cognizant, had ensured that the price of the land "would be 'kept reasonable' to sweeten the deal."[22]

53.     Notably, while Cognizant received SEZ licensing for its Kolkata facilities, the state government had refused to grant licenses to the Company's competitors, including Wipro Limited and Infosys Limited. Both Wipro and Infosys had purchased fifty acres of land apiece in the region based on the previous state administration's assurances that their projects would receive SEZ status – a promise the new state government had declined to honor. In an August 5, 2016 article, the

---

[19] *Cognizant to Invest Rs 1,000 cr in TN in Next 5 Yrs*, India Today (Sept. 10, 2015, 21:25 IST), http://indiatoday.intoday.in/story/cognizant-to-invest-rs-1000-cr-in-tn-in-next-5-yrs/1/470681.html.

[20] *Mamata Government Allots New Town Plot for Company's Third Campus in Calcutta*, Telegraph (India) (Aug. 3, 2016), https://www.telegraphindia.com/1160803/jsp/calcutta/story_100288.jsp.

[21] *Id.*

[22] *Id.*

*Times of India* reported that, in the wake of the government's grant of SEZ licensing to Cognizant, several other IT outsourcing companies called on the state's IT Minister, Bratya Basu, "to evince interest in contributing more to the state's technological ecosystem."[23][19] While Minister Basu met with several business leaders, his meeting with Cognizant's Senior Vice President of Infrastructure Service, Nachiket Deshpande, reportedly took "significantly more time than the other chat sessions."[24]

      **C.**      **Defendants Underscored the Benefits of Cognizant's SEZ Licenses As a Key Driver of Its Financial Performance, While Assuring Investors that Cognizant Did Not Make Improper Payments to Foreign Officials**

54.      As detailed below, throughout the Class Period, Defendants repeatedly emphasized that the Company's SEZ facilities were a critical driver of its strong financial performance. At the same time, Defendants also assured the investing public that they had legitimately obtained the SEZ licenses, stating that Cognizant did not make any payments to government officials to obtain anything of value, and that the Company maintained a system of rigorous internal controls precisely to prevent such payments. As investors would ultimately learn, these statements were materially false and misleading.

      **1.**      **Defendants Highlighted that Cognizant's SEZ Operations Were a Crucial Driver of Its "Strong" Financial Performance**

55.      During the Class Period, Defendants and dismissed Defendants consistently reported what they described as "strong" financial results, even when the IT outsourcing industry was facing headwinds. When reporting these results, Defendants and dismissed Defendants

---

[23] *Tech Bosses Meet Kolkata's IT Minister Bratya Basu*, Times of India (Aug. 5, 2016, 8:39 AM IST);   http://timesofindia.indiatimes.com/city/kolkata/Tech-bosses-meet-Kolkatas-IT-minister-Bratya-Basu/articleshow/53551377.cms.

[24] *Id.*

repeatedly highlighted the benefits the Company received from the SEZ status of its Indian operations during the Class Period. For instance, in its 2014 Annual Report, Cognizant reported that 2014 saw "strong growth on the top line," and explained that its financial results were driven in significant part by its SEZ facilities, stating that "the effect of the income tax holidays granted by the Indian government was to reduce the overall income tax provision and increase net income by approximately [$183 million] . . . and increase diluted EPS by $0.30."[25] In reporting on its "strong performance" in its 2015 Annual Report, Cognizant again emphasized that its results were driven significantly by its Indian SEZ operations, reporting that these facilities had "increase[d] net income by approximately $201.4 million . . . and increase[d] diluted EPS by $0.33," a material increase over the prior year.[26]

56. Defendants also highlighted to investors that expanding Cognizant's SEZ facilities was a key part of its business strategy. For instance, in the Company's SEC filings, Defendants repeatedly stated that "[w]e pursue an international strategy that includes expanded infrastructure investments in India," "[w]e have constructed and expect to continue to operate most of our newer development facilities in SEZs," and Cognizant would continue to "[l]ocate most of our new development center facilities in tax incentivized areas" in response to the most significant trends and risks it was seeing in its business.[27] Defendants also assured investors that Cognizant was continuing to pursue this strategy by making significant capital expenditures to grow and expand its SEZ operations. For instance, in its second quarter 2016 Form 10-Q, Cognizant stated that, "[a]s of June 30, 2016, we had outstanding fixed capital commitments of approximately $184.0 million

---

[25] Cognizant, *2014 Annual Report*, at 3, 126.

[26] Cognizant, *2015 Annual Report*, at 4, 92.

[27] *Id.* at 92, 58, 47.

related to our India development center expansion program to build new state-of-the-art IT development and delivery centers."[28]

57.     In addition to emphasizing the positive financial impact of the Company's SEZ operations, Defendants and dismissed Defendants also made statements attributing Cognizant's financial success to a number of other ostensibly legitimate business factors and conditions. For example, in its SEC filings, Cognizant repeatedly set forth the "key drivers of our revenue growth," which included numerous legitimate factors such as "[s]olid performance across all of our business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including Consulting, IT IS, and BPS services"; "[i]ncreased penetration at existing customers"; and "[c]ontinued expansion of the market for global delivery of IT services and BPS." Defendants and dismissed Defendants also made specific statements on earnings calls and at investor conferences in which they further attributed Cognizant's success to a variety of legitimate factors, such as:

- On a May 4, 2015 earnings call, D'Souza stated that the Company's performance "was driven by strong organic growth in our core business coupled with solid in-line performance in the TriZetto business."[29]

- On Cognizant's May 6, 2016 earnings call, Coburn stated that Cognizant's strong global results were "driven primarily by strength in key markets such as India, Australia and the Middle East where we're seeing good traction with clients' adoption of digital technologies."[30]

- At a May 24, 2016 investor conference, Coburn touted Cognizant's ability to deliver low cost services to clients as a key driver of growth and profitability. For example, Coburn stated that Cognizant was satisfying

---

[28] Cognizant Tech. Sols. Corp., Quarterly Report (Form 10-Q), at 19 (Aug. 5, 2016).

[29] Tr. of Q1 2015 Earnings Call at 2 (Bloomberg May 4, 2015).

[30] *Id.*

customer demand for cost savings by "bring[ing] best practices to our clients for our traditional services, constantly lower[ing] their cost of ownership while maintaining our margin. . . . We're very good at that."[31]

58.    At the same time that Defendants were reporting strong financial results driven by Cognizant's SEZ strategy, they were reassuring investors that Cognizant was not bribing foreign officials, and that the Company was taking concrete steps to ensure compliance with anticorruption laws. As discussed below, these statements were material to investors.

### 2.    Defendants Assured Investors That Cognizant Did Not Make Improper Payments to Foreign Officials, and Maintained a System of Internal Controls to Prevent Such Payments

59.    The FCPA prohibits both direct and indirect payments to "any officer or employee of a foreign government," including employees of state-owned enterprises, in order to influence their official "act[s] or decision[s]" or to "secur[e] any improper advantage."[32] Companies can, and often do, face FCPA liability based on improper payments made by their agents or other business partners.

60.    The penalties, including criminal penalties, that may be imposed for violations of the FCPA's anti-bribery provisions are severe.[33] Corporate violators, in particular, may face multi-million dollar fines and disgorgement of up to twice the benefit obtained through the corrupt payment. The Attorney General or the SEC may bring civil actions seeking fines against both corporate and individual violators.

---

[31] Tr. of J.P. Morgan Glob. Tech., Media & Telecom Conf. at 3 (May 24, 2016).

[32] 15 U.S.C. § 78dd-1.

[33] *See, e.g., Clayco Petrol. Corp. v. Occidental Petrol. Corp.,* 712 F.2d 404, 408 (9th Cir. 1983) ("The Act provides for severe criminal penalties including fines and imprisonment." (citing 15 U.S.C. §§ 78dd-2(b), 78ff)).

61.    In recent years, both the DOJ and the SEC have significantly increased enforcement of the FCPA.[34] In 2010, the SEC's Enforcement Division created a specialized unit to further enhance its enforcement of the FCPA.[35] That same year, the DOJ brought forty-eight enforcement actions and the SEC brought twenty-six.[36] Furthermore, the DOJ and the SEC "have worked to create a network of international cooperation in the global war against bribery and corruption."[37] As commentators remarked: "With the recent burst of enforcement activity and the sharp increase in fines and penalties collected, everyone doing business abroad must now pay particular attention to the FCPA."[38] Gibson Dunn's "2016 Year-End FCPA Update" noted that:

> 2016 was a precedent-setting year for the Foreign Corrupt Practices Act ("FCPA"). After several years of consistent enforcement numbers, the Department of Justice ("DOJ") and Securities and Exchange Commission ("SEC") produced what arguably is the most significant year of enforcement in the statute's 39-year history. With 53 combined enforcement actions, more than $2 billion in corporate fines levied by U.S. enforcers and billions more by foreign regulators in coordinated prosecutions, early returns on the DOJ's FCPA Pilot Program, and an increasingly

---

[34] Cortney Thomas, *The Foreign Corrupt Practices Act: A Decade of Rapid Expansion Explained, Defended, and Justified*, 29 Rev. Litig. 439, 439-40 (Winter 2010) (noting "exponential increase" in FCPA enforcement by DOJ and SEC beginning in early 21st century).

[35] Press Release, U.S. SEC, SEC Names New Specialized Unit Chiefs and Head of New Office of Market Intelligence (Jan. 13, 2010), https://www.sec.gov/news/press/2010/2010-5.htm.

[36] Covington & Burling LLP, Significant Developments and Trends in Anti-Corruption Enforcement 1 (Jan. 2011), http://www.cov.com/files/Publication/5ff26ab9-61cf-46f4-ba8a-aa463a65f9fe/Presentation/PublicationAttachment/437b6d49-f6c1-4b3a-b2ad-be89b9337322/Significant%20Developments%20and%20Trends%20in%20AntiCorruption%20Enforcement.pdf.

[37] Tom Fox, *Global Anti-corruption Enforcement Numbers Going Up, Compliance Week* (Feb. 14, 2017), https://www.complianceweek.com/blogs/tom-fox-tom-fox/global-anti-corruption-enforcement-numbers-going-up#.WMf5Xm_yvcs.

[38] Robert C. Blume & Ryan V. Caughey, Commentary, The FCPA: *Overview, Enforcement Trends and Best Practices*, 13 Andrews Sec. Litig. & Reg. Reporter 1, 1 (Nov. 3, 2009).

clear intersection between the FCPA and Dodd-Frank's whistleblower provisions, there is much to discuss.[39]

62.     Because Cognizant's operations are principally located outside of the United States, the Company's compliance with anticorruption laws, and its maintenance of appropriate controls to ensure continued compliance, was critical to investors. This was particularly true of Cognizant's Indian business, not only because it comprised the vast majority of the Company's operations and was crucial to Cognizant's success, but because, as Forbes reported on February 11, 2016, corruption watchdogs ranked India as one of the world's most corrupt countries during the Class Period.[40]

63.     Indeed, U.S. companies' Indian operations have become an increasingly prominent target of federal regulators' FCPA enforcement programs. As commentators have explained, over the past decade "both the DOJ and the SEC have targeted misconduct in India across a wide range of industries from manufacturing and construction to oil and information technology."[41]   For example:

- Anheuser-Busch InBev paid $6 million in September 2016 "to settle charges that it violated the [FCPA] and impeded a whistleblower who reported the misconduct. The company's India minority-owned joint venture used third-

---

[39] Gibson, Dunn & Crutcher LLP, *2016 Year-End FCPA Update* 1 (Jan. 3, 2017), http://www.gibsondunn.com/publications/documents/2016-Year-End-FCPA-Update.pdf.

[40] Ronak D. Desai, *India Remains One of the Most Corrupt countries in the World*, Forbes (Feb. 11, 2016 4:11 PM), https://www.forbes.com/sites/ronakdesai/2016/02/11/india-remains-one-of-the-most-corrupt-countries-in-the-world/#590d3498155f.

[41] Jeremy B. Zucker, Darshak S. Dholakia & Hrishikesh N. Hari, *Anti-bribery Compliance in India: Both Sword and Shield 3* (Dechert LLP Nov. 2016), https://www.dechert.com/files/Uploads/Documents/Lit%20-%20General/White%20Paper%20-%20Anti-Bribery%20Compliance%20in%20India%20FINAL%20-%2011-16.pdf.

party sales promoters to make improper payments to government officials in India to increase sales and production."[42]

- In 2016, government officials proposed that Wal-Mart Stores Inc. "pay at least $600 million to resolve probes by the [DOJ] and the [SEC] into whether it bribed government officials" in foreign markets, including India.[43]

- In 2012, Tyco International paid $26 million to settle FCPA violations when a "German subsidiary paid third parties to secure contracts" and payments were "recorded as commissions."[44]

- In 2011, "London-based liquor manufacturer Diageo plc paid more than $16 million to settle FCPA-related offenses it committed in several countries, including India. According to the SEC, Diageo paid $1.7 million in bribes to Indian government officials 'responsible for purchasing or authorizing the sale of its beverages in India.'"[45]

- In 2010, Pride International paid $56.1 million as a result of a payment made for a "favorable administrative judicial decision regarding customs issues."[46]

64.     In particular, FCPA lawyers have stated that some of the "key high risk areas" for conducting business in India include "[o]btaining licenses and permits"; "[l]and acquisition";

---

[42] Richard L. Cassin, *Anheuser-Busch InBev Pays SEC $6 Million for India FCPA Offenses and Impeding Whistleblower*, FCPA Blog (Sept. 28, 2016, 12:08 PM), http://www.fcpablog.com/blog/2016/9/28/anheuser-busch-inbev-pays-sec-6-million-for-india-fcpa-offen.html.

[43] Tom Schoenberg & Matt Robinson, *Wal-Mart Balks at Paying $600-Million-Plus in Bribery Case*, Bloomberg (Oct. 6, 2016, 2:24 PM), https://www.bloomberg.com/news/articles/2016-10-06/wal-mart-said-to-balk-at-paying-600-million-plus-in-bribe-case.

[44] Foley & Lardner LLP, *Anti-Bribery and Foreign Corrupt Practices Act Compliance Guide for U.S. Companies Doing Business in India* 4 (2016).

[45] Ronak D. Desai, *Complying with U.S. Anti-Corruption Laws While Conducting Business in India*, Forbes (Oct. 30, 2015, 1:14 PM), https://www.forbes.com/sites/ronakdesai/2015/10/30/ensuring-foreign-corrupt-practices-act-compliance-while-conducting-business-in-india/#5de6a740183a.

[46] Foley & Lardner LLP, *supra* note 44, at 4.

"[s]etting up plants and operations"; and "[c]ustoms and taxes" – precisely the subject areas at issue here.[47]

65.     Given these facts, throughout the Class Period, Cognizant repeatedly acknowledged that noncompliance with anticorruption laws, and failure to implement adequate control systems to monitor and enforce compliance, could have serious negative consequences for the Company. In reports filed with the SEC during the Class Period Cognizant stated:

> Among other anti-corruption laws and regulations, we are subject to the United States Foreign Corrupt Practices Act, or FCPA, which prohibits improper payments or offers of improper payments to foreign officials to obtain business or any other benefit, and the U.K. Bribery Act. Violations of these laws or regulations could subject us to criminal or civil enforcement actions, including fines and suspension or disqualification from government contracting or contracting with private entities in certain highly regulated industries, any of which could have a material adverse effect on our business, results of operations and financial condition.[48]

66.     Accordingly, Cognizant assured investors that it did not make improper payments to foreign officials, and that it implemented a rigorous control system in order to ensure compliance with anticorruption laws, including the FCPA. Cognizant published, and disseminated to investors on its website, its Code of Conduct. In it, Cognizant again acknowledged the importance of compliance with anticorruption laws and the maintenance of adequate controls to monitor that compliance, stating that "anti-corruption law violations come with severe legal penalties to the company, its executives and the individuals involved in such actions."[49] Thus, in a section entitled, "Preventing Corrupt Activities," Cognizant stated that the Company did not make improper payments to government officials to obtain any business or other advantage: "We do not corruptly

---

[47] Anthony Campanelli, *Managing Corruption Risks in India* 4 (Deloitte LLP 2014).

[48] *See, e.g.,* 2014 Form 10-K, *supra* note 15, at 28.

[49] 2015 Code of Conduct, *supra* note 2, at 10.

give or offer, directly or indirectly, anything of value to a government official to obtain or maintain business or any other advantage for the Company."[50]

67.     Cognizant's Code of Conduct also represented that the Company would take several specific actions to vet payments to foreign officials and ensure their legitimacy, stating that any such payments would receive "pre-approval from our Legal Department," and that all such payments would be appropriately "reported and documented as part of the FCPA's and other laws' books and records requirements."[51]

68.     In addition, the Code of Conduct directed investors to the Anticorruption Policy, which Cognizant published and disseminated to investors through its website.[52] The Anticorruption Policy set out certain proscriptions on conduct to which the Company purported to adhere, and set forth affirmative preventative actions that the Company purported to take. Pursuant to the Anticorruption Policy, Cognizant assured investors that the Company would:

- "never pay, promise, offer or authorize a bribe or anything of value to a government official or any other individual in order to obtain business for the Company or to secure an improper advantage for the Company";

- "conduct risk assessments, in consultation with our Legal Department, for certain activities involving officials in high-risk countries for corrupt practices";

- "ensure that entries into the Company's books and records are accurate, and that all Company internal controls and procedures are maintained and followed when making payments from the Company"; and

---

[50] *Id.* at 9.

[51] *Id.* at 10.

[52] Cognizant published the same Anticorruption Policy annually, including each year from 2011 through 2017.

- "comply with, and enforce, all the Company's requirements for documentation of expenses and payment requests . . . consistent with our Core Values and Standards of Business Conduct on transparency."[53]

69.     Cognizant also publicly assured investors that it was taking a number of additional concrete steps to ensure Company compliance with anticorruption laws. In the Anticorruption Policy, Cognizant told investors, among other things, that its Legal Department would review "red flag" transactions, including those transaction involving a government-related counterparty, and that "[p]eriodic audits of compliance shall be performed by each business unit in coordination with our Legal Department" in order to "[m]onitor [a]nd [a]udit [c]ompliance [w]ith [the] Anticorruption Policy."[54]

70.     Cognizant touted both its Anticorruption Policy and its Code of Conduct in SEC filings throughout the Class Period. For example, Cognizant's 2014 Form 10-K stated, "we make available our code of business conduct and ethics entitled 'Cognizant's Core Values and Standards of Business Conduct' free of charge through our website. We intend to disclose any amendments to, or waivers from, our code of business conduct and ethics that are required to be publicly disclosed pursuant to rules of the SEC and the NASDAQ Global Select Market by posting it on our website."[55]

71.     In SEC filings throughout the Class Period, Cognizant also assured investors that it maintained an adequate system of internal accounting controls, as mandated by the FCPA and the Sarbanes-Oxley Act ("SOX"). The FCPA imposes accounting requirements that operate as a complement to, and a means of enforcing, its anti-bribery provisions. Specifically, the FCPA

---

[53] Cognizant, *Cognizant Technology Solutions FCPA, UK Bribery Act and Anticorruption Policy* 2 (2011).

[54] *Id.* at 3, 5, 7.

[55] 2014 Form 10-K, *supra* note 15, at 17.

requires issuers to keep books and records that accurately and fairly describe their transactions, and to develop and maintain an adequate system of internal accounting controls, in order to track payments and prevent bribery. SOX mandates, in part, that internal controls must be designed so as to "ensure that material information relating to the company . . . is made known to" officers responsible for certifying the accuracy of the company's public reports.

