**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION SECURITIES LITIGATION | Civil Action No. 16-6509 (ES) (CLW)<br><br>OPINION |

**SALAS, DISTRICT JUDGE**

Plaintiffs bring a putative class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 against defendants Cognizant Technology Solutions Corporation, Gordon Coburn, and Steven E. Schwartz (collectively, "Defendants").  Before the Court are three motions to dismiss the Second Amended Class Action Complaint (D.E. No. 83 "SAC")) from the Defendants pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ("PSLRA").  (D.E. Nos. 92, 93 & 94 (collectively, the "Motions")).  The Court has considered the parties' submissions and decides the Motions after the extensive oral argument conducted on May 19, 2020, via videoconferencing due to the COVID-19 pandemic.  (*See* D.E. No. 129 ("Tr.")); *see also* L. R. 78.1(b)(2).  For the following reasons, the Motions are DENIED.

## I.      Background

This putative securities class action involves an alleged bribery scheme that, according to the SAC, a criminal indictment, and other court filings, was spearheaded by Cognizant Technology Solutions Corporation's ("Cognizant") former President, Gordon Coburn ("Coburn") and its Chief Legal and Corporate Affairs Officer, Steven E. Schwartz ("Schwartz").  (SAC ¶¶ 16 & 33–34). Coburn and Schwartz, among others, allegedly devised and implemented a scheme to bribe Indian

government officials in order to secure permits that were necessary to operate Cognizant's facility known as the Knowledge Industry Township Campus (the "KITS Campus" or "KITS Facility") in Chennai, India. (*Id.* ¶¶ 19–20). The KITS Facility was built in one of India's Special Economic Zones ("SEZs") and was Cognizant's largest SEZ facility. (*Id.* ¶¶ 3 & 19). By locating the KITS Facility in an SEZ, Cognizant would gain several lucrative tax and labor benefits. (*Id.* ¶ 3).

At the core of the allegations, Plaintiffs contend that Cognizant touted the benefits of its SEZ licenses while failing to disclose the bribery scheme orchestrated in connection with the KITS Facility, which ultimately could not operate without the necessary underlying permits. (*Id.* ¶¶ 5 & 19). Coburn, Schwartz, and other members of senior management allegedly worked with the Indian-based construction company contracted to develop the KITS Facility to ultimately devise and implement the bribery scheme. (*Id.* ¶ 20). Under the scheme, Cognizant's contractor would facilitate payments to Indian government officials, and Cognizant would reimburse its contractor for these costs. (*Id.*) As such, the bribe payments appeared as legitimate reimbursement requests from Cognizant's contractor. (*Id.*). Consequently, Cognizant overstated its earnings to investors because it recorded the bribe payments as capital expenditures rather than expenses. (*Id.* ¶ 9). Cognizant's stock price dropped by more than 13%, or $7.29 per share, after it finally disclosed that it was "conducting an internal investigation into whether certain payments relating to facilities in India were made improperly and in possible violation of the U.S. Foreign Corrupt Practices Act and other applicable laws." (*Id.* ¶¶ 11–12).

Because this case involves an intricate procedural history, the Court first discusses the procedural posture as it relates to the present Motions before summarizing the key factual allegations included in the SAC.

### A.      Procedural History

#### i.      Prior Opinion

The SAC comes before the Court following an opinion by the late Judge William H. Walls dated August 8, 2018, on motions to dismiss the consolidated First Amended Class Action Complaint (D.E. No. 38 ("FAC")).  (D.E. No. 66 ("Prior Opinion" or "Op.")).  In Count I of the FAC, Plaintiffs brought claims under the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 against Cognizant; Francisco D'Souza ("D'Souza"), Cognizant's former Chief Executive Officer; Karen McLoughlin ("McLoughlin"), Cognizant's former Chief Financial Officer; and Gordon Coburn, Cognizant's former President.  (*Id.* at 1–2).  In Count II of the FAC, Plaintiffs brought claims under Section 20(a) of the Exchange Act against D'Souza, McLoughlin, and Coburn.  (*Id.* at 10).

As discussed more fully below, Plaintiffs' Section 10(b) and Rule 10–5 claims were initially premised on five categories of allegedly material misstatements, including: (i) statements highlighting the benefits of Cognizant's SEZ licenses; (ii) statements emphasizing legal compliance and anti-corruption controls; (iii) statements touting Cognizant's low-cost services and attributing its financial results to legitimate business factors; (iv) overstatements of earnings resulting from improperly recording bribes as capital expenditures; and (v) Cognizant's SOX certifications.  (*Id.* at 10–11 & 33).  Judge Walls found that Plaintiffs adequately pled materially misleading statements in three of the five categories, including:  (i) statements highlighting the benefits of Cognizant's SEZ licenses; (ii) statements emphasizing legal compliance and anti-corruption controls, specifically limited to statements reporting no incidents of corruption and statements touting the effectiveness of anti-corruption training in Cognizant's 2014 and 2015 Sustainability Reports; and (iii) overstatements of earnings resulting from improperly recording

bribes as capital expenditures.  (*Id.* at 33–36, 41–44 & 52–53).  Thus, Judge Walls dismissed claims based on statements emphasizing legal compliance and anti-corruption controls, specifically those concerning Cognizant's Code of Conduct and Anticorruption Policy, statements touting the low-cost services and attributing the company's financial results to legitimate business factors, and statements contained in Cognizant's SOX certifications.  (*Id.* at 74).

Because Judge Walls found that at least some categories of allegedly material misstatements survived the motions to dismiss, His Honor continued to evaluate the second element in contention: scienter.  Judge Walls ultimately dismissed, *without prejudice*, Count I against D'Souza and McLoughlin for failure to plead scienter.  (*Id.* at 62 & 74).  Although Judge Walls held that Plaintiffs adequately pled scienter with respect to Coburn, His Honor dismissed Count I against Coburn because he did not make any of the allegedly material misstatements that survived dismissal.  (*Id.* at 55).  Critically, however, unlike D'Souza and McLoughlin, the dismissal of Count I against Coburn was *with prejudice*.  (*Id.* at 74).

At the outset, it is unclear to this Court why Plaintiffs were permitted to reallege Count I against D'Souza and McLoughlin, but not Coburn.  The parties previously stipulated to Plaintiffs' filing of the consolidated FAC (*see* D.E. No. 26), and there were no prior motions to dismiss the original complaint.  Rather than amend allegations against D'Souza and McLoughlin, Plaintiffs confirmed their intent to preserve the right to appeal the Court's Prior Opinion as it relates to "all previously dismissed claims, [d]efendants, and statements."  (SAC at 2 n.1, 12 n.3, 130 n.123 & 132 n.124 (citing *U.S. ex rel. Atkinson v. PA Shipbuilding Co.*, 473 F.3d 506, 517 (3d Cir. 2007) (stating that "[i]f a party omits a claim from an amended complaint that it would not have been futile to replead, that party can still preserve the claim for appellate review by standing on the dismissed claim despite leaving it out of the amended complaint. . . . Adding a section to an

amended pleading specifically preserving the claim certainly suffices.")); *see* Tr. at 32:24–33:7. At the present juncture, this Court must respect Plaintiffs' decision to stand on their prior allegations pertaining to all previously dismissed claims, defendants, and statements for purposes of appeal.[1]  As such, the Court makes clear that it will not address the sufficiency of allegations raised by the SAC against (i) Coburn, D'Souza, or McLoughlin under Count I; (ii) D'Souza or McLoughlin under Count II; or (iii) Cognizant under Count I for the categories of alleged misstatements that were previously deemed non-actionable.

Next, Judge Walls was tasked, as this Court is again, to determine whether Plaintiffs pled scienter with respect to Cognizant as a corporate entity.  Central to this issue was the fact that Judge Walls found, for pleading purposes, actionable misstatements; however, those statements were not made by Coburn, the only individual defendant that Judge Walls inferred had scienter at the pleading stage.  (Op. at 55 & 63–66).  As discussed in-depth herein, there are three approaches that divide the Circuit Courts of Appeals on the issue of "corporate scienter" or "collective scienter" when there is no identified individual responsible for making any of the alleged misstatements at issue who also possessed the requisite scienter.  The Third Circuit has yet to weigh in on which approach it considers controlling.  *See, e.g.*, *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 121 n.6 (3d Cir. 2018) ("We have neither accepted nor rejected th[e] doctrine [of corporate scienter] and decline to do so here because the [] allegations would not give rise to corporate scienter under any recognized theory of that doctrine.").  Ultimately, Judge Walls concluded that Coburn's scienter could be imputed to Cognizant under the broad and middle

---

[1]     In addition, neither Plaintiffs, Coburn, nor Cognizant moved for reconsideration of Judge Walls's Prior Opinion at any point in time.  *See Geibel v. United States*, 667 F. Supp. 215, 219 (W.D. Pa. 1987) (noting four exceptions to the law-of-the-case doctrine where a successor judge may reevaluate a previously decided issue by a former judge, which may include a timely motion for reconsideration of the prior judge's decision), *aff'd*, 845 F.2d 1011 (3d Cir. 1988).

approaches followed by various Circuit Courts of Appeals.  (Op. at 66–72).

Accordingly, Count I of the FAC survived against Cognizant only.  (*Id.* at 74).  The Court also held that Count II survived against Coburn and allowed Plaintiffs to amend Count II against D'Souza and McLoughlin in a subsequent complaint.  (*Id.*).

### ii.   Interlocutory Appeal

Approximately one month after Judge Walls issued the Prior Opinion, Cognizant moved for immediate appeal pursuant to 28 U.S.C. § 1292(b), so that the Third Circuit could resolve the threshold issue that implicated Cognizant's potential liability:  "what a securities plaintiff must plead in order to [] impute the alleged scienter of an individual to a corporation."  (D.E. No. 70-1 at 1).  Because Count II could not survive without a viable claim against Cognizant or another individual defendant under Count I, Cognizant correctly noted at the time that the issue of corporate scienter would be outcome-determinative of the entire case.  (*Id.* at 2).[2]

Given the clear divide that exists amongst the Circuit Courts of Appeals on the issue of corporate scienter, and recognizing that Plaintiffs' claims could have been dismissed in their entirety had Cognizant succeeded on appeal, Judge Walls certified the Court's August 8, 2018 Order for immediate appeal pursuant to 28 U.S.C. § 1292(b), and stayed the action on October 18, 2018.  (D.E. No. 75).  Subsequently, on February 25, 2019, Plaintiffs moved to vacate the Court's October 18, 2018 Order granting certification for interlocutory appeal and staying the matter pending appeal.  (D.E. No. 76).  In their motion, Plaintiffs expressed their intention to file an amended complaint in light of new and material factual developments, specifically (i) a twelve-

---

[2]   "Section 20(a) of the Exchange Act creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, who has committed a section 10(b) violation."  *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 177 (3d Cir. 2014) (citing 15 U.S.C. § 78t(a)).  In the Prior Opinion, Judge Walls found that no claim could proceed under Count I against D'Souza, McLoughlin, or Coburn.  However, because Coburn's scienter was imputed to Cognizant, thus allowing Count I to proceed against the corporation, Count II survived dismissal against Coburn.  Thus, had the Third Circuit decided the issue of corporate scienter in favor of Cognizant, Count II against Coburn would have also been dismissed.

count criminal indictment against Coburn and Schwartz issued on February 14, 2019, for their part in spearheading the bribery scheme at issue here; (ii) a civil action filed by the Securities Exchange Commission ("SEC") on February 15, 2019, based on the same bribery scheme; and (iii) an announcement from the SEC stating that Cognizant agreed to settle civil charges for violations of securities laws for $25 million.  (D.E. No. 76-1 at 1–2 & 16–17).

Nine days after Plaintiffs filed their motion to vacate, the Third Circuit denied Cognizant's petition for interlocutory appeal under 28 U.S.C. § 1292(b).  (D.E. No. 79–1).  Specifically, the Third Circuit denied the petition *without prejudice*, "if the District Court denie[d] leave to amend [Plaintiffs'] complaint."  (*Id.*).  As a result, Plaintiffs agreed to provide a proposed second amended complaint to counsel for existing defendants Coburn and Cognizant, and a new defendant, Schwartz.  (D.E. No. 79 at 1; D.E. No. 80 at 1).  The parties also agreed to a briefing schedule for any potential motions to dismiss in the event Coburn, Cognizant, and Schwartz consented to the proposed second amended complaint.  (D.E. No. 79 at 2; D.E. No. 80 at 2).  In accordance with the parties' proposed schedule, the SAC was filed on April 26, 2019.  (*See* SAC).

### B.    Second Amended Class Action Complaint

#### i.    Current Claims

In the SAC, Plaintiffs reallege claims under Count I for violations of Section 10(b) of the Exchange Act and Rule 10b–5 against Cognizant and Count II against Coburn for violation of Section 20(a).  (SAC ¶¶ 335–49).  In addition, Plaintiffs brought claims under Counts I and II against Schwartz based on new allegations that implicate him in the bribery scheme.  (*Id.*).

Cognizant and Schwartz move to dismiss Count I for failure to plead (i) misrepresentations or omissions and (ii) scienter.  (*See generally* D.E. No. 92-1 ("Cognizant Mov. Br.") and D.E. No. 94-1 ("Schwartz Mov. Br.")).  Coburn and Schwartz also move to dismiss Count II.  (*See generally*

D.E. No. 93-1 ("Coburn Mov. Br."); Schwartz Mov. Br.).

This matter was then transferred to the undersigned on July 26, 2019. (D.E. No. 108). On the same day, Plaintiffs filed one "Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Second Amended Complaint." (D.E. No. 109 ("Opp. Br.")). Thereafter, on August 26, 2019, Defendants filed three separate reply briefs. (D.E. No. 110 ("Coburn Reply Br."), D.E. No. 111 ("Schwartz Reply Br."), and D.E. No. 112 ("Cognizant Reply Br.")).

### ii.     Allegations

This action concerns a bribery scheme allegedly conducted by Cognizant's senior management to secure necessary permits for its largest SEZ facility in Chennai, India—the KITS Facility. (SAC ¶ 19). Cognizant is headquartered in Teaneck, New Jersey, and provides "information technology and business process outsourcing" services with its principal operations located in India. (*Id.* ¶¶ 2 & 30). By operating in India, Cognizant was allegedly able to provide its services at lower, more competitive costs to its clients, which was key to the company's overall profitability. (*Id.* ¶ 2).

One of the primary ways Cognizant leveraged its Indian operations was by locating its facilities in SEZs. (*Id.* ¶ 3). Companies that operate in SEZs were "guaranteed a number of highly lucrative benefits, including numerous tax exemptions and holidays, easing of various customs and labor regulations and procedures, and heightened access to credit, infrastructure, and other resources." (*Id.* ¶¶ 3 & 44). Furthermore, Plaintiffs allege that by building and expanding its SEZ facilities, Cognizant increased its "ability to drive revenue: the more employees the Company could put to work at its SEZ facilities, the more revenue it would book." (*Id.* ¶ 46). However, between February 27, 2015, and September 29, 2016 (the "Class Period") (*see id.* at 2; *id.* ¶ 329), there were several announcements by the Indian government regarding the phasing out of tax

benefits for SEZ facilities established after 2017.  (*Id.* ¶¶ 49 & 50).  As a result, Cognizant allegedly embarked on establishing numerous SEZ facilities during the Class Period.  (*Id.* ¶ 51).  And, as detailed below, Coburn and Schwartz (among others) allegedly devised and implemented the bribery scheme at issue to secure permits that were necessary for the operation of Cognizant's largest SEZ facility, the KITS Facility.  (*Id.* ¶¶ 19–20).

The bribery scheme remained hidden from investors until September 30, 2016, when Cognizant announced in a Form 8-K that its Board of Directors was "conducting an internal investigation into whether certain payments relating to facilities in India were made improperly and in possible violation of the U.S. Foreign Corrupt Practices Act and other applicable laws." (*Id.* ¶¶ 11 & 141).  That same day, Cognizant admitted that Coburn had suddenly resigned three days earlier during the investigation.  (*Id.* ¶¶ 11, 142 & 155–58).  The market's reaction to the disclosure resulted in Cognizant's stock price dropping by more than 13% per share from $55.00 to $47.71.  (*Id.* ¶¶ 12 & 148).

Subsequently, Cognizant stated that its "'senior management' 'may have participated in' making $6 million dollars' worth of corrupt payments to Indian government officials to procure permits relating to the Company's Indian facilities . . . ."  (*Id.* ¶¶ 9, 149 & 157).  On November 7, 2016, in its third quarter Form 10-Q, Cognizant admitted that "certain members of *senior management* may have participated in or failed to take action to prevent the making of potentially improper payments by either *overriding or failing to enforce* the controls established by the Company relating to real estate and procurement principally in connection with permits for certain facilities in India."  (*Id.* ¶ 81 (emphasis in original); *id.* ¶ 150).  During its third quarter earnings call on the same day, D'Souza announced that Cognizant

> discovered in the course of the investigation that certain members of
> senior management may have been aware of or participated in the

> matters under investigation . . . .  Based on the results of the
> investigation to-date, those who may have been involved are no
> longer with the company or in the senior management position.