72.     A critical element of the internal accounting controls prescribed by the FCPA is called "tone at the top." "Tone at the top" refers to senior management's commitment to legal and ethical compliance and accurate reporting, expressed as a function of management initiatives, policies, and, most importantly, management's conduct. SOX also recognizes the primacy of "tone at the top" as a control mechanism in, among other things, its rules making a company's senior management ultimately responsible for the quality of an issuer's disclosure controls and financial reporting. Regulators and auditors likewise recognize "tone at the top" as a key internal control mechanism. For example, the *Resource Guide to the U.S. Foreign Corrupt Practices Act*, jointly issued by the DOJ and the SEC, emphasizes that an issuer's implementation of "an appropriate tone at the top" is a key factor in assessing the seriousness of an FCPA violation.[56]

73.     Similarly, then-SEC Commissioner Cynthia Glassman stated in an April 2003 speech on the SEC's implementation of SOX:

> [T]he ultimate effectiveness of the new corporate governance rules will be determined by the "tone at the top." Adopting a code of ethics means little if the company's chief executive officer or its directors make clear, by conduct or otherwise, that the code's provisions do not apply to them. . . . Corporate officers and directors hold the ultimate power and responsibility for restoring public trust

---

[56] Criminal Div., U.S. DOJ & Enf't Div., U.S. SEC, *A Resource Guide to the U.S. Foreign Corrupt Practices Act* 55 (Nov. 14, 2012), https://www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf [hereinafter "*Resource Guide*"].

by conducting themselves in a manner that is worthy of the trust that is placed in them.[57]

74.     Accordingly, Cognizant's maintenance of adequate internal control systems, including its "tone at the top," was critically important to investors because it ensured that the Company adhered to the Code of Conduct and Anticorruption Policy it purported to practice, and that the Company's public disclosures were accurate.

75.     In connection with Cognizant's SEC filings throughout the Class Period, and pursuant to SOX, D'Souza and McLoughlin signed certifications representing to investors that Cognizant's internal reporting controls were "effective" and were designed to "provide reasonable assurance regarding the reliability" of Cognizant's financial reports; that Cognizant's SEC filings were free from material misstatements and omissions, and "fairly present[ed], in all material respects, the financial condition and results of operations of the Company"; and that there were no "significant deficiencies and material weaknesses in the design or operation" of Cognizant's internal controls that had not been disclosed.

76.     On Cognizant's website, the Company also touted the rigorousness of its internal controls, stating "Cognizant employs rigorous internal controls to ensure our commitment to ethical behavior, proper risk management and exemplary corporate conduct. Our internal controls are maintained by an effective and far-reaching corporate governance system implemented by our senior leadership team and overseen by an independent Board of Directors."[58]  Based on these

---

[57] Cynthia A. Glassman, Commissioner, SEC, SEC Implementation of Sarbanes-Oxley: The New Corporate Governance (Apr. 7, 2003), https://www.sec.gov/news/speech/spch040703cag.htm.

[58] Internal Controls, Cognizant, https://web.archive.org/web/20150104185219/http://www.cognizant.com/company-overview/internal-controls (last visited Mar. 24, 2017).

statements, the Company assured investors that they could take comfort in the conduct of its management and the accuracy and completeness of its public disclosures.

77. The cumulative effect of the statements summarized above was to drive Cognizant's stock price significantly higher throughout the Class Period. Specifically, Defendants' statements caused Cognizant's stock price to rise from $46.50 per share at the start of the Class Period to a Class Period high of more than $68 per share – an increase of more than 46%.

78. Unfortunately for investors, as detailed below, Defendants' statements to investors concealed a bribery scheme that went to the core of Cognizant's SEZ operations and involved the highest levels of Cognizant management. This undisclosed bribery scheme rendered a host of Defendants' statements to investors materially false and misleading, including their statements: touting the significant benefits Cognizant received from its SEZ operations; representing that the Company did not bribe foreign officials and took concrete steps to ensure FCPA compliance; assuring investors that the Company maintained reliable internal controls; and attributing the Company's performance to additional legitimate factors.

**D.    In Truth, Cognizant Bribed Indian Government Officials to Procure Valuable SEZ Licensing**

79. Unbeknownst to investors, to secure the valuable SEZ licenses Cognizant repeatedly touted, the Company engaged in a long-standing bribery scheme through which it made several million dollars worth of improper payments to Indian government officials. As discussed below, Cognizant has admitted that, between 2010 and 2015, it made at least $6 million (over 400 million Indian rupees) in payments "relating to Company-owned facilities in India" that "may" have been "improper[] and in possible violation of the [FCPA]."

80. Cognizant further admitted that, in its publicly reported financial statements, it improperly booked these payments as capital expenditures rather than operating expenses, which

are deducted dollar-for-dollar against the Company's bottom line as they are spent. This had the effect of disguising the illicit payments as legitimate capital investments and inflating the Company's reported investments in its SEZ facilities, as well as its net income.

81. Notably, Cognizant also has admitted that the bribery scheme was carried out by "senior management," and that its officers actually *overrode* the Company's internal controls to facilitate the bribery scheme. Specifically, the Company ultimately admitted in its November 7, 2016 third quarter Form 10-Q that "certain members of *senior management* may have participated in or failed to take action to prevent the making of potentially improper payments by either *overriding or failing to enforce* the controls established by the Company relating to real estate and procurement principally in connection with permits for certain facilities in India." As detailed below, chief among the senior management who carried out the scheme is Defendant Coburn.

82. Former Cognizant employees have corroborated the Company's admissions. Former Employee 1 served as a Cognizant Manager, Internal Audit & SOX Compliance from November 2014 through December 2015. Former Employee 1 was tasked with overseeing an FCPA compliance audit of Cognizant's Indian operations, which began in September 2014 and was completed in May 2015. Notably, notwithstanding the Company's representations that it conducted "periodic audits of [FCPA] compliance," Former Employee 1 reported that it was apparent based on the absence of prior-period audit documentation that an FCPA compliance audit had not been performed in at least two years prior to 2015. Former Employee 2, Cognizant's Assistant Vice President, Internal Audit from 2007 through 2012 and the Company's Chief Audit Executive, stated that no FCPA-specific audits were performed during his/her tenure at Cognizant.

83. Former Employee 1 further reported that the 2015 audit found evidence that payments related to procuring SEZ licensing were being made to Indian government personnel

and that these payments were being improperly classified in Cognizant's internal systems. Specifically, Former Employee 1 explained that Cognizant coordinated its land and facility procurement through a contractor. Former Employee 1 reported that the 2015 audit turned up several invoices from this contractor that explicitly sought reimbursement for payments for licenses to operate in SEZs in Bangalore and elsewhere. While the local government had the power to grant SEZ licenses in the area, the payments were made to what appeared to be a private, non-governmental entity. Upon investigating, Former Employee 1 discovered that key positions in the ostensibly private entity were held by government-affiliated individuals.

84.    While, as set forth above, the invoices made the purpose of the payments explicit (i.e., for SEZ licenses), Former Employee 1 stated that Cognizant internally recorded the payments as "lease payments." When Former Employee 1 interviewed Cognizant personnel, including a Director of Procurement and Director of Accounts Payable (individuals who were senior managers) about these transactions, he/she was unable to get a "straight cooperative answer," and, instead, was met with "inconsistent responses and no backup to support what they were saying." According to Former Employee 1, the personnel interviewed were all saying something different, particularly about the purpose of the payments, and the inconsistency "raised a big red flag." Former Employee 1 stated that the team would "speak to three people" about the purpose of the payments and "get three different answers." Although Former Employee 1 could not recall the amount of the payments in question, he/she stated that the payments would have had to have been significant enough to be selected for auditing. Notably, Former Employee 1 reported that the audit team discovered these payments "fairly easily," by running a few searches through the Company's electronic database.

85.    Former Employee 1 also reported that the 2015 audit turned up several "high risk" problems in Cognizant's internal controls. *First*, as described above, the audit revealed that numerous payments to Indian government-affiliated personnel had been improperly classified as lease payments or otherwise characterized in a way that was inconsistent with the nature of the actual transaction. *Second*, as stated in the Company's published Anticorruption Policy, all transactions involving government personnel were to be authorized by Cognizant's legal department. Former Employee 1, however, discovered that proper authorization was not being obtained for payments to government officials. *Third*, and relatedly, Former Employee 1 discovered that there were deficiencies in the Company's disclosure controls, as payments to government officials were not being properly flagged as such for further vetting, as per the Company's anticorruption and internal control policies.

86.    *Fourth*, contrary to Defendants' statements in the Anticorruption Policy, Former Employee 1 stated that Cognizant employees did not receive adequate FCPA compliance training. Specifically, Former Employee 1 noted that training materials were in English, rather than the language native to the employees being trained. Moreover, the training materials were generic, and were not specific to either the country in which employees operated or the specific positions they held. Unsurprisingly in light of these deficiencies, Former Employee 1 noted that the completion rate for compliance training was low. Corroborating Former Employee 1's reports, Former Employee 2, a highly placed audit executive, stated that his/her staff had no FCPA-specific training and that no FCPA training manuals even existed.

87.    Former Employee 1 reported the findings of the 2015 audit described above to Cognizant's Associate Vice President of Audit, Abraham Verghese ("Verghese"), for inclusion in a formal final audit report. Former Employee 1 further reported that he/she was included on emails

in which Verghese raised these findings with Cognizant's Assistant Vice President of Global Compliance & Ethics, Misty Pederson ("Pederson") – one of Cognizant's most senior compliance executives.[59] Former Employee 1 stated that the final audit report would have been disseminated to senior Cognizant executives including Pederson, Bhavna Sharma (Senior Manager, Internal Audit), and Steve Casari (Vice President Enterprise Risk Management & Internal Audit). Former Employee 1 also stated that summary audit findings, at a minimum, would have been distributed to the Audit Committee of Cognizant's Board, which had approved the plan to conduct the FCPA audit, as well as D'Souza and McLoughlin.

88.    As discussed above, Cognizant has admitted that its "senior management" "participated" in the Company's bribery scheme by, among other things, overriding internal controls related to real estate permitting or refusing to enforce these controls. There is ample evidence that Coburn, the Company's President and former CFO, "participated" in Cognizant's scheme. Former Employee 3, Cognizant's Infrastructure Team Lead from July 2015 through January 2016, stated that Coburn was the "responsible authority" for overseeing Cognizant's leases in India. Former Employee 4, Cognizant's Associate Director - Strategic Sourcing from September 2011 through March 2015, stated that Coburn was "involved directly" in real estate transactions; "[h]e used to take a special interest." Moreover, Coburn, who had served as a senior Cognizant executive for seventeen years, suddenly resigned when the Board's corruption investigation was announced.

---

[59] Pederson's biography on the business networking website LinkedIn stated that she is "[r]esponsible for developing, sustaining, measuring, and communicating programs that ensure Cognizant associates are committed to compliance with all local laws and [the Company's] Code of Conduct."

### E. The New Facts in the Indictment, SEC Action, and SEC Order Further Establish Cognizant's Bribery Scheme and False Statements to Investors

89.     As discussed above, the Indictment, SEC Action, and SEC Order are the result of a two-year investigation by the DOJ and SEC, and are based on Cognizant's own internal documents and the accounts of multiple current and former employees.  Indeed, in a February 13, 2019 letter to Cognizant, the DOJ noted that Cognizant provided it with "all known relevant facts about the misconduct"—facts which Cognizant obtained through its own multi-year investigation conducted by its own counsel, at a cost of tens of millions of dollars.  While the DOJ's investigation is still ongoing, the Indictment, the SEC Action, and the SEC Order strongly corroborate  that Cognizant engaged in an illicit bribery scheme to secure lucrative SEZ permitting; that the scheme was conceived and orchestrated by some of the Company's most senior management, including Defendants Coburn and Schwartz; and that Cognizant, Coburn and Schwartz made and caused to be made numerous false statements to investors concealing the scheme. As explained below, the Indictment, SEC Action, and SEC Order set forth detailed facts demonstrating how, between 2014 and 2016, Cognizant—through Coburn, Schwartz and other senior executives—authorized the payment of at least $3.6 million in bribes to Indian government officials to obtain permits required to build and operate lucrative SEZ facilities across India, including in Pune, Siruseri, and Chennai.

### 1. Defendants Coburn and Schwartz Arranged $2.5 Million in Illicit Payments to Obtain  Permitting Necessary to Create and Operate Cognizant's Largest SEZ Facility

90.     Between in or about January 2014 and in or about January 2016, Coburn and Schwartz, as well as other senior Cognizant executives, engaged in a scheme to bribe one or more government officials in India to secure and obtain a planning permit (the "KITS Permit") necessary to construct and operate Cognizant's largest SEZ, the KITS Campus in Chennai.  The Indictment makes clear that Cognizant could not have built and operated this crucial SEZ facility, nor enjoyed

the lucrative SEZ benefits attendant to it, without the KITS Permit.  Specifically, the Indictment explains that the KITS Permit was "a statutory approval that *was required prior to the commencement of the KITS Campus*," and states that the Permit was "discretionary and non-routine."

91.     As discussed in ¶¶43-48 and 55-57 above, the KITS Campus was critical to Defendants' SEZ strategy. Located at 1 SEZ Avenue in Chennai, the capital of the state of Tamil Nadu, the KITS Campus would become the Company's largest facility in India, encompassing 2.7 million square feet and supporting between 17,000 and 20,000 Cognizant employees. The KITS Campus' SEZ status would provide Cognizant with a significant business advantage by, among other things, allowing the Company to massively reduced the taxes and operating costs associated the work done by *thousands* of employees, as discussed in ¶¶45-48 above.

92.     Cognizant retained a construction firm (which, on information and belief, as set forth above, is believed to be L&T) in or about November 2011 to develop the KITS Campus. CC#1, Cognizant's Vice President of Administration who resided in India, was Cognizant's primary liaison with L&T and directly oversaw development of the KITS Campus.

93.     Given its importance, Coburn was personally involved in the KITS Campus project from its inception, and received regular updates from CC#1. Indeed, Cognizant's February 7, 2011 press release that announced the construction project quoted Coburn touting the project as "part of our ongoing strategy of investing in our people, processes, systems, and infrastructure to support our long-term growth."[60]

---

[60] Press Release, *Cognizant to Invest Over $500 Million in India Infrastructure Expansion* (Feb. 7, 2011).

94.     Coburn was responsible for personally approving any payments in excess of $500,000 that L&T requested from Cognizant for reimbursement of unanticipated costs associated with the agreed-upon scope of work (known as "variation claims" or "change order requests").

95.     Cognizant's contract with L&T provided that L&T would obtain all statutory approvals and permits. Though, as noted above, the KITS Permit was statutorily required prior to the commencement of construction, L&T did not submit an application and fee for the Permit until on or about February 7, 2013, approximately fourteen months *after* beginning work on the KITS Campus. By that time, Cognizant had already invested significant resources in building the KITS Campus, which would be jeopardized without the required Permit.

96.     The Indian government had still not issued the KITS Permit by April 2014—more than a year since L&T had first submitted the KITS Permit application and fee, and over two years since L&T had begun work on the KITS Campus (without having obtained the required permitting).  On April 21 and 22, 2014, with the timely completion of the KITS Campus in jeopardy, Defendants Coburn and Schwartz participated in video conference calls with CC#1 and Thiruvengadam to discuss paying a $2 million bribe (more than 120 million INR) to an official with the Chennai Metro Development Authority in order to secure the KITS Permit and complete this critical SEZ facility.  On the calls, CC#1 told Coburn and Schwartz that the government official had demanded the bribe in exchange for approving the Permit and asked for their guidance. As set forth in the Indictment, during the calls, Coburn and Schwartz agreed with CC#1 and Thiruvengadam that L&T would pay the bribe, and that Cognizant would reimburse L&T for the bribe payment through a change order request at the end of the project.

97.     Specifically, to disguise Cognizant's repayment of the illegal bribe to L&T, Schwartz and Coburn agreed that L&T would submit a number of fraudulent change order requests

at the end of the project totaling $2 million.  The fact that Coburn had sole authority to approve large change orders was key to the execution of Defendants' scheme.  Coburn was to use that authority to approve payment of the phony change order requests to effectuate disbursement of the bribe monies, thus causing the repayment to be falsely recorded in Cognizant's books and records as *bona fide* construction costs. To ensure that their fraudulent scheme went undetected, Schwartz emphasized during the April 22, 2014 video conference that the reimbursement payment should not stand out in the change order request.

98.     In order to secure L&T's cooperation in their scheme, Coburn directed CC#1 to tell L&T that Cognizant would withhold future payments related to the KITS Campus construction until it delivered the bribe to the Indian government official, and to notify L&T that its future business with Cognizant was in jeopardy unless it complied. CC#1 did as directed.  Several weeks later, L&T advised CC#1 that it would take necessary steps to secure and obtain the KITS Permit and that it had hired a special third-party consultant to make the bribe payment.

99.     To further entice L&T to participate in the illegal bribery scheme, Coburn authorized an additional $500,000 payment to L&T.  As with the $2 million bribe, Coburn orchestrated the submission of fake change order requests to Cognizant, used his authority to approve those requests to disburse the illicit payment to L&T, and, thus, caused the additional payment to be falsely recorded in Cognizant's books and records as *bona fide* construction costs.

100.     As noted above, following the April 22, 2014 calls, L&T advised CC#1 that it had hired a special third-party consultant to make the bribe payment. On or about May 17, 2014, CC#3 emailed CC#1, writing: "As committed, we are going ahead with approval part (not to inform your site team & others, except your top management if required so)." CC#3 also noted that Cognizant

had approximately $17 million in outstanding bills owed to L&T and asked for CC#1's assistance in getting Cognizant to pay those bills.

101.    CC#1 forwarded the above email to, among others, Coburn and Thiruvengadam, in which CC#1 stated that Cognizant had "some positive traction" on the KITS Campus "approval process" and that L&T was "moving full swing on the process." CC#1 also wrote that L&T had "appointed a new liaison consultant to process the approval" and that L&T "was confident [Cognizant] will receive approval by this month end/early June." Discussing L&T's request regarding its outstanding bills, CC#1 stated that the total "on hold" payments were approximately $17 million, "the freeze on payment is hurting them very badly," and CC#1 believed that it was a "good idea to release payment."

102.    Nonetheless, still lacking the critical KITS Permit, Coburn agreed to release only partial payment of money owed to L&T for legitimate construction work.  On May 20, 2014, Coburn wrote in an email to CC#1 and others, "Suggest you pay 7mm and hold the balance 10m until they deliver?"

103.    Coburn thereafter directed the co-conspirators not to discuss the bribery scheme over email. On or about June 16, 2014, Thiruvengadam sent CC#1 an email that read, "[Coburn] wanted an update on the [KITS Campus] approval (no [e]mails he said)."

104.    On or about June 30, 2014, L&T received a government order needed to obtain the KITS Permit, which the bribe recipient had promised to secure. That day, CC#3 emailed a scanned copy of the order to CC#1 and others, writing: "As discussed, nobody should know that [L&T] has got this [order.] Request to maintain this confidentiality." Later that day, CC#1 sent the scanned government order, without CC#3's note, to several Cognizant executives, including

Thiruvengadam and Defendants Coburn and Schwartz, writing "We will now start firm planning for occupation. Thanks to [L&T] for support."

105.    In order to sustain the pressure on L&T to secure the completed KITS Permit, Coburn continued to withhold payment owed to L&T for legitimate construction work.  Coburn responded to a June 30, 2014 email from CC#1 asking for permission to unfreeze the remaining $10 million owed to L&T by instructing CC#1 to "pay $5mm of the $10mm" and to "hold the other $5mm until all approvals are finalized and received."

106.    A little more than four months later, on or about November 5, 2014, the KITS Permit was issued to Cognizant.  On or about November 10, 2014, CC#1 emailed Defendant Coburn, copying Thiruvengadam and others, to announce that the KITS Permit had been issued and recommending that Cognizant release L&T's remaining funds that Cognizant had frozen. Two days later, Coburn responded via email, "OK."

107.    Around this time, as the KITS Campus project neared completion, L&T began submitting change order requests to Cognizant for reimbursement of unanticipated construction costs, in accordance with the plan devised by Coburn and Schwartz. Specifically, L&T submitted approximately forty-five claims totaling approximately $25 million.  These claims included an approximately $2.5 million request for "statutory approvals - planning permit" listed as part of a larger $3.7 million claim for "approvals/campus regularization." This $2.5 million request corresponded to the approximately $2 million bribe payment and the $500,000 additional payment to L&T for delivering the bribe.