(*Id.* ¶ 154).  And, in its March 1, 2017 Form 10-K, Cognizant further admitted that "senior

management who may have participated in or been aware of the making of the identified

potentially improper payments and failed to take action . . . were no longer with the Company or

in a senior management position as of December 31, 2016."  (*Id.* ¶ 159).

### 1.    KITS Facility Bribery Scheme

Among the primary additions in the SAC are factual allegations from the Department of

Justice ("DOJ") and SEC's two-year investigation of Cognizant's bribery scheme related to its

SEZ facilities, including the KITS Facility in Chennai, India.  (*Id.* ¶¶ 15 & 19).  The DOJ issued

an indictment on February 14, 2019 (*see* D.E. No. 92-2 ("Brown Decl.") ¶ 5; D.E. No. 92-6, Ex.

D. to Brown Decl. (the "Indictment")), charging Coburn and Schwartz with twelve criminal counts

in connection with the KITS Facility bribery scheme at issue in this matter.  (SAC ¶ 16 (citing

*United States v. Gordon J. Coburn and Steven Schwartz*, Crim. No. 19-120 (D.N.J.))).  The

Indictment refers to Cognizant's high-ranking corporate officers as co-conspirators, including

Cognizant's former Chief Operating Officer—believed to be Sridhar Thiruvengadam

("Thiruvengadam")—and Cognizant's former Vice President of Administration.  (*Id.*).  On the

same day, the SEC brought a civil lawsuit (*see* D.E. No. 92-5, Ex. C. to Brown Decl. (the "SEC

Action")) against Coburn and Schwartz alleging Foreign Corrupt Practices Act ("FCPA") and

securities laws violations.  (SAC ¶ 17 (citing *SEC v. Gordon J. Coburn and Steven E. Schwartz*,

No. 19-5820 (D.N.J.))).  In addition, the SEC separately issued an order (*see* D.E. No. 92-4, Ex.

B. to Brown Decl. (the "SEC Order")) on the same day announcing that Cognizant agreed to settle

claims against it for violations of securities laws dealing with numerous bribes that comprised

Cognizant's overall scheme to secure licensing for its various SEZ facilities, including the KITS Facility.  (SAC ¶ 18).  Specifically, Cognizant agreed to pay $25 million and to conduct various remediation efforts with oversight by the SEC.  (*Id.*).  The Indictment, SEC Action, and SEC Order (collectively, the "Government Filings") were based on the DOJ and SEC's investigations, Cognizant's internal documents, and information from numerous unindicted co-conspirators.  (*Id.* ¶ 19).

In sum, the Government Filings detail the alleged scheme in which Cognizant's construction company, Larsen & Toubro Ltd. ("L&T"), would ultimately pay Indian government officials to secure a planning permit for the KITS Facility ("KITS Planning Permit").  (*Id.* ¶¶ 38, 90 & 96).  The KITS Facility was slated to support "between 17,000 and 20,000 Cognizant employees."  (*Id.* ¶ 91).  Plaintiffs maintain that Cognizant retained L&T to develop the KITS Facility in or about November 2011, and that the "SEZ status" of the KITS Facility "would provide Cognizant with a significant business advantage by, among other things, allowing the Company to massively reduce[ ] the taxes and operating costs associated [with] the work done by ***thousands*** of employees."  (*Id.* ¶¶ 91–92 (emphasis in original)).  Cognizant's Vice President of Administration ("CC#1") "directly oversaw development of the KITS [Facility]" and was the company's primary liaison with L&T.  (*Id.* ¶ 92).  Per its agreement with Cognizant, L&T was responsible for "obtain[ing] all statutory approvals and permits" for the KITS Facility.  (*Id.* ¶ 95).  However, L&T did not apply for the KITS Planning Permit until about fourteen months *after* work on the project began.  (*Id.*).  By April of 2014, the KITS Planning Permit had not yet issued.  (*Id.* ¶ 96).

On April 21 and 22, 2014, Coburn, Schwartz, CC#1, and Thiruvengadam participated on videoconference calls to allegedly discuss "paying a $2 million bribe . . . to an official with the

Chennai Metro Development Authority in order to secure the KITS [Planning] Permit and complete this critical SEZ facility." (*Id.*). CC#1 allegedly informed Coburn and Schwartz that a bribe payment was demanded by an Indian government official "in exchange for approving the [KITS Planning Permit] and asked for their guidance." (*Id.*). During these videoconference calls, Coburn, Schwartz, CC#1, and Thiruvengadam allegedly agreed that L&T would front the bribe payment and that it would submit reimbursement requests to Cognizant for $2 million at the project's completion. (*Id.* ¶¶ 96–97). Coburn was allegedly the person "responsible for personally approving any payments in excess of $500,000 that L&T requested from Cognizant for reimbursement of unanticipated costs associated with the agreed-upon scope of work (known as 'variation claims' or 'change order requests')." (*Id.* ¶ 94). Plaintiffs claim that Coburn's authority was key to the bribery scheme because he would ultimately "approve payment of the phony change order requests to effectuate disbursement of the bribe monies, thus causing the repayment to be falsely recorded in Cognizant's books and records as *bona fide* construction costs." (*Id.* ¶ 97). On the April 22, 2014 videoconference call, Schwartz allegedly emphasized "that the reimbursement payment should not stand out in the change order request" specifically "[t]o ensure that their fraudulent scheme went undetected." (*Id.*).

CC#1, at the direction of Coburn, allegedly told L&T that Cognizant would not make any future KITS Facility payments until L&T tendered the bribe payment to the Indian government official, and CC#1 also informed L&T that its business with Cognizant would be jeopardized unless it complied with the bribe payment. (*Id.* ¶ 98). Throughout the process, CC#1 allegedly kept Coburn, Thiruvengadam, and others informed as to the "traction" on the KITS Planning Permit. (*See id.* ¶ 101). On May 20, 2014, Coburn corresponded with CC#1 and others suggesting that Cognizant pay some money owed to L&T, but to withhold the remaining balance until L&T

delivered.  (*Id.* ¶ 102).  Thereafter, on or about June 16, 2014, Thiruvengadam emailed CC#1 stating that "'[Coburn] wanted an update on the [KITS Campus] approval (no [e]mails he said).'" (*Id.* ¶ 103).  On or about June 30, 2014, L&T secured the KITS Planning Permit and asked CC#1, among others, to maintain confidentiality because no one should have known that L&T obtained the approval.  (*Id.* ¶ 104).  CC#1 later circulated a scanned copy of the government order, without L&T's confidentiality instructions, stating that Cognizant "will now start firm planning for occupation.  Thanks to [L&T] for support."  (*Id.*).  About four months later, on November 5, 2014, the KITS Planning Permit was issued to Cognizant.  (*Id.* ¶ 106).

When the KITS Facility neared completion, L&T submitted nearly $25 million in reimbursement requests, which included $2.5 million related to the KITS Planning Permit, comprised of $2 million for the bribe payment and $500,000 paid to L&T for its part in delivering the bribe payment.  (*Id.* ¶ 107).  CC#1 circulated a "Variations List Discussion Document" to Coburn and others detailing L&T's change order requests that contained a claim for $3.7 million described as "Approvals/Campus Regularisation [*sic*]," and a subsequent document with a shortened description for "Statutory Approvals," which encompassed the $2.5 million for the KITS Planning Permit.  (*Id.* ¶ 108).  However, knowing that this "Statutory Approvals" designation would stand out against Schwartz's advisement, "CC#1 instructed a co-conspirator who was a member of Cognizant's real estate group to create a fake version of [the document] that would replace the entire $3.7 million claim for 'approvals/campus regularization' (which included the $2.5 million 'statutory approvals' request) with eleven previously-rejected claims worth roughly the same amount."  (*Id.* ¶ 109).  In January 2015, Coburn received the faulty change order requests, and preliminarily approved them in an email sent to CC#1 on February 3, 2015.  (*Id.* ¶ 110).  Plaintiffs allege that in order "[t]o facilitate the formal approval of the bribe payments by

Cognizant's finance unit, on or about March 11, 2015, Defendant Coburn falsified a spreadsheet and related approvals containing and incorporating the false change order requests in connection with the KITS Campus." (*Id.* ¶ 111). Subsequently, on March 13, 2015, Coburn emailed Cognizant's finance unit to formally approve the phony change order requests. (*Id.* ¶ 112). Based on Coburn's approvals, Cognizant issued multiple reimbursement payments to L&T encompassing the $2.5 million bribe payment for the KITS Planning Permit between March 2015 and January 2016. (*Id.* ¶ 113).

### 2.      Statements Touting the Benefits of SEZs

Plaintiffs contend that during the Class Period, Cognizant falsely touted the benefits of its SEZ licenses, which were materially misleading when those benefits were obtained by way of a bribery scheme. For example, in its 2014 Form 10-K filed with the SEC on February 27, 2015, Cognizant stated that its "Indian subsidiaries . . . are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the Indian government for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years." (*Id.* ¶ 169). This statement also appeared in Cognizant's Q1 2015 Form 10-Q, filed on May 4, 2015; Q2 2015 Form 10-Q, filed on August 6, 2016; Q3 2015 Form 10-Q, filed on November 5, 2015; 2015 Form 10-K, filed on February 25, 2016; Q1 2016 Form 10-Q, filed on May 6, 2016; and Q2 2016 Form 10-Q, filed on August 5, 2016. (*Id.* ¶¶ 174, 177, 180, 183, 188 & 191; *see* Op. at 11–12).

In the same 2014 Form 10-K, Cognizant quantified the "effect of the income tax holidays granted by the Indian government" which resulted in "increase net income by approximately[in thousands] $182,973, $146,326, and $151,789, respectively, and increase diluted EPS [earnings per share] by $0.30, $0.24, and $0.25, respectively." (*Id.* ¶ 170). In addition, Cognizant claimed that "[a]s of December 31, 2014, we had outstanding fixed capital commitments of approximately

$20,452 [in thousands] related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers."  (*Id.* ¶ 171).  However, Cognizant's outstanding fixed capital commitments included at least $4.1 million in illicit bribe payments to Indian government officials.  (*Id.* ¶ 172).  Plaintiffs allege that substantially similar misstatements were included in Cognizant's (i) 2015 Form 10-K filed on February 25, 2016; (ii) Q1 2016 Form 10-Q filed on May 6, 2016; and (iii) Q2 2016 Form 10-Q filed on August 5, 2016.  (*Id.* ¶ 183–93).

Lastly, the 2014 Form 10-K also stated that Cognizant "constructed and except[ed] to continue to locate most of our newer development facilities in SEZs."  (*Id.* ¶ 171).  Similar renditions of this statement are contained in Cognizant's Q1 2015 Form 10-Q, filed on May 4, 2015; Q2 2015 Form 10-Q, filed on August 6, 2016; Q3 2015 Form 10-Q, filed on November 5, 2015; 2015 Form 10-K, filed on February 25, 2016; Q1 2016 Form 10-Q, filed on May 6, 2016; and Q2 2016 Form 10-Q, filed on August 5, 2016.  (*Id.* ¶¶ 174, 177, 180, 185, 188 & 191; *see* Op. at 12).

### 3.    2014 & 2015 Sustainability Reports

Next, as it relates to the Court's prior finding of actionable misstatements contained in Cognizant's 2014 and 2015 Sustainability Reports,[3] Plaintiffs now allege that Coburn and

---

[3]    These alleged misstatements include the following representations in Cognizant's 2014 Sustainability Report:

- "[Cognizant] delivered 331,114 hours of Code of Ethics training through eLearning in 2014," and "delivered live Code of Ethics trainings to targeted audiences of over 18,000 associates in India and the Philippines."  (SAC ¶ 202; Op. at 41–42).
- "[O]ur Enterprise Risk Management group conducts annual risk analysis surveys covering all business units and corporate functions to assess the likelihood of various risks including corruption."  (SAC ¶ 202; Op. at 42).
- "[There were] no incidents [of corruption] reported in 2014."  (SAC ¶ 202; Op. at 42).

Schwartz "participated in approving and issuing" the reports, "which falsely stated that there had been 'no incidents' of corruption at the Company." (*Id.* ¶ 22).  For example, Plaintiffs claim that both Coburn and Schwartz "intentionally furnished false information that was incorporated into [the reports]—including certifying their personal compliance with the Company's anticorruption policy and maintenance of accurate books and records." (*Id.*; *see also id.* ¶ 129).  However, when Coburn and Schwartz executed these certifications related to the Sustainability Reports, they allegedly "knew that they had authorized Cognizant to execute a scheme to bribe an Indian government official to acquire an essential permit necessary for the completion of the Company's largest SEZ facility, the KITS Campus." (*Id.* ¶ 129).

Moreover, Plaintiffs maintain that Coburn monitored Cognizant's sustainability performance, which encompassed compliance with anti-corruption laws, "'and reporting the results of this review to our Board of Directors,' including the CEO, who signed and approved the report." (*Id.* ¶ 130).  In addition, Schwartz allegedly "furnished information for inclusion in, and participated in approving, Cognizant's Sustainability Reports," and as the Chief Legal Officer, he "was ultimately responsible for monitoring and ensuring Cognizant's compliance with anti-corruption laws" and "for monitoring and reporting the false compliance data included in the Sustainability Reports." (*Id.* ¶ 131).

### 4.   Financial Earnings Releases

Akin to the prior allegations, Plaintiffs continue to claim that because Cognizant incorrectly booked bribe payments as capital expenditures when "those payments should have been booked as expenses and charged dollar-for-dollar against the Company's earnings," it overstated its

---

Additionally, Judge Walls held that certain statements from Cognizant's 2015 Sustainability Report were actionable, including that there were "no incidents [of corruption] reported in 2015," and "no [significant risks related to corruption] reported in 2015." (SAC ¶ 209; Op. at 42).

earnings during the Class Period.  (*Id.* ¶ 282).  Cognizant admitted that at least $4.1 million in corrupt bribe payments should have been expensed on its earnings/profit-and-loss statement when instead it appeared as increased assets on Cognizant's balance sheet.  (*Id.*).  Out of the $4.1 million in capitalized expenses, "$1 million was expensed as depreciation and amortization."  (*Id.*).  Accordingly, during the Class Period, Cognizant admitted that it overstated its "earnings and investment in physical assets by at least $3.1 million and understated its expenses by the same amount."  (*Id.*).  Plaintiffs allege that by virtue of their authorization of the KITS Facility bribery scheme, both Coburn and Schwartz "made and caused to be made this false financial information in Cognizant's Class Period earnings releases and financial statements."  (*Id.* ¶ 283).

### 5.    Forms 8-K

During the Class Period, Cognizant's earnings releases that reported its quarterly financial results were attached to numerous Forms 8-K filed with the SEC.  (*Id.* ¶ 284).  These Forms 8-K were allegedly "personally signed and authorized" by Schwartz and were "disseminated to investors on May 4, 2015, August 5, 2015, November 4, 2015, February 1, 2016, May 6, 2016 and August 5, 2016."  (*Id.*).   The earnings releases included reports on "Cognizant's capital expenditures, operating expenses, and net income."  (*Id.*).

### 6.    SOX Sub-Certifications

Notwithstanding the Court's Prior Opinion dismissing as nonactionable statements from Cognizant's SOX Certifications, Plaintiffs now claim that Coburn and Schwartz "signed numerous false SOX 'sub-certifications' in connection with the Company's financial reports filed with the SEC between July 2014 and January 2016," in which they attested to "the accuracy of the Company's financial reports and integrity of its controls."  (*Id.* ¶ 123).  These sub-certifications allegedly formed the basis of statements contained in the SOX Certifications, that Cognizant's Chief Executive Officer and Chief Financial Officer relied on when certifying the statements.

(*Id.*).  Plaintiffs maintain that "any refusal by a member of senior management to sign a sub-certification would surely have raised red flags to the auditor about the accuracy of the Company's SEC filings and would have also precluded filing the financial reports."  (*Id.*).  The allegations state that Coburn and Schwartz's false SOX sub-certifications falsely stated the following:

> (1) Cognizant's internal controls had been in force and effective; (2) they had disclosed to Cognizant's CEO and CFO all known deficiencies in the operation of the internal controls; (3) they had disclosed to Cognizant's CEO and CFO "any known fraud, whether or not material, that involves management or other employees, within my area of responsibility, who have a significant role in the Company's internal controls"; and (4) that the financial information for each relevant period "does not contain any untrue statement of fact or omit to include a material statement of fact necessary to make such financial information, in light of the circumstances under which such financial information was compiled, not misleading."