108.    Circulated within Cognizant as an attachment to an email on or about October 29, 2014 was a document entitled "Variations List Discussion Document," which included the $3.7 million claim along with the description "Approvals/Campus Regularisation." A subsequent

version of the document, circulated as an attachment to an email on or about November 12, 2014, contained an item in the same amount, but with the description shortened to just "Statutory Approvals." On or about January 13, 2015, CC#1 sent an email to Coburn and others that included a chart summarizing L&T's pending change order requests, and which contained this item for "Statutory Approvals."

109.    Knowing that a multi-million dollar line item for "statutory approvals" would likely raise a red flag and invite further inquiry from Cognizant's auditors, and in keeping with Schwartz's April 2014 warning that the reimbursement payment should not stand out in the change order request, CC#1 instructed a co-conspirator who was a member of Cognizant's real estate group to create a fake version of the "Variations List Discussion Document" that replaced the entire $3.7 million claim for "approvals/campus regularization" (which included the $2.5 million "statutory approvals" request) with eleven previously-rejected claims worth roughly the same amount.  CC#1 then retroactively "accepted" the previously-rejected claims. This substitution would ensure that L&T was reimbursed for the bribe payment and the additional $500,000, while disguising the true purpose of the payment.

110.    In or about January 2015, CC#1 told Coburn that certain line items in the fake Variations List Discussion Document had been used to conceal Cognizant's bribe payments, including the additional payment to L&T. By email on or about January 15, 2015, the fraudulent change orders and supporting Excel spreadsheets were forwarded to Coburn for approval.  Coburn preliminarily approved these payments in a February 3, 2015 email to CC#1, in which he stated, "Approved."

111.    To facilitate the formal approval of the bribe payments by Cognizant's finance unit, on or about March 11, 2015, Defendant Coburn falsified a spreadsheet and related approvals containing and incorporating the false change order requests in connection with the KITS Campus.

112.    On or about March 13, 2015, Defendant Coburn formally approved the illicit payments, sending an email to a member of Cognizant's finance unit authorizing a payment to L&T that included reimbursement for the $2 million bribe and the $500,000 additional payment for making the bribe.  Based on their communications with CC#1 and Thiruvengadam as set forth above, Coburn and Schwartz knew that the reimbursement for the bribe would be and was included in the amount Cognizant agreed to pay L&T, and that the change order documents would be and were falsified to conceal the true nature of those payments.

113.    Based on Coburn's approvals, Cognizant issued several separate payments to L&T to cover the cost of L&T's change order requests between March 2015 and January 2016 that included approximately $2 million for the bribe and $500,000 for the additional payment for paying the bribe.

   **2. To Conceal the Illicit Bribery Scheme, Defendants Coburn and Schwartz Made and Caused to Be Made False and Misleading Statements and Omissions in Cognizant's SEC Filings and Sustainability Reports**

114.    As described further below, Defendants Coburn and Schwartz took numerous steps to conceal the bribery scheme from the investing public, including: a) falsifying Cognizant's books, records, and accounts, thus falsifying Cognizant's publicly-filed earnings releases and financial statements; b) preventing discovery of the scheme by Cognizant's auditors, which ensured that Cognizant would publicly issue the financial statements and earnings releases containing the false information that Coburn and Schwartz created; and c) making and causing to

be made false and misleading statements in Cognizant's public Sustainability Reports, including by falsely certifying their compliance with Cognizant's Code of Conduct.

> **a.** **Coburn and Schwartz falsified Cognizant's books, records, and accounts, thus knowingly falsifying its public financial statements and SEC filings.**

115. As discussed above, upon learning of the $2 million bribe demand during the April 2014 video teleconferences and approving it, Defendant Coburn, with Schwartz's approval, authorized the use of fraudulent change orders to disguise Cognizant's reimbursement of $2 million to L&T for the bribe payment. In addition, Coburn later authorized an additional $500,000 payment to L&T for delivering the bribe, also to be paid through fraudulent change orders.

116. Coburn—having served as Cognizant's CFO and President—and Schwartz—having served as the Company's General Counsel—knew that these actions would cause Cognizant to improperly record the illicit payments in Cognizant's books and records as *bona fide* construction expenses. Coburn further knew that the bribery scheme would cause Cognizant to falsely and improperly record the payments in Cognizant's books and records as *bona fide* expenses related to construction of the KITS Campus because Coburn personally approved the fraudulent change orders.

117. Coburn and Schwartz approved and executed a plan to conceal the bribery scheme that necessarily entailed deliberately falsifying Cognizant's books, records, and accounts, which were used to generate Cognizant's Class Period financial statements and earnings releases. Thus, as these Defendants knew, the bribery scheme would also cause Cognizant's publicly reported financial statements to be falsified. By disguising the bribes as *bona fide* construction costs, these Defendants understood that these expenditures would be capitalized, rather than expensed, thus overstating capital expenditures, understating operating expenses, and overstating earnings in Cognizant's publicly-reported financial statements.

118.    In addition, Defendant Schwartz, as Cognizant's Chief Legal Officer, personally signed and authorized the filing of each of Cognizant's Forms 8-K that publicly disseminated Cognizant's false earnings releases for each reporting period during the Class Period.  Specifically, as discussed further below, Schwartz signed Forms 8-K filed with the SEC on May 4, 2015, August 5, 2015, November 4, 2015, February 1, 2016, May 6, 2016 and August 5, 2016, attaching earnings releases that, as Schwartz knew, misstated Cognizant's capital expenditures, operating expenses, and net income.

119.    Coburn and Schwartz also took a number of steps to ensure that the truth about Cognizant's reported financial information would not be uncovered, and that the false financial information would be reported to investors.  As described further below, Defendants Coburn and Schwartz concealed the bribery scheme from Cognizant's auditor in connection with its audits of the Company's financial statements from 2014 through 2016. Had Cognizant's auditor learned about the bribery scheme, the auditor would not have provided unqualified audit opinions to accompany Cognizant's annual reports during that time, thereby precluding the false information from being publicly reported (as SEC regulations require that annual reports be audited).  Thus, this deception by Coburn and Schwartz enabled Cognizant to publicly release the false and misleading financial information that Coburn and Schwartz created and authorized, as described above.

120.    *First*, in order to conceal the improper payments to L&T, Defendants Coburn and Schwartz made false and misleading statements and omissions to Cognizant's auditor concealing the bribery scheme, the disguised payments to L&T, the resulting false books and records of Cognizant, and their intentional circumvention of Cognizant's Code of Ethics and internal accounting controls.  Indeed, the SEC Action states that "Coburn and Schwartz lied to Cognizant's

auditor" by making "false and misleading statements or omissions to Cognizant's auditor in connection with its audits of the company's financial statements from 2014 through 2016." These lies by Coburn and Schwartz concealed the bribery scheme, "the resulting false books and records of Cognizant, and their intentional circumvention of Cognizant's Code of Ethics and internal accounting controls."

121.  *Second*, between August 2014 and June 2016, Defendant Coburn signed false management representation letters that were provided to Cognizant's auditor during its audit, review, and examination of Cognizant's financial information, including Cognizant's financial statements. As stated in the SEC Action, this false financial information "was incorporated by reference or attached to periodic and annual reports filed with the [SEC]"—in other words, it was contained in the false SEC filings at issue in this case. These false management representation letters were essential to causing Cognizant to report false financial information to investors. As discussed above, any refusal by Coburn to affirm that he was unaware of any fraud inside the Company, would have surely raised red flags with Cognizant's auditors. GAAS AU 333 and 722.24 specifically require that members of management provide such representation letters for both annual and quarterly reports. Each of Coburn's management representation letters falsely stated that:

> We acknowledge our responsibility for the design and implementation of programs and controls to provide reasonable assurance that fraud is prevented and detected.

> We have no knowledge of any fraud or suspected fraud affecting the Company involving: a) Senior management; b) Management or other employees who have significant roles in internal control over financial reporting; or c) Others where the fraud could have a material effect on the condensed consolidated interim financial statements.

> There have been no violations or possible violations of laws or regulations whose effects should be considered for disclosure in the consolidated financial statements or as a basis for recording a loss contingency.

122.    In fact, as described above, Defendant Coburn knew at the times that he signed these false management representation letters that he, with Defendant Schwartz's approval, had authorized Cognizant to execute a scheme to bribe an Indian government official so as to acquire an essential permit necessary for the completion of the Company's largest SEZ facility, the KITS Campus. Coburn also knew when he signed the false management representation letters that, at his direction, Cognizant had concealed these illicit payments through fraudulent change orders and circumvented the Company's internal controls, which resulted in a series of improper payments to L&T between 2015 and 2016, and that the books, records and accounts of Cognizant – and its public financial statements – were thereby falsified.

123.    *Third*, as set forth in the SEC Action, Coburn and Schwartz signed numerous false SOX "sub-certifications" in connection with the Company's financial reports filed with the SEC between July 2014 and January 2016.  As discussed below, SOX requires that an issuer's CEO and CFO certify the completeness and accuracy of financial reports filed with the SEC, the effectiveness of the issuer's internal controls, and the absence of disclosure deficiencies.  In order to verify the accuracy of these attestations, Cognizant's CEO and CFO relied on sub-certifications from other members of senior management, including Coburn and Schwartz, attesting to the accuracy of the Company's financial reports and integrity of its controls.  Without these sub-certifications, D'Souza and McLoughlin would have been unable to sign their own certifications required by SOX, and the Company would have been unable to file the financial reports with the SEC.  Moreover, any refusal by a member of senior management to sign a sub-certification would surely have raised red flags to the auditor about the accuracy of the Company's SEC filings and would have also precluded filing the financial reports.  Accordingly, Coburn and Schwartz's false

sub-certifications were a crucial step in the dissemination to investors of Cognizant's false financial reports.

124.    In their sub-certifications, Coburn and Schwartz falsely stated, among other things, that: (1) Cognizant's internal controls had been in force and effective; (2) they had disclosed to Cognizant's CEO and CFO all known deficiencies in the operation of the internal controls; (3) they had disclosed to Cognizant's CEO and CFO "any known fraud, whether or not material, that involves management or other employees, within my area of responsibility, who have a significant role in the Company's internal controls"; and (4) that the financial information for each relevant period "does not contain any untrue statement of fact or omit to include a material statement of fact necessary to make such financial information, in light of the circumstances under which such financial information was compiled, not misleading."

125.    In fact, at the time that Defendants Coburn and Schwartz executed each of these certifications, Coburn and Schwartz knew that they had authorized Cognizant to execute a scheme to bribe an Indian government official so as to acquire an essential permit necessary for the completion of the Company's largest SEZ facility, the KITS Campus. Coburn and Schwartz further knew that they had approved a plan to conceal the bribery scheme and circumvented the Company's internal controls, which necessarily entailed deliberately falsifying Cognizant's books, records, and accounts – and, in turn, its public financial statements.

126.    In addition to the facts set forth in the SEC Action, the Indictment also provides further specific examples of false statements that Coburn and Schwartz made in connection with Cognizant's SEC filings at issue in this action, which enabled them to be published to investors. Specifically, the Indictment states that "Coburn, Schwartz and others, in connection with the preparation of Cognizant's filing of its annual report with the SEC, made and caused to be made

false, fraudulent, and misleading representations and omissions in [Cognizant's] Annual Report on Form 10-K and Proxy Statement Disclosure Questionnaires for the year ended December 31, 2014 and the year ended December 31, 2015"—the two Forms 10-K at issue in this case— "including, but not limited to, providing false answers to questions relating to: bribes or kickbacks; disguised or intentionally mis-recorded entries in Cognizant's books and records; and transactions that may have violated Cognizant's Code of Conduct."

127.   Similarly, the Indictment states that "Coburn, Schwartz, and others, in connection with the preparation of Cognizant's SEC filings,  made and caused to be made false, fraudulent, and misleading representations and omissions in Sarbanes-Oxley Quarterly Global 302 Certifications for the quarter ending June 30, 2014 and the quarter ending March 31, 2015, including, but not limited to, falsely certifying that Cognizant's internal controls had been in force and effective, and that they had disclosed to Cognizant's Chief Executive Officer and Chief Financial Officer all known deficiencies in the operation of the internal controls and any known fraud involving management or other employees who had a significant role in Cognizant's internal controls."

### b.   Defendants Coburn and Schwartz Participated In Making Cognizant's False Sustainability Reports.

128.   In 2014 and 2015, Cognizant published Sustainability Reports that, among other things, stated to investors that there were "no incidents" of corruption and (in the 2015 Sustainability Report) that "Cognizant treats reports of misconduct seriously." These statements were false and misleading: as discussed above, Cognizant—through its most senior management, including Defendants Coburn and Schwartz—was engaged in a bribery scheme.

129.   Defendants Coburn and Schwartz made and caused to be made these false and misleading statements in Cognizant's Sustainability Reports. Specifically, the Sustainability

Reports incorporated information from certifications provided by Coburn and Schwartz throughout the Class Period. As set forth in the SEC Action, from 2014 through 2016, Coburn and Schwartz submitted false certifications stating that they adhered to Cognizant's "Core Values and Standards of Business Conduct"—which, as described above (¶¶65-70), required compliance with the Company's anti-corruption policy, the maintenance of accurate books and records, and compliance with all laws, rules and regulations applicable to the Company in India and wherever Cognizant conducted business. Yet, at the time that Coburn and Schwartz executed these certifications, they knew that they had authorized Cognizant to execute a scheme to bribe an Indian government official to acquire an essential permit necessary for the completion of the Company's largest SEZ facility, the KITS Campus. They also knew that they had approved a plan to conceal the bribery scheme which necessarily entailed deliberately falsifying Cognizant's books, records, and accounts—and consequently, its public financial statements.

130.     In addition, Cognizant's Sustainability Reports state that "Cognizant's President," *i.e.*, Coburn, was responsible for monitoring the Company's sustainability performance, including its compliance with anti-corruption laws, "and reporting the results of this review to our Board of Directors," including the CEO, who signed and approved the report. Coburn's responsibility for this function further demonstrates his authorization of, and control over, the false information in the Sustainability Reports.

131.     Likewise, Schwartz furnished information for inclusion in, and participated in approving, Cognizant's Sustainability Reports. As Cognizant's Chief Legal Officer, Cognizant's compliance function reported to Schwartz. Schwartz was ultimately responsible for monitoring and ensuring Cognizant's compliance with anti-corruption laws. Thus, Schwartz was ultimately

responsible for monitoring and reporting the false compliance data included in the Sustainability Reports.

### 3.   Cognizant—acting through its senior executives—executed very similar bribery schemes at other SEZ facilities.

132.   As revealed in the SEC Order, around the same time Defendants Coburn and Schwartz authorized and concealed the bribery scheme described above, Cognizant—acting through its senior executives—engaged in very similar bribery schemes involving at least two other SEZ facilities.

#### a.   Pune, Maharashtra

133.   The bribery scheme in Pune also involved the construction of a commercial office facility with L&T as Cognizant's builder.

134.   The Pune facility was also part of Cognizant's SEZ strategy. Cognizant had announced the construction of the Pune facility in the same February 7, 2011 press release announcing construction of the KITS Campus, which also noted that the Pune facility was in a SEZ. As noted above, that press release also indicates Defendant Coburn's involvement, quoting him as describing the construction projects as "part of our ongoing strategy of investing in our people, processes, systems, and infrastructure to support our long-term growth."

135.   L&T began construction of the Pune facility in 2012. L&T began construction prior to the issuance of necessary permits, including specifically an environmental clearance. Thereafter, Cognizant—acting through its senior executives—authorized L&T to pay, on Cognizant's behalf, a $770,000 bribe to a government official in exchange for issuing the permit necessary to construct and operate the SEZ facility.

136.   Just as with the scheme that Coburn and Schwartz implemented to obtain the KITS Permit, Cognizant reimbursed L&T for the bribe through false change order requests: in this

instance, after the bribe had been paid in early 2013, L&T sought reimbursement through a change order request submitted in April 2013 containing a line item for "Liasoning [sic] and consultations charge towards Environmental clearance." Cognizant rejected the change order, but later approved the payment after L&T falsely changed the rationale to "Change in the make of Workstation from Featherlite to Art matrix." As noted above, with respect to the KITS Campus, Coburn's authorization was required for change order requests of $500,000 or more—a threshold that this change order easily exceeded.

137.    Cognizant ultimately reimbursed L&T for the bribe payment in January 2014 pursuant to the phony change order. As a result, Cognizant falsely reported this illegal bribe as *bona fide* capital expenses—and thereby overstated the Company's earnings—in Cognizant's Class Period financial statements and earnings releases.

### b.    Siruseri, Tamil Nadu

138.    The bribe scheme in Siruseri again involved the construction of a commercial office facility with L&T as Cognizant's builder and again related to the Company's SEZ strategy: Cognizant's operations in Siruseri are in SIPCOT IT Park, a designated SEZ.  In its 2009-2010 Annual Report, L&T stated that the "SEZ at Siruseri for Cognizant" was a "major order[] bagged."

139.    In Siruseri, Cognizant—acting through its senior executives—authorized L&T to pay $840,000 in bribes to government officials for the issuance of several permits required to construct and operate the SEZ facility, including a planning permit, a power permit from the local electricity board, and an environmental clearance. After L&T made the payments in or around 2012, and Cognizant thereafter received the permits, L&T submitted false change order requests for several inflated or unjustified work items. Again, after Cognizant rejected the initial requests, the sham descriptions were revised and Cognizant approved the false change orders. As with Pune,

the size of the change order request significantly exceeded the $500,000 threshold needed for Defendant Coburn's approval.

140.    Cognizant ultimately reimbursed L&T for the Siruseri bribe payments in installments between 2015 and 2016. Again, Cognizant falsely reported this illegal bribe as *bona fide* capital expenses—and thereby overstated the Company's earnings—in Cognizant's Class Period financial statements and earnings releases.

### F.    The Truth Is Finally Revealed

141.    On September 30, 2016, Cognizant shocked investors by announcing, in a Form 8-K filed with the SEC, that its Board was "conducting an internal investigation into whether certain payments relating to facilities in India were made improperly and in possible violation of the U.S. Foreign Corrupt Practices Act and other applicable laws."[61]

142.    In that same filing, Cognizant also announced that Coburn, whom analysts had described as "a leading face of CTSH to the investment community," a "key executive," and "a major contributor to the development of the company's strategy since its inception," had resigned amidst the Board's corruption investigation and was being replaced as President by then-CEO of IT Services Rajeev Mehta. Analysts noted the abruptness of Coburn's departure, pointing out that he had "been attending/participating at recent investor conferences."[62]

143.    Analysts and investors were shocked by Cognizant's September 30, 2016 disclosures. For example, in a September 30, 2016 report, Argus analysts downgraded Cognizant,

---

[61] Cognizant Tech. Sols. Corp., Current Report (Form 8-K), at Item 8.01 (Sept. 30, 2016) [hereinafter 2016 Form 8-K].

[62] *Cognizant Gags Staff, Steps up Graft Probe*, Times of India (Oct. 3, 2016, 4:00 AM IST), http://timesofindia.indiatimes.com/business/india-business/Cognizant-gags-staff-steps-up-graft-probe/articleshow/54646587.cms.

characterizing the "announced resignation of the company's president amid a corruption investigation in India" as ***blockbuster news***."[63] These analysts observed that "[g]iven that a top executive has resigned, . . . we see risks that the illegal practices could be extensive and long-lived. Additional agencies such as DoJ and SEC could conduct investigations of their own, and this matter could overhang the CTSH shares [for] a significant amount of time."[64] In a September 30, 2016 report, RW Baird analysts expressed deep concern that illegal payments made to procure SEZ permitting could have profoundly adverse consequences for Cognizant, noting that, "[w]hile we haven't seen this in the past, we consider possible outcomes to include reputational damage – could hurt revenue growth via client loss/limited client wins, fines and potential limits on operations in certain areas."[65]

144.    In a September 30, 2016 report, Jefferies analysts similarly expressed shock at the Company's "two surprising announcements" concerning the Board's investigation into FCPA violations and Coburn's resignation, specifically noting that Coburn's "***sudden departure was not anticipated in our opinion***."[66] The report further noted that "we don't believe [Coburn] will receive any severance."[67]

---

[63] Jim Kelleher, CFA, *Change in Rating: Downgrading to HOLD on Corruption Probe* 1-2 (Argus Research Co. Sept. 30, 2016).