(*Id.* ¶ 124).  Both Coburn and Schwartz allegedly knew, when executing these sub-certifications, that "they had authorized Cognizant to execute a scheme to bribe an Indian government official so as to acquire an essential permit necessary for the completion of the Company's largest SEZ facility, the KITS Campus," and that "they had approved a plan to conceal the bribery scheme and circumvented the Company's internal controls, which necessarily entailed deliberately falsifying Cognizant's books, records, and accounts – and, in turn, its public financial statements."  (*Id.* ¶ 125).

### 7.     Management Representation Letters

The SAC includes allegations that Coburn specifically provided "false management representation letters" to Cognizant's auditors between August 2014 and June 2016.[4]  (*Id.* ¶ 121).

---

[4]     Schwartz correctly notes that the specific allegations with respect to the management representation letters are ultimately connected to Coburn, not Schwartz.  (*See* Schwartz Mov. Br. at 17 n.5; *compare* SAC ¶ 21, *with id.* ¶¶ 121–22).

Coburn's management representation letters allegedly stated that "[w]e have no knowledge of any fraud or suspected fraud affecting the Company involving a) Senior management; b) Management or other employees who have significant roles in internal control over financial reporting; or c) Others where the fraud could have a material effect on the condensed consolidated interim financial statements." (*Id.*).  Plaintiffs maintain that "[t]hese false management representation letters were essential to causing Cognizant to report false financial information to investors." (*Id.*). Yet, Coburn allegedly "knew at the times that he signed these false management representation letters that he . . .  had authorized Cognizant to execute a scheme to bribe an Indian government official so as to acquire an essential permit necessary for the completion of the Company's largest SEZ facility, the KITS Campus," and knew that "at his direction, Cognizant had concealed these illicit payments through fraudulent change orders and circumvented the Company's internal controls, which resulted in a series of improper payments to L&T between 2015 and 2016, and that the books, records and accounts of Cognizant – and its public financial statements – were thereby falsified." (*Id.* ¶ 122).

### 8. Statements to Cognizant's Auditors

Finally, Plaintiffs allege that between 2014 and 2016, Coburn and Schwartz continued to hide the KITS Facility bribery scheme from Cognizant's auditors.  (*Id.* ¶¶ 119 & 120). Specifically, Plaintiffs claim that Coburn and Schwartz failed to disclose to Cognizant's auditors information relating to "the bribery scheme, the disguised payments to L&T, the resulting false books and records of Cognizant, and their intentional circumvention of Cognizant's Code of Ethics and internal accounting controls." (*Id.* ¶ 120).[5]

---

[5]     Other allegations in the SAC that were included in the FAC and referenced in Judge Walls's Prior Opinion are also incorporated herein. (*See, e.g.*, FAC ¶¶ 68–74; SAC ¶¶ 82–88; Op. at 6–8 (recounting allegations attributed to Cognizant's former employees)).

## II.     Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed, in whole or in part, for failure to state a claim upon which relief can be granted.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The burden is on the moving party to show that the plaintiff has not stated a facially plausible claim.  *See Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016).

The Court also observes that there are certain heightened pleading standards under the PSLRA.  "The PSLRA imposes two exacting and distinct pleading requirements for securities fraud actions."  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010).  First, a complaint bringing a Section 10(b) or Section 20(a) claim that is based on "an untrue statement of a material fact," or an omission of "a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made not misleading," must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . ."  15 U.S.C. § 78u-4(b)(1); *In re Aetna*, 617 F.3d at 277.  "[Federal Rule of Civil Procedure] 9(b)'s particularity requirement is comparable to and effectively subsumed by the requirements of [§ 78u–4(b)(1)] of the PSLRA."[6]  *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir.

---

[6]      Federal Rule of Civil Procedure 9(b) states that when "alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . ."  "In order to satisfy Rule 9(b), a complaint must provide all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue."  *United States v. Eastwick Coll.*, 657 F. App'x 89, 93 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)) (internal quotation marks omitted).  In other words, a complaint "must state the circumstances of the alleged fraud with sufficient particularity to place the

2009) (internal quotation marks omitted).  Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); *In re Aetna*, 617 F.3d at 277–78.  The Third Circuit has described the required state of mind as one "'embracing [an] intent to deceive, manipulate, or defraud,' either knowingly or recklessly."  *In re Hertz*, 905 F.3d at 114 (quoting *Avaya, Inc.*, 564 F.3d at 252)) (alteration in original).  The PSLRA thus "unequivocally raise[d] the bar for pleading scienter."  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 317, 321 (2007) (internal quotations omitted) (alteration in original).

## III.   Discussion

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b–5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).  To allege a claim pursuant to Section 10(b), a plaintiff must plead "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation."  *In re Hertz*, 905 F.3d at 114 (*City of Edinburgh Council*, 754 F.3d at 167).  A Section 10(b) claim is subject to the PSLRA's heightened pleading standard previously discussed.  *Id.*  Here, the elements in contention are (i) material misrepresentation or omission, and (ii) scienter.

### A.   Material Misrepresentations

"To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a statement [or omission] that was '*misleading* as to a *material* fact.'"  *Matrixx Initiatives, Inc., v. Siracusano*,

---

defendant on notice of the 'precise misconduct with which [it is] charged.'"  *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223–224 (3d Cir. 2004)).

563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  Materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).  Materiality is satisfied when "there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic Inc.*, 485 U.S. at 231–32).  "[T]he materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock."  *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005).

Because materiality is often very fact-specific, courts have noted that it is typically an issue reserved for the factfinder.  *See In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997) ("[T]he emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings.").  "Only if the alleged misrepresentations or omissions are so *obviously unimportant* to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law."  *Adams Golf*, 381 F.3d at 275 (internal quotations omitted).

First, the Court will assess the parties' arguments pertaining to the three categories of allegedly material misstatements that previously survived dismissal from the FAC, including: (i) statements touting the benefits of SEZ licenses; (ii) certain statements in Cognizant's 2014 and 2015 Sustainability Reports, specifically statements reporting no incidents of corruption and statements touting the effectiveness of anti-corruption training; and (iii) statements of error in Cognizant's financial earnings releases.

i.        **Statements Touting the Benefits of SEZ Licenses**

Throughout its briefing, Cognizant argues that Plaintiffs' entire case is debunked by the SAC's new "allegations based on the DOJ and SEC investigations" because the investigations "did *not* show, or even suggest, that any payments were ever made to obtain licenses to locate facilities in SEZs, as Plaintiffs allege." (Cognizant Mov. Br. at 2 & 16–23; *see also* Schwartz Mov. Br. at 2 & 10–11 (echoing Cognizant's argument)). Rather, Cognizant and Schwartz maintain that the Government Filings show the alleged bribe payments were only made for planning, construction, or operating permits for the timely completion of the KITS Facility. (*See* Cognizant Mov. Br. at 17 & 18; Schwarz Mov. Br. at 10–11).

The Court finds that the theory Cognizant and Schwartz proffer is, as Plaintiffs characterize, "a distinction without a difference." (*See* Opp. Br. at 60). The Plaintiffs do not allege that the bribery scheme was orchestrated to secure one or more SEZ licenses. (*See generally* SAC). Rather, Plaintiffs allege, as they did previously in the FAC, that the bribery scheme concerned permits that were "*necessary* for the construction and *operation* of" Cognizant's KITS Facility. (*Id.* ¶ 19 (emphasis added); *see id.* ¶¶ 89–90; *see also* Opp. Br. at 60). For example, Plaintiffs allege that the Government Filings "describe a significant bribery scheme to secure critical *permits* for the Company's SEZ campuses" which included "permits that were *necessary* for the construction and *operation* of the Company's largest SEZ facility" known as the KITS Facility in Chennai. (SAC ¶ 19 (emphasis added)). Plaintiffs also claim that "Cognizant could not have built and *operated* this crucial SEZ facility, nor enjoyed the lucrative SEZ benefits attendant to it, without the KITS [Planning] Permit." (*Id.* ¶ 90 (emphasis added)). Once L&T secured the KITS Planning Permit via the bribe payments, Cognizant's Vice President of Administration allegedly wrote to Cognizant's executives stating that "[w]e will now start firm planning for occupation."

-23-

(*See id.* ¶¶ 37 & 104; Opp. Br. at 59).  Thus, even if the KITS Facility was already designated as

an SEZ facility, Plaintiffs plausibly allege that it could not fully operate or occupy the facility—

and thereby obtain the corresponding SEZ-related benefits—without the necessary permits.  (*See*

SAC ¶¶ 19 & 89–90; *see also* Tr. at 31:24–32:1 ("An SE[Z] license isn't really worth anything if

you can't actually develop and occupy and operate the facility for which the license is for.")).

Moreover, the Government Filings do not contradict Plaintiffs' theory of the case, specifically in

light of the allegations reiterated above.  Rather, the Government Filings mirror Plaintiffs'

allegations, as those documents claim that the KITS Facility bribe concerned a statutorily "required

planning permit," not an SEZ license.  (SEC Order at 3; SEC Action ¶¶ 2, 25 & 35; Indictment ¶

28).

Cognizant also attempts to debunk Plaintiffs' theory by arguing that it could have leased

space in another SEZ facility to house its employees while its KITS Facility permit remained

pending.  (Cognizant Mov. Br. at 19–20 ("Plaintiffs nowhere allege that absent the alleged bribe

for the KITS planning permit, Cognizant would not have been able to locate its employees in

leased space [at a different facility] within the same SEZ, *and gain the benefits of locating there*,

while it waited to receive [the KITS] permit."); *see also* Cognizant Reply Br. at 3–4 & 5–7).

However, as counsel for Plaintiffs suggested during oral argument, Cognizant's hypothetical

assumes that there were one or more SEZ facilities available to house Cognizant's 17,000 to 20,000

employees slated to work in the KITS Facility.  (*See* Tr. at 23:14–15).  Moreover, it defies logic at

the pleading stage to infer that Cognizant would have embarked on building its largest SEZ facility

only to incur additional costs to lease other SEZ space to house the KITS Facility's employees.

And, as Plaintiffs argued, if "the same large economic benefits could have been obtained at a much

lower cost than construction; that is, just by leasing facilities, then Cognizant's decision to build[,]

occupy and operate this facility wouldn't have made any sense if they could have just so easily leased a preexisting facility." (Tr. at 22:12–17).

Moreover, the Court does not agree with Cognizant's contention that Former Employee 1's ("FE1") statements[7] contradict the Government Filings or the SEC's February 13, 2014 letter to Cognizant's counsel. (*See* Cognizant Mov. Br. at 18 & 21). In particular, the allegations attributed to FE1—Cognizant's former Manager, Internal Audit & SOX Compliance—reveal that FE1 conducted an FCPA compliance audit and reported finding evidence "that payments *related to* procuring SEZ licensing were being made to Indian government personnel and that these payments were being improperly classified in Cognizant's internal systems." (*See* SAC ¶ 83 (emphasis added); *id.* ¶¶ 10 & 82). In addition, FE1 allegedly reported that the 2015 audit revealed that invoices from Cognizant's contractor "explicitly sought reimbursement for payments for licenses *to operate* in SEZs in Bangalore and elsewhere." (*Id.* ¶ 83 (emphasis added)). These allegations do not, as Cognizant suggests, show that FE1's statements were limited to improper payments *directly* for procuring SEZ licenses. (*See* Cognizant Mov. Br. at 18 & 21). Rather, they plausibly indicate that FE1 uncovered evidence of improper payments that were in some way related to Cognizant's SEZ licenses and the *operation* of Cognizant's SEZ facilities. Thus, statements touting the benefits of Cognizant's SEZ licenses remain actionable at the pleading stage.

### ii.     Statements in Cognizant's 2014 & 2015 Sustainability Reports

Next, Cognizant and Schwartz contend that statements reporting no incidents of corruption and statements regarding Cognizant's anticorruption training contained in the 2014 and 2015

---

[7]     Although Cognizant correctly notes that it previously moved to strike allegations attributed to FE1 based on his alleged repudiation of those allegations (*see* Cognizant Mov. Br. at 19 n.8), Judge Walls denied Cognizant's motion to strike (*see* Op. at 21–26) and Cognizant never moved for reconsideration on that decision. Accordingly, this Court may consider the allegations attributed to FE1. Moreover, the Court agrees with Judge Walls's prior assessment as to FE1's basis of knowledge and similar indicia under the factors articulated in *California Public Employees' Retirement System v. Chubb Corporation*, 394 F.3d 126, 147 (3d Cir. 2004). (*See* Op. at 34–35).

Sustainability Reports are not materially false or misleading because the Government Filings contradict these statements. (Cognizant Mov. Br. at 20–21; Cognizant Reply Br. at 4–5; Schwartz Mov. Br. at 11). Specifically, Cognizant argues that the Government Filings contradict these allegations because information attributed to FE1, which Judge Walls found corroborated the Sustainability Reports' misstatements, relates solely to SEZ licenses. (Cognizant Mov. Br. at 21). For the reasons already articulated, the allegations relating to FE1's discovery of payments made in connection with SEZ licenses are not refuted by the Government Filings.

In addition, Cognizant claims that the SEC's February 13, 2019 letter to Cognizant's counsel (*see* D.E. No. 92-3, Ex. A to Brown Decl. (the "Declination Letter"))[8] contradicts information attributed to FE1 regarding Cognizant's training materials because the Declination Letter states that "Cognizant provided 'all known relevant facts about the misconduct,' [and] the DOJ declined to prosecute Cognizant because of, among other things, 'the existence and effectiveness of the Company's pre-existing compliance program.'" (Cognizant Mov. Br. at 21 (quoting Declination Letter at 2)). Moreover, for the same reason, Cognizant contends that the Declination Letter contradicts allegations attributed to Former Employee 2 ("FE2"), who allegedly stated that his or her "staff had no FCPA-specific training and that no FCPA training manuals even existed." (SAC ¶ 86; Cognizant Mov. Br. at 21–22). However, as Plaintiffs correctly note, the Declination Letter made no finding whatsoever with respect to the effectiveness of Cognizant's anticorruption *training* in particular. (Opp. Br. at 68). Thus, the Court declines to find that the Declination Letter contradicts the allegations attributed to FE1 or FE2 concerning Cognizant's

---

[8] The Court may consider the Declination Letter and other documents such as the Forms 8-K attached to Cognizant's and Schwartz's motions to dismiss because they are incorporated by reference, integral to the claims in the SAC, or are items subject to judicial notice. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider . . . any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'") (alteration in original); *see also Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (taking judicial notice of SEC filings).

anti-corruption training practices.  (*See generally* Declination Letter; *see also* Opp. Br. at 68).

Accordingly, the Court will not disrupt Judge Walls's holding with respect to the actionable

misstatements contained in Cognizant's 2014 and 2015 Sustainability Reports.

### iii.     Statements of Error in Cognizant's Financial Earnings Releases

Cognizant and Schwartz also ask this Court to revisit the Prior Opinion's conclusion that

the financial misstatements were plausibly material to investors because they concealed the

underlying bribery scheme.  (Cognizant Mov. Br. at 22–23; Cognizant Reply Br. at 5–7; Schwartz

Mov. Br. at 11).  The Court declines to revisit Judge Walls's prior assessment as to the materiality

of Cognizant's financial earnings releases.  The parties failed to challenge Judge Walls's decision

in a motion for reconsideration.  *See Geibel*, 667 F. Supp. at 219.  Thus, this Court is bound by the

prior ruling.

Although Cognizant contends that the financial misstatements were immaterial because its

share price did not drop after the Government Filings went public (*see* Cognizant Mov. Br. at 23),

this argument, as Plaintiffs note, fails to account for the market's reaction when it initially learned

about the bribery scheme on September 2016.  (*See* Opp. Br. at 64–65).  Following the September

30, 2016 disclosure, Cognizant's stock price dropped by more than 13% per share.  (SAC ¶¶ 12 &

148).

Moreover, this Court finds no reason to sway from Judge Walls's finding of materiality at

the pleading stage based on the additional allegations in the SAC.[9]  For the reasons stated above

---

[9]     Nor will the Court entertain Cognizant's latest attempt to argue that the financial misstatements are quantitatively immaterial as a matter of law.  (*See* D.E. No. 124 (citing *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158 (S.D.N.Y. 2003), *aff'd*, 113 F. App'x 427 (2d Cir. 2004))).  Although Cognizant had ample opportunity to include *Duke Energy* in its briefing, Cognizant cited to this case for the first time in its May 5, 2020 letter to the Court that it submitted prior to oral argument.  (*See id.*).  And, in any event, *Duke Energy* precedes the decisions that Judge Walls relied on in concluding that the alleged misstatements were qualitatively material for pleading purposes.  (*See* Op. at 52 (citing *Indian Public Ret. Sys.*, 818 F.3d at 89 and *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 464–65 (S.D.N.Y. 2017))).