[64] *Id.* at 1.

[65] Jochelle Mendonca, *Cognizant Investigating Improper Payments Paid in India; Informs DOJ, SEC*, ETtech (Oct. 1, 2016, 09:51 IST), http://tech.economictimes.indiatimes.com/news/ corporate/cognizant-investigating-improper-payments-paid-in-india-informs-doj-sec/54607942.

[66] Jason Kupferberg, Equity Analyst, *Surprise Management Departure and Possible FCPA Violation* 1 (Jefferies Group LLC Sept. 30, 2016).

[67] *Id.*

145.    That same day, Evercore ISI published a report opining that Defendant Coburn's resignation may have been "as a direct result of this investigation":

> This morning Cognizant announced that Gordon Coburn, President, resigned and [has] been replaced with Rajeev Mehta, CEO of [Cognizant] IT Services. In conjunction, [Cognizant] is conducting an internal investigation into whether certain payments relating to licenses and permits on a small number of its 12 owned facilities in India were made improperly and in possible violation of the [FCPA] and other applicable laws. While not specified, **we believe Gordon Coburn may have resigned as a direct result of this investigation** and potentially other issues [Cognizant] may be facing given a weak discretionary spending environment in the Company's large Financial Services and Healthcare verticals.[68]

146.    Morgan Stanley analysts likewise stated in a September 30, 2016 report that "investors may assume a connection" between Coburn's resignation and the announcement of the FCPA investigation, "given the timing" of the two events.[69]

147.    Finally, Morningstar issued a September 30, 2016 report emphasizing that Cognizant's "unexpected" announcement had "surprised the market" and was "clearly a black eye for the company and could potentially provide dark clouds" over the "reputation of the firm's consulting franchise."[70] A few days later, on October 3, another Morningstar report noted: "Given that Coburn had been with the company for over 20 years and president since 2012, the quick-handed nature of his dismissal seems to indicate a link to the FCPA investigation."[71]

148.    On September 30, 2016, in response to the Company's disclosures, Cognizant's stock price swiftly declined. The Company's stock price fell more than 13%, or $7.29 per share, declining from $55.00 to $47.71 on the year's highest trading volume.

---

[68] David Togut, CFA et al., *Nibble on Bad News* 1 (Evercore ISI Sept. 30, 2016).

[69] Brian Essex, CFA et al., *CTSH Quick Comment* 2 (Morgan Stanley Sept. 30, 2016).

[70] Brian Colello, CPA, *Cognizant's Shares Remain Undervalued as the Firm Investigates Possible Corruption Violations* 1 (Morningstar Equity Research Sept. 30, 2016).

[71] Andrew Lange, Equity Analyst, *Cognizant in Possible Violation of Foreign Corrupt Practices; Scant Detail, Stock Still Undervalued* 1 (Morningstar Equity Research Oct. 3, 2016).

**G.** **Cognizant Has Admitted that the Company's Class Period Representations Were False and that Senior Management Participated in Making Improper Payments to Indian Officials, and Coburn and Schwartz Have Been Indicted and Sued by the SEC for This Misconduct**

149.     Since the end of the Class Period, Cognizant has acknowledged that: (1) Cognizant's "senior management" "may have participated in" making $6 million dollars' worth of corrupt payments to Indian government officials to procure permits relating to the Company's Indian facilities including by, among other things, "overriding" the very internal controls designed to detect and prevent such misconduct; (2) the Company's prior reported financial results were misstated because millions of dollars in bribes were improperly reported as "capital expenditures" (i.e., legitimate expenditures to build or maintain physical facilities); (3) Defendants' representations about Cognizant's compliance with anticorruption laws and the adequacy of its internal controls were both false; and (4) senior management knew that the Company's internal controls were inadequate to detect and prevent the bribery scheme.

150.     On November 7, 2016, Cognizant filed its third quarter results on Form 10-Q with the SEC. In that filing, the Company admitted that Cognizant's "senior management may have participated" in making – or had allowed to be made – corrupt payments to procure licenses for the Company's Indian facilities:

> During the closing process for the third quarter of 2016, based on the results of the internal investigation to date, we concluded that as of December 31, 2015 and in subsequent interim periods, ***we did not maintain an effective control environment. Specifically, we did not maintain an effective tone at the top as certain members of senior management may have participated in or failed to take action to prevent the making of potentially improper payments by either overriding or failing to enforce the controls established by the Company relating to real estate and procurement principally in connection with permits for certain facilities in India.*** . . .

As a result of the foregoing, ***we have determined that a material weakness existed as of December 31, 2015, and continues to exist in subsequent interim periods, in our internal control over financial reporting.[72]***

151.    Accordingly, Cognizant admitted in that Form 10-Q that its senior management was deeply involved in the bribery scheme and that its prior statements concerning the integrity of its internal controls were false. Cognizant was forced to correct the certifications in its 2015 Form 10-K and first and second quarter 2016 Forms 10-Q – that "our disclosure controls and procedures and internal controls over financial reporting were effective" – to state the opposite, instead – "that [those controls] as of December 31, 2015 were ineffective."[73]

152.    The Company further admitted that it had misstated its prior financial results to conceal Cognizant's bribery scheme. Specifically, to hide the purpose and nature of these payments, the Company had mis-booked many of the improper payments as capital expenditures – investments in physical assets that may be depreciated – rather than operating expenses, which are deducted dollar-for-dollar against the Company's bottom line as they are spent. The Company stated:

> To date, the investigation has identified a total of approximately $ 5.0 million in payments that may have been recorded improperly. During the three months ended September 30, 2016, we recorded an out-of-period correction related to $ 3.1 million of such payments that were previously capitalized that should have been expensed. The remaining $1.9 million of such payments remains under investigation. The recorded correction resulted in an increase of selling, general and administrative expenses of $ 3.1 million, a reduction in depreciation and amortization expense of $ 0.4 million, and a reduction in property and equipment, net of $ 2.7 million.[74]

---

[72] Cognizant Tech. Sols. Corp., Quarterly Report (Form 10-Q), at 7 (Nov. 7, 2016) [hereinafter Q3 2016 Form 10-Q].

[73] *Id.*

[74] *Id.* at 26-27.

153.    In its 2018 Form 10-K, the Company updated these findings, stating that it "recorded out-of-period corrections related to $4 million of such payments that had been previously capitalized that should have been expensed."[75]

154.    On November 7, 2016, Cognizant held its Q3 2016 earnings conference call with analysts and investors. During this call, D'Souza reiterated that the Company's senior management was involved in the scheme. He further stated that the members of senior management who participated in the scheme were no longer with the Company:

> [W]e discovered in the course of the investigation that certain members of senior management may have been aware of or participated in the matters under investigation. Any such conduct would be inconsistent with our core values. Based on the results of the investigation to-date, those who may have been involved are no longer with the company or in the senior management position.[76]

155.    D'Souza's statement leaves little doubt that Coburn, the Company's former President, was personally involved in the bribery scheme. As noted above, at the time D'Souza made this statement, Coburn was "no longer with the Company" because he had suddenly and surprisingly "resigned" just three days before the Company disclosed the investigation into improper payments.

156.    Cognizant also has acknowledged that its representations in its credit agreement with a commercial bank syndicate that the Company was compliant with anticorruption laws was "materially incorrect."[77] Specifically, in its 2014 credit agreement, which the Company publicly filed with the SEC on November 20, 2014, Cognizant represented that:

---

[75] Cognizant Tech. Sols. Corp., Annual Report (Form 10-K), at 21 (Feb. 29, 2019) [hereinafter 2018 Form 10-K]

[76] Tr. of Q3 2016 Earnings Call at 2 (Bloomberg Nov. 11, 2016).

[77] Q3 2016 Form 10-Q, *supra* note 72, at 12, 42, 53.

[Cognizant], its Subsidiaries and their respective directors, officers and employees, and to the best knowledge of [Cognizant,] its affiliates and agents, have not engaged in any activity or conduct which would violate any applicable Anti-Corruption Laws, and are in compliance with Anti-Corruption Laws and applicable Sanctions and are not engaged in any activity that would reasonably be expected to result in [Cognizant] being designated as a Sanctioned Person.[78]

In its third quarter 2016 Form 10-Q, Cognizant acknowledged that the existence of the bribery scheme rendered this statement false and that the Company was therefore forced to secure a waiver of default from the syndicate and amend its credit agreement.[79]  Specifically, this statement was amended to read, in pertinent part, "to the best knowledge of the Borrower, its affiliates and agents, . . . *except for the Disclosed Matters*, [Cognizant has] not engaged in any activity or conduct that would violate any applicable Anti-Corruption Laws," with the Disclosed Matters defined as the Company's September 30, 2016 disclosure about the bribery scheme.[80]

157.    On February 8, 2017, in connection with its fourth quarter 2016 earnings call, Cognizant provided another update to its ongoing investigation of corrupt payments made to Indian officials. The Company disclosed that it had discovered another $1 million in improper payments, bringing the total amount of bribes paid to $6 million.[81]

158.    On March 1, 2017, Cognizant filed a Form 10-K with the SEC, which disclosed that the bribery scheme had been ongoing since at least 2010. Specifically, the 2016 Form 10-K stated: "To date, the investigation has identified a total of approximately $6 million in payments made between 2010 and 2015 that may have been recorded improperly."[82]

---

[78] Cognizant Tech. Sols. Corp., Current Report (Form 8-K), Ex. 10.1 at 52-53 (Nov. 20, 2014).

[79] *See* Q3 2016 Form 10-Q, *supra* note 72, at 12.

[80] *Id.* at Ex. 10.1.

[81] Tr. of Q4 2016 Earnings Call at 7-8 (Bloomberg Feb. 8, 2017).

[82] Cognizant Tech. Sols. Corp., Annual Report (Form 10-K), at 37 (Mar. 1, 2017) [hereinafter 2016 Form 10-K].

159.    The 2016 Form 10-K also demonstrated that the bribery scheme was widespread and involved multiple members of senior management and other Company employees. Under "Remediation Plans," the 2016 Form 10-K reiterated that multiple members of senior management were involved with the bribery scheme and acknowledged that additional Cognizant employees may be disciplined:

> [T]he members of senior management who may have participated in or been aware of the making of the identified potentially improper payments and failed to take action to prevent the making of the identified potentially improper payments were no longer with the Company or in a senior management position as of December 31, 2016. Additional personnel actions have been taken with respect to other employees and further actions may be required.[83]

160.    The Company further acknowledged that the cost of the scandal was ongoing and severe, stating: "In 2016, we incurred $27 million in costs related to the FCPA investigation and related lawsuits. We expect to continue to incur expenses related to these matters in 2017 and future periods."[84]

161.    During its October 30, 2018 earnings call, the Company told investors that its discussions with the DOJ and SEC had "progressed to a point where we are now able to reasonably estimate a probable loss and have recorded an accrual of $28 million in our financial statements in Q3." In its Form 10-Q filed the next day, the Company further disclosed that it had "substantially completed" its internal investigation. In its 2018 Form 10-K, the Company stated that had incurred a total of ***$79 million*** in costs related to the investigation, excluding the $28 million paid to the SEC and DOJ.

162.    On February 6, 2019, in connection with its earnings release, Cognizant announced what the *International Business Times* called a "major management shake-up." D'Souza—who

---

[83] *Id.* at 58.

[84] *Id.* at 37.

co-founded Cognizant in 1994 and had been CEO since 2007—would be stepping down from Cognizant in April 2019, to be replaced by Vodafone executive Brian Humphries. Humphries will be the first outsider to become CEO in the Company's history. In addition, the Company also announced that Rajeev Mehta—who had served as Cognizant's President since the Company fired Coburn in September 2016—would also be stepping down from Cognizant in April 2019.

163.    On February 14, 2019—and made publicly available the following day—the United States Attorney for the District of New Jersey filed the Indictment, in which a federal grand jury sitting in Newark, New Jersey, charged Defendants Coburn and Schwartz with 12 criminal counts related to the bribery scheme.

164.    The same day that the Indictment became public—February 15, 2019—the SEC filed the SEC Action, alleging civil claims against Defendants Coburn and Schwartz for violations of the FCPA and securities laws in connection with the bribery scheme.

165.    Also that day, the SEC separately announced the SEC Order, in which Cognizant agreed to pay $25 million to settle claims that it had violated the securities laws in connection with the bribery scheme; cease-and-desist future violations; and report to the SEC periodically for two years on its remediation and implementation of enhanced compliance measures, including through periodic reviews by SEC Staff and the submission of written reports to the SEC.

166.    On February 19, 2019, *The Economic Times* reported that Cognizant may still be liable for wrongdoing under Indian law.[85] That same day, the President of the Indian political party Dravida Munnetra Kazhagam, M.K. Stalin, demanded the registration of a case against Cognizant

---

[85] ET Bureau, *DMK seeks probe against former AIADMK ministers*, The Economic Times, )Feb. 16, 2019), https://economictimes.indiatimes.com/news/politics-and-nation/dmk-seeks-probe-against-former-aiadmk-ministers/articleshow/68059327.cms.

for the bribery scheme. Stalin also urged the India Central Bureau of Investigation and Interpol to obtain evidence, and further demanded that the government should assist the state's Directorate of Vigilance and Anti-Corruption in acquiring evidence against Cognizant from the United States.[86]

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD AND ANALYST AND MARKET REACTIONS THERETO[87]

167.   During the Class Period, Defendants and dismissed Defendants made numerous statements regarding Cognizant's business and results of operations that were materially false and misleading in light of the Company's misconduct, namely, the undisclosed bribery scheme. **First**, in the Company's SEC filings, Defendants informed investors of the financial benefits Cognizant received from its SEZ licenses without revealing that the Company was engaged in a bribery scheme in order to obtain and perpetuate those benefits. The Company also reported the investments it made in its SEZs – figures that were overstated because they included several million dollars worth of illicit payments to Indian government officials. **Second**, Defendants claimed that Cognizant had established robust policies and procedures to ensure legal and ethical compliance, including extensive training and "risk analysis" functions to assess and prevent "corruption." Based on these representations, Defendants specifically stated that "no" "confirmed incidents" of "corruption" had been "reported in 2014" or "in 2015." Defendants also stated that "no incidents" of "significant risks" of "corruption" had been reported "in 2015." These representations were materially false and misleading in light of the facts that (1) Cognizant was involved in a bribery scheme in India; (2) the scheme was facilitated by senior management,

---

[86] *Id.*

[87] In this section, Defendants' statements that are ***bolded and italicized*** are alleged to be false and misleading. Other statements are included to provide context, including those that are bolded (but not italicized) for emphasis.

including the Company's President and Chief Legal Officer, overriding or failing to enforce the much-hyped internal controls; and (3) Cognizant has admitted that, in truth, its internal controls were materially deficient. **Third**, Defendants represented that Cognizant's financial performance and ability to deliver low-cost services were due to legitimate business factors without revealing that the Company was achieving its success, at least in part, through bribes to Indian government officials. **Fourth**, Defendants overstated Cognizant's earnings during the Class Period by incorrectly booking its bribe payments as capital expenditures when, in fact, those payments should have been booked as operating expenses and charged against the Company's net income. **Finally**, the Company reported in its SEC filings that its internal controls were "effective" when, as the Company has now admitted, those controls and its "tone at the top" were materially defective due to senior management's overriding the controls or knowingly allowing them to be breached in order to facilitate the bribery scheme.

### A. Cognizant Highlighted the Benefits It Received from Its SEZ Licenses in India Without Disclosing that the Company Was Involved in a Bribery Scheme to Obtain and Perpetuate Those Benefits

168.    During the Class Period, Defendants repeatedly highlighted the "significant" tax benefits and "relaxed . . . regulatory restrictions" that Cognizant received from the Indian government because many of its operations were located in India's SEZs. Defendants emphasized that these benefits materially "increase[d] net income." These statements were materially false and misleading when made because Cognizant obtained those benefits in material part through the scheme to bribe Indian officials for SEZ permits.

### 1. February 27, 2015: 2014 Form 10-K

169.    On February 27, 2015, Cognizant filed its 2014 Form 10-K with the SEC, which was signed by D'Souza and McLoughlin (and others). The 2014 Form 10-K described the "income

tax holiday benefits" that Cognizant's "Indian subsidiaries" had received from the "Indian government" as follows:

> ***Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the Indian government for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years.*** Changes in Indian tax laws that would reduce or deny SEZ tax benefits could have a material adverse effect on our business, results of operations and financial condition.

170.    The 2014 Form 10-K quantified the "effect of the income tax holidays granted by the Indian government" as follows:

> For the years ended December 31, 2014, 2013, and 2012, the effect of the income tax holidays granted by the Indian government was to reduce the overall income tax provision and ***increase net income by approximately[in thousands] $182,973, $146,326, and $151,789, respectively, and increase diluted EPS by $0.30, $0.24, and $0.25, respectively.***

171.    Cognizant also reported that, ***"[a]s of December 31, 2014, we had outstanding fixed capital commitments of approximately $20,452 [in thousands] related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers."*** The 2014 Form 10-K further stated, ***"[w]e have constructed and expect to continue to locate most of our newer development facilities in SEZs."***

172.    The above statements made in the 2014 Form 10-K were materially false and misleading when made. It was materially false and misleading for Cognizant to tout the "income tax holiday benefits" that the Company received from the "Indian government" when, in fact, the Company was obtaining those benefits through the bribery scheme detailed herein. Similarly, it was materially false and misleading for Cognizant to state that the SEZ facilities meaningfully ***"increase net income . . . and increase diluted EPS"*** when the Company was obtaining such benefits through the bribery scheme detailed herein. It also was materially false and misleading for Cognizant to state that it had ***"outstanding fixed capital commitments of approximately***

***$20,452 [in thousands] related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers,"*** when that figure included at least $4.1 million in bribes paid to government officials.

173.     It also was misleading for Cognizant to state that it would "locate most of our newer development facilities in SEZs," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme detailed herein.

### 2.      May 4, 2015: Q1 2015 Form 10-Q

174.     On May 4, 2015, Cognizant filed its Q1 2015 Form 10-Q with the SEC that was signed by D'Souza and McLoughlin and stated, in part: ***"Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years."*** Cognizant also reported that, in response to the factors and risks affecting its business and operating results, the Company planned to ***"[l]ocate most of our new development center facilities in tax incentivized areas."***

175.     The above statements made in the Q1 2015 Form 10-Q were materially false and misleading when made. It was materially false and misleading for Cognizant to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" it had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein.

176.     It also was misleading for Cognizant to state that it would "[l]ocate most of our new development center facilities in tax incentivized areas," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

### 3.     August 6, 2015: Q2 2015 Form 10-Q

177.    On August 6, 2015, Cognizant filed a Form 10-Q with the SEC that was signed by D'Souza and McLoughlin and that stated, in part: ***Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years.*** Cognizant also reported that in response to the environment of factors affecting its business and operating results, the Company planned to ***"[l]ocate most of our new development center facilities in tax incentivized areas."***

178.    The above statements made in the Q2 2015 Form 10-Q were materially false and misleading when made. It was materially false and misleading for Cognizant to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" it had received, when, in fact, Cognizant was obtaining such benefits through the bribery scheme detailed herein.

179.    It also was misleading for Cognizant to state that it would "[l]ocate most of our new development facilities in tax incentivized areas," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

### 4.     November 5, 2015: Q3 2015 Form 10-Q

180.    On November 5, 2015, Cognizant filed a Form 10-Q with the SEC that was signed by D'Souza and McLoughlin and that stated, in part: ***Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years.*** Cognizant also reported that in response to the environment of factors affecting its business and operating results, the Company planned to ***"[l]ocate most of our new development center facilities in tax incentivized areas."***

181.    The above statements made in the Q3 2015 Form 10-Q were materially false and misleading when made. It was materially false and misleading for Cognizant to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" it had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein.