(*see supra* Section III.A.i), the Government Filings do not contradict the qualitative nature of the alleged misstatements because those documents relate to the bribery scheme for essential permits that were necessary for the operation and occupation of the KITS Facility.  Accordingly, the alleged financial misstatements are sufficiently material at the pleading stage.

**B.      Statements Attributable to Schwartz**

Next, the Court will assess whether Plaintiffs' Section 10(b) claim may proceed against Schwartz.  Plaintiffs seek to attribute statements made in Cognizant's earnings releases to Schwartz because he signed various SEC Forms 8-K that attached the releases for dissemination to shareholders. [10]  Schwartz argues that Plaintiffs' claim fails because he is not the "maker" of any allegedly material misstatements attached to the Forms 8-K.  (Schwartz Mov. Br. at 11–22).

**i.      Forms 8-K**

Plaintiffs allege that Schwartz signed six Forms 8-K filed during the Class Period which attached Cognizant's earnings releases, that, "as Schwartz knew, misstated Cognizant's capital expenditures, operating expenses, and net income."  (SAC ¶ 118).  The Forms 8-K in contention include those filed with the SEC on (i) May 4, 2015; (ii) August 5, 2015; (iii) November 4, 2015; (iv) February 1, 2016; (v) May 6, 2016; and (vi) August 5, 2016 (collectively, "Cognizant's Forms 8-K").  (*Id.*).  As stated above, Judge Walls previously found, for purposes of pleading, that Cognizant made materially false and misleading statements by overstating its earnings as a result of the bribery scheme.  (Op. at 52–53).  And, for the reasons previously discussed, this Court does not disturb that finding.  The issue presently before the Court is whether Schwartz, as the signer of Cognizant's Forms 8-K, may be held liable as the "maker" of the alleged earnings misstatements

---

[10]      A "Form 8-K is the 'current report' companies must file with the SEC to announce major events that shareholders should know about."  Form 8-K, U.S. Sec. and Exch. Comm'n, https://www.sec.gov/fast-answers/answersform8khtm.html. (last visited June 5, 2020).

contained in the releases.  The Court finds that while Schwartz cannot be held liable as the "maker" of the alleged misstatements in Cognizant's Forms 8-K under Rule 10b–5(b), Plaintiffs' Section 10(b) claim nonetheless survives against Schwartz under the doctrine of scheme liability pursuant to Rule 10b–5(a) and (c).

To begin, Rule 10b–5 provides three ways that persons may be liable under Section 10(b) of the Exchange Act.  *See* 17 C.F.R. § 240.10b–5.  Specifically, Rule 10b–5 makes it unlawful:

> (a) [t]o employ any device, scheme, or artifice to defraud,
>
> (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

that is carried out "in connection with the purchase or sale of any security."  *Id.*  Traditionally, under subsection (b), an individual must "make" the allegedly misleading statements or omissions of material fact, while subsections (a) and (c) cover what is referred to as "scheme liability" for allegedly deceptive conduct.  *De Vito v. Liquid Holdings Grp., Inc.*, No. 15-6969, 2018 WL 6891832, at *41 (D.N.J. Dec. 31, 2018) (citing *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 643 n.29 (3d Cir. 2011)).  The Court will first evaluate whether Plaintiffs adequately plead a claim under Rule 10b–5(b) against Schwartz.

### 1.      Liability Under Rule 10b–5(b)

Defendant Schwartz argues that he is not liable under Rule 10b–5(b) as the "maker" of the statements attached to Cognizant's Forms 8-K because Plaintiffs fail to allege that Schwartz had ultimate authority over any statements in Cognizant's earnings releases.  (Schwartz Mov. Br. at 12–16; Schwartz Reply Br. at 2–7).  The Court agrees that Schwartz is not the "maker" of the

alleged misstatements attached to Cognizant's Forms 8-K.

"For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  Thus, "[w]ithout control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." *Id.* Moreover, in *Janus*, the Supreme Court noted that "[o]ne who prepares or publishes a statement on behalf of another is not its maker." *Id.*  As such, "make" means "to state" rather than "to create." *Id.* at 142–44.  The Supreme Court analogized this distinction to the relationship between a speechwriter and a speaker. *Id.* at 143.  Although a speechwriter drafts the speech, the speaker is ultimately the person in control of its delivery and will take blame for what he or she ultimately says. *Id.*

Here, the parties cite to a number of cases that deal specifically with the intricacies of Forms 8-K when deciphering potential liability under Rule 10b–5.  Each of these cases, however, suggests that the signer of Forms 8-K may be liable for misstatements contained in attachments to the Forms 8-K when they allegedly have at least some authority over the misleading statements. For example, in *United States Securities Exchange Commission v. Carter*, the plaintiff adequately alleged that the Form 8-K signer was the "maker" of misstatements made in the attached press release.  No. 10-6145, 2011 WL 5980966, at *2–3 (N.D. Ill. Nov. 28, 2011).  The signer allegedly reviewed and approved the press release, listed his contact information on the press release, and had been quoted in the press release. *Id.* at *2–3.  Similarly, in *Levy v. Gutierrez*, a general counsel who signed the Forms 8-K could not be the maker of quoted misstatements contained in the attached press releases because the releases quoted *other* corporate officers rather than general counsel himself.  No. 14-443, 2017 WL 2191592, at *12 (D.N.H. May 4, 2017).

And while the parties extensively debate their renditions of *In re Banco Bradesco S.A. Securities Litigation*, 277 F. Supp. 3d 600 (S.D.N.Y. 2017) and *North Port Firefighters' Pension-Local Option Plan v. Temple Inland, Incorporated*, 936 F. Supp. 2d 722 (N.D. Tex. Mar. 28, 2013), the Court finds that these cases ultimately support Schwartz's position.  First, it is unclear whether Mr. Angelotti, the signer of Forms 6-K[11] at issue in *Banco Bradesco*, had also signed the press releases attached to those forms, as Schwartz suggests.  *See* 277 F. Supp. 3d at 663; (Schwartz Reply Br. at 4).  In any event, the district court there held that by signing a Form 6-K that included the language "we would like to take this opportunity to reiterate the clarifications provided in the Notice to Market of May 31, 2016," Mr. Angelotti effectively ratified and approved the earlier May 31, 2016 statement, and therefore plaintiffs adequately alleged that he "made" those statements under *Janus*.  *Banco Bradesco*, 277 F. Supp. 3d at 663.

*North Port Firefighters'* is also inapposite.  *North Port Firefighters'* ultimately did not assess the issue presently before the Court:  whether the signer of Forms 8-K may be liable for statements attached therein.  Rather, the signer of the Form 8-K at issue in *North Port Firefighters'* was not a named party in the action, and potential liability as to him was therefore never assessed. 936 F. Supp. 2d at 742–43.  By contrast, the court only analyzed whether those individuals and companies that signed documents attached to the Form 8-K could be liable for "making" statements contained in those attachments.  *Id.* at 740–43.

In the present matter, Plaintiffs do not allege that Schwartz was quoted in any of the financial earnings press releases attached to Cognizant's Forms 8-K.  (*See generally* SAC).  Nor do Plaintiffs allege that Schwartz's name or contact information appeared on the press releases, or that Schwartz was responsible for reviewing or approving the press releases prior to their issuance.

---

[11]   Under 17 C.F.R. § 240.13a-16(a), foreign private issuers are required to make reports on Forms 6-K if they are subject to Rule 13a-1 under the Exchange Act.

(*See generally id.*).  The Court's review of Cognizant's Forms 8-K, attached to Cognizant's and Schwartz's moving briefs and incorporated by reference in the SAC, do not indicate the contrary. (*See* D.E. Nos. 92-10, 92-11, 92-12, 92-13, 92-14 & 92-15, Exs. H–M to Brown Decl.).

Moreover, a case from this district that analyzed the potential liability of a Form 8-K signer comports with the principles gleaned from the parties' cited cases.  *See In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 940 (D.N.J. 1998).  In *MobileMedia*, the corporate entity, MobileMedia, issued a Form 8-K signed by its Senior Vice President and General Counsel, Mr. McVay.  *Id.* at 912.  "Item 5" of the Form 8-K included portions of MobileMedia's credit agreement that provided funds for its acquisition of another company, MobileComm.  *Id.* at 939.  "Item 5" restated certain credit agreement terms, specifically the portion that required MobileMedia to be in compliance with all Federal Communication Commission ("FCC") rules and regulations.  *Id.*  However, McVay knew that MobileMedia failed to comply with all FCC rules and regulations.  *Id.* at 940. Thus, the Court held that McVay's alleged "fail[ure] to disclose information known to him concerning the filing of false Forms 489 supports the inference that the inclusion of the Credit Agreement in the 1996 Form 8–K was materially misleading in violation of Rule 10b–5."  *Id.*

Although *MobileMedia* presents a closer call, it is significant that the misleading and materially false portion of the credit agreement was quoted *directly* in "Item 5" on the Form 8-K that McVay signed.  "Item 5" was "designated as the space where events 'the registrant deems of importance to security holders' are to be reported."  *Id.* at 939.  Here, by contrast, Plaintiffs do not cite to any alleged misstatements contained on the itemized portion of Cognizant's Forms 8-K. Instead, the Court's review of Cognizant's Forms 8-K reflects that the allegedly material misstatements were *attached* in the underlying press releases that Schwartz was not alleged to have drafted or approved.  (*See, e.g.*, D.E. No. 92-10, Ex. H to Brown Decl. (stating that "[o]n May 4,

2015, Cognizant Technology Solutions Corporation, a Delaware corporation (the "Company"), issued a press release to report the Company's financial results for the quarter ended March 31, 2015. The full text of the press release is attached to this current report on Form 8-K as Exhibit 99.1.*")).  Thus, unlike the allegations here, the misstatement in *MobileMedia* was on a document in which McVay appended his signature to, and arguably had "authority" over.  Moreover, dissimilar to the present circumstances, where Schwartz vigorously contests his attribution to any of the alleged misstatements, McVay had already admitted that the misstatement made in the Form 8-K was attributable to him.  *MobileMedia*, 28 F. Supp. 2d at 939.

Accordingly, because Plaintiffs fail to allege how Schwartz had "ultimate authority" over the alleged misstatements attached to Cognizant's Forms 8-K, the Court finds that Schwartz was not the "maker" of those statements under Rule 10b–5.

### 2.      Scheme Liability Under Rule 10b–5(a) and (c)

Next, Plaintiffs contend that, notwithstanding whether Schwartz was the "maker" of the alleged misstatements appended to Cognizant's Forms 8-K, he nonetheless faces "scheme liability" for violations of Rule 10b–5(a) and (c).  (Opp. Br. at 73; Tr. at 50:12–17).  Relying on the Supreme Court's recent decision in *Lorenzo v. Securities and Exchange Commission*, 139 S. Ct. 1094 (2019), Plaintiffs argue that "Schwartz . . . disseminated statements he knew to be false to investors," thereby implicating "scheme liability" under Rule 10b–5(a) and (c).  (Opp. Br. at 74).  In his reply brief, Schwartz maintains that while "*Lorenzo* opened the door to scheme liability claims based upon the dissemination of a misstatement, there is no suggestion from the opinion that the Supreme Court intended to do away with a requirement that the *act of dissemination* be 'inherently deceptive.'"  (Schwartz Reply Br. at 8 (emphasis added)).

As set out above, liability under Rule 10b–5(a) or (c) is implicated when an individual,

either directly or indirectly, "employ[s] any device, scheme, or artifice to defraud, . . . or []
engage[s] in any act, practice, or course of business which operates or would operate as a fraud or
deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. §
240.10b–5.  To state a valid claim for "scheme liability" under Rule 10b–(a) or (c), a "plaintiff
must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of
the alleged scheme to defraud, (3) with scienter, and (4) reliance."  *S.E.C. v. Lucent Techs., Inc.*,
610 F. Supp. 2d 342, 350 (D.N.J. 2009); *see also Trustcash Holdings, Inc. v. Moss*, 668 F. Supp.
2d 650, 661 (D.N.J. 2009).[12]

In *Lorenzo*, the Supreme Court granted certiorari under "the assumption that Lorenzo was
not a 'maker' under subsection (b) of Rule 10b–5" and therefore declined to revisit the District of
Columbia's Circuit Court of Appeals' decision on that point.  139 S. Ct. at 1100.  Accordingly, the
Court considered the narrow issue of "whether those who do not 'make' statements (as *Janus*
defined 'make'), but who disseminate false or misleading statements to potential investors with
the intent to defraud, can be found to have violated the *other* parts of Rule 10b–5, subsections (a)
and (c). . . ."  *Id.* at 1099.  Critical to the case at bar, however, the Supreme Court made clear that
its grant of certiorari on this issue was limited to the circumstance before it—specifically "when
the *only* conduct involved concerns a misstatement."  *Id.* at 1100 (emphasis added).

At the outset, the Court notes that this case is markedly different than *Lorenzo* because
Plaintiffs make clear that Schwartz's alleged conduct—namely, his participation in and
concealment of the bribery scheme—extended far beyond the mere dissemination of alleged
misstatements in Cognizant's Forms 8-K.  To understand this distinction, the facts in *Lorenzo* are
paramount.  Francis Lorenzo was an investment banking director who, through his employer, was

---

[12]        The Court's analysis in this section is limited to elements one, two and four only.  As discussed in *infra*
Section III.C.ii, Plaintiffs adequately allege scienter with respect to Schwartz.

hired to sell $15 million of debentures to prospective investors on behalf of Waste2Energy Holdings, Inc. ("W2E"). *Id.* at 1099. At the direction of his supervisor, Lorenzo sent two emails to prospective investors that discussed the debenture offering. *Id.* However, because those emails were authored and approved by Lorenzo's supervisor, Lorenzo did not have "ultimate authority" over the emails' content which had precluded liability under Rule 10b–5(b), as determined by the Court of Appeals. *Id.* at 1100. The emails authored by Lorenzo's supervisor misstated W2E's assets, and Lorenzo knew they were inaccurate. *Id.* at 1099. In fact, Lorenzo was informed about the true value of W2E's assets, and W2E had publicly disclosed the accurate value of its assets before Lorenzo sent the misstated emails. *Id.* Despite this knowledge, Lorenzo appended his signature to the emails, identifying himself as "Vice President—Investment Banking," and encouraged the recipients to contact him with any questions. *Id.*

The Supreme Court held that "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b–5, . . . even if the disseminator did not 'make' the statements and consequently falls outside subsection (b) of the Rule." *Id.* at 1100–01. It reasoned that "[b]y sending emails he understood to contain material untruths, Lorenzo 'employ[ed]' a 'device,' 'scheme,' and 'artifice to defraud' within the meaning of subsection (a) of the Rule, § 10(b) . . . . [and b]y the same conduct, he 'engage[d] in a[n] act, practice, or course of business' that 'operate[d] . . . as a fraud or deceit' under subsection (c) of the Rule." *Id.* at 1101. After reviewing the dictionary definitions of the terms "device," "scheme," "artifice," "act," and "practice," the Court concluded that subsections (a) and (c) encompass "a *wide range of conduct*" including the act of "disseminating false or misleading information to prospective investors with the intent to defraud." *Id.* (emphasis added). Moreover, because Lorenzo did not challenge the District of Columbia's Circuit Court of Appeals' scienter finding,

-35-

the Supreme Court was not tasked with evaluating whether Lorenzo had the requisite scienter, that is, whether he intended to deceive investors. *Id.* ("Recall that Lorenzo does not challenge the appeals court's scienter finding, so we take for granted that he sent the emails with 'intent to deceive, manipulate, or defraud' the recipients.").

Thus under *Lorenzo*, unlike prior precedent, a plaintiff need not necessarily allege deceptive conduct that extends beyond the alleged misstatement itself. *See De Vito*, 2018 WL 6891832, at *42 (noting that district courts in the Third Circuit "consistently required that a subsection (a) or (c) claim encompass deceptive conduct that [went] *beyond* a material misstatement or omission" (emphasis added)); Kyle A. Mason, *Life after Lorenzo – The Strained Re-Emergence of Scheme Liability*, 48 SEC. REG. L.J. 1 (2020) ("[B]ecause *Lorenzo* held directly to the contrary (that is, scheme liability can be based purely on conduct involving *only* a misstatement) it should completely abrogate this rule. . . ."). Under a narrow application of *Lorenzo*, Schwartz attempts to steer this Court to view the alleged misstatement in isolation by arguing that *Lorenzo* did not "do away with a requirement that *the act of dissemination* be 'inherently deceptive.'" (Schwartz Reply at 8 (emphasis added)). However, while *Lorenzo* may have altered the scope of scheme liability by allowing a claim in the narrow circumstance "when the only conduct involved concern[ed the dissemination of] a misstatement," it did not necessarily preclude from liability instances where the dissemination of a misstatement is preceded by *additional* allegedly deceptive conduct. *See Lorenzo*, 139 S. Ct. at 1100–01. This interpretation of *Lorenzo* is bolstered by the Supreme Court's comment that the "provisions [under subsections (a) and (c)] capture a *wide range of conduct*." *Id.* at 1101 (emphasis added).