182.    It also was misleading for Cognizant to state that it would "[l]ocate most of our newer development facilities in SEZs," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

### 5.    February 25, 2016: 2015 Form 10-K

183.    On February 25, 2016, Cognizant filed a 2015 Form 10-K with the SEC that was signed by D'Souza and McLoughlin, among others. The 2015 Form 10-K touted the "income tax holiday benefits" that Cognizant's "Indian subsidiaries" had received from the "Indian government":

> *Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the Indian government for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years.* [If enacted, proposed changes in Indian tax laws] that would reduce or deny SEZ tax benefits could have a material adverse effect on our business, results of operations and financial condition.

184.    The 2015 Form 10-K quantified the "effect of the income tax holidays granted by the Indian government" as follows:

> *For the years ended December 31, 2015, 2014 and 2013, the effect of the income tax holidays granted by the Indian government was to reduce the overall income tax provision and increase net income by approximately $201.4 million, $183.0 million and $146.3 million, respectively, and increase diluted EPS by $0.33, $0.30 and $0.24, respectively.*

185.    Cognizant also reported that, *"[a]s of December 31, 2015, we had outstanding fixed capital commitments of approximately $76.4 million related to our India real estate*

*development program to build new Company-owned state-of-the-art IT development and delivery centers." The 2015 Form 10-K also stated, "We have constructed and expect to continue to operate most of our newer development facilities in SEZs."*

186.   The above statements made in the 2015 Form 10-K were materially false and misleading when made. It was materially false and misleading for Cognizant to tout the "significant tax incentives" from the "Indian government" and related "benefits realized by us from Indian operations" it had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein. Similarly, it was materially false and misleading for Cognizant to state that the SEZ facilities meaningfully "*increase net income . . . and increase diluted EPS*" when the Company was obtaining such benefits through the bribery scheme detailed herein. It also was materially false and misleading for Cognizant to state that it had "*outstanding fixed capital commitments of approximately $76.4 million related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers,*" when that figure included at least $4.1 million in bribes paid to government officials.

187.   It also was misleading for Cognizant to state that it would "continue to operate most of our newer development facilities in SEZs," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

**6.      May 6, 2016: Q1 2016 Form 10-Q**

188.   On May 6, 2016, the Company filed a Form 10-Q with the SEC that was signed by D'Souza and McLoughlin and that stated, in part: *"Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years."* Cognizant also reported that

73

in response to the environment of factors affecting its business and operating results, the Company planned to *"[l]ocate most of our new development center facilities in tax incentivized areas."* Cognizant also reported that, *"[a]s of March 31, 2016, we had outstanding fixed capital commitments of approximately $76.2 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers."*

189.     The above statements made in the Q1 2016 Form 10-Q were materially false and misleading when made. It was materially false and misleading for Cognizant to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" it had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein. It also was materially false and misleading for Cognizant to state that it had "outstanding fixed capital commitments of approximately $76.2 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers" when that figure included at least $4.1 million in bribes paid to government officials.

190.     It also was misleading for Cognizant to state that it would "[l]ocate most of our new development center facilities in tax incentivized areas," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

### 7.     August 5, 2016: Q2 2016 Form 10-Q

191.     On August 5, 2016, the Company filed a Form 10-Q with the SEC that was signed by D'Souza and McLoughlin and that stated, in part: *"Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years."* Cognizant also reported that in response to the environment of factors affecting its business and operating results, the Company

74

planned to *"[l]ocate most of our new development center facilities in tax incentivized areas."*
*Cognizant also report that, "[a]s of June 30, 2016, we had outstanding fixed capital*
*commitments of approximately $184.0 million related to our India development center*
*expansion program to build new state-of-the-art IT development and delivery centers."*

192.     The above statements made in the Q2 2016 Form 10-Q were materially false and
misleading when made. It was materially false and misleading for Cognizant to tout the "income
tax holiday benefits granted by the government of India for export activities conducted within
Special Economic Zones" it had received, when, in fact, Cognizant was obtaining those benefits
through the bribery scheme detailed herein. It also was materially false and misleading for
Cognizant to state that it had "outstanding fixed capital commitments of approximately $184.0
million related to our India development center expansion program to build new state-of-the-art
IT development and delivery centers" when that figure included at least $4.1 million in bribes paid
to government officials.

193.     It also was misleading for Cognizant to state that it would "[l]ocate most of our new
development center facilities in tax incentivized areas," when Cognizant was obtaining licenses
for its new SEZ facilities through the bribery scheme alleged herein.

**B.     Cognizant Emphasized Its Legal Compliance and Internal "Anti-Corruption" Controls While Specifically Denying Any "Incident" of "Corruption" During 2014 or 2015**

194.     During the Class Period, Defendants stated that Cognizant did not offer payments
to government officials to obtain anything of value. Defendants further stated that Cognizant had
established robust policies and procedures to ensure legal and ethical compliance, including
extensive training and "risk analysis" functions to assess and prevent "corruption." Based on these
representations, Defendants specifically stated that "no" "confirmed incidents" of "corruption"
had been "reported in 2014" or "in 2015." Defendants also stated that "no incidents" of "significant

risks" of "corruption" had been reported "in 2015." As explained below, these statements were materially false and misleading when made because Cognizant and its "senior management" were engaged in the bribery scheme detailed above.

### 1.   Defendants' False Statements in the Anticorruption Policy

195.   Throughout the Class Period, Cognizant published and disseminated its Anticorruption Policy to investors through its website.

196.   The Anticorruption Policy stated that the Company would:

- *"never pay, promise, offer or authorize a bribe or anything of value to a government official or any other individual in order to obtain business for the Company or to secure an improper advantage for the Company";*

- *"never permit, allow, authorize (or turn a 'blind eye' to) a Company third-party's representative payment, promise, offer or authorization of a bribe or anything of value to a government official or any other individual in order to win business or obtain improper advantages for the Company";*

- *"consult with our Legal Department before offering or giving anything of value, even of nominal value (e.g., for meal or dinner, or sports tickets), to a government official or to someone who is in a position to influence a government official or a third-party representative, as governed by our Core Values and Standards of Business Conduct regarding gifts and entertainment";*

- *"ensure that entries into the Company's books and records are accurate, and that all Company internal controls and procedures are maintained and followed when making payments from the Company"; and*

- *"comply with, and enforce, all the Company's requirements for documentation of expenses and payment requests, particularly those payments related to the Company's sales, marketing, and business development efforts, consistent with our Core Values and Standards of Business Conduct on transparency."*

197.   The Anticorruption Policy further assured investors that Cognizant was taking a number of additional concrete steps to ensure the Company's compliance with anticorruption laws. Among other things, Cognizant told investors that all employees involved in procurement and contracting, as well as *"[k]ey business partners and third-party representatives," would "receive*

*appropriate training from the Company"* regarding compliance with anticorruption laws. The Company also represented that its Legal Department would review "red flag" transactions, including those transaction involving a government-related counterparty. Moreover, Cognizant stated that *"periodic audits of compliance shall be performed by each business unit in coordination with our Legal Department" in order to "[m]onitor and [a]udit [c]ompliance [w]ith [the] Anticorruption Policy."*

198.    The above statements made by Cognizant in the Anticorruption Policy were materially false and misleading when made. It was misleading for Defendants to state that the Company would "never pay, promise, offer or authorize a bribe or anything of value to a government official or any other individual" in order to "to secure an improper advantage for the Company," or permit a Company "representative" to do so, when as alleged above, the Company and its representatives paid bribes to Indian officials in order to secure SEZ licensing for Cognizant's Indian operations, with the knowledge and participation of senior Company management.

199.    It was further misleading for Defendants to represent that the Company had established and followed a robust and comprehensive system of FCPA compliance mechanisms when in fact, Defendants knowingly eschewed compliance with the FCPA and the Company's Anticorruption Policy because they were engaged in a scheme to bribe Indian government officials. Among other things, it was misleading for Defendants to represent that the Company would "ensure that entries into the Company's books and records are accurate, and that all Company internal controls and procedures are maintained and followed," and that Cognizant would "comply with, and enforce, all the Company's requirements for documentation of expenses and payment requests" when, as alleged above: (1) the Company's books and records were

misstated, as the improper payments to Indian officials were inappropriately recorded and inappropriately capitalized in the Company's financial statements; (2) senior management actually overrode the Company's internal controls and thus Cognizant did not maintain an appropriate "tone at the top"; and (3) Company policies concerning "documentation of expenses," including flagging payments to foreign officials and vetting them with Cognizant's Legal Department, were not followed.

200.    It also was misleading for Defendants to state that Cognizant employees and "[k]ey business partners and third-party representatives" with procurement-related responsibility would "receive appropriate training from the Company" regarding compliance with anticorruption laws when, as reported by numerous former Cognizant employees, adequate training was not provided.

201.    Finally, it was misleading for Defendants to tout Cognizant's "periodic audits" to "[m]onitor and [a]udit [c]ompliance [w]ith [the] Anticorruption Policy" when: (1) the Company failed to undertake any such audit for years prior to 2014; and (2) the Company's first FCPA compliance audit undertaken at the end of 2014 had uncovered evidence of bribes and several "high risk" problems in Cognizant's internal controls, yet these findings were not acted upon.

### 2.    Defendants' False Statements in the 2014 Sustainability Report

202.    In June 2015, Cognizant published and disseminated to investors through its website its 2014 Sustainability Report. In this report, Cognizant stated that it had performed thorough audits of anticorruption compliance and had discovered "no incidents" of corruption. Moreover, the Company claimed that it provided "role based anti-corruption training" to Cognizant employees:

> *SO 3 Training on Anti-Corruption.*
>
> *In 2014, we introduced role based anti-corruption training to supplement the anti-corruption provisions of the general ethics training our employees received. We delivered 331,114 hours of Code of Ethics training through eLearning in*

*2014. We also delivered live Code of Ethics trainings to targeted audiences of over 18,000 associates in India and the Philippines. Our formal learning was supplemented in 2014 by education campaigns featuring games, quizzes and prizes.*

*Additionally, our Enterprise Risk Management group conducts annual risk analysis surveys covering all business units and corporate functions to assess the likelihood of various risks including corruption.*

*SO4 Actions taken in response to incidents of corruption.*

*<u>No incidents reported in 2014.</u>[88]*

203.    The above statements in Cognizant's 2014 Sustainability Report were materially false and misleading when made. It was misleading for Defendants to state that "no incidents" of "corruption" had been reported in 2014, when, among other things: (1) the Company's President, Chief Legal Officer, and other members of senior management were involved in the bribery scheme detailed herein, and thus, were aware of such corruption; (2) the 2015 audit findings providing evidence of the Company's bribery already had been reported to senior Cognizant personnel at the time this report was published; and (3) Cognizant's senior management participated in making the corrupt payments by overriding and/or failing to enforce the Company's internal financial controls designed to detect, report, and prevent such bribes.

204.    It was further misleading for Defendants to state that extensive "anti-corruption training" had been provided to Cognizant employees, when, as reported by former Cognizant personnel, no adequate anticorruption compliance training was provided to Company personnel.

### 3.    Defendants' False Statements in the Code of Conduct

205.    From the start of the Class Period until approximately May 30, 2015, Defendants published and disseminated Cognizant's Code of Conduct to investors through Cognizant's website. The Code of Conduct stated that the Company does not ***"[g]et involved with  middlemen***

---

[88] Cognizant, *2014 Sustainability Report – Building New Tomorrows*, at 55.

*and/or the bribing of government officials while procuring or leasing land and infrastructure.*"[89] The Code of Conduct further stated:

**We must not:**

- Accept or permit any member of our immediate family to accept any gifts, gratuities or other favors from any customer, supplier or other person doing or seeking to do business with the Company, other than items of nominal value or items that do not exceed local social and/or business customs.

- Give gifts outside of standard business practices in hopes of influencing a business decision.

- Give Company funds or assets for gifts, gratuities or other favors to government officials.

- **Bribes and Kickbacks**

  Bribes and kickbacks are criminal acts, strictly prohibited by law. As Cognizant Associates we must never offer, give, solicit or receive any form of bribe or kickback anywhere in the world.[90]

206.    On or around July 5, 2015, Cognizant published a revised version of its Code of Conduct. This document remains on the Company's website and contains a message from D'Souza:

I have said many times that the easy way is not the Cognizant way. We do not cut corners, bend the rules, or look for shortcuts—and we **have a zero-tolerance policy toward those who do**.[91]

207.    The revised Code of Conduct further states, in explicit terms, that the Company complies with "all applicable anti-corruption laws":

*This means, in part, that we comply with all applicable anti-corruption laws, rules, and regulations wherever we conduct business.*

---

[89] *Cognizant's Core Values and Standards of Business Conduct*, at 16 (2013).

[90] *Id.* at 29.

[91] *Cognizant's Core Values and Standards of Business Conduct* (2015).

*We do not corruptly give or offer, directly or indirectly, anything of value to a government official to obtain or maintain business or any other advantage for the Company.*[92]

208.   The above representations in Cognizant's Codes of Conduct were materially false and misleading when made. It was misleading for Defendants to state that the Company was "comply[ing] with all applicable anti-corruption laws," did "not corruptly give or offer, directly or indirectly, anything of value to a government official to obtain or maintain business or any other advantage for the Company," and did not "[g]et involved with middlemen and/or the bribing of government officials while procuring or leasing land and infrastructure," because, as alleged above, Cognizant was engaged in a scheme to bribe Indian government officials in exchange for SEZ licenses for the Company's facilities in India. It was further misleading for Defendants to state that the Company had "a zero-tolerance policy toward those who" fail to comply with Cognizant's anticorruption policies because, as the Company has admitted, its own senior management officials overrode and/or failed to enforce Cognizant's internal financial controls in order to facilitate the bribery scheme.

### 4.    Defendants' False Statements in the 2015 Sustainability Report

209.   In August 2016, Cognizant published its 2015 Sustainability Report. This report stated:

**G4-56 The organization's values, principles, standards and norms of behavior such as codes of conduct and codes of ethics.**

As a global business, Cognizant is committed to complying with the laws of the countries in which we operate. . . .

. . . .

*Cognizant treats reports of misconduct seriously.* All reports are reviewed by the Chief Compliance Officer, who appoints a responsible person as appropriate to conduct an informal inquiry or a formal investigation. If a violation of our

---

[92] *Id.*

Standards has occurred, appropriate disciplinary action will be taken against individuals involved as permitted by local laws. Additional steps will be taken if an alleged violation involves an Executive Officer or Board Member.

Today's dynamic global marketplace demands that we achieve the highest standards of behavior. It is therefore critical that all of us at Cognizant make business decisions that align with our ethical principles. ***This means, in part, that we comply with all applicable anti-corruption laws, rules, and regulations wherever we conduct business.***[93]

. . . .

## SUB-CATEGORY: SOCIETY

**Aspect: Anti-corruption**

**G4-SO3 Total number and percentage of operations assessed for risks related to corruption and the significant risks identified**

***There were no incidents reported in 2015***.

## G4-SO4 Communication and training on anti-corruption policies and procedures

We delivered 689,288 hours of Code of Ethics training through eLearning in 2015. We also delivered live Code of Ethics trainings to targeted audiences of over 203,947 associates in India. Our formal learning was supplemented in 2015 by education campaigns featuring games, quizzes and prizes. The percentage of Associates completing the online Code of Ethics training was 94%. Anti-Corruption training was provided for 500 hours and delivered for selected associates in Administration, Procurement, Sales & Marketing, Finance and other support Functions.

Additionally, our Enterprise Risk Management group conducts annual risk analysis surveys covering all business units and corporate functions to assess the likelihood of various risks including corruption.

## G4-SO5 Confirmed incidents of corruption and actions taken

***There were no incidents reported in 2015.***[94]

---

[93] Cognizant, *2015 Sustainability Report – Helping People Navigate the Digital Shift*, at 50.

[94] *Id.* at 60.

210.     It was misleading for Defendants to state that Cognizant had performed a thorough audit of the Company's anticorruption compliance and that "[t]here were no incidents reported in 2015" of "corruption," or even "significant risks" of "corruption," and that "we comply with all applicable anti-corruption laws, rules, and regulations wherever we conduct business," when, among other things: (1) the Company's President, Chief Legal Officer and other members of senior management were involved in the bribery scheme detailed herein, and thus, were aware of such corruption; (2) the 2015 audit findings providing evidence of the Company's bribery had already been reported to senior Cognizant personnel at the time this report was published; and (3) Cognizant's senior management participated in making the corrupt payments by overriding and/or failing to enforce the Company's internal financial controls designed to detect, report and prevent such bribes.

211.     Additionally, it was misleading for Defendants to state that "Cognizant treats reports of misconduct seriously" and that "Cognizant is committed to complying with the laws of the countries in which we operate," because the Company's senior management overrode and/or failed to enforce Cognizant's internal financial controls in order to facilitate the bribery scheme.

212.     It was further misleading for Defendants to tout the anticorruption training provided to Company personnel, when, as described above, no adequate anticorruption compliance training was provided.

### C.     Cognizant Touted Its Ability to Deliver Low-Cost Services to Clients Through Legitimate Means, and Attributed the Company's Financial Results to Legitimate Business Factors and Conditions

213.     Throughout the Class Period, Defendants attributed Cognizant's financial results to a variety of legitimate "key" business factors and conditions. Defendants also touted Cognizant's ability to achieve "organic growth" in its "core business" of IT and business process outsourcing by lowering client costs through the Company's supposedly legitimate operations in India.

Defendants also repeatedly attributed Cognizant's revenue growth from its "Rest of World customers" primarily to its supposedly legitimate Indian operations. As explained below, these statements were materially false and misleading when made because, unbeknownst to investors, Cognizant's performance, including its ability to deliver cost savings to its clients, was driven, in material part, by the Company's scheme to bribe Indian officials in order to secure SEZ permits for its Indian operations.

### 1.    February 27, 2015: 2014 Form 10-K

214.   In Cognizant's 2014 Form 10-K, filed February 27, 2015, and signed by, among others, D'Souza and McLoughlin, Defendants stated, ***"In 2014, our revenue increased to $10,262.7 million compared to $8,843.2 million in 2013."*** Cognizant's 2014 Form 10-K further stated that the ***"key drivers of our revenue growth in 2014"*** were: ***"[s]olid performance across all of our business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including Consulting, IT IS, and BPS services"; "[i]ncreased penetration at existing customers"; and "[c]ontinued expansion of the market for global delivery of IT services and BPS."***

215.   The above statements in Cognizant's 2014 Form 10-K were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's revenue growth to legitimate business factors and conditions, including the "[e]xpansion of our service offerings" and "[c]ontinued expansion of the market for global delivery of IT services and BPS," when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

### 2.  May 4, 2015: Press Release and Form 8-K

216.   On May 4, 2015, Cognizant issued a press release, also incorporated in the Form 8-K filed with the SEC on the same date, setting forth its financial results for Q1 2015. The press release quoted McLoughlin as attributing Cognizant's "strong" financial performance to the "organic growth of our core business": "***Our strong revenue performance this quarter versus our guidance was driven primarily by organic growth of our core businesses*** and is a reflection that our strategy and offerings are resonating with our clients."

217.   The above statements made by McLoughlin in the May 4, 2015 press release and the Form 8-K were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's "strong" financial performance to legitimate business factors and conditions, including the "organic growth" of the Company's "core business," when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

### 3.  May 4, 2015: Q1 2015 Form 10-Q

218.   On May 4, 2015, the Company filed its Q1 2015 Form 10-Q with the SEC. As noted above, that filing was signed by D'Souza and McLoughlin. In the Form 10-Q, Cognizant stated, "***For the three months ended March 31, 2015, our revenue increased to $2,911.4 million compared to $2,422.3 million for the three months ended March 31, 2014.***" Cognizant's 1Q 2015 Form 10-Q further stated that the "***key drivers of our revenue growth during the three months ended March 31, 2015***" were: "***[o]ur November 2014 acquisition of TZ US Parent, Inc., or TriZetto***"; "***[s]olid performance across all of our business segments***"; "***[s]ustained strength in the North American market***"; "***[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets***"; "***[i]ncreased customer spending on discretionary projects***"; "***[e]xpansion of our service offerings, including consulting, infrastructure services,***"

*and business process services"; "[i]ncreased penetration at existing customers";* and *"[c]ontinued expansion of the market for global delivery of IT services and business process services."*

219.   Cognizant's Q1 2015 Form 10-Q further reported that, "*[t]he revenue growth from our Rest of World customers in 2015 was primarily driven by the India*, Japan, Australia, Hong Kong, and Singapore markets and include[d] a negative currency impact of 5.8%."