Here, the Court cannot simply turn a blind eye to the alleged conduct that preceded Schwartz's dissemination of the misstatements at issue. First and most significantly, the

allegations reflect that Schwartz participated in devising the scheme on the April 21 and 22, 2014 videoconference calls to disguise the true nature of bribe payments.  (SAC ¶ 96).  Specifically, during the April 22, 2014 videoconference call, Schwartz allegedly advised that the reimbursement payment made to L&T for the bribe to the Indian government official "*should not stand out* in the change order request" so that the fraudulent scheme would remain undetected.  (*See id.* ¶ 96 (emphasis added)).  Second, Schwartz also allegedly knew that the way in which the bribe payments were ultimately disguised—as *bona fide* construction payments to L&T—would result in Cognizant reporting overstated capitalized expenditures and overstated earnings.  (*Id.* ¶¶ 112 & 116 ("Schwartz knew that the reimbursement for the bribe would be and was included in the amount Cognizant agreed to pay L&T, and that the change order documents would be and were falsified to conceal the true nature of those payments," and "that these actions would cause Cognizant to improperly record the illicit payments in Cognizant's books and records as *bona fide* construction expenses"); *id.* ¶ 117 (alleging that Schwartz knew "the bribery scheme would also cause Cognizant's publicly reported financial statements to be falsified. . . . [because b]y disguising the bribes as *bona fide* construction costs, [Schwartz] understood that these expenditures would be capitalized, rather than expensed, thus overstating capital expenditures, understating operating expenses, and overstating earnings in Cognizant's publicly-reported financial statements.")).  Third, Schwartz allegedly furthered the scheme by causing inaccurate financial information to be reported to investors by concealing "the bribery scheme from Cognizant's auditor in connection with its audits of the Company's financial statements . . . ."  (*Id.* ¶¶ 119–20).

Moreover, Schwartz's position and job responsibilities at Cognizant take him far outside the confines of an employee such as a mailroom clerk who is only "tangentially involved" in the dissemination of misstatements "for whom liability would typically be inappropriate."  *See*

*Lorenzo*, 139 S. Ct. at 1101.  And Schwartz's prior role at Cognizant is arguably even more paramount than the position occupied by Lorenzo.  *See id.* at 1099.  Here, Schwartz's alleged participation and concealment of the bribery scheme, and his dissemination of Cognizant's Forms 8-K, occurred in his capacity as Cognizant's Executive Vice President, Chief Legal and Corporate Affairs Officer.  (*See* SAC ¶ 34).  Plaintiffs allege that in his role at Cognizant, Schwartz "manag[ed] Cognizant's global legal teams, global government affairs efforts, and global security team," oversaw and managed Cognizant's compliance functions, and "was ultimately responsible for monitoring and ensuring Cognizant's compliance with anti-corruption laws."  (*Id.* ¶¶ 34 & 131).  As such, Plaintiffs claim that Schwartz was responsible for "reporting the false compliance data included in the Sustainability Reports."  (*Id.* ¶ 131).

When viewed cumulatively, the Court cannot find that Schwartz's dissemination of Cognizant's Forms 8-K was merely tangential.  (*See* Tr. at 64:22–25 (arguing that the "[term] scheme itself is necessarily cumulative.  You look at the whole.  You don't look at one single piece.")).  Rather, the Court can plausibly infer from the alleged facts that Schwartz engaged in a pattern of deceptive conduct leading up to and encompassing the dissemination of the alleged misstatements that he plausibly knew to be false by virtue of his participation in the scheme and its concealment.  This conclusion comports with the reasoning articulated by the Supreme Court in *Lorenzo*:

> Our conviction is strengthened by the fact that we here confront behavior that, though plainly fraudulent, might otherwise fall outside the scope of the Rule.  Lorenzo's view that subsection (b), the making-false-statements provision, *exclusively* regulates conduct involving false or misleading statements would mean those who disseminate false statements with the intent to cheat investors might escape liability under the Rule altogether.  But using false representations to induce the purchase of securities would seem a paradigmatic example of securities fraud. We do not know why Congress or the Commission would have wanted to disarm

> enforcement in this way.  And we cannot easily reconcile Lorenzo's
> approach with the basic purpose behind these laws: to substitute a
> philosophy of full disclosure for the philosophy of *caveat emptor*
> and thus to achieve a high standard of business ethics in the
> securities industry.

*Lorenzo*, 139 S. Ct. at 1102–03 (internal quotation marks omitted).  And, as the Supreme Court

did in *Lorenzo*, this Court confronts alleged behavior by Schwartz that is "plainly fraudulent, [but]

might otherwise fall outside the scope of Rule [10b–5]."  *See id.*  Accordingly, for the cumulative

reasons stated above, the Court finds that the alleged facts state a claim for scheme liability against

Schwartz in that he committed a deceptive or manipulative act by disseminating financial

misstatements in furtherance of a scheme to defraud.

Moreover, even under cases that pre-date *Lorenzo*, scheme liability would still prevent

dismissal of the Section 10(b) claim against Schwartz.  *See, e.g.*, *De Vito*, 2018 WL 6891832, at

\*41–42.  Traditionally, claims under subsections (a) and (c) for scheme liability are viewed as

distinct from claims under subsection (b) because the former "make deceptive *conduct* actionable,

as opposed to . . . deceptive *statements*."  *DVI, Inc.*, 639 F.3d at 643 n.29 (emphasis added).  Before

*Lorenzo*, district courts in the Third Circuit "consistently required that a subsection (a) or (c) claim

encompass deceptive conduct that [went] *beyond* a material misstatement or omission."  *De Vito*,

2018 WL 6891832, at \*42 (collecting cases).  Many other courts held the same view: that scheme

liability required an inherently deceptive act distinct from the alleged misstatement.  *See id.* at \*41;

*see also Public Pension Fund Group v. KV Pharmaceutical Co.*, 679 F.3d 972, 987 (8th Cir. 2012);

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011);

*S.E.C. v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011).  However, pre-*Lorenzo* courts

recognized that deceptive conduct under Rule 10b–5(a) and (c) may overlap with misstatements

or omissions that fall under Rule 10b–5(b).  *De Vito*, 2018 WL 6891832, at \*42.  "But to be

actionable [under subsections (a) or (c)], the conduct must be fraudulent in its own right, apart

from any misrepresentations about the conduct." *Id.* In *De Vito*, the Court articulated the

following test to determine whether liability falls under Rule 10b-5(a), (b) or (c) where "the

deceptive conduct is alleged to be the act of making the statement or omission itself" thus blurring

the line "between scheme liability and the misrepresentation/omission liability:"

> If disclosure of the full details of the alleged misconduct would
> transform that conduct into otherwise permissible behavior, liability
> likely falls under Rule 10b-5(b). But if the complete details of the
> conduct had been fully disclosed, and that conduct would still be
> fraudulent, scheme liability under Rule 10b-5(a) and (c) is
> appropriate.

*Id.* at *42–3. Here, it is clear that if the full details of the financial misstatement (*i.e.*, the bribery

scheme) were disclosed, the underlying alleged conduct would still be fraudulent such that a claim

for scheme liability would be appropriate under subsections (a) and (c). *See, e.g.*, *Eletrobras*, 245

F. Supp. 3d at 471 (failing to plead scheme liability claims where plaintiffs only focused on

"defendants' alleged misstatements or omissions, and therefore fail[ed] to state that they

committed an 'inherently deceptive act that is distinct from an alleged misstatement'"); *JAC

Holding Enters., Inc. v. Atrium Capital Partners, LLC*, 997 F. Supp. 2d 710, 735 (E.D. Mich. 2014)

(finding that plaintiffs adequately pled scheme liability where the alleged conduct was "not just

specific false statements . . . but also the planning and carrying out of a comprehensive scheme,

by specific steps, to mislead the buyers as to JAC's value"). Because Plaintiffs maintain that

Schwartz participated in devising the bribery scheme and concealing it thereafter, the allegations

plausibly indicate that he engaged in inherently deceptive conduct apart from the dissemination of

the alleged misstatements. The Court disagrees with Schwartz's contention that had he "at the

time of the filing of the 8-K said here are the facts, there would be nothing else to disclose . . . .

because there would be full disclosure to investors of the effects on the financial statements." (*See

Tr. at 82:24–83:12).  Thus, even under the pre-*Lorenzo* scheme liability framework, Plaintiffs have adequately alleged the first two elements of a scheme liability claim against Schwartz.

Finally, with respect to the last element of a scheme liability claim—reliance—Schwartz cites to *Trustcash*, for the proposition that "'[t]he alleged deception is not sufficiently causally connected to any inherently unlawful activities propagated on Plaintiffs' to support a claim for scheme liability."  (Schwartz Reply Br. at 9 (citing *Trustcash*, 668 F. Supp 2d at 662)).  In *Trustcash*, the Court further stated that "[t]he lack of a direct causal connection between the alleged inherently deceptive conduct and [p]laintiffs' alleged injuries can alternatively be framed as a defect in reliance, which requires a causal connection between a defendant's alleged misconduct and a plaintiff's injury."  668 F. Supp 2d at 662 n.5 (citing *Basic*, 485 U.S. at 243).  Here, however, it is adequately alleged that but-for Schwartz's misconduct in devising, advising, and concealing the bribery scheme, as well as his dissemination of the financial misstatements, Cognizant would not have overstated its earnings, which then resulted in Plaintiffs' alleged injuries.[13]  Accordingly, Plaintiffs have adequately alleged reliance.

Finally, as discussed below (*see infra* Part III.C.ii), Plaintiffs' claim for scheme liability against Schwartz survives because the SAC adequately pleads the remaining element, Schwartz's scienter.

ii.      **Sustainability Reports**

With respect to the Sustainability Reports, Schwartz argues that the allegations claiming that he "'participated in approving' and was 'ultimately responsible' for the false compliance data" are "sheer speculation" that this Court should reject.  (Schwartz Mov. Br. at 21 (quoting SAC ¶ 131)).  As such, Schwartz contends that he cannot be the "maker" of any alleged misstatements in

---

[13]      In addition, the Court notes that even Cognizant fails to challenge the element of reliance under the Section 10(b) claim asserted against it.  (*See generally* Cognizant Mov. Br.).

the Sustainability Reports.  (*Id.* at 21–22).

For the reasons discussed above in light of *Janus*, the Court agrees that Schwartz cannot be the "maker" of statements contained in the Sustainability Reports.  Schwartz is not alleged to have directly drafted or completely approved any of the claimed misstatements in the Sustainability Reports, and Plaintiffs do not contest Schwartz's arguments in this regard.  (*See generally* Opp. Br.).  Plaintiffs' allegation that Schwartz "participated in approving" the false compliance data and was "ultimately responsible for . . . *reporting* the false compliance data included in the Sustainability Reports" suggests that other individuals aside from Schwartz had "ultimate authority" or approval over the alleged misstatements as they appeared in the reports.  (*See* SAC ¶ 131 (emphasis added)); *see also Janus*, 564 U.S. at 142.  And notably, in their opposition brief, Plaintiffs focus their attention on Schwartz's alleged furnishing or reporting of false information for inclusion in the Sustainability Reports, as it relates to the analysis of corporate scienter rather than Schwartz's liability under Rule 10b–5.  (*See* Opp. Br. at 40–43; *see id.* at 25 (stating that "Schwartz was responsible for *reporting* the false compliance data in the Sustainability Reports" (emphasis added)); *id.* at 43 n.6 (stating that Cognizant's argument that Schwartz did not draft misstatements in the Sustainability Reports "rests on the entirely misbegotten premise that a corporate agent's scienter is imputable to the corporation only if they 'draft' the misstatement")).  Accordingly, the Court declines to find that Schwartz was the "maker" of the alleged misstatements contained in the Sustainability Reports.

### iii.       SOX Sub-Certifications

Lastly, Schwartz contests that he is the "maker" of any statements contained in Cognizant's SOX Certifications, SEC filings, or financial reports by way of his alleged signing of SOX sub-certifications that were provided internally to Cognizant's Chief Executive Officer and Chief

Financial Officer.  (*See* Schwartz Mov. Br. at 18–19; *see* SAC ¶¶ 123–24).  Plaintiffs argue that "without Coburn and Schwartz's sub-certifications, the CEO and CFO 'would have been unable to sign their own certifications required by SOX, and the Company would have been unable to file the financial reports with the SEC.'"  (Opp. Br. at 36 (quoting SAC ¶ 123)).

Plaintiffs' argument, however, is ultimately flawed in light of the Court's Prior Opinion. The Court already held that the SOX Certifications themselves are non-actionable in the first instance, and Plaintiffs do not challenge this finding in the SAC.  (*See* Op. 53–55; *see, e.g.*, SAC at 2 n.1 & 12 n.3).  Thus, because this Court does not disturb Judge Walls's holding, any attempt by Plaintiffs to hold Schwartz liable as the maker of statements in the SOX Certifications (or attendant filings) by way of his SOX sub-certifications is unpersuasive at this juncture.

### C.     Scienter

"To establish liability under [Section] 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'"  *Tellabs*, 551 U.S. at 319.  The PSLRA requires that Plaintiffs alleging violations of Section 10(b) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," which can be shown by alleged facts "giving rise to a 'strong inference' of 'either reckless or conscious behavior.'"  *Avaya, Inc.*, 564 F.3d at 267 (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534–35 (3d Cir. 1999)).  The Third Circuit has defined "reckless" as "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Advanta*, 180 F.3d at 539 (internal quotations omitted); *see also Fan v. StoneMor Partners LP*, 927 F.3d 710, 718 (3d Cir. 2019).  Allegations reflecting mere corporate mismanagement are not sufficient.  *City of Roseville Emps.' Ret. Sys. v. Horizon Lines,*

*Inc.*, 442 F. App'x 672, 675 (3d Cir. 2011).

"[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. The Court must "consider[] all the arguments presented by [an amended c]omplaint and assess[] scienter holistically." *See OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 493 (3d Cir. 2016). The relevant question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23. Nor do plaintiffs need to come forth with "smoking-gun" evidence to support the inference of scienter. *Id.* at 324. Thus, at the motion to dismiss stage, a court must weigh the "plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Id.* at 323–24. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324; *see also*, *Avaya, Inc.*, 564 F.3d at 259.

### i.   Coburn

At the outset, the Court notes that in its briefing, Cognizant does not appear to contest the sufficiency of the allegations that are presently before the Court as they relate to Coburn's scienter. (*See generally* Cognizant Mov. Br.; *see also* Cognizant Reply Br.). Nor does Cognizant attempt to suggest that this Court should reassess the Prior Opinion's conclusion that Coburn's scienter was adequately alleged.[14] (*See generally* Cognizant Mov. Br.; *see also* Cognizant Reply Br.).

---

[14]   As previously stated, Judge Walls found that the allegations supported scienter as to Coburn but dismissed Count I against him *with prejudice* because he did not make any of the alleged misstatements that survived dismissal. (Op. at 55, 63–66 & 74).

"[W]hen one district judge has rendered a decision in a case, and the case is later transferred to another judge, the successor should not ordinarily overrule the earlier decision." *See Geibel*, 667 F. Supp. at 219. However, the Third Circuit has stated four exceptions to the law-of-the-case doctrine in this circumstance. *Id.* Accordingly, a

However, even if the parties had raised the issue of Coburn's scienter, this Court finds that the new allegations contained in the SAC serve to bolster Judge Walls's prior analysis.  (*See* Op. at 63–66).

For example, neither Cognizant nor Coburn contest that the timing and circumstances of Coburn's resignation support the inference of scienter.  (*See id.*; *see generally* Cognizant Mov. Br., Coburn Mov. Br., Cognizant Reply Br. & Coburn Reply Br.).  Cognizant and Coburn also do not dispute that "Coburn was a participant in the bribery scheme and, consequently, that he had actual knowledge that statements touting SEZ licenses, touting compliance procedures, and misrepresenting financial statements were false and misleading."  (Op. at 63; *see generally* Cognizant Mov. Br., Coburn Mov. Br., Cognizant Reply Br. & Coburn Reply Br.).

Furthermore, the new allegations contained in the SAC only serve to bolster the Court's prior scienter analysis because they describe Coburn's specific involvement in devising and implementing the alleged bribery scheme in connection with the KITS Facility.  (*See* SAC ¶¶ 89–131).  For example, Coburn was allegedly the individual who ultimately approved L&T's phony change order requests that concealed the true nature of the bribe payments.  (*Id.* ¶¶ 94, 97, 108 & 111–13).  And Plaintiffs allege that "having served as Cognizant's CFO and President . . . [he] knew that these actions would cause Cognizant to improperly record the illicit payments in Cognizant's books and records as *bona fide* construction expenses."  (*Id.* ¶ 116).  The bribery scheme thus "necessarily entailed deliberately falsifying Cognizant's books, records and accounts, which were used to generate Cognizant's Class Period financial statements and earnings releases."