220.   The above statements made in the Q1 2015 Form 10-Q were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and "penetration of the Rest of World . . . markets," when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials. It also was materially false and misleading for Defendants to attribute Cognizant's financial performance to revenue growth "from our Rest of World customers in 2015," including India, when the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

### 4.   May 4, 2015: Q1 2015 Earnings Conference Call

221.   Also on May 4, 2015, Cognizant hosted its Q1 2015 earnings conference call, during which Defendant Coburn stated: "Finally, we saw good traction in the rest of the world which was up 7.6% sequentially after a 2.8% negative currency impact. *Growth was driven primarily by strength in key markets such as India and the Middle East.*"

222.     Also during the call, D'Souza stated: ***"Our sequential growth was well ahead of our previous guidance and was driven by strong organic growth in our core business coupled with solid in-line performance in the TriZetto business."***

223.     The above statements made by Defendant Coburn and D'Souza during the Q1 2015 earnings conference call were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including "strong organic growth in our core business coupled with solid in-line performance in the TriZetto business" and "strength in key markets such as India" when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

224.     The market readily believed Defendants. Analysts repeated management's statements attributing Cognizant's "strength" to India. For example, on May 4, 2015, UBS published a report stating: "Cognizant provides a mix of application management and application development solutions **using an on-site/offshore business model centered on its India-based development centers**."[95]

225.     On May 4, 2015, William Blair and Company, L.L.C. published a report stating: "Significant growth in the rest of the world geography was driven by India and the Middle East."[96]

226.     Consistent with the positive statements made by Coburn and D'Souza regarding Cognizant's strong organic growth driven by strength in key markets such as India, Cognizant's

---

[95] Steven Milunovich, CFA et al., *Global Research: Impressive Start, Yet Multiple Remains Above the Comfort Zone* 2 (UBS Securities LLC May 4, 2015).

[96] Anil Doradla et al., *With TriZetto Synergies Ahead of Schedule, 2015 Guidance Could Prove Conservative* 2 (William Blair & Co., L.L.C. May 4, 2015).

stock price increased from an opening price of $58.65 per share on May 1, 2015, to a closing price of $62.78 per share on May 4, 2015, an increase of approximately 7%.

227.    In June 2015, analysts continued to discuss Cognizant's cost-cutting measures in India. On June 10, 2015, Wells Fargo Securities published an analyst report stating: "An article in the India press (Economic Times) indicates that [Cognizant] is 'taking a series of steps to rein in costs and meet its operating margin target' according to their sources."[97]

228.    On June 30, 2015, Jefferies published an analyst report stating:

[Cognizant] seemed confident in maintaining operating margins in the target range. Following an Indian news media article speculating that [Cognizant] is undertaking cost-cutting measures to maintain its operating margins, [Cognizant] management indicated that it remains confident in maintaining its adjusted operating margins in the 19-20% target range and is not undertaking any out of the ordinary cost rationalization measures.[98]

229.    On July 27, 2015, Deutsche Bank Markets Research published an analyst report stating: "[Rest of world] was up . . . with **growth being driven primarily by strength in key markets such as India** and the Middle East."[99]

### 5.    August 5, 2015: Q2 2015 Earnings Conference Call

230.    On August 5, 2015, Cognizant held its Q2 2015 earnings conference call with analysts and investors. During the call, Defendant Coburn stated: "Finally, we saw continued strong traction in the Rest of World, which was up 10.7% sequentially. ***Growth was driven primarily by strength in markets such as India*** and Australia."

---

[97] Ed Caso, CFA, CTSH: *Article Says Moving to Control Expense Growth* 1 (Wells Fargo Securities LLC June 10, 2015).

[98] Jason Kupferberg, Equity Analyst, *Flash Note: Jefferies NASDAQ 2015 Investor Conference Takeaways* 1 (Jefferies Group LLC June 30, 2015).

[99] Bryan Keane, Research Analyst et al., *Cognizant: HNET Loss Creates Void; Trimming FY16 Estimates* 11 (Deutsche Bank AG July 27, 2015).

231.     The above statement made by Defendant Coburn during the Q2 2015 earnings call was materially false and misleading when made. It was misleading for Coburn to attribute Cognizant's financial performance to legitimate business factors and conditions, including strength in markets such as India, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

232.     Analysts again reacted positively to Defendants' statements. On August 5, 2015, Société Générale published a report noting that "Cognizant is picking up momentum in newer geographies like India and Australia where it had little presence even two years ago."[100]

233.     Also on August 5, 2015, SIG Susquehanna Financial Group, LLLP published an analyst report stating: "Rest of the world also rose 10.7% sequentially, driven by strong demand in India and Australia."[101]

234.     Consistent with Defendants' statements regarding Cognizant's strong growth "driven primarily" by strength in key markets such as India, and analysts' positive reactions to those statements, Cognizant's stock price increased from an opening price of $63.06 per share on August 4, 2016, to a closing price of $67.34 per share on August 5, 2016, an increase of nearly 7%.

### 6.     August 6, 2015: Q2 2015 Form 10-Q

235.     On August 6, 2015, Cognizant filed its Q2 2015 Form 10-Q with the SEC. As noted above, that filing was signed by D'Souza and McLoughlin. Cognizant's Q2 2015 Form 10-Q

---

[100] Mukul Garg, Equity Analyst et al., *Cognizant: On Track to Deliver Another Good Year, Retain Buy* 1 (Société Générale Group Aug. 5, 2015).

[101] James E. Friedman, *Cognizant: Good Results Despite HNT Merger* 1 (Susquehanna Financial Group, LLLP Aug. 5, 2015).

stated, *"For the three and six months ended June 30, 2015, our revenue increased to $3,085.1 million and $5,996.5 million compared to $2,517.1 million and $4,939.4 million for the three and six months ended June 30, 2014, respectively."* Cognizant's Q2 2015 Form 10-Q further stated that the *"key drivers of our revenue growth during the three months ended June 30, 2015"* were: *"[o]ur November 2014 acquisition of TZ US Parent, Inc., or TriZetto"; "[s]olid performance across all of our business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including consulting, infrastructure services, and business process services"; "[i]ncreased penetration at existing customers";* and *"[c]ontinued expansion of the market for global delivery of IT and business process services."*

236.    The Company in its Q2 2015 Form 10-Q further reported: *"Revenue grew 30.0% from our Rest of World customers in the second quarter of 2015 . . . and was primarily driven by the India* and Australia markets." Cognizant further noted: *"The revenue growth from our Rest of World customers in the first half of 2015 grew 27.0% . . . and was primarily driven by the India*, Australia and Japan markets."

237.    The above statements made in the Q2 2015 Form 10-Q were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and revenue growth from "Rest of World customers," such as India, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

238.    On October 15, 2015, Cantor Fitzgerald published an analyst report stating: "[Cognizant] continued to expand in other key regional markets, including India, Singapore, Australia, Japan and Hong Kong, with revenues increasing 23.6% over the prior year."[102]

### 7.    November 4, 2015: Q3 2015 Earnings Conference Call

239.    On November 4, 2015, Cognizant held its 2015 third quarter earnings call with analysts and investors. During this call, Defendant Coburn and D'Souza responded to an analyst's question about pressure on revenue growth in its "traditional" IT and business operations outsource business based in India. Defendants responded by stating that Cognizant continued to "take market share on the maintenance side" by "lowering cost" to help customers "become more efficient":

> [Analyst]: The question really is, **what sort of pressure are you seeing on revenue growth on the traditional side?** . . . And how does it change your notion of revenue visibility and impact on margins?
>
> [**Coburn**]: . . . I think you're right that **clients are trying to fund spending on innovation and on digital by optimizing the cost on run the business, which a lot of that is the traditional outsourcing**. And you've seen that in our numbers now for many quarters, where our technology and consulting business is growing faster than the outsourcing business.
>
> But let's be clear. *We continue to do very well and take market share on the maintenance side. What customers are looking for is they're interested in how can we become more efficient, lower their cost of ownership on maintenance, so they can free up those dollars to move elsewhere. And we – Cognizant just has this incredible track record of delivering very high quality services, while continuously delivering productivity and efficiency.*
>
> *So I think we're probably better positioned than most others in the market in terms of lowering cost of ownership on maintenance . . . .*
>
> . . . .
>
> . . . [*D'Souza*]: . . . *I would say that the bulk of the productivity that we drive in the core business is through traditional means of driving productivity*

---

[102] Joseph Foresi, *Initiating with a BUY; Expecting Solid Performance to Continue* 7 (Cantor Fitzgerald Oct. 15, 2015).

*and efficiency that includes process kinds of things like Lean and Six Sigma and so on, and also more traditional tools in automation.*

240.    Also, during this call, Coburn stated, ***"We're going to continue with the strategy that we've been executing successfully on, which is making long-term organic investments is the key – the core of our business."***

241.    The above statements made by Defendant Coburn and D'Souza during the Q3 2015 earnings conference call were materially false and misleading when made. Specifically, it was materially false and misleading for D'Souza to attribute the Company's success in its "core business" to legitimate business factors and conditions, such as lowering cost through "traditional means of driving productivity and efficiency," when, in fact, Cognizant's efforts to lower costs were accomplished in part by bribes paid to Indian government officials in exchange for SEZ licenses.

242.    Similarly, it was materially false and misleading for Coburn to state that the Company's "core" "strategy that we've been executing successfully on" was "making long-term organic investments," when in fact, Cognizant's strategy and financial performance were driven in part by bribes paid to Indian government officials in exchange for SEZ licenses for the Company's facilities in India. It also was materially false and misleading for Coburn to state that the Company's ability to "take market share" was driven by legitimate factors, such as its ability to lower "cost of ownership" and the Company's "incredible track record of delivering very high quality services, while continuously delivering productivity and efficiency," when Cognizant's performance was driven, in part, by bribes paid to Indian government officials in exchange for SEZ licenses.

### 8. November 5, 2015: Q3 2015 Form 10-Q

243.  On November 5, 2015, the Company filed a Form 10-Q with the SEC. As noted above, that filing was signed by D'Souza and McLoughlin. Cognizant's Q3 2015 Form 10-Q stated, *"For the three and nine months ended September 30, 2015, our revenue increased to $3,187.0 million and $9,183.5 million compared to $2,581.0 million and $7,520.5 million for the three and nine months ended September 30, 2014, respectively."* Cognizant's Q3 2015 Form 10-Q further stated that the *"key drivers of our revenue growth during the three months ended September 30, 2015" were: "[o]ur November 2014 acquisition of TZ US Parent, Inc., or TriZetto"; "[s]olid performance across all of our business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including consulting, infrastructure services, and business process service"; "[i]ncreased penetration at existing customers";* and *"[c]ontinued expansion of the market for global delivery of IT and business process services."*

244.  Cognizant's Q3 2015 Form 10-Q further reported: *"Revenue grew 31.0% from our Rest of World customers in the third quarter of 2015 . . . and was primarily driven by the India*, Singapore and Australia markets."

245.  The above statements made in the Q3 2015 Form 10-Q were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and penetration of the Rest of World markets, such as India, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

93

### 9.     February 8, 2016: Q4 2015 Earnings Conference Call

246.    On February 8, 2016, Cognizant held its 2015 fourth quarter earnings call with analysts and investors. During this call, Coburn stated:

> Finally, we saw continued strong traction in the rest of the world, which was up by 6.8% sequentially and 34% year over year. ***Growth was driven primarily by strengths in key markets such as India, Singapore and the Middle East where we're seeing good traction with clients' adoption of digital technologies.***

247.    The above statement made by Defendant Coburn during the Q4 2015 earnings conference call was materially false and misleading when made. It was misleading for Coburn to attribute Cognizant's financial performance to legitimate business factors and conditions, including strength in "key markets such as India" where it had seen "good traction with clients' adoption of digital technologies," when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

248.    Following the Q4 2015 earnings call, numerous analysts cited Coburn's statement emphasizing growth driven by the Indian market. For example, on February 8, 2016, Evercore ISI published a report stating: "[Cognizant] generated revenue growth of 19% for North America, while Rest of World revenue advanced 34% led by India, Singapore and the Middle East given strong demand for digital technologies."[103]

---

[103] David Togut, CFA et al., *Cognizant: Attractive Entry Point Given Soft Outlook* 1 (Evercore ISI Feb. 8, 2016).

249. Also on February 8, 2016, Barclays published a report stating: "**Rest of World**: RoW grew 6.8% Q/Q and 34% Y/Y. Growth was primarily driven by strengthen in key markets including India, Singapore, and the Middle East."[104]

250. Nomura published a report on February 8, 2016, stating: "Growth in the ROW was driven by strength in markets such as India, Singapore, and the Middle East."[105]

251. That same day, Oppenheimer published an analyst report stating: "Rest of World (~6% of revenue) led all geographic segments with strong 6.8% Q/Q growth to ~$179M, driven by strength in India, Singapore, and the Middle East."[106]

### 10.    February 25, 2016: 2015 Form 10-K

252. On February 25, 2016, the Company filed a Form 10-K with the SEC that was signed by D'Souza and McLoughlin, among others. In that filing, Cognizant reported revenue of *$12,416 million*, an increase over the previous year's revenue of $10,262.7 million. Cognizant's 2015 Form 10-K further stated that the *"key drivers of our revenue growth"* during the three months ended March 31, 2015 were: *"[o]ur November 2014 acquisition of TZ US Parent Inc., or TriZetto"; "[s]olid performance across all of our business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including consulting, infrastructure services,*

---

[104] Darrin D. Peller et al., *Wide Range Underscores Macro Uncertainties; Continue to See Strong Growth as Underappreciated* 4 (Barclays Capital Inc. Feb. 8, 2016).

[105] Ashwin Mehta et al., *Cognizant: Guidance Disappoints* 4 (Nomura Int'l Feb. 8, 2016).

[106] Glenn Greene, CFA et al., *Modest FY16 Guide Reflects Cautious FSI/Healthcare Outlook* 3 (Oppenheimer & Co. Inc. Feb. 8, 2016).

*and business process services"; "[i]ncreased penetration at existing customers";* and *"[c]ontinued expansion of the market for global delivery of IT and business process services."*

253.    Cognizant's 2015 Form 10-K further reported, "In 2015, revenue from our Rest of World customers grew 29.9%, after a negative currency impact of 9.2%. In 2014, revenue from our Rest of World customers grew 23.6%. In 2015 and 2014, *growth was primarily driven by the India*, Singapore, Australia, Japan and Hong Kong markets."

254.    The above statements made in the 2015 Form 10-K were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and "revenue from our Rest of World" customers and growth in the Indian market, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

**11.    May 6, 2016: Q1 2016 Form 10-Q**

255.    On May 6, 2016, Cognizant filed a Form 10-Q with the SEC. As noted above, that filing was signed by D'Souza and McLoughlin. The Form 10-Q reported revenue for the three months ended March 31, 2016 of $3,202 million, an increase over first quarter 2015 revenue of $2,911.4 million. Cognizant's Q1 2016 Form 10-Q further stated that the *"key drivers of our revenue growth during the three months ended March 31, 2016"* were: *"[s]olid performance across our Financial Services, Manufacturing/Retail/Logistics and Other business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including consulting*

*and digital services"; "[c]ontinued expansion of the market for global delivery of IT and business process services";* and *"[i]ncreased penetration at existing customers."*

256.     Cognizant's Q1 2016 Form 10-Q further reported that "[r]evenue from our Rest of World customers increased 24.9% . . . as compared to the quarter ended March 31, 2015." Cognizant further reported: *"Revenue from our Rest of World customers grew 24.9% . . . in the first quarter of 2016, and was primarily driven by the India*, Singapore and Australia markets."

257.     The above statements made in the Q1 2016 Form 10-Q were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and penetration of the Rest of World market, and India specifically, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

### 12.     May 6, 2016: Q1 2016 Earnings Conference Call

258.     Also on May 6, 2016, Cognizant held its Q1 2016 earnings call with analysts and investors. During this call, D'Souza described the Company's "strategic initiative" to "achieve new levels of efficiency" for "clients" in their "core transaction processing operations":

> *The second strategic initiative is to help clients achieve new levels of efficiency and effectiveness in their core transaction processing operations by building platform-based solutions and industry utilities. . . . By applying a series of levers including process optimization, digitization and large-scale efficiencies, we're able to bring clients levels of effectiveness which they would have been unable to reach on their own.*

259.     During this call, Coburn also attributed the Company's strong retail and manufacturing results to "growing" client relationships and Cognizant's ability to "leverage" its technical expertise in "retail, manufacturing and logistics." Coburn added: "[T]he rest of the world

was up 30 basis points sequentially, and almost 25% year-over-year. ***Growth was driven primarily by strength in key markets such as India***, Australia and the Middle East where we're seeing good traction with client's adoption of digital technologies."

260.    The above statements made by D'Souza and Coburn during the Q1 2016 earnings call were materially false and misleading when made. It was misleading for D'Souza to attribute Cognizant's ability to deliver lower cost IT services to clients to wholly legitimate business factors and conditions, such as "applying a series of levers including process optimization, digitization and large-scale efficiencies," when, in fact, Cognizant's ability to deliver cost savings to its clients was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

261.    Likewise, it was misleading for Coburn to attribute Cognizant's financial performance to legitimate business factors and conditions, including "growing" client relationships and Cognizant's ability to "leverage" its technical expertise in "retail, manufacturing and logistics," and growth in the Indian market, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

262.    The market accepted Defendants' statements. On May 6, 2016, an S&P Capital analyst report stated: "We think cost-cutting initiatives will be a source of strength for the India-based outsourcing companies in the group."[107]

---

[107] S&P Capital IQ, *Cognizant Technology Solutions Corp. 3* (Standard & Poor's Financial Services LLC May 6, 2016).

263.     Also on May 6, 2016, Oppenheimer published an analyst report stating: "Rest of World revenue (~6% of total revenue) grew a lackluster 0.3% Q/Q to ~$179M, driven by India, Australia, and the Middle East."[108]

264.     That same day, William Blair stated in its analyst report: "From a geographic point of view, significant growth in the rest of the world was driven by India, Australia, and the Middle East, with management citing especially good traction and opportunity within digital."[109]

265.     Similarly, Barclays published an analyst report on May 9, 2016 stating: **"Rest of World: RoW grew 0.3% Q/Q and almost 25% Y/Y. Growth was primarily driven by strength in key markets including India**, Australia, and the Middle East due to adoption of digital technologies."[110]

266.     Consistent with Defendants' statements regarding Cognizant's strong growth "driven primarily" by strength in key markets such as India, and analysts' positive reactions to those statements, Cognizant's stock price increased from an opening price of $57.50 per share on May 5, 2016, to a closing price of $60.55 per share on May 6, 2016, an increase of approximately 5%.

### 13.     May 24, 2016: J.P. Morgan Technology, Media and Telecom Conference

267.     On May 24, 2016, Defendant Coburn attended the J.P. Morgan Technology, Media and Telecom Conference, at which he spoke to analysts and investors. During the conference,

---

[108] Glenn Greene, CFA et al., *1Q Healthcare/FSI Weakness Puts CTSH in Early FY16 Hole* 4 (Oppenheimer & Co. Inc. May 6, 2016).

[109] Anil Doradla et al*., Events Uneventful – Macro Weakness Affects Banking Segment; Pipeline Commentary Positive* 2 (William Blair & Co., L.L.C. May 6, 2016).

[110] Darrin D. Peller et al., *In-Line 1Q; Set-Up for 2H Acceleration* 4 (Barclays Capital Inc. May 9, 2016).