---

successor judge may (i) consider a timely motion for reconsideration when the successor judge is unavailable; (ii) address a previously decided issue based on the availability of new evidence; (iii) apply a new rule of law that is valid and applicable to the issues; and (iv) reassess the prior decision if it was "clearly erroneous and would work a manifest injustice."  *Id.*  Here, Cognizant does not argue that the undersigned should revisit Judge Walls's scienter analysis as it relates to Coburn under any of the exceptions to the law-of-the-case doctrine.  (*See generally* Cognizant Mov. Br.).

(*Id.* ¶ 117).  Accordingly, for all of the reasons stated in the Court's Prior Opinion and based on the newly alleged facts detailing Coburn's participation, execution, and concealment of the bribery scheme, Plaintiffs have adequately pled Coburn's scienter.  (*See* Op. at 63–66).

       **ii.**       **Schwartz**

Next, Schwartz contests that the allegations support the inference that he acted with the requisite scienter.  (Schwartz Mov. Br. 23–30).  The Court finds that cumulatively, Plaintiffs' allegations regarding Schwartz reflect a strong inference of scienter.

First, the SAC makes clear that Schwartz not only participated on the April 21 and 22, 2014 videoconference calls during which the bribery scheme was conceived, but also advised co-conspirators to conceal the true nature of the bribe payments so that they did "not stand out."  (SAC ⁋ 96; *id.* ⁋ 97 ("To ensure that their fraudulent scheme went undetected, Schwartz emphasized during the April 22, 2014 video conference that the reimbursement payment should not stand out in the change order request."); *id.* ⁋ 298).  As alleged by Plaintiffs, it follows that Schwartz "approved and executed a plan to conceal the bribery scheme that necessarily entailed deliberately falsifying Cognizant's books, records, and accounts, which were used to generate Cognizant's Class Period Financial statements and earnings releases."  (*Id.* ⁋ 117).  Schwartz knew that the "bribery scheme would also cause Cognizant's publicly reported financial statements to be falsified" because Schwartz, having served as Cognizant's general counsel, "understood that these expenditures would be capitalized, rather than expensed, thus overstating capital expenditures, understating operating expenses, and overstating earnings in Cognizant's publicly-reported financial statements."  (*Id.*).

Second, akin to Judge Walls's scienter analysis as to Coburn, the new allegations regarding Schwartz's departure from Cognizant also provide for an inference of scienter.  The resignation of

corporate executive defendants is one "factor that can strengthen the inference of scienter." *In re Hertz*, 905 F.3d at 118 (collecting cases). As Judge Walls noted, "[t]he resignation of a member of senior management in the midst of an internal investigation can be indicative of scienter." (Op. at 64 (citing *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 12-993, 2016 WL 466958, at *4 (M.D. Pa. Feb. 8, 2016))). "For a resignation to add to an inference of scienter, a pleading must set forth allegations suggesting a compelling inference that the resignation was the result of something other than 'the reasonable assumption that the resignation occurred as a result of' the release of bad news." *In re Hertz*, 905 F.3d at 118; *see also Fain v. USA Techs., Inc.*, 707 F. App'x 91, 97 (3d Cir. 2017).

Here, Schwartz allegedly departed from Cognizant in November of 2016. (SAC at 2; *id.* ¶ 34). Any nonculpable explanation for Schwartz's departure is refuted by Cognizant's public statement in its Form 10-K filed on March 1, 2017 with the SEC. Specifically, Cognizant disclosed:

> [T]he members of senior management who may have participated in or been aware of the making of the identified potentially improper payments and failed to take action to prevent the making of the identified potentially improper payments were no longer with the Company or in a senior management position as of December 31, 2016. Additional personnel actions have been taken with respect to other employees and further actions may be required.

(*Id.* ¶ 159). Thus, given that Schwartz allegedly departed from Cognizant sometime in November 2016 (*see id.* ¶ 34), coupled with the allegations concerning his direct participation in and concealment of the bribery scheme (*see id.* ¶¶ 89–131), the Court finds that Schwartz's departure strengthens the inference of scienter.

Third, based on Schwartz's knowledge of and participation in the bribery scheme, Plaintiffs allege that both he and Coburn "'lied to Cognizant's auditor' by making 'false and misleading

statements or omissions to Cognizant's auditor in connection with its audits of the company's financial statements from 2014 through 2016.'" (SAC ¶ 120). This allegation lends further support to Schwartz's concealment of the bribery scheme.

Fourth, although this Court does not disrupt Judge Walls's decision, which held that the SOX certifications are non-actionable statements, Plaintiffs allege that both Schwartz and Coburn provided false SOX sub-certifications internally to Cognizant's Chief Executive Officer and Chief Financial Officer. (*Id.* ¶ 124). In these SOX sub-certifications, Schwartz allegedly failed to disclose "any known fraud, whether or not material, that involves management or other employees, within [his] area of responsibility, who have a significant role in the Company's internal controls." (*Id.*). Moreover, in the SOX sub-certifications, Schwartz also falsely certified that "the financial information for each relevant period 'does not contain any untrue statement of fact or omit to include a material statement of fact necessary to make such financial information, in light of the circumstances under which such financial information was compiled, not misleading.'" (*Id.*). Notwithstanding that statements contained in the SOX Certifications and SOX sub-certifications are non-actionable (*see supra* Section III.B.iii), the Court finds that Schwartz's conduct in allegedly providing false information internally in connection with those certifications is probative of his scienter.

Finally, Plaintiffs allege that Schwartz, in his role as Cognizant's Chief Legal Officer, "was ultimately responsible for monitoring and ensuring Cognizant's compliance with anti-corruption laws." (*Id.* ¶ 131). As such, Plaintiffs contend that Schwartz was "responsible for monitoring and reporting the false compliance data included in the Sustainability Reports." (*Id.*).

Collectively, these allegations provide a strong inference that, at minimum, Schwartz acted recklessly by virtue of his participation in the bribery scheme and his subsequent failure to account

for the scheme's consequences in (i) his internal dealings with auditors, and (ii) his various internal reporting functions.  By advising co-conspirators to disguise the true nature of the bribe payments, the allegations do not support the inference that Schwartz was merely an innocent or negligent bystander.  Nor do Schwartz's alleged actions reflect corporate mismanagement.  Rather, the totality of the allegations above support the inference that Schwartz acted in "an extreme departure from the standards of ordinary care, [that] present[ed] a danger of misleading buyers or sellers that [was] either known . . . or is so obvious that [Schwartz] must have been aware of it."  *See Advanta*, 180 F.3d at 539 (internal quotation marks omitted); *cf. Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 510 (S.D.N.Y. 2017) (noting that "the lack of actual knowledge of bribery weighs down the [n]ew [c]omplaint's allegations, particularly when it comes to scienter"); *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 833–34 (S.D. Tex. 2016) (stating that to plead scienter, "[p]laintiffs may not rely on a general assertion that [d]efendants knew about a particular bribe or a specific accounting violation or internal control problem because of their positions in the company, because they are officers, or because of their day-to-day involvement in the company; instead there must be specific allegations of facts showing that they actually knew about a particular accounting violation, bribe, or internal control problem").

### iii.     Cognizant

Finally, Cognizant asks this Court to revisit its prior conclusion that Coburn's scienter may be imputed to Cognizant under the doctrine of corporate scienter.  (Cognizant Mov. Br. at 24–40; Cognizant Reply Br. at 7–15).  The doctrine of corporate scienter allows a plaintiff to plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant.  *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013).  There are currently three approaches that divide the Circuit Courts of Appeals on this

issue, including the narrow approach followed in the Fifth and Eleventh Circuits, the broad approach followed in the Second and Seventh Circuits, and the middle approach followed in the Sixth Circuit.  (*See* Op. 66–68).  Although the Third Circuit has held that a corporate defendant was not liable for violations of Section 10(b) because it failed to find primary liability on the part of any individual officers, *see In re Tyson Foods, Incorporated*, 155 F. App'x 53, 57 (3d Cir. 2005), the court has since made clear that it has not taken a position with respect to the corporate or collective scienter doctrine.  *See In re Hertz*, 905 F.3d at 121, n.6; *Rahman*, 736 F.3d at 246; *City of Roseville*, 442 F. App'x at 676 (declining to weigh in on the doctrine of corporate scienter because the "plaintiff did not plead sufficient facts, when viewed in their totality, to raise a strong inference of scienter as to the senior executives. [The company's] scienter, thus, cannot be based on the scienter of any individual.").

Under the narrow approach adopted in the Fifth and Eleventh Circuits, a plaintiff must identify an individual responsible for the alleged misstatement who also possessed the requisite mental state.  *See, e.g.*, *City of Roseville*, 442 F. App'x at 676.  In the Prior Opinion, Judge Walls declined to adopt the narrow approach, reasoning that it fails to encompass circumstances "where widespread corporate fraud cannot be connected to individual defendants at the pleading stage." (Op. at 68–69 (quoting *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481–82 (S.D.N.Y. 2006))).  Thus, as Judge Walls's explained, under this approach, corporations could theoretically evade liability by willfully turning a blind eye to fraudulent activity.  (*See id.* at 68).

By contrast, Judge Walls found that under either the broad approach adopted in the Second and Seventh Circuits or the "middle ground" approach employed by the Sixth Circuit, Coburn's scienter may be imputed to Cognizant.  (*Id.* at 69).  Under the broader approach, courts may impute the scienter of an individual defendant where "[t]here are sufficient allegations regarding the

pervasiveness of the fraud, the conscious misbehavior of the particular corporate employees, and the complicity of the corporate entities to find that [the corporate defendant] was aware of or recklessly disregarded the intentional misconduct." (*Id.* at 66 (quoting *In re Marsh*, 501 F. Supp. 2d at 482)). Judge Walls found that the allegations in the FAC were sufficient under this standard because the alleged bribery scheme involved Coburn, Cognizant's President, and "by Cognizant's own admission, [the scheme] involved other members of senior management." (*Id.* at 70). While Judge Walls recognized that an individual's knowledge may not be imputed to a corporate entity to hold it liable in every circumstance, the following allegations from the FAC supported the inference of pervasive fraud: "the breadth and duration of the alleged bribery scheme, the importance of SEZ licenses to the company, and the alleged involvement of [d]efendant Coburn and other unnamed members of senior management." (*Id.* at 72). Lastly, under the middle ground approach, Judge Walls found that Coburn's scienter "may be imputed to the corporation because he [was] a 'high managerial agent . . . who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance.'" (*Id.* at 69 (quoting *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014))).

Now, Cognizant asks this Court to adopt the narrow approach followed in the Fifth and Eleventh Circuits to conclude that because the allegations fail to establish that Coburn or Schwartz made any material misstatements, their scienter may not be imputed to Cognizant. (Cognizant Mov. Br. at 24–27). Plaintiffs assert that under any approach to corporate scienter, Coburn and/or Schwartz's scienter may be imputed to Cognizant. (Opp. Br. at 32–57). At the outset, the Court notes that based on the Prior Opinion's holding with respect to Coburn and this Court's analysis relating to Schwartz, neither of the individual defendants is responsible for "making" any of the allegedly material misstatements at issue under Rule 10b–5(b). While the Court allows a claim

-51-

for scheme liability to proceed against Schwartz under subsections (a) and (c), this theory is premised on his dissemination of material misstatements and alleged participation in the underlying bribery scheme.  Notwithstanding the implications of the scheme liability claim as it relates to Cognizant's scienter, the Court will assess whether it may impute Coburn and/or Schwartz's scienter to Cognizant under any approach to the corporate scienter doctrine.  For the reasons stated below, the Court concludes that scienter may be imputed to Cognizant under all three approaches to the corporate scienter doctrine that currently divide the Circuit Courts.[15]

### 1.        Narrow Approach

The Fifth and Eleventh Circuits have required a strong inference of scienter as to the individual corporate official or officials who make or issue the statement rather than generally to the collective knowledge of all the corporation's officers and employees.  *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004); *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004).  Specifically, under *Southland*, scienter may be imputed to a corporation by looking at "the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment."  365 F.3d at 366.

Courts that have applied the "furnish information" standard under *Southland* have imputed an individual's scienter to a corporation where that person was *not* responsible for making any of the alleged misstatements, but supplied misinformation internally to other corporate individuals

---

[15]        Because the Court concludes that scienter may be imputed to Cognizant under any approach, it declines, as Cognizant requests, to state that the choice of standard is outcome-dispositive in this case.  (*See* Cognizant Mov. Br. at 36 n.14).  The Court will entertain any future motion for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) following this Opinion.

who then made the allegedly false statements with that misinformation.  *See, e.g.*, *Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 882–85 (W.D. Tex. 2014); *see also Knurr v. Orbital ATK, Inc.*, 294 F. Supp. 3d 498, 503, 511–16 (E.D. Va. 2018).  For example, in *Lee*, the corporate officer hired to oversee all Chinese-based operations of Active Power, Inc. ("Active Power"), knowingly lied to the Chief Executive Officer and Chief Financial Officer regarding the identity of an entity in which Active Power had purportedly partnered with.  *Lee*, 29 F. Supp. 3d at 878–79.  This lie resulted in Active Power issuing public statements that touted its partnership with a different corporation, which would help its lagging trends in China and Asia.  *Id.*  Notwithstanding the defendant's argument that the rogue employee's scienter could not be imputed to the company, the court commented that "*Southland*'s 'furnish information' language is alive and well."  *Id.* at 884.  The court ultimately held that the employee's scienter could be imputed to Active Power.  *Id.* at 884–85.[16]

Similarly, in *Knurr v. Orbital ATK, Incorporated*, plaintiffs alleged that defendants failed to disclose substantial cost overruns on a specific contract and failed to record estimated contract losses as soon as they became evident.  294 F. Supp. 3d at 501.  In an amended Form 10-K, the corporate defendant disclosed that lower-level management had actively "suppress[ed] information . . . related to cost overruns and the override of certain controls due to pressure to achieve cost savings and maintain[] a targeted profit rate."  *Id.* at 516.  Under common law agency

---

[16]     Cognizant attempts to distinguish the corporate scienter holding in *Lee* from the instant case by claiming that the determination hinged on the employee's lie to mislead investors, which ultimately caused a substantial overstatement of Active Power's projected sales.  (Cognizant Reply Br. at 11 n.8).  Consequently, Cognizant argues that *Lee* is "a far cry from the allegations here, which involve quantitatively and qualitatively immaterial misstatements and no intent to deceive investor."  (*Id.*).  Significantly, however, the court in *Lee* did not qualify its corporate scienter holding on the materiality of the employee's alleged misstatements.  *See Lee*, 29 F. Supp. 3d at 881–85.  Furthermore, the imputation of scienter to a corporate defendant is not dependent on the gravity or impact of the alleged misstatements.  And for pleading purposes, Coburn and Schwartz possessed the requisite scienter, by, at minimum, recklessly disregarding the consequences of the bribery scheme they concocted and implemented.  (*See supra* Section III.C).

principles, the court stated that "a corporate defendant can be liable if an agent provides false information to the corporation and its officers intending that the corporation make a false or misleading statement." *Id.* at 512.  The court reasoned that even when lower-level employees provide false information to higher-level corporate officers "with the intent that those officers rely on that information, [it] has the same effect on stockholders and the market as if the manager personally made the misrepresentations or as if the corporate officers made the misrepresentations with fraudulent intent." *Id.*  In *Knurr*, the court found that the amended complaint alleged facts warranting a strong inference of scienter when lower-level employees furnished inaccurate information about the contract cost overruns and profit rates that were then given to corporate officers "for inclusion in SEC filings and other public reports." *Id.* at 516.  Accordingly, the court imputed the scienter of the lower-level employees to the corporation at the pleading stage.  *Id.*

Although Cognizant urges this Court to uphold the Prior Opinion's ruling that rejected the narrow approach to corporate scienter, Judge Walls did not have the benefit of analyzing new allegations contained in the SAC, specifically those allegations detailing the KITS Facility bribery scheme.  (*See* SAC ¶¶ 89–131).  The Court finds that the additional allegations are sufficient at the pleading stage to meet *Southland*'s "furnish information" standard.