Coburn noted that Cognizant had seen "intense pressure" from its customers "to squeeze costs" and "to reduce cost of ownership." In this context, Coburn touted Cognizant's ability to respond to the customer demand by ***"bring[ing] best practices to our clients for our traditional services, constantly lower[ing] their cost of ownership while maintaining our margin. So that's one piece of work. We're very good at that."***

268.    The above statements made by Defendant Coburn during the J.P. Morgan Technology, Media and Telecom Conference were materially false and misleading when made. It was misleading for Coburn to tout Cognizant's ability to "constantly lower [clients'] cost of ownership while maintaining [the Company's] margin," when Cognizant's ability to deliver cost savings to its clients while maintaining its margin was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

### 14.    August 5, 2016: Q2 2016 Form 10-Q

269.    On August 5, 2016, Cognizant filed a Form 10-Q with the SEC. As noted above, this public filing was signed by D'Souza and McLoughlin. The Form 10-Q reported revenue for the three months ended June 30, 2016, of $3,369.9 million, an increase over second quarter 2015 revenue of $3,085.1 million. Cognizant's Q2 2016 Form 10-Q further stated that the ***"key drivers of our revenue growth during the three months ended June 30, 2016" were: "[s]olid performance in our Manufacturing/Retail/Logistics and Other business segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including consulting and digital services"; "[c]ontinued expansion of the market for global delivery of IT and business process services";*** and ***"[i]ncreased penetration at existing customers."***

100

270.    Cognizant's Q2 2016 Form 10-Q further reported: *"**Revenue from our Rest of World customers grew 25.0% . . . in the second quarter of 2016, and was primarily driven by the India**, Singapore and Australia markets."*

271.    The above statements made in the Q2 2016 Form 10-Q were materially false and misleading when made. It was misleading for Defendants to attribute Cognizant's financial performance to legitimate business factors and conditions, including the "[e]xpansion of our service offerings," "[c]ontinued expansion of the market for global delivery of IT and business process services," and penetration of the Rest of World market, and India specifically, when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

### 15.    August 5, 2016: Q2 2016 Earnings Conference Call

272.    On August 5, 2016, Cognizant held its Q2 2016 earnings conference call with analysts and investors. Defendant Coburn again emphasized Cognizant's ability to deliver cost savings to clients and attributed that ability to wholly legitimate elements of the Company's business model:

> *[T]he drive for getting continued efficiencies from existing IT infrastructure to be able to fund innovation projects remains absolutely essential to almost every client. . . . Our strong vertical presence and investments in building sharply focused industry-specific platforms allow clients to obtain these efficiencies by shifting from buying a service to buying an outcome. These trends will continue to open opportunities for us over the coming years.*

273.    During the same call, McLoughlin attributed the Company's financial success *"to a slightly lower tax rate and stronger operating margins."*

274.    The above statements, made by Coburn and McLoughlin during the Q2 2016 earnings conference call, were materially false and misleading when made. It was misleading for Coburn to attribute Cognizant's ability to deliver costs savings to clients to wholly legitimate

business factors and conditions, including the Company's "strong vertical presence and investments in building sharply focused industry-specific platforms," when, in fact, the Company's ability to deliver cost savings to its clients was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

275.   Similarly, it was misleading for McLoughlin to attribute Cognizant's financial performance to legitimate business factors and conditions, including "a slightly lower tax rate and stronger operating margins," when, in fact, the Company's financial performance was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials.

276.   Analysts reacted favorably to these statements. On August 5, 2016, Evercore ISI published an analyst report stating: "Meanwhile Rest of World revenue advanced 25% led by Singapore, India, and Australia."[111]

277.   Also on August 5, 2016, Religãre published a report stating:   "Overall, [Cognizant]'s earnings have grown faster than Indian IT."[112]

278.   On that same day, William Blair published a report stating: "Revenue: From a geographic point of view, significant growth in the rest of the world was driven by Singapore, India, and Australia, while North America grew 8.3% year-over-year, and Europe grew 8.9% year-over-year."[113]

---

[111] David Togut, CFA et al., *Outlook Softens but CTSH Inexpensive* 1 (Evercore ISI Aug. 5, 2016).

[112] Rumit Dugar et al., *Cognizant: Weak Guidance; Gloomy Outlook for Indian IT* 1 (Religãre Capital Markets Ltd. Aug. 5, 2016).

[113] Anil Doradla et al., *Growth Under Pressure; Repatriated Cash Creates Flexibility in Capital Allocation* 2 (William Blair & Co., L.L.C. Aug. 5, 2016).

279.    Consistent with Defendants' statements regarding Cognizant's strong growth "driven primarily" by strength in key markets such as India, and analysts' positive reactions thereto, Cognizant's stock price increased from an opening price of $58.22 per share on August 4, 2016, to a closing price of $59.71 per share on August 5, 2016, an increase of approximately 2.5%.

### 16.    September 6, 2016: Citi Global Technology Conference

280.    On September 6, 2016, Defendant Coburn attended the Citi Global Technology Conference with analysts and investors. During the conference, Coburn stated:

> In the core business, it is becoming more difficult in the clients' eyes to differentiate yourself. When I say core business, traditional, application, maintenance. There, it is fairly easy though to have a conversation with a client if you don't care about the rate card, you care about the cost of ownership. So let's move away from time and materials pricing to output-based pricing. ***I will reduce your cost of ownership, because I'm going to bring in automation, I'm going to bring in various tools of productivity, go more offshore whatever, pull the different levers, clients are very open to that discussion.***
>
> ***And we've been very successful at, while maintaining our margins, being able to achieve the cost of ownership that the clients want.***

281.    The above statements made by Defendant Coburn during the Citi Global Technology Conference were materially false and misleading when made. It was misleading for Coburn to tout Cognizant's ability to "reduce your cost of ownership" through "various tools of productivity," such as "automation" and "offshore" operations, when, in fact, the Company's ability to deliver cost savings to its clients, while maintaining margins, was driven, in material part, by Cognizant's scheme to obtain SEZ licensing by bribing Indian government officials. It also was misleading for Coburn to tout Cognizant's "success[]" at cutting clients' IT costs "while maintaining our margins" for the same reason.

**D.      Cognizant Overstated Earnings by Capitalizing Bribes that Should Have Been Expensed**

282.    In its Forms 10-K, Forms 10-Q, and earnings releases filed on Form 8-K at each reporting period during the Class Period, Cognizant overstated its earnings by incorrectly booking the bribery payments it made as capital expenditures when, in fact, those payments should have been booked as expenses and charged dollar-for-dollar against the Company's earnings. Specifically, the Company has stated that at least $4.1 million in corrupt payments were incorrectly capitalized, i.e., shown as increased assets on the balance sheet. In truth, as Cognizant has admitted, those payments should have been expensed, i.e., shown as increased expenses on the earnings/profit-and-loss statement. Of this $4.1 million of capitalized expenses, $1 million was expensed as depreciation and amortization. Consequently, Cognizant has admitted that, at each quarter during the Class Period, Defendants overstated Cognizant's earnings and investment in physical assets by at least $3.1 million and understated its expenses by the same amount.

283.    As described above, Defendants Coburn and Schwartz made and caused to be made this false financial information in Cognizant's Class Period earnings releases and financial statements by authorizing the bribery scheme to secure the essential permitting for the construction and operation of the Company's largest SEZ facility, the KITS Campus, and then approving the creation of phony change order invoices to disguise the bribes.

284.    In addition, Defendant Schwartz personally signed and authorized each of Cognizant's Form 8-Ks publicly filed with the SEC during the Class Period (the "Earnings Form 8-Ks") reporting on Cognizant's quarterly financial results, which attached Cognizant' quarterly earnings releases issued the same day.  The Earnings Form 8-Ks were filed with the SEC and disseminated to investors on May 4, 2015, August 5, 2015, November 4, 2015, February 1, 2016, May 6, 2016 and August 5, 2016.  Among the items reported in these earnings releases were

Cognizant's capital expenditures, operating expenses, and net income.  As above, Cognizant mis-booked the bribe payments as *bona fide* construction expenditures, thus capitalizing, rather than expensing them.  As a result, in the earnings releases attached to each of these Earnings Form 8-Ks, Cognizant understated its operating expenses, and overstated both capital expenses and income.

### E.    SOX Certifications Executed Throughout the Class Period

285.    In connection with each quarterly and annual report Cognizant filed with the SEC during the Class Period, D'Souza and McLoughlin signed SOX certifications. Pursuant to Section 302 of SOX, and also covered by Sections 304 and 906 of SOX, D'Souza and McLoughlin certified that they had designed and evaluated effective internal and disclosure controls over financial reporting, which assured the reliability of financial reporting, and also that the financial statements fairly and accurately presented the financial condition of the Company. For example, in connection with the Company's Form 10-K filed on February 25, 2016, D'Souza and McLoughlin certified as follows:

1.    I have reviewed this Annual Report on Form 10-K of Cognizant Technology Solutions Corporation;

2.    ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.[114]

---

[114] In the other quarterly and annual reports Cognizant filed with the SEC during the Class Period, Defendants D'Souza and McLoughlin executed false SOX certifications, in substantially identical forms as those attached to the 2015 Form 10-K.

286.    The SOX certifications signed by D'Souza and McLoughlin during the Class Period were materially false and misleading when made because, as the Company has admitted, Cognizant "did not maintain an effective control environment" as of December 31, 2015.  Indeed, the Company has admitted that material weaknesses existed in its internal controls, including its "tone at the top," as senior management participated in making corrupt payments by overriding and/or failing to enforce the Company's internal financial controls.

287.    Additionally, the statements described above were false and misleading when made because, contrary to the representation that the Company's SEC filings did "not contain any untrue statement of a material fact" or any material omission, the SEC filings to which these certifications were appended contained numerous materially false and misleading statements and omissions, as set forth elsewhere herein.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

288.    Numerous allegations, as set forth above and summarized below, give rise to the strong inference that Defendants knowingly or at least recklessly misled investors by making the materially false and misleading statements described herein.

289.    *First*, the Company has admitted that the misconduct was executed at the highest levels of Cognizant.[115] As noted above, the Company admitted in its third quarter 2016 Form 10-Q that multiple members of its "***senior management*** may have participated in or failed to take action to prevent the making of potentially improper payments by either ***overriding or failing to enforce*** the controls established by the Company relating to real estate and procurement principally in connection with permits for certain facilities in India." Moreover, the Company placed the

---

[115] Under applicable law, the cumulative knowledge of Cognizant's senior management team, including the Individual Defendants, is imputed to the Company and supports a finding of corporate scienter.

blame for the bribery scheme squarely on the shoulders of senior management who were "no longer with the Company or in a senior management position," the most prominent of whom was Coburn, Cognizant's President and former CFO. In short, Cognizant's own senior management perpetrated the scheme, a fact which more than adequately demonstrates Cognizant's scienter, and demonstrates that the Individual Defendants acted with either knowledge or, at minimum, severe recklessness.

290.    *Second*, numerous allegations set forth above give rise to a particularly strong inference that Coburn knew and was actively involved in the bribes Cognizant paid government officials to secure SEZ licenses. As noted above, Coburn suddenly and unexpectedly resigned in the midst of the Board's investigation into the bribery scheme, shortly before the Company attributed responsibility for the bribery scheme to senior executives who were "no longer with" Cognizant. There were no signs that Coburn's departure was planned or that he was slowly stepping away from the business to make room for a successor. To the contrary, at the time Coburn left he was, as shocked analysts noted, still "a leading face of CTSH to the investment community," and had been actively attending and participating in investor conferences. Moreover, former Cognizant employees reported that Coburn personally oversaw, and was deeply involved in, Cognizant's Indian real estate transactions. Coburn's oversight over the procurement process for Indian real estate licensing and permitting yields a particularly strong inference of scienter because, as Cognizant's former CFO, he would have been intimately familiar with the Company's controls over financial reporting relating to that process and the appropriate journal entry procedure for booking relating expenditures and payments – and therefore understood how to best override those controls, as the Company has acknowledged occurred.  The new facts set forth in

the Indictment, the SEC Action and the SEC Order strongly corroborate the inference that Coburn knew of the fraud.

291.   *Third*, the allegations set forth above—including information provided in the Indictment and SEC Action—likewise give rise to an inference that Schwartz knew and was actively involved in the bribes Cognizant paid government officials to secure SEZ licenses. The Indictment and SEC Complaint both state with detailed evidence that Schwartz – as not previously disclosed by the Company – was an active participant in the bribery scheme and in falsifying Cognizant's financial statements to conceal the payments.   Moreover, as Chief Legal Officer, Schwartz was responsible for monitoring the Company's legal compliance, including specifically for monitoring and reporting Cognizant's compliance with anti-corruption laws. Accordingly, Schwartz was intimately familiar with the Company's FCPA and anticorruption controls—and therefore understood how to best override those controls, as the Company has acknowledged, and the Indictment and SEC Action have confirmed, occurred.

292.   *Fourth*, Cognizant's characterizations of the bribery scheme in its admissions to date make clear - and the Indictment and SEC Action confirm—that the misconduct at issue here was intentional. As noted above, Cognizant has acknowledged that its senior management participated in the bribery scheme by, among other things, ***"overriding or failing to enforce*** the controls established by the Company relating to real estate and procurement principally in connection with permits for certain facilities in India." In other words, Cognizant admitted that, in order to facilitate the corrupt payments, members of its senior management team either actively countermanded the very controls that Defendants assured investors the Company adhered to, or knowingly permitted those controls to be breached – acts that are, by definition, intentional. Moreover, senior management took affirmative steps to conceal evidence of the bribery scheme

by improperly booking the corrupt payments as capital expenditures. Accordingly, Cognizant's admission that senior management consciously participated in or facilitated the corrupt payments to Indian officials, coupled with the fact that they then took specific steps to cover up those payments, provides a strong inference of scienter.

293.     *Fifth*, as discussed above, the evidence within the Company that Cognizant was making improper payments to Indian government officials in exchange for SEZ licensing was manifest and obvious, and was, in fact, reported to senior Cognizant executives. The misconduct here was not complex, novel, or arcane. Instead, as discussed above, auditors, including Former Employee 1, uncovered paid invoices that explicitly sought reimbursement for payments made to a private entity for SEZ licenses. Moreover, Former Employee 1 readily discovered that the entity to which the payments were made was government-related. Additional evidence of impropriety abounded. Transactions were misclassified and inaccurately characterized in journal entries; among other things, payments for licenses were characterized as "lease payments." As discussed above, these payments also were inexplicably booked as capital expenditures, rather than expensed. Additionally, it was evident that internal controls had been circumvented with respect to these corrupt payments: in contravention of Company policy, the transactions had neither been flagged as payments to government officials, nor cleared with Cognizant's legal department. The fact that Former Employee 1 and his/her team readily uncovered evidence of these transactions further demonstrates that the existence of these improper payments would have been easy to discover. Moreover, as discussed above, Former Employee 1 directly reported the improper payments, along with control deficiencies that allowed them to occur, to Verghese. *Id.* Former Employee 1 was included on emails in which Verghese reported the existence of these payments and control deficiencies to one of Cognizant's most senior executives, Pederson, who is

responsible for the Company's anticorruption compliance. *Id.* Former Employee 1 also stated that summary audit findings, at a minimum, would have been distributed to the Audit Committee of Cognizant's Board of Directors, which had approved the plan to conduct the FCPA audit, as well as to D'Souza and McLoughlin. In addition, as noted above, multiple members of senior management were involved in the bribes, including Defendant Schwartz, who as Chief Legal Officer had responsibility for the Company's anticorruption compliance. In short, the evidence of wrongdoing was readily available to anyone who cared to look.

294. *Sixth*, the duration of the misconduct also supports an inference of scienter. As alleged above, Cognizant has admitted that it actively bribed Indian officials from at least 2010 to 2016 – a period of seven years – to obtain permitting related to its Indian operations. During this time, Cognizant's "senior management" "overrode" internal control on numerous occasions or allowed them to be breached, in order to facilitate the bribery scheme. That this bribery scheme lasted for such a significant period of time demonstrates that the fraud alleged herein was not a temporary lapse in otherwise rigorous management oversight, but rather a sustained course of misconduct facilitated by senior executives – which further demonstrates scienter.

295. *Seventh*, the importance of SEZ licensing to Cognizant's business further supports an inference of scienter. As discussed above, SEZ licensing was fundamental to Cognizant's business model, which leveraged the low cost of its Indian operations in order to provide IT Services to clients at highly competitive prices. The tax benefits alone that Cognizant derived from its SEZ licenses increased the Company's profitability substantially. For instance, for 2015, the tax savings flowing from Cognizant's SEZ licensing increased the Company's net income by $201.4 million (more than 14%) and increased diluted EPS by $0.33 per share (more than 12%). Apart from lowering the Company's tax burden, SEZ licensing also increased the Company's

profitability by lowering transaction, labor, and regulatory costs. The importance of SEZ licensing to the Company supports an inference that the Individual Defendants knew of or, at minimum, recklessly disregarded any corrupt payments related to this critical area, and bolsters the numerous former employee reports that Coburn was "involved directly" in this area and took "a special interest" in it. Moreover, the size of these benefits enhances the inference that when the Indian government publicly disclosed plans to phase out SEZ-related tax benefits for new developments, Cognizant's senior management were focused on the Company's efforts to quickly amass SEZ licensing in an effort to forestall significant damage to Cognizant's bottom line.

296.    *Eighth*, the Company's senior management was well aware that bribery was particularly prevalent in India and that violations of the FCPA posed material risks to the Company, and designed Cognizant's Code of Conduct and Anticorruption Policy with these risks specifically in mind. As discussed above, Cognizant repeatedly acknowledged during the Class Period that failure to comply with applicable anticorruption laws could have serious negative consequences for the Company. Further, as Chief Legal Officer, Schwartz personally oversaw the Company's compliance with these anticorruption laws and therefore was particularly aware of the importance of Cognizant's efforts. Moreover, the lion's share of the Company's operations were located in India, a country that corruption watchdogs ranked as "one of the most corrupt countries in the world" during the Class Period. Coburn, himself, explained that "India . . . is a very critical and important market for us."[116] Accordingly, given the importance of India to the Company's success and its bottom line, senior management's keen awareness of FCPA-related risks pertaining to the Company's Indian operations, and the availability of clear, cogent, and uncomplicated

---

[116] Venkatesha Babu, *Gordon J. Coburn: Our Strategy Is to Maximize Revenue Growth*, Live Mint (Aug. 25, 2010, 11:32 PM IST), http://www.livemint.com/Companies/HyIeM692lDn ByONSHr6MTM/Gordon-J-Coburn--Our-strategy-is-to-maximize-revenue-growt.html.

evidence that such violations were actually occurring during the Class Period, Defendants' statements were severely reckless, at the very minimum.

297.   *Ninth*, the Indictment and the SEC Action and Order confirm that a criminal bribery scheme pervaded Cognizant's senior executive suite; that certain of the Company's highest-ranking officers intentionally falsified Cognizant's SEC filings and Sustainability Reports in carrying out that scheme; and specifically that, for Cognizant's largest SEZ facility, Defendants Coburn and Schwartz orchestrated a multimillion dollar bribery scheme and "made and caused to be made false, fraudulent and misleading representations and omissions" in Cognizant's financial statements, earnings releases, and Sustainability Reports.  Cognizant entered into the SEC Order, which requires the Company to pay $25 million and submit to a rigorous two-year remediation program.

298.   For example, based in substantial part on documents and other information provided by the Company, as well as the accounts of multiple current and former employees, the Indictment and SEC Action and Order set forth that (1) after directing that L&T should pay on Cognizant's behalf a $2 million bribe for the KITS Permit, Defendants Coburn and Schwartz knowingly agreed to conceal the bribes by the use of phony invoices; (2) in assenting to the use of a change order request to reimburse L&T, Defendant Schwartz explicitly cautioned that the reimbursement payment should not stand out in the change order request; (3) to induce L&T to pay the bribe on Cognizant's behalf, Defendant Coburn directed the payment of an additional $500,000 to L&T, also to be hidden as a change order request, and directed that Cognizant freeze and withhold all future payments to L&T until it had obtained all necessary permits for the KITS Campus and that L&T be notified that its future business with Cognizant was in jeopardy; (4) Coburn explicitly directed co-conspirators that "no [e]mails" should be used in implementing the

bribery scheme; (5) Coburn and Schwartz took affirmative steps to conceal the scheme, including lying to Cognizant's auditor and submitting false sub-certifications (Sarbanes-Oxley Quarterly Global 302 Certifications) relied upon by Cognizant's CEO and CFO, as well as (Coburn only) signing false management representation letters.