Notably, Cognizant does not contest that the Fifth Circuit's standard may be satisfied when an individual *furnishes* information for inclusion in public statements.  (Cognizant Reply Br. at 11).  However, it argues that under *Pipefitters Local Number 636 Defined Benefit Plan v. Zale Corporation*, 499 F. App'x 345 (5th Cir. 2012), the Court cannot find that Coburn furnished information at the pleading stage because there are no alleged facts suggesting that Coburn or Schwartz intended to defraud investors.  (Cognizant Mov. Br. at 33; Cognizant Reply Br. at 10).  Similar to the present case, *Pipefitters* involved alleged misstatements that were not purportedly

made by any individual defendant who also possessed scienter. *Id.* at 351. However, the defendant corporation's Vice President of marketing, a non-party in the action, had allegedly caused the company to record advertising costs as pre-paid when those costs should have been expensed in the period during which they were incurred. *Id.* at 347. The district court concluded that the more compelling inference was that the Vice President of marketing was "acting under the motivation to make the Marketing Department appear to be efficient, organized, and well-managed, and not that she intended to initiate company-wide fraud." *Id.* at 348. The Fifth Circuit ultimately declined to disturb the district court's finding: the alleged facts did not suggest that the Vice President of marketing was "even aware her actions could potentially lead to fraudulent financial statements on behalf of the entire company." *Id.* at 348 & 351. Moreover, the defendant in *Zale* declined to challenge the district court's assessment that the Vice President of marketing "was not severely reckless to the possibility that her false information might cause Zale to release misleading financial statements." *Id.* at 351.

This Court finds that Cognizant's argument under *Zale* is misplaced. First, *Zale* is inapposite because the allegations with respect to the Vice President of marketing did not involve an underlying bribery scheme or fraud. *See generally id.* The allegations surrounding the alleged bribery scheme, particularly Coburn's involvement in devising and implementing the scheme, and Schwartz's advice that the reimbursement request should not stand out, are sufficiently distinguishable from the alleged facts in *Zale*. The alleged bribe payments themselves—disguised as legitimate change order requests—are indicative of Coburn's intent to perpetrate a fraud by way of concealing the true nature of the bribe payments as *bona fide* expenditures. At minimum, the allegations support that Coburn acted recklessly by ignoring the full ramifications of the faulty change order requests, specifically in Cognizant's financial statements. Thus, unlike the corporate

executive in *Zale*, Coburn was "aware [or at least reckless in that his] actions could potentially lead to fraudulent financial statements on behalf of the entire company."  *See* 499 F. App'x at 348; (*see also* SAC ¶¶ 116–17 (noting that Coburn, "having served as Cognizant's CFO . . . knew that these actions would cause Cognizant to improperly record the illicit payments in Cognizant's books and records as *bona fide* construction expenses . . . . [and that] the bribery scheme would also cause Cognizant's publicly reported financial statements to be falsified.")).  Moreover, as the court stated in *Lee*, the fact that the Fifth Circuit in *Zale* even evaluated whether the Vice President of marketing acted with scienter means that "imputation is permissible from those who merely 'furnish information,'" because, like Coburn and Schwartz, she was not found to have uttered any alleged misstatements.  *Lee*, 29 F. Supp. 3d at 883.

Here, the allegations tied to Coburn create a stronger inference that, at minimum, he furnished information under *Southland* for inclusion in Cognizant's financial misstatements. Plaintiffs allege that Coburn was responsible for personally approving payments over $500,000 to Cognizant's contractor for reimbursement of unanticipated costs associated with the parties' scope of work agreement.  (SAC ¶ 94).  These requests were known as variation claims or change order requests.  (*Id.*).  Before March 2015, CC#1 (Cognizant's VP of Administration) allegedly "instructed a co-conspirator who was a member of Cognizant's real estate group to create a fake version of the 'Variations List Discussion Document' that replaced the entire $3.7 million claim for 'approvals/campus regularization' (which included the $2.5 million 'statutory approvals' request) with eleven previously-rejected claims worth roughly the same amount."  (*Id.* ¶ 109). Plaintiffs allege that on January 15, 2015, Coburn received change order requests and supporting spreadsheets to approve the agreed-upon bribe payments, and on February 3, 2015, Coburn sent an email in which he stated that these requests were preliminarily "approved."  (*Id.* ¶ 110).  Coburn

was allegedly informed by a co-conspirator within Cognizant that certain line items in the document were used to conceal the bribe payments. (*Id.*). On or about March 11, 2015, Coburn allegedly proceeded to falsify "a spreadsheet and related approvals" that incorporated L&T's false change order requests made in connection with the KITS Facility bribe payments. (*Id.* ¶ 111). Approximately two days later, Coburn formally authorized the bribe payments to L&T as disguised change order requests in an email sent to Cognizant's finance unit. (*Id.* ¶ 112). "Based on Coburn's approvals, Cognizant issued several separate payments to L&T to cover the cost of L&T's change order requests between March 2015 and January 2016 that included approximately $2 million for the bribe and $500,000 for the additional payment for paying the bribe." (*Id.* ¶ 113). Ultimately, having previously served as Cognizant's Chief Financial Officer, Coburn "knew that these actions would cause Cognizant to improperly record the illicit payments in Cognizant's books and records as *bona fide* construction expenses . . . . [and that] the bribery scheme would also cause Cognizant's publicly reported financial statements to be falsified." (*Id.* ¶¶ 116–17). Coburn's approvals "were used to generate Cognizant's Class Period financial statements and earnings releases." (*Id.* ¶ 117).

Collectively, these allegations reflect that Coburn ultimately furnished information that materially altered Cognizant's financial statements. Indeed, Plaintiffs allege that Coburn's approval of the phony change order requests caused "the repayment to be falsely recorded in Cognizant's books and records as *bona fide* construction costs." (*Id.* ¶¶ 97, 99 & 117). This inference is furthered by Cognizant's own admission in its November 7, 2016 Form 10-Q, stating that "certain members of senior management may have participated in or failed to take action to prevent the making of potentially improper payments by either overriding or failing to enforce the controls . . . in connection with permits for certain facilities in India. As a result . . . a material

weakness existed as of December 31, 2015, and continues to exist in subsequent interim periods, in our internal control over financial reporting." (*Id.* ¶ 150).

Moreover, based on the amended allegations, it is also plausible that Coburn and/or Schwartz furnished information for inclusion in Cognizant's Sustainability Reports that relate to the actionable misstatements reporting no incidents of corruption in 2014 and 2015. (*See id.* ¶¶ 128 & 202 (stating that Cognizant reported "'no incidents' of corruption" in light of its anticorruption compliance audit); *id.* ¶ 209 (reporting "no incidents [of corruption] in 2015")). For example, Plaintiffs claim that Coburn and Schwartz provided false certifications during the Class Period which ultimately stated that they complied with Cognizant's "anti-corruption policy the maintenance of accurate books and records, and compliance with all laws, rules and regulations applicable to the Company in India and wherever Cognizant conducted business." (*Id.* ¶ 129). Yet, prior to providing these allegedly false certifications, both Coburn and Schwartz allegedly participated in implementing and devising the bribery scheme beginning in April 2014, and Coburn began approving false change order requests as early as February 2015. (*Id.* ¶¶ 96 & 110–13). Thus, it is plausible that the allegedly false certifications by Coburn and Schwartz were used to compile the actionable misstatements contained in Cognizant's 2014 and 2015 Sustainability Reports, especially if, as Plaintiffs allege, the certifications stated that the defendants adhered to Cognizant's anti-corruption policy. (*See id.* ¶ 129).

In addition, the District of Delaware's decision in *City of Roseville*, which was affirmed by the Third Circuit, supports this Court's finding. *See City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 403 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011). There, plaintiffs argued that the court should have found a strong inference of scienter as to the corporate defendant because at least two managers who conspired in a price-fixing scheme and

-58-

possessed scienter "participated in the making of" the misstatements by the corporation and other individual defendants. *Id.* at 403. The court rejected plaintiffs' arguments because there were no allegations that other senior executives' false or misleading statements must have been based on information provided by the co-conspirators. *Id.* Plaintiffs had no evidence that any pricing figures or reports were prepared by the co-conspirators or any other individual from the company. *Id.* Although plaintiffs relied on information from a confidential witness, that witness stated the reports with misinformation were created internally at another company that was not connected to the defendant corporation. *Id.* at 397–98 & 403.

Significantly, unlike in *City of Roseville*, Cognizant admits that Coburn "provided information to other, unnamed Cognizant employees who then drafted the [allegedly misleading] financial statements without scienter." (Cognizant Mov. Br. at 31). Here, Plaintiffs allege that Coburn sent an email to Cognizant's finance unit in which he authorized illegitimate payments to L&T. (SAC ¶ 112). The alleged act of furnishing information for the drafters of Cognizant's financial statements—that Coburn allegedly knew to be false in furtherance of the scheme—is sufficient to meet the corporate scienter standard articulated by the Fifth Circuit at the pleading stage. *See City of Roseville*, 713 F. Supp. 2d at 403; *see also Pipefitters*, 499 Fed. App'x 345; *Knurr*, 294 F. Supp. 3d 498, 511–16; *Lee*, 29 F. Supp. 3d at 881–85; *Kerr v. Exobox Techs. Corp.*, 2012 WL 201872, at *14 (S.D. Tex. Jan. 23, 2012) (stating that "plaintiffs need only assert that [an individual] furnished the information or language for inclusion in order to attribute his scienter to [the corporation]"). Accordingly, the Court finds that Coburn's scienter may be imputed to Cognizant under the narrow approach.

### 2.   Broad Approach

Conversely, the Second and Seventh Circuits have adopted a broader approach to the

doctrine of corporate scienter.  *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *see Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).  Under this standard, to allege scienter of a corporate defendant, a plaintiff must plead facts that "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Dynex*, 531 F.3d at 195.  In *Dynex*, the Second Circuit stated that "the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant."  *Id.*  However, the court acknowledged that "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant."  *Id.*; *see also Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 371 (S.D.N.Y. 2012).  For example, in *Bank of America*, the Court upheld, on a motion for reconsideration, its holding that the allegations were sufficient to plead scienter, notwithstanding that the plaintiff failed to allege scienter with respect to any individual defendant.  874 F. Supp. 2d at 370–72.

Cognizant maintains that even under the broader approach, the Court may not impute scienter to Cognizant because the Government Filings and the SAC depict isolated misconduct and "immaterial payments" that are not indicative of widespread corporate fraud.  (Cognizant Mov. Br. at 36–37; Cognizant Reply Br. at 13).  Plaintiffs argue that while it is possible to impute scienter to a corporation without specifically naming an individual that possessed scienter, allegations of widespread fraud are not required when, as here, named senior officers are alleged to have had the requisite scienter.  (Opp. Br. at 53–54).  Here, because the Court finds a strong inference of scienter as it relates to Coburn and Schwartz, it need not analyze, in the traditional sense of the broader approach, whether some *unknown* individual at the company may have possessed scienter.  *See, e.g.*, *Li v. Aeterna Zentaris, Inc.*, No. 14-7081, 2016 WL 3583821, at *2 (D.N.J. June 30, 2016)

(upholding, on a motion for reconsideration, the imputation of scienter to a corporate entity where the court previously held that plaintiffs adequately alleged scienter with respect to its President and Chief Executive Officer).  In any event, the Court agrees with Plaintiffs and Judge Walls's prior analysis in that the collective allegations reflect a scheme which plausibly extended beyond those named senior management in the SAC.  (*See* Op. at 70–72 (stating that "[t]here is a strong inference that someone involved with the making of the [financial misstatements] and the Sustainability Reports knew of their falsity" and that the "bribery scheme required multiple employees across the globe and involved the President and other members of senior management"); *see also* Opp. Br. at 52–54).

In the Third Circuit's opinion in *City of Roseville*, the court declined to weigh in on the doctrine of corporate scienter because it found that in any event, plaintiffs did not plead sufficient facts, when viewed in their totality, to raise a strong inference of scienter as to the senior executives who made the alleged misrepresentations.  442 F. App'x at 676.  The underlying facts concerned a price-fixing conspiracy in the corporate defendant's shipping business from Puerto Rico to the United States, for which three members of its Puerto Rico management team had pled guilty to criminal charges.  *Id.* at 673.  The corporation itself also pled guilty to price-fixing charges under the doctrine of respondeat superior liability.  *Id.*  The district court held that the allegations gave rise to a strong inference of scienter with respect to the three co-conspirators, but these co-conspirators did not make any of the allegedly false statements.  *Id.* at 674.  Conversely, the allegations sufficiently alleged that other senior executives made material misstatements, but they did so without scienter.  *Id.* at 673–74.

In the *City of Roseville*, the Third Circuit suggested that plaintiffs could invoke the corporate-scienter doctrine under the broader approach in unique and extraordinary circumstances.

*Id.* at 676–77.  *City of Roseville* cited to *Bridgestone Corporation*, which involved a tire manufacturer and Firestone, the manufacturer's subsidiary; these entities allegedly possessed information that their tires had been rupturing and causing a significant number of rollover accidents.  *See City of Monroe Emps.' Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 656–59 (6th Cir. 2005).  In *Bridgestone*, the companies were involved "in a variety of tactics, such as a large-scale secret settlement" with a car insurance company, to keep the extent of the tire problems from investors as well as national and foreign safety regulators.  *City of Roseville*, 442 F. App'x at 676; *see Bridgestone Corporation*, 399 F.3d at 658–59.  In *City of Roseville*, the Third Circuit posited that the alleged conduct in *Bridgestone* was extraordinary, in line with the following hypothetical articulated by the Seventh Circuit:  "Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero.  There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false."  442 F. App'x at 676 (quoting *Tellabs, Inc.*, 513 F.3d at 710).  Ultimately, the Third Circuit concluded that even if "it were possible to plead scienter against a corporation without pleading scienter against an individual," the facts presented in light of the price-fixing conspiracy were "a far cry from those in *Bridgestone* or in the Seventh Circuit's hypothetical."  *Id.* at 676–77.  Although the Third Circuit upheld the district court's opinion that declined to impute scienter under the Fifth Circuit's narrow standard, it in essence considered the broader approach by analyzing the facts before it against the facts in *Bridgestone*.  *Id.* at 677.  Thus, it appears that the Third Circuit has not foreclosed application of the broader approach in this district.

This Court finds that the alleged facts in the SAC are distinguishable from the allegations in *City of Roseville* where only three co-conspirators allegedly possessed scienter and carried out

the price-fixing scheme.  For example, the bribery scheme at issue here allegedly involved at least

four of Cognizant's corporate executives who participated in devising and implementing the KITS

Facility bribery scheme, including Coburn (Cognizant's President), Schwartz (Cognizant's

Executive Vice President, Chief Legal and Corporate Affairs Officer), Thiruvengadam

(Cognizant's Chief Operating Officer), and CC#1 (Cognizant's Vice President of Administration).

(SAC ¶¶ 33–34 & 36–37; Opp. Br. at 5 & 47).  In addition, CC#1 allegedly involved a fifth

individual from Cognizant's real estate group, who was instructed to "create a fake version of the

'Variations List Discussion Document'" that ultimately changed the designation of the "statutory

approval" change order requests to eleven previously-rejected claims.  (SAC ¶ 109).

Moreover, unlike *City of Roseville*, the allegations connected to Former Employee 1 allow

the Court to plausibly infer that additional executives at Cognizant became aware of the illicit bribe

payments, which further supports the inference that widespread or pervasive fraud existed within

Cognizant.  FE1 was Cognizant's former Manager, Internal Audit & SOX Compliance, between

November 2014 and December 2015.  (*Id.* ¶ 82).  FE1 was responsible for "overseeing an FCPA

compliance audit of Cognizant's Indian operations" that began in September 2014 and ended in

May 2015.  (*Id.*).  FE1 "reported that the 2015 audit found evidence that payments related to

procuring SEZ licensing were being made to Indian government personnel and that these payments

were being improperly classified in Cognizant's internal systems."  (*Id.* ¶ 83).  FE1 also "reported

that the 2015 audit turned up several invoices from [Cognizant's] contractor that explicitly sought

reimbursement for payments for licenses to operate in SEZs in Bangalore *and elsewhere*."  (*Id.*

(emphasis added)).  The reimbursement payments "were made to what appeared to be a private,

non-governmental entity."  (*Id.*).  Moreover, according to FE1 "numerous payments to Indian

government-affiliated personnel had been improperly classified as lease payments *or otherwise*

*characterized in a way that was inconsistent with the nature of the actual transaction*." (*Id.* ¶ 85 (emphasis added)). Apparently, these payments were discovered by the audit team "'fairly easily,' by running a few searches through [Cognizant's] electronic database." (*Id.* ¶ 84). Significantly, FE1 reported the 2015 audit findings described above to "Cognizant's Associate Vice President of Audit, Abraham Verghese, for inclusion in a formal final audit report." (*Id.* ¶ 87). FE1 "further reported that he/she was included on emails in which Verghese raised these findings with Cognizant's Assistant Vice President of Global Compliance & Ethics, Misty Pederson []—one of Cognizant's most senior compliance executives." (*Id.*).