299. The Indictment and SEC Action and Order each were the result of more than two years of SEC and Department of Justice investigation with the cooperation of the Company, and the presentation of evidence by the Department of Justice to a grand jury. As part of its cooperation, Cognizant provided to the SEC and DOJ "all known relevant facts about the misconduct," including internal emails and other documents. The Indictment and SEC Complaint and Order also cite specific payments, communications and meetings, and they identify false certifications made by Coburn and Schwartz.

300. The DOJ's February 2019 letter to Cognizant also states that the Department of Justice made its own findings of criminal misconduct following a thorough investigation, stating:

> **The Department's investigation found that Cognizant**, through its employees, authorized its agents to pay an approximately $2 million bribe to one or more government officials in India in exchange for securing and obtaining a statutorily required planning permit in connection with the development of an office park in Tamil Nadu, India, known as the CKC/KITS facility in Chennai, as well as other improper payments in connection with other projects in India.

> Specifically, from in or about 2014 through in or about 2015, certain high-level employees of Cognizant, along with agents of the Company, took part in a scheme through which they authorized a third-party construction company to pay an approximately $2 million bribe to one or more government officials in India….

> Additionally, certain Cognizant employees and officers also falsified and caused to be falsified certain internal books and records of the Company, including by failing to disclose the existence or nature of the payments in certain disclosure questionnaires, as well as "sub-certifications" signed as part of the Company's Sarbanes-Oxley process.

114

301.    Notably, Cognizant has not denied that these bribes were made, or that Coburn and Schwartz were responsible for the misconduct set forth in the Indictment and SEC Action, and it has agreed to cooperate with the Justice Department in its prosecution of Schwartz and Coburn.

302.    The similarity of the three schemes described by the Indictment, the SEC Action, and the SEC Order, demonstrates that these bribes were not isolated incidents, but, instead formed a pattern and practice organized, directed, and replicated at the highest levels of the Company. Specifically, the bribery schemes related to Cognizant's facilities in Chennai (the KITS Campus), Pune, and Siruseri *all* concerned: (1) Cognizant's creation of SEZ facilities; (2) Cognizant's selection of L&T as builder, who had responsibility for obtaining permits; and (3) Cognizant's reimbursement of L&T for making bribe payments on Cognizant's behalf through the use of falsified change order requests that were initially rejected but retroactively approved. Critically, given the size of each of the illicit payments, the change order request for each would have required Defendant Coburn's authorization.

303.    In addition to the foregoing, other indices of scienter are:

a.    Defendants made repeated and specific statements during the Class Period to the investing public regarding the significance of India to Cognizant's operations, noting, in particular (and among other things), that its presence in India was "a crucial piece" of the Company's "global business strategy." Moreover, in addition to the Company's specific Class Period statements emphasizing its rigorous internal control system with regard to anti-corruption laws, D'Souza emphasized pre-Class Period the quality of the Company's compliance mechanisms in his direct discussions with securities analysts. For example, during an earnings conference call conducted by the Company in February 2009, D'Souza explained that "customers are looking for partners that demonstrate strong corporate governance controls. At Cognizant, transparency is

115

essential to our business and every member of the Cognizant team is committed to the highest levels of ethics and integrity."[117] He added that the Company had the "utmost confidence that we have the systems and controls in place to continue to meet the criteria [imposed by SOX]," further explaining that Cognizant provided "*the best in client management and corporate governance.*"[118] The specific pronouncements referenced above, regarding India's significance to the Company, and the state of Cognizant's compliance mechanisms, provide strong circumstantial evidence that the Defendants were receiving specific information about such matters. Alternatively, if the Defendants were not knowledgeable about the matters in which they purported to speak in detail, such recklessness would readily satisfy the scienter requirement.

       b.    The SOX Certifications executed by D'Souza and McLoughlin are a particularly strong indicator of scienter because the malfeasance at issue directly implicates the adequacy of the Company's internal control systems. On November 14, 2012, the DOJ and the SEC released their Resource Guide, which explained, "[a]n effective [FCPA] compliance program is a critical component of an issuer's internal controls."[119] As detailed herein, during the Class Period, Cognizant's internal controls were woefully inadequate and, in many respects, virtually non-existent. Indeed, the Company has now admitted that it "did not maintain an effective control environment" during the Class Period.

       304.    When reviewed collectively, as required by applicable law, Lead Plaintiffs' allegations support a strong inference of fraudulent intent on the part of the Defendants or, at the

---

[117] Tr. of Q4 2008 Earnings Call (Seeking Alpha Feb. 13, 2009), https://seekingalpha.com/article/120552-cognizant-technology-solutions-q4-2008-earnings-call-transcript.

[118] *Id.*

[119] *Resource Guide, supra* note 52, at 40.

very least, the strong inference that Defendants' conduct was severely reckless. In either case, scienter has been adequately pled.

## VII.    LOSS CAUSATION

305.    Lead Plaintiffs incorporate by reference the allegations set forth above. During the Class Period, Defendants publicly disseminated materially false and misleading statements and omitted material facts concerning the Company's operations and its true financial condition.

306.    The conduct alleged herein and the materially false and misleading statements and omissions made during the Class Period concealed the Company's involvement in the bribery scheme described above, and caused Cognizant's common stock to trade at artificially inflated prices, closing as high as $69.76 per share during the Class Period, thereby operating as a fraud on investors in the Company's common stock.

307.    When the truth was disclosed on September 30, 2016, Cognizant's stock price declined significantly as the artificial inflation was removed from the stock price.

308.    On September 30, 2016, Cognizant filed a Form 8-K with the SEC revealing that Defendant Coburn had abruptly resigned from his position as Cognizant's President on September 27, 2016. Cognizant also disclosed in this Form 8-K that the Company had initiated an internal investigation regarding occurrences of bribery related to its business operations in India:

> The Company is conducting an internal investigation into whether certain payments relating to facilities in India were made improperly and in possible violation of the U.S. Foreign Corrupt Practices Act and other applicable laws. The investigation is being conducted under the oversight of the Audit Committee, with the assistance of outside counsel, and is currently focused on a small number of Company-owned facilities. The Company has voluntarily notified the United States Department of Justice (the "DOJ") and United States Securities and Exchange Commission (the "SEC") and is cooperating fully with both agencies. The internal investigation is in its early stages, and the Company is not able to predict what, if any, action may be taken by the DOJ, SEC or any governmental authority in connection with the

investigation or the effect of the matter on the Company's results of operations, cash flows or financial position.[120]

309.    On this news, the price of the Company's common stock declined $7.29 per share, or more than 13%, from a close of $55.00 per share on September 29, 2016, to close at $47.71 per share on September 30, 2016. A total of 53,397,250 shares of Cognizant common stock were traded on September 30, 2016, a 987% increase in volume from the 4,911,900 shares traded on the immediately preceding trading date (September 29, 2016). This was substantially greater than the 3,956,594 share average daily trading volume of Cognizant shares during the Class Period.



---

[120] 2016 Form 8-K, *supra* note 56, at Item 8.01.

310.    While Cognizant's share price declined by approximately 13.25% on September

30, 2016, the IT Consulting & Other Services Index fell by only $1.98, from $150.12 on September



29, 2016, to $148.14 on September 30, 2016, a decline of 1.31%, demonstrating that the fall in the

Company's share price was a direct result of the fraud rather than other factors:[121]

311.    In the Company's most recent Form 10-K filed on March 1, 2017, Cognizant listed

the following companies as being in its "Peer Group Index": Accenture plc., Computer Sciences

Corporation, Computer Task Group, Inc., ExlService Holdings Inc., Genpact Limited, Infosys

Ltd., Syntel Inc., Wipro Ltd., and WNS (Holdings) Limited. Those companies' share prices

changed as follows between September 29 and September 30, 2016, once again showing that the

---

[121] his chart shows the value on September 30, 2016, of $100 invested in Cognizant common stock
at its closing price on September 27, 2016, as compared to $100 invested in the S&P 500 IT
Consulting & Services Index, a basket of S&P 500 companies in the IT consulting and services
industry that includes Cognizant.

decline in Cognizant's share price was due to the revelation of Defendants' fraud rather than other, non-fraud-related factors:

| Company | Sept. 29, 2016 Closing Price | Sept. 30, 2016 Closing Price | Percentage Change |
|---|---|---|---|
| Cognizant | $55.00 | $47.71 | (13.25%) |
| Accenture plc | $121.64 | $122.17 | 0.44% |
| Computer Sciences Corporation | $52.25 | $52.21 | (0.08%) |
| Computer Task Group, Inc. | $4.68 | $4.70 | 0.43% |
| ExlService Holdings Inc. | $49.81 | $49.84 | 0.06% |
| Genpact Limited | $23.81 | $23.95 | 0.59% |
| Infosys Ltd. | $15.87 | $15.78 | (0.57%) |
| Syntel Inc. | $41.47 | $41.91 | 1.06% |
| Wipro Ltd. | $9.78 | $9.71 | (0.72%) |
| WNS (Holdings) Limited | $29.69 | $29.95 | 0.88% |

312.    As demonstrated in the table above, of the nine competitors identified by Cognizant, six of them saw a gain in their closing prices between September 29 and September 30, 2016. Of the three that saw declines in their stock prices, the drops were minor: 0.08% (Computer Sciences Corp.), 0.57% (Infosys Ltd.), and 0.72% (Wipro Ltd.). The following chart

depicts the divergence on September 30, 2016, between Cognizant's stock and the Company's self-selected "Peer Group Index":[122]



313.    Thus, the September 30, 2016 stock drop was a direct consequence of the market learning the truth and/or the materialization of the risks concealed by Defendants throughout the Class Period. The timing and magnitude of the price decline in Cognizant's common stock negate any inference that the loss suffered by Lead Plaintiffs and the Class was caused by changed market

---

[122] This chart shows the value on September 30, 2016, of $100 invested in Cognizant common stock at its closing price on September 27, 2016, as compared to $100 invested in the publicly traded companies that Cognizant identified as its competitors in its Form 10-K filed on March 1, 2017. This Peer Group Index is weighted by relative market capitalization as follows: Accenture plc (49.25%), Computer Sciences Corporation (4.72%), Computer Task Group, Inc. (0.05%), ExlService Holdings Inc. (1.08%), Genpact Limited (3.02%), Infosys Ltd. (23.40%), Syntel Inc. (2.22%), Wipro Ltd. (15.31%), and WNS (Holdings) Limited (0.95%). *See* 2016 Form 10-K, *supra* note 76, at 33 (comparing performance of $100 investment in Cognizant to $100 investment in a market capitalization-weighted basket of the same nine competitors).

conditions, macroeconomic, or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. Accordingly, as a result of their purchases of Cognizant common stock during the Class Period, Lead Plaintiffs and the Class suffered economic loss and damages under the federal securities laws.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE

314. Lead Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon omissions of material fact that Defendants were under a duty to disclose.

315. In addition, Lead Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory, because Cognizant's common stock traded in an efficient market during the Class Period, as follows:

a. The Company's common stock was actively traded on the NASDAQ, an informationally efficient market, throughout the Class Period. Shares were highly liquid during the Class Period, with an average daily volume of 4,033,038 shares traded;

b. As a regulated issuer, Cognizant filed periodic public reports with the SEC and the NASDAQ;

c. The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

       d.     The market reacted promptly to public information disseminated by the Company;

       e.     Cognizant's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace; and

       f.     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Cognizant's common stock.

316. Therefore, the market for Cognizant common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Cognizant's share price. Under these circumstances, all purchasers of Cognizant common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

## IX.    CONTROL PERSON ALLEGATIONS

317. By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Cognizant, its business, operations, operational trends, finances, and present and future business prospects. The Individual Defendants would ascertain such information through the Company's internal corporate documents, conversations, and connections with other corporate officers, bankers, traders, risk officers, marketing experts, employees, attendance at management and Board meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as the Company officers and/or directors.

318. It is appropriate to presume that the materially false, misleading, and incomplete information conveyed in Cognizant's public filings, press releases, and public statements, as

alleged herein, was the result of the collective actions of the Individual Defendants identified above. The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

319.    The Individual Defendants were involved in drafting, producing, reviewing, approving, and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company and themselves, and approved or ratified these statements, in violation of the federal securities laws.

320.    As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, and governed by the provisions of the federal securities laws, each of the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Cognizant's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

321.    The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of Cognizant, were able to and did control the content of the various SEC

filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein.

322.    The facts set forth in detail throughout this Complaint further confirm Individual Defendant Coburn's ability to control, and actual control of, Cognizant's false and misleading statements, including: (1) his approval of the change order requests and related approvals in connection with the KITS Campus, which authorized Cognizant to pay L&T approximately $2.5 million as reimbursement for the bribe payment and related expenses and resulted directly in falsifying Cognizant's books and records; (2) his signing of management representation letters that were provided to Cognizant's auditors, thereby enabling false and misleading financial information to be reported to investors in Cognizant's Forms 10-K and 10-Q filed with the SEC; and (3) his execution of sub-certifications to management representation letters that were provided to and relied upon by Cognizant's CEO and CFO in signing management representation letters that were given to Cognizant's auditor, thereby enabling false and misleading financial information to be reported to investors in Cognizant's Forms 10-K and 10-Q filed with the SEC.

323.    The facts set forth in detail throughout this Complaint further confirm Individual Defendant Schwartz's ability to control, and actual control of, Cognizant's false and misleading statements, including: (1) his signing of Forms 8-K that contained Cognizant's earnings releases, through which he directly reported the false and misleading financial information to investors; (2) his execution of sub-certifications to management representation letters that were provided to and relied upon by Cognizant's CEO and CFO in signing management representation letters that

were given to Cognizant's auditor, thereby enabling false and misleading financial information to be reported to investors in Cognizant's Forms 10-K and 10-Q filed with the SEC; and (3) his input into, and approval of, the Company's public statements about its compliance with anti-corruption laws pursuant to his responsibility, as Chief Legal Officer, for both monitoring and reporting that compliance, thereby enabling the Company's false and misleading Sustainability Reports to be provided to investors.

324.     The Individual Defendants are all liable as a participant in a scheme, plan, and course of conduct that operated as a fraud and deceit on Class Period purchasers of Cognizant's common stock.

## X.     INAPPLICABILITY OF SAFE HARBOR

325.     Defendants acted with scienter because at the time that they issued public documents and other statements in Cognizant's name they knew, or with extreme recklessness disregarded, the fact that such statements were materially false and misleading or omitted material facts. Moreover, Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

326.     As set forth in detail throughout this Complaint, Defendants, by virtue of their control over, and/or receipt of, Cognizant's materially misleading statements and their positions with the Company that made them privy to confidential proprietary information, used such information to artificially inflate the Company's financial results. Defendants were informed of, participated in, and knew of the improprieties and unlawful conduct alleged herein and understood their material effect on the Company's business and future prospects. With respect to non-forward-looking statements and omissions, Defendants knew and recklessly disregarded the falsity and

misleading nature of that information, which they caused to be disseminated to the investing public.

327.    The PSLRA's statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. None of the statements pleaded herein are forward-looking statements and no such statement was identified as a forward-looking statement when made. Rather, the statements alleged herein to be materially false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

328.    Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XI.    CLASS ACTION ALLEGATIONS

329.    Lead Plaintiffs bring this action on its own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased the common stock of Cognizant from February 27, 2015,

through and including September 29, 2016. Excluded from the Class are: Defendants; members of the immediate families of the Individual Defendants; the Company's subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

330.    The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, the Company had between approximately 605.87 million and 610.52 million shares of common stock outstanding and actively trading on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

331.    Lead Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

332.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class. Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

333.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

a.         whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.         whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

c.         whether and to what extent the market price of Cognizant's common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

d.         whether Defendants acted with the requisite level of scienter;

e.         whether the Individual Defendants were controlling persons of the Company;

f.         whether reliance may be presumed; and

g.         whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

334.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Cognizant and Schwartz[123]**

335.     Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

336.     This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against Cognizant and Schwartz.

337.     As alleged herein, throughout the Class Period, Cognizant and Schwartz, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of Cognizant's common stock; and (iii) cause Lead Plaintiffs and members of the Class to purchase the Company's common stock at artificially inflated prices.

338.     Cognizant and Schwartz were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or

---

[123] As noted above, Plaintiffs have tailored Counts I and II to reflect both the Court's Order and their amended allegations.  However, Plaintiffs fully preserve their right to appeal any and all previously dismissed claims, and hereby stand on their allegations regarding the dismissed claims, Defendants, and statements.  *See Atkinson*, 473 F.3d at 517.

disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

339.   As set forth above, Defendants made their materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiffs and the other members of the Class who purchased Cognizant's common stock during the Class Period.

340.   In ignorance of the materially false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for the Company's common stock, Lead Plaintiffs and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiffs and members of the Class would not have purchased the Company's common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Cognizant's common stock declined precipitously and Lead Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

341.   By virtue of the foregoing, Defendants are liable to Lead Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5.

**COUNT II**
**Violation of § 20(a) of the Exchange Act**
**Against Defendants Coburn and Schwartz[124]**

342.    Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

343.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against Individual Defendants Coburn and Schwartz.

344.    As alleged above, Cognizant violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omissions in connection with the purchase and sale of the Company's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter, and Cognizant is charged with the knowledge and scienter of each of Individual Defendants Coburn and Schwartz who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

345.    As set forth above, Individual Defendants Coburn and Schwartz were controlling persons of Cognizant during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same.

---

[124] As noted above, Plaintiffs have tailored Counts I and II to reflect both the Court's Order and their amended allegations.  However, Plaintiffs fully preserve their right to appeal any and all dismissed claims, and hereby stand on their allegations regarding the previously dismissed claims, Defendants, and statements.  *See Atkinson*, 473 F.3d at 517.

346.     By virtue of the foregoing, Individual Defendants Coburn and Schwartz each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

347.     Individual Defendants Coburn and Schwartz acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiffs and the other members of the Class who purchased Cognizant's common stock during the Class Period.

348.     In ignorance of the materially false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for the Company's common stock, Lead Plaintiffs and other members of the Class purchased the Company's common stock at an artificially inflated price during the Class Period. But for the fraud, Lead Plaintiffs and members of the Class would not have purchased the Company's common stock at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of the Company's common stock declined precipitously, and Lead Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Cognizant's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth began to be disclosed.

349.     By reason of the foregoing, Individual Defendants Coburn and Schwartz are liable to Lead Plaintiffs and the members of the Class as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs respectfully pray for judgment as follows:

A.      Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiffs as class representatives, and appointing Bernstein Litowitz Berger & Grossmann LLP as class counsel pursuant to Rule 23(g);

B.      Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.      Awarding Lead Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorney's fees and costs incurred by consulting and testifying expert witnesses; and

E.      Granting such other and further relief as the Court deems just and proper.

## XIII.   JURY DEMAND

Lead Plaintiffs demand a trial by jury of all issues so triable.

Dated: April 26, 2019                    Respectfully submitted,

**LOWENSTEIN SANDLER LLP**

*s/ Michael B. Himmel*

Michael B. Himmel
Michael T.G. Long
65 Livingston Avenue
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
Emails:    mhimmel@lowenstein.com
                mlong@lowenstein.com

*Liaison Counsel for Lead Plaintiffs*

**BERNSTEIN LITOWITZ BERGER &**
   **GROSSMANN LLP**
John Rizio-Hamilton (pro hac vice)
Abe Alexander (pro hac vice)
Kurt M. Hunciker (pro hac vice)
Jesse L. Jensen (pro hac vice)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Emails:    johnr@blbglaw.com
           kurt@blbglaw.com
           abe.alexander@blbglaw.com
           jesse.jensen@blbglaw.com

*Lead Counsel for Lead Plaintiffs*