The allegations attributed to FE1 support the inference that other high-level executives at Cognizant, beyond the four identified co-conspirators, became aware of the alleged fraud during the Class Period.[17] These allegations also negate the contention that the alleged fraud was "isolated outlier conduct involving only a few former employees" who concealed the alleged fraud from corporate management, especially considering the alleged ease in which the illicit payments were discovered by the audit team. (*See* Cognizant Mov. Br. at 26 n.11 & 36; *see also* SAC ¶ 84). Most significantly, FE1 allegedly reported the 2015 audit findings to Cognizant's Associate Vice President of Audit, who then included those findings in emails with Misty Pederson, Cognizant's Assistant Vice President of Global Compliance & Ethics. (SAC ¶ 87). Both Abraham Verghese and Misty Pederson were in elevated executive positions at Cognizant. (*See id.*). Specifically, Plaintiffs allege that Misty Pederson was "one of Cognizant's most senior compliance executives." (*Id.*). And, as Plaintiffs submit, the new allegations and Government Filings only serve to bolster

---

[17]   To be clear, the 2015 audit ended in May 2015, and FE1 was employed in his/her capacity as Manager, Internal Audit & SOX Compliance until December 2015. (SAC ¶ 82). Thus, the Court can plausibly infer that FE1 reported the findings of the 2015 audit sometime between May 2015 and December 2015, plausibly before some of the alleged misstatements were made during the Class Period, which extended from February 27, 2015 to September 29, 2016. (*Id.* ¶ 329; *see* Op. at 42–43).

the allegations attributed to FE1.  (*See* Tr. at 154:17–23 & 156:4–8).  Ultimately, whether these allegations are sufficient to prove liability is not the question before the Court.  Rather, for pleading purposes at this juncture, the totality of allegations support Judge Walls's prior finding that "[t]he alleged bribery scheme was widespread throughout the company and involved multiple personnel."  (*See* Op. at 70).

        In addition, Cognizant attempts to analogize the instant matter to *Christian v. BT Group PLC*, No. 17-497, 2018 WL 3647213, at *9 (D.N.J. Aug. 1, 2018), a case where Judge McNulty declined to impute scienter to the defendant corporation because it was "at least as likely that key individuals at [the defendant company] were unaware of the fraud, were not reckless in ignoring it, and reacted appropriately when the relevant facts came out."  (*See* Cognizant Reply Br. at 13 n.10).[18]  However, Judge McNulty's decision hinged on facts that are very different than those alleged here.  *See generally Christian*, 2018 WL 3647213.  Most significantly, *Christian* was a putative securities class action that involved the relationship between a parent corporation and its subsidiary.  *Id.* at *1.  The subsidiary allegedly knew about the underlying fraud, and plaintiffs claimed that individuals at the parent corporation knew or were reckless in ignoring the subsidiary's fraudulent practices.  *Id.*  Central to the court's decision, Judge McNulty specifically noted that the "Third Circuit has declined to impute the scienter of a subsidiary to a parent."  *Id.* (citing *Rahman*, 736 F.3d at 246); *see also Pathfinder Mgmt., Inc. v. Mayne Pharma, Inc.*, No. 6-2204, 2009 WL 4250061, at *9 (D.N.J. Nov. 25, 2009) (stating that the "knowledge and actions of a subsidiary company's agents cannot be imputed to the parent company").  Here, unlike *Christian*, a parent-subsidiary relationship is not a factor in the Court's scienter analysis.  Rather,

---

[18]     In Cognizant's letter to the Court dated May 5, 2020 (D.E. No. 124), Cognizant cited to Judge McNulty's latest decision in the same case.  *See Christian v. BT Group. PLC*, No. 17-497, 2020 WL 1969941 (D.N.J. Apr. 24, 2020).  Judge McNulty again declined to impute scienter to the corporation for the same reasons stated in the court's initial opinion.  *Id.* at *8–9.

the allegations indicate that some of Cognizant's top corporate executives participated in developing and implementing the bribery scheme.  (*See* SAC ¶¶ 33–34; 36–37 & 89–113; Opp. Br. at 5 & 47).  Accordingly, Cognizant's reliance on *Christian* is unpersuasive.

Similarly, Cognizant's broad characterization of *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) is inapposite.  (*See* Cognizant Reply Br. at 14 n.11).  Cognizant contends that *Glazer* rejected the identical argument proffered here because the plaintiff "failed to connect the actual makers of the alleged misstatements to knowledge of FCPA violations and thus failed to allege corporate scienter under [the broader approach]."  (*Id.*).  Unlike the present allegations, however, *Glazer* involved three alleged warranty misstatements contained within one sixty-page legal document that stated "the company was in compliance 'with all laws.'"  *See Glazer*, 549 F.3d at 745.  The court acknowledged that under plaintiff's theory, it would be able to impute scienter to the company if *any* employee knew that the company violated any law.  *Id.* Although the court held that plaintiff must plead scienter as to an individual who made one of the three misstatements in the legal document, it ultimately confined its holding to "the limited nature and unique context of the alleged misstatements in [the] case."  *Id.*  Here, by contrast, the alleged misstatements at issue extend beyond three warranties in one sixty-page legal document.  Rather, on multiple separate occasions during the 19-month Class Period, Cognizant allegedly (i) touted the benefits of its SEZ licenses, (ii) stated that there was no reported corruption within the company, and (iii) overstated its financial earnings in light of the underlying bribery scheme, which caused it to capitalize bribe payments that should have been expensed.  (*See* SAC ¶¶ 167–93, 202–04 & 282–84).

Accordingly, for the reasons articulated above, this Court finds that the allegations satisfy a strong inference of scienter as to Cognizant under the broad approach to the corporate scienter

doctrine.

### 3.      Middle Approach

Lastly, under the middle approach articulated in *In re Omnicare, Incorporated Securities Litigation*, "[t]he state(s) of mind of any of the following are probative for purposes of determining whether a misrepresentation made by a corporation was made by it with the requisite scienter under Section 10(b):"

> (a)    The individual agent who uttered or issued the misrepresentation;
>
> (b)    Any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance;
>
> (c)    Any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance.

769 F.3d 455, 476 (6th Cir. 2014).  In the Prior Opinion, Judge Walls focused on subsection (c) in concluding that Coburn's scienter could be imputed to Cognizant as a "high managerial agent . . . who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance."  (Op. at 69).  Thus, Judge Walls found "a strong inference that as President of the company, [d]efendant Coburn either had a role in preparing the statements at issue or that, if he did not actually participate in their preparation, he became aware that they misstated earnings and touted SEZ licenses and internal compliance measures, but nevertheless 'tolerated the misrepresentation.'"  (*Id.* at 70).

Cognizant maintains that the Sixth Circuit's subsequent decision in *Doshi v. General Cable Corporation*, 823 F.3d 1032 (6th Cir. 2016), clarified *Omnicare*'s meaning of the term

"probative," such that when an individual does not make any alleged misstatements, only his or her knowledge may be imputed to the corporation, not the person's state of mind. (Cognizant Mov. Br. at 37–38). Under *Doshi*, the Sixth Circuit proceeded to determine whether the state of mind of an individual who did not make any alleged misstatements could be imputed to the corporate defendant by examining a non-exhaustive list of factors set forth in *Helwig v. Vencor, Incorporated*, 251 F.3d 540, 552 (6th Cir. 2001). *Doshi*, 823 F.3 1040–42. Plaintiffs argue that this Court need not impute corporate scienter to Cognizant utilizing the *Helwig* factors because they have not been adopted by the Third Circuit. (Opp. Br. at 49; Tr. 172:23–173:6).

As an initial matter, Plaintiffs are correct in that the *Helwig* factors are not binding on this Court. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 344 n.60 (D.N.J. 2007) (stating that "[p]laintiffs fail[ed] to observe that, in *Helwig*, the . . . Sixth Circuit adopted a list of nine factors indicative of scienter, . . . . The Court of Appeals for Third Circuit, however, has not directed district courts in this Circuit to apply such an analysis [under *Helwig*]."). Nor has this Court located any decision in the Third Circuit applying the *Helwig* factors under *Omnicare*'s corporate scienter standard. Thus, this Court adopts the analysis and holding articulated in the Prior Opinion as it relates to the middle ground approach. (*See* Op. at 69–70).

Furthermore, even if the Court were to consider the non-exhaustive list of *Helwig* factors,[19]

---

[19]    The *Helwig* factors that the Sixth Circuit considers probative of scienter include:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending stock sale; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

the imputation of scienter to Cognizant would nonetheless be supported.  Particularly, the Court

finds that factors four and five are supported by the allegations and are probative of Cognizant's

scienter at the pleading stage.  *See Helwig*, 251 F.3d at 552 (finding that the list of factors, "while

not exhaustive, [is] at least helpful in guiding securities fraud pleading).  Here, there are most

certainly allegations pointing to "evidence of bribery by [multiple] top company official[s],"

including Coburn, Schwartz, Thiruvengadam, and CC#1.  *See id.*; (*see, e.g.*, SAC ¶¶ 96–97).

Second, Plaintiffs also allege the "existence of an ancillary lawsuit charging fraud by [Cognizant]

and [Cognizant's] quick settlement of that suit."  *See Helwig*, 251 F.3d at 552; (*see, e.g.*, SAC ¶¶

18, 165 (stating that in the SEC Order "Cognizant agreed to pay $25 million to settle claims that

it had violated the securities laws in connection with the bribery scheme; cease-and-desist future

violations; and report to the SEC periodically for two years on its remediation and implementation

of enhanced compliance measures . . . .") & 297).  Moreover, unlike *Doshi*, there is no "disparity

between [Coburn's or Schwartz's] knowledge and what [Cognizant] publicly misstated," such that

the force behind these factors is not reduced.  *See Doshi*, 823 F.3d 1042.  For all of these reasons,

scienter may also be imputed to Cognizant under the middle ground approach.

## D.     Section 20(a) Claims

Finally, Count II of the SAC asserts claims under Section 20(a) of the Exchange Act against

Coburn and Schwartz.  Section 20(a) creates a cause of action against individual defendants who

are "control persons" of corporations that are guilty of securities fraud.  *Jones v. Intelli-Check,*

*Inc.*, 274 F. Supp. 2d 615, 644 (D.N.J. 2003).  Section 20(a) states that:

> [e]very person who, directly or indirectly, controls any person liable
> under any provision of this chapter or of any rule or regulation
> thereunder shall also be liable jointly and severally with and to the
> same extent as such controlled person to any person to whom such
> controlled person is liable, . . . unless the controlling person acted in

_____

*Helwig*, 251 F.3d at 552.

> good faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Plaintiffs alleging a violation under Section 20(a) "must plead facts showing:

(1) an underlying violation by the company; and (2) circumstances establishing defendant's control

over the company's actions." *Jones*, 274 F. Supp. 2d at 644–45.

Because the Court finds that Plaintiffs adequately alleged an underlying violation of

Section 10(b) against Cognizant, the remaining issue is whether Plaintiffs sufficiently allege that

Coburn and Schwartz are "controlling persons" under Section 20(a).  The term "control" has been

defined as "the possession, direct or indirectly, of the power to direct or cause the direction of the

management and policies of a person, whether through the ownership of voting securities, by

contract, or otherwise." *Rochez Bros. v. Rhoades*, 527 F.2d 880, 890 (3d Cir. 1975) (quoting 17

C.F.R. § 240.12(b)–2(f)).  Thus, "a plaintiff must demonstrate [that] the defendant had actual

power or influence over the allegedly controlled" company.  *MobileMedia*, 28 F. Supp. 2d at 940

(internal quotation marks omitted).

Both Coburn and Schwartz contest that they are control persons under Section 20(a).

(Coburn Mov. Br. at 2–3; Coburn Reply Br. at 2–3; Schwartz Mov. Br. at 32–34).  Although the

Court agrees that an individual's position at a corporation is insufficient, standing alone, to

establish whether he or she is a "control person" (*see* Coburn Mov. Br. at 2–3; Coburn Reply Br.

at 1–2; Schwartz Mov. Br. at 32–34), the allegations here extend beyond the mere corporate titles

held by Coburn and Schwartz.  *See In re DVI, Inc. Sec. Litig.*, 919 F. Supp. 2d 498, 510–11 (E.D.

Pa. 2013) (holding oneself out as "senior vice president [was] not probative of his actual power to

direct or cause the direction of the management and policies" at the corporation).  In *DVI*, the

record lacked support that the individual was responsible for the corporation's operations in any

way.  *Id.* at 511.

Here, the Court finds that Plaintiffs adequately allege how Coburn and Schwartz had "power or influence" over Cognizant's operations in addition to alleging the executive positions they held. *See MobileMedia*, 28 F. Supp. 2d at 940. Most notably, Plaintiffs maintain that "Coburn was responsible for personally approving any payments in excess of $500,000 that L&T requested from Cognizant for reimbursement of unanticipated costs associated with the agreed-upon scope of work (known as 'variation claims' or 'change order requests')." (SAC ¶ 94). Contrary to Coburn's representation (*see* Coburn Mov. Br. at 3), this allegation also supports the inference that Coburn had control or influence over the bribery payment transactions and financial misstatements at issue. To be clear, if Coburn did not have the alleged authority to approve such requests or declined to exercise his authority over the illegitimate reimbursement requests, it follows that Cognizant's books and records would not have been misstated. (*See* SAC ¶ 116 ("Coburn further knew that the bribery scheme would cause Cognizant to falsely and improperly record the payments in Cognizant's books and records as *bona fide* expenses related to construction of the KITS Campus because Coburn personally approved the fraudulent change orders.")). As Plaintiffs argue, Coburn makes an "irrelevant proposition, given that [he] directed the bribery scheme at issue." (Opp. Br. at 76). Thus, the Court finds that the allegations adequately state how Coburn "played a role in the alleged nondisclosures." *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 561 (D. Del. 2002), *aff'd*, 357 F.3d 322 (3d Cir. 2004).

Similarly, Plaintiffs allege that Schwartz actively participated on the videoconference calls when the scheme was conceived, specifically by advising co-conspirators that reimbursement payments to L&T for the bribe "should not stand out in the change order request." (*See* SAC ¶ 97). Moreover, by virtue of his job responsibilities as Cognizant's Chief Legal Officer, Schwartz disseminated Cognizant's Forms 8-K, thereby demonstrating that Schwartz had the ability to exert

"power or influence" over Cognizant's operations.  (*Id.* ¶¶ 283–84).  Schwartz's "arguments to the contrary are questions of fact which are improper at the motion to dismiss stage."  *See Jones*, 274 F. Supp. 2d at 645.  Nor does Schwartz attempt to rebut any arguments made by Plaintiffs with respect to the Section 20(a) claim brought against him.  (*See generally* Schwartz Reply Br.).  Accordingly, the Court finds that these allegations are sufficient to allege that Schwartz was a "control person" under Section 20(a).

In addition, to ultimately succeed under a Section 20(a) claim, a defendant "must have been a culpable participant in the act or acts constituting the violation or cause of action."  *See Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013) (collecting cases) (internal quotations omitted).  However, as Judge Walls previously noted, district courts in the Third Circuit disagree as to "whether 'culpable participation' must be alleged to survive a motion to dismiss."  (Op. at 72 n.13).[20]  Moreover, "[c]ulpable participation may only be based on inaction if the plaintiff proves *both* knowledge of the underlying fraud and that the inaction was 'deliberate and done intentionally to further the fraud.'"  *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 397 (D. Del. 2016) (emphasis added); *accord Belmont*, 708 F.3d at 485.

The Court need not decide whether "culpable participation" must be pled to survive dismissal of the Section 20(a) claims in the instant case because the Plaintiffs' allegations would satisfy such a pleading requirement in any event.  Here, by virtue of Coburn's and Schwartz's alleged participation in and implementation of the bribery scheme, Plaintiffs adequately plead that both defendants had knowledge of the underlying bribery scheme.  (*See* SAC ¶¶ 96–97).  Lastly,

---

[20]     *Compare Jones*, 274 F. Supp. 2d at 645 ("[T]he overwhelming trend in this circuit" is that a plaintiff need not plead "culpable participation" to survive a motion to dismiss.), *with Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 397 (D. Del. 2016) ("[T]he heightened standard of the PSLRA requires that a claim under Section 20(a) state with particularity the circumstances of both the defendants' control of the primary violator, as well as of the defendants' culpability as controlling persons.") (internal quotations omitted).

for the reasons stated above with respect to each defendant's scienter (*see supra* Section III.C), the Court can infer that any subsequent inaction by Coburn and Schwartz was conducted with the requisite intent.  (*See* Op. at 73).  Thus, the Court finds that Plaintiffs' Section 20(a) claims against Coburn and Schwartz may proceed past the pleading stage.

## IV.    Conclusion

For the foregoing reasons, the Court DENIES the Defendants' motions to dismiss the SAC. An appropriate Order accompanies this Opinion.

<u>*s/Esther Salas*</u>
**Esther Salas, U.S.D.J.**