**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| IN RE COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION SECURITIES LITIGATION | Civil Action No. 16-6509 (ES) (CLW) |

**DECLARATION OF JOHN RIZIO-HAMILTON IN SUPPORT OF
(I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S
<u>MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES</u>**

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................................2

II. HISTORY OF THE ACTION ..........................................................................................5

    A.  Background .......................................................................................................... 5

    B.  Commencement of the Action and the Appointment of Lead Plaintiffs and
        Lead Counsel .......................................................................................................... 5

    C.  The Investigation and Filing of the Amended Complaint ...................................... 6

    D.  Union Substitutes BLB&G for Motley Rice, and BLB&G Continues as
        Sole Lead Counsel ................................................................................................ 8

    E.  Defendants' Motions to Dismiss the Amended Complaint ................................... 8

    F.  The Court's Ruling on the Motions to Dismiss and Cognizant's Petition
        for an Interlocutory Appeal .................................................................................. 12

    G.  The Department of Justice Indicts Defendants Coburn and Schwartz ................. 13

    H.  The Filing of the Second Amended Complaint ..................................................... 14

    I.  The Parties Conduct Discovery ............................................................................ 17

    J.  Interviews of Former Cognizant Employees ........................................................ 19

    K.  Work with Experts ................................................................................................ 19

    L.  The Parties Engage in Lengthy Arm's-Length Negotiations that Ultimately
        Culminate in the Proposed Settlement .................................................................. 20

    M.  The Court Grants Preliminary Approval to the Settlement .................................. 21

III. RISKS OF CONTINUED LITIGATION .....................................................................21

    A.  Risks Concerning Liability .................................................................................. 22

        1.  Material Misrepresentations.................................................................... 22

        2.  Scienter .................................................................................................... 24

    B.  Risks Related to Loss Causation and Damages .................................................... 25

    C.  Risks and Significant Delay Related to the Criminal Action ............................... 27

| | | |
|---|---|---|
| D. | Risks and Further Delays Related to Gathering Evidence in India ...................... 28 | |
| E. | The Settlement Amount Compared to Likely Damages that Could Be Proved at Trial ............................................................................................... 29 | |
| IV. | LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE ....................................... 31 | |
| V. | ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT .................................... 33 | |
| VI. | THE FEE AND EXPENSE APPLICATION ..................................................................... 35 | |
| | A. | The Fee Application ............................................................................................ 36 |
| | | 1. Lead Plaintiffs Have Authorized and Support the Fee Application ......... 37 |
| | | 2. The Time and Labor of Plaintiffs' Counsel ............................................. 37 |
| | | 3. The Skill and Experience of Plaintiffs' Counsel ..................................... 39 |
| | | 4. Standing and Caliber of Defendants' Counsel .......................................... 40 |
| | | 5. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases ................................. 40 |
| | | 6. The Reaction of the Settlement Class to the Fee Application .................. 42 |
| | B. | The Litigation Expense Application ..................................................................... 43 |
| VII. | CONCLUSION .............................................................................................................. 46 | |

I, JOHN RIZIO-HAMILTON, declare as follows:

1.      I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G").  BLB&G serves as counsel for Lead Plaintiffs Union Asset Management Holding AG ("Union"), Amalgamated Bank, as Trustee for the LongView Collective Investment Funds ("Amalgamated"), and the Fire and Police Pension Association of Colorado ("Colorado FPPA," and, with Union and Amalgamated, "Lead Plaintiffs") and Lead Counsel for the Settlement Class in the above-captioned action (the "Action").[1]  I have personal knowledge of the matters set forth herein based on my active participation in all aspects of the prosecution and settlement of the Action.

2.      I submit this declaration in support of: (i) Lead Plaintiffs' motion, pursuant to Federal Rule of Civil Procedure 23(e), for final approval of the proposed Settlement and the proposed plan of allocation of Settlement proceeds (the "Plan of Allocation"); and (ii) Lead Counsel's motion for an award of attorneys' fees and litigation expenses (the "Fee and Expense Application").

3.      In support of these motions, Lead Plaintiffs and Lead Counsel are also submitting: (i) the exhibits attached hereto; (ii) the Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum"); and (iii) the Memorandum of Law in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Fee Memorandum").

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated September 2, 2021 (ECF No. 165-3) (the "Stipulation"), which was entered into by and among (i) Lead Plaintiffs, on behalf of themselves and the Settlement Class, and (ii) defendant Cognizant Technology Solutions Corporation ("Cognizant" or "the Company"); Cognizant's former President, Gordon Coburn ("Coburn"), and Cognizant's former Chief Legal Officer, Steven Schwartz ("Schwartz" and, with Cognizant and Coburn, "Defendants").

## I.      INTRODUCTION

4.      The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $95,000,000 for the benefit of the Settlement Class.  As detailed herein, Lead Plaintiffs and Lead Counsel believe that the proposed Settlement represents an excellent result and is in the best interests of the Settlement Class.  Lead Plaintiffs would have faced significant risks in establishing Defendants' liability and proving damages in the Action, and the proposed $95 million Settlement represents a substantial percentage of the maximum damages that Lead Plaintiffs reasonably believed could be established at trial.  Thus, as explained further below, the Settlement provides a considerable benefit to the Settlement Class by conferring a substantial, certain, and immediate recovery while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover nothing or less than the Settlement Amount after years of additional litigation and delay.

5.      The proposed Settlement is the result of extensive efforts by Lead Plaintiffs and Lead Counsel, which included, among other things detailed herein: (i) conducting an extensive investigation into the alleged fraud; (ii) drafting a detailed Amended Complaint based on this investigation; (iii) preparing extensive briefing in opposition to the Original Defendants' motions to dismiss the Amended Complaint; (iv) opposing Cognizant's motion for an interlocutory appeal of the partial denial of its motion to dismiss the Amended Complaint; (v) preparing a Second Amended Complaint to incorporate new information revealed by the criminal charges brought by the Department of Justice ("DOJ") against Coburn and Schwartz and related actions brought by the Securities Exchange Commission ("SEC'); (vi) successfully opposing Defendants' motions to dismiss the Second Amended Complaint through extensive briefing and oral argument; (vii) undertaking substantial fact discovery efforts—to the extent permitted by the partial stay

resulting from the criminal action against Coburn and Schwartz—which resulted in production of more than 600,000 pages of documents from Cognizant; (viii) successfully opposing Cognizant's motion for an interlocutory appeal of the denial of the motions to dismiss the Second Amended Complaint; (ix) consulting extensively with experts and consultants, including experts in the areas of loss causation and damages and an expert on the Foreign Corrupt Practices Act ("FCPA"); and (x) engaging in extended arm's-length settlement negotiations to achieve the Settlement, which included a mediation with former United States District Judge Layn Phillips.

6.      As a result of the efforts summarized in the foregoing paragraph, and more fully set forth below, Lead Plaintiffs and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they reached an agreement to settle in August 2021.   Moreover, as noted, the Settlement was achieved only after extended arm's-length negotiations between the Parties, including the mediation before Judge Layn Phillips. The Settlement is the product of a mediator's recommendation issued by Judge Phillips.

7.      In light of the benefits of the Settlement and the significant risks, costs, and delays of further litigation, Lead Counsel believes that the Settlement represents a very favorable outcome for the Settlement Class and that its approval would be in the best interests of the Settlement Class. In addition, all three Lead Plaintiffs—each of which is a sophisticated institutional investor that was actively involved in supervising the litigation—have endorsed the Settlement and believe it provides an excellent recovery for the Settlement Class. *See* Declaration of Jochen Riechwald on behalf of Union ("Riechwald Decl.") (attached as Exhibit 1), at ¶¶ 7-9; Declaration of Deborah Silodor on behalf of Amalgamated ("Silodor Decl.") (attached as Exhibit 2), at ¶¶ 7-9; Declaration of Kevin Lindahl on behalf of Colorado FPPA ("Lindahl Decl.") (attached as Exhibit 3), at ¶¶ 7-9.

8.      As discussed in further detail below, the Plan of Allocation was developed with the assistance of Lead Plaintiffs' damages expert, and provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis based on losses attributable to the alleged fraud.

9.      For its efforts in achieving the Settlement, Lead Counsel requests a fee award of 20% of the Settlement Fund, net of the Court-awarded Litigation Expenses, plus interest earned at the same rate as the Settlement Fund, on behalf of all Plaintiffs' Counsel.[2]   The fee requested is consistent with the retainer agreements entered into with Lead Plaintiffs and has been approved by Lead Plaintiffs.  As discussed in the Fee Memorandum, the fee requested is well within the range of percentage awards granted by courts in this Circuit and elsewhere in similarly sized class action settlements.  Moreover, the requested fee represents a multiplier of 2.2 of Lead Counsel's lodestar, which is within the range of multipliers typically awarded in class actions with significant contingency risks such as this one, and thus, the lodestar cross-check also supports the reasonableness of the fee.  Lead Counsel respectfully submits that the fee request is fair and reasonable in light of the result achieved in the Action, the efforts of Lead Counsel, and the risks and complexity of the litigation.

10.     For all of the reasons set forth herein and in the accompanying memoranda, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable and adequate, and should be approved.  In addition, Lead Counsel respectfully submits that its request for attorneys' fees and litigation expenses is also fair and reasonable, and should be approved.

---

[2] Plaintiffs' Counsel are: Lead Counsel BLB&G, Liaison Counsel Lowenstein Sandler LLP, former co-lead counsel Motley Rice LLC, and additional counsel Kessler Topaz Meltzer & Check, LLP.

## II.    HISTORY OF THE ACTION

### A.    Background

11.    Defendant Cognizant is a company that provides information technology ("IT") and business process outsourcing.  At all relevant times, Cognizant common stock traded on the NASDAQ under the ticker symbol CTSH.  Although headquartered in the United States, the Company's principal operations are based in India and spread throughout several large campuses. Certain of these facilities in India were located in Special Economic Zones ("SEZs") that provided a variety of benefits to the Company, including certain tax exemptions, easing of various customs and labor regulations and procedures, and heightened access to credit, infrastructure, and other resources.

12.    On September 30, 2016, Cognizant announced that it was conducting an internal investigation into "whether certain payments relating to facilities in India were made improperly and in possible violation of the U.S. Foreign Corrupt Practices Act and other applicable laws." Cognizant also announced that Gordon Coburn, the Company's President, had resigned.

### B.    Commencement of the Action and the Appointment of Lead Plaintiffs and Lead Counsel

13.    On October 5, 2016, the initial complaint in this Action was filed, styled *Park v. Cognizant Technology Solutions Corporation, et al.*, Case No. 2:16-cv-06509.  ECF No. 1.  Two other related securities class action complaints, *Daddabbo v. Cognizant Technology Solutions Corporation*, No. 2:16-cv-08010-WHW-CLW (D.N.J.), and *Johnson v. Cognizant Technology Solutions Corporation*, No. 2:16-cv-08641-KSH-CLW (D.N.J.), were also filed in the Court.

14.    On December 5, 2016, Union, Amalgamated, and Colorado FPPA moved for appointment as lead plaintiffs and for approval of their counsel, Motley Rice LLC ("Motley Rice")

and BLB&G, as co-lead counsel.  ECF No. 11.  Four other sets of competing movants also sought appointment as lead plaintiff.  ECF Nos. 8, 9, 10, 12.

15.     By Order dated February 3, 2017, the Court (the Honorable William H. Walls) appointed Union, Amalgamated, and Colorado FPPA as Lead Plaintiffs, recognizing that they had the largest financial interest of the competing movants. The Court also approved Lead Plaintiffs' selection of Motley Rice and BLB&G as co-lead counsel for the class.  ECF No. 20.  The Court's Order also provided that the case would be recaptioned *In re Cognizant Technology Solutions Corporation Securities Litigation*, Master File No. 2:16-cv-06509 (the "Action") and that any subsequently filed, removed, or transferred actions related to the claims asserted in the Action be consolidated for all purposes.  *Id.*

### C.     The Investigation and Filing of the Amended Complaint

16.     Prior to filing the consolidated complaint on behalf of Lead Plaintiffs, Lead Counsel undertook an extensive investigation into the facts concerning the alleged fraud.  This investigation included a thorough review and analysis of:  (i) transcripts, press releases, news articles, and other public statements issued by or concerning Cognizant and the individual defendants; (ii) research reports issued by financial analysts concerning the Company; (iii) reports filed publicly by Cognizant with the U.S. Securities and Exchange Commission ("SEC"); (iv) Cognizant's corporate website; and (v) other publicly available materials.

17.     In connection with this investigation, Lead Counsel BLB&G and its in-house investigators contacted 251 former employees of Cognizant who were believed to potentially possess information relevant to the claims.  Lead Counsel eventually conducted interviews with 42 of these former Cognizant employees and included information received from four of them in the Amended Complaint.

18.     Lead Counsel also retained and consulted with a damages expert in connection with the preparation of the Amended Complaint, including concerning the impact of Defendants' alleged misstatements and omissions on the market price of Cognizant's common stock and the damages suffered by Cognizant shareholders.

19.     On April 7, 2017, Lead Plaintiffs filed and served their Amended Class Action Complaint (the "Amended Complaint").  ECF No. 38.  The Amended Complaint asserted claims against: (i) Cognizant; (ii) Gordon Coburn, Cognizant's President, whose resignation was publicly disclosed on September 30, 2016; (iii) Francisco D'Souza, Cognizant's Chief Executive Officer; and (iv) Karen McLoughlin, Cognizant's Chief Financial Officer (collectively, the "Original Defendants").  The Amended Complaint asserted claims against all of the Original Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, and claims against Coburn, D'Souza, and McLoughlin under Section 20(a) of the Exchange Act.  ECF No. 38.  Among other things, the Amended Complaint alleged that the Original Defendants had made materially false and misleading statements and omissions about Cognizant's business and financial results, including concealing the fact that the Company had made illegal payments to Indian governmental officials to secure permits and licenses for its SEZ facilities in India.  The Amended Complaint further alleged that the price of Cognizant common stock was artificially inflated during the Class Period as a result of Defendants' allegedly false and misleading statements and omissions, and declined when the truth was revealed on September 30, 2016.

**D.      Union Substitutes BLB&G for Motley Rice, and BLB&G Continues as Sole Lead Counsel**

20.      In their initial motion for appointment of lead counsel, Lead Plaintiff Union had selected Motley Rice to represent it in this matter, and Lead Plaintiffs Amalgamated and Colorado FPPA had selected BLB&G.

21.      On May 15, 2017, Union filed a Stipulation and [Proposed] Order with the Court stating that Union had terminated its relationship with Motley Rice and had retained BLB&G to represent it this matter, so that thereafter BLB&G would serve as sole Lead Counsel in the Action, subject to the approval of the Court.  ECF No. 39.

22.      On May 19, 2017, the Court approved Union's substitution of BLB&G for Motley Rice as counsel for Union and approved the selection of BLB&G as sole Lead Counsel in the Action.  ECF No. 40.

**E.      Defendants' Motions to Dismiss the Amended Complaint**

23.      On June 6, 2017, the Original Defendants filed and served their motions to dismiss the Amended Complaint.  ECF Nos. 41-42.

24.      Cognizant, D'Souza, and McLoughlin filed a joint motion arguing that the Amended Complaint should be dismissed because Lead Plaintiffs had failed to allege any material misstatements or omissions by the Original Defendants during the Class Period; the alleged statements were unactionable; and the Complaint failed to allege facts giving rise to a strong inference of scienter.  ECF No. 42-1.  In their 40-page brief in support of their motion to dismiss, Cognizant, D'Souza, and McLoughlin argued, among other things:

(a)      that Lead Plaintiffs had not alleged that Defendants' statements about the benefits Cognizant received from SEZ licenses and the Company's investments in SEZs were inaccurate, and had not plead any particularized facts showing that any improper payments were made to obtain SEZ licenses;

(b)    that Defendants' challenged statements about Cognizant's Code of Conduct and Anticorruption Policy were not actionable because the Code of Conduct was inherently aspirational, and the fact that a violation of it may have occurred did not render Defendants' statements about its adoption misleading;

(c)    that Lead Plaintiffs had not alleged any facts showing that statements in Cognizant's 2014 and 2015 Sustainability Reports about the lack of any reported incidents of corruption were false when made;

(d)    that Lead Plaintiffs had not alleged that Defendants' statements about Cognizant's financial performance and services for clients were inaccurate;

(e)    that Cognizant's alleged overstatement of net income was immaterial as a matter of law, because the amount in question—$3.1 million—was less than two tenths of one percent of Cognizant's annual net income (and that the immateriality of this amount was confirmed by the fact that Cognizant's stock price *rose* after those expenses were reclassified in November 2016);

(f)    that Lead Plaintiffs' allegations that D'Souza and McLoughlin's certifications under the Sarbanes-Oxley Act ("SOX") concerning internal controls were false and misleading failed because Lead Plaintiffs had not alleged particularized facts showing that those statements were false when made and because the certifications were unactionable statements of opinion;

(g)    that Lead Plaintiffs had not alleged facts supporting a strong inference of Defendants' scienter because there were no allegations that D'Souza, McLoughlin, or Coburn had knowledge of the alleged bribes and that inferences of scienter drawn from the duration and amount of the alleged improper payments or their importance to Cognizant's "core operations" failed because the amount of the alleged bribes was immaterial given the overall size and scope of Cognizant's business; and

(j)    the fact that Cognizant, upon discovering the potentially improper payments, had immediately launched an internal investigation and self-reported the issue to the SEC and DOJ, strongly weighed against a finding of scienter;

ECF No. 42-1. These defendants' memorandum in support of their motion to dismiss was accompanied by over 60 pages of exhibits. ECF No. 42.

25.    Defendant Coburn filed a separate motion to dismiss the same day, which argued that Lead Plaintiffs failed to adequate allege that Coburn had made any material misstatements; that Lead Plaintiffs' allegations did not support a strong inference that Coburn had the requisite scienter in making the alleged misstatements; and that Lead Plaintiffs' Section 20(a) control claim

against Coburn should be dismissed.  ECF No. 41.  Coburn argued in his 40-page brief, among

other things:

(a)     that Lead Plaintiffs did not allege that Coburn had ever publicly said anything about
        Cognizant's SEZ licenses and that the alleged misstatements he did make—
        concerning Cognizant's revenue growth and Cognizant's ability to lower client's
        costs—did not misstate the manner in which Cognizant had acquired its SEZ
        licenses;

(b)     that Coburn's alleged misstatements were also inactionable puffery or too vague to
        be a basis for liability;

(c)     that the allegations of the Amended Complaint failed to establish a strong inference
        of Coburn's scienter because, among other things, (i) the statements of the former
        Cognizant employees included in the Amended Complaint did not directly establish
        his knowledge of the alleged wrongdoing and because statements from confidential
        witnesses should be discounted and (ii) the timing of his resignation could not
        support an inference that he was complicit in the alleged improper payments; and

(d)     that Lead Plaintiffs' Section 20(a) claims against Coburn should be dismissed
        because Lead Plaintiffs had not adequately alleged an underlying 10(b) violation,
        that Coburn controlled Cognizant, or Coburn's culpable participation in the alleged
        wrongdoing.

ECF No. 41-1.

26.     On July 21, 2017, Lead Plaintiffs served an omnibus 80-page memorandum of law

in opposition to the Original Defendants' motions to dismiss the Amended Complaint, which

addressed the arguments Defendants raised in their motions.  ECF No. 46.  Among other things,

Lead Plaintiffs argued that the Complaint adequately alleged false or misleading statements by

Defendants, including that:

(a)     Defendants' statements assuring investors that Cognizant did not make improper
        payments to foreign officials, and that the Company had a rigorous anticorruption
        control system to prohibit such payments, were false and misleading because they
        were contradicted by then-existing facts;

(b)     Defendants' statements about Cognizant's revenue growth and ability to deliver
        cost savings to customers had attributed the Company's success in these areas
        entirely to legitimate factors and, thus, were rendered misleading by the fact that

Cognizant had not disclosed the role that corrupt payments concerning SEZ licenses had played in achieving those results; and

(c)    Cognizant had admitted to issuing financial statements in which it improperly recorded at least $4.1 million in corrupt payments as capital expenditures rather than operating expenses, and the materiality of that misstatement was a fact-intensive question that was not suited for resolution at the motion to dismiss stage;

Lead Plaintiffs further argued that the Complaint adequately alleged Defendants' scienter, including that:

(a)    Cognizant's admissions that "senior management" knew about the bribery scheme and that it had been ongoing for six years gave rise to a strong inference of scienter;

(b)    the circumstances of Coburn's sudden departure, which occurred immediately before the public disclosure of the Company's investigation into the bribery scheme, coupled with Cognizant's admission that members of senior management who were "no longer with" the Company had participated in the scheme, yielded a strong inference of scienter; and

(c)    the duration and nature of the misconduct supported a strong inference of scienter.

ECF No. 46. Finally, Lead Plaintiffs argued that their Section 20(a) claims were properly asserted against D'Souza, McLoughlin, and Coburn, who were all senior executives of the Company.

27.    On September 5, 2017, the Original Defendants served their reply papers in further support of their motions to dismiss. ECF Nos. 50-51. These reply briefs generally reiterated arguments that the Original Defendants had advanced in their opening briefs. Coburn's brief focused on his argument that his statements did not address any alleged improper payments or SEZ licenses at all, and that his statements about Cognizant's revenue growth and ability to lower costs for customers were factually true and could not, under governing law, be rendered false by the alleged omissions. ECF No. 50, at 2-7.

28.    In addition, on September 5, 2017, Cognizant, D'Souza, and McLoughlin also moved to strike certain allegations in the Amended Complaint. ECF No. 52. Specifically, these defendants argued that allegations attributed to Former Employee 1 in the Amended Complaint

11

should be stricken because that employee had allegedly repudiated certain of the allegations attributed to him. *Id*.

29.     On October 2, 2017, Lead Plaintiffs filed their opposition to the motion to strike. ECF No. 58.  On October 10, 2017, Cognizant, D'Souza, and McLoughlin filed their reply papers in further support of the motion.  ECF No. 59.

**F.     The Court's Ruling on the Motions to Dismiss and Cognizant's Petition for an Interlocutory Appeal**

30.     On August 8, 2018, the Court denied in part and granted in part the Original Defendants' motions to dismiss the Amended Complaint.  ECF Nos. 66-67.  Specifically, the Court: (i) sustained Section 10(b) claims against Cognizant based on statements in its Sustainability Reports, misstated financial statements, and statements in its SEC filings concerning the benefits of its SEZ licenses; (ii) dismissed the Section 10(b) claims against Cognizant based on Cognizant's Code of Conduct and Anticorruption Policy, the statements touting low-cost services and attributing the Company's financial results to legitimate business factors, and the SOX certifications; (iii) dismissed the Section 10(b) claim against Coburn because Lead Plaintiffs failed to allege Coburn made any material misstatements; (iv) sustained the Section 20(a) claim against him; and (v) dismissed all claims against D'Souza and McLoughlin, finding that Lead Plaintiffs had failed to adequately allege their scienter or culpable participation.  ECF No. 66, at 74.  The Court also denied the motion to strike.  ECF No. 66, at 21-26.

31.     On September 7, 2018, Cognizant filed a motion seeking immediate interlocutory appeal under 28 U.S.C. § 1292(b) of the Court's August 8, 2018 ruling denying its motion to dismiss.  ECF No. 70.  Cognizant argued that a key, dispositive legal issue in the Action—namely, what a securities plaintiff must plead in order to try to impute the alleged scienter of an individual to a corporation—was unsettled in the Third Circuit and was the subject of conflicting standards

in other Circuits, thus supporting their request for an immediate appeal.  ECF No. 70-1.  On September 28, 2018, Lead Plaintiffs opposed that motion.  ECF No. 73.  On October 9, 2018, Cognizant filed its reply papers.  ECF No. 74.

32.     On October 18, 2018, the Court granted Cognizant's motion to certify its August 8, 2018 order for immediate appeal, finding that there was a controlling question on which there is "a substantial ground for difference of opinion" as to whether scienter could be adequately alleged as to a corporation in the absence of scienter allegations as to the individuals who made the material misstatements, noting a Circuit split on the issue and the fact that the Third Circuit had not squarely decided the issue.  ECF No. 75.   The Court order that the Action be stayed pending the outcome of Cognizant's petition to the Third Circuit for an interlocutory appeal.  *Id.*

33.     On October 29, 2018, Cognizant filed its petition with the Court of Appeals for the Third Circuit for permission to take interlocutory appeal of the Court's order partially denying its motion to dismiss.  On November 8, 2018, Lead Plaintiffs filed their opposition to that motion. On November 13, 2018, Cognizant filed a motion for leave to file additional briefing in support of its petition and, on November 21, 2018, Lead Plaintiffs opposed that motion.

### G.     The Department of Justice Indicts Defendants Coburn and Schwartz

34.     On February 14, 2019, while these motions were pending, the U.S. Department of Justice indicted Defendants Coburn and Schwartz on charges that they engaged in a scheme to bribe one or more government officials in India to secure and obtain a planning permit relating to Cognizant's KITS facility in India.  *See United States v. Gordon J. Coburn and Steven Schwartz,* Criminal No. 19-120 KM (D.N.J.) (the "Criminal Action").

35.     On February 18, 2019, Lead Plaintiffs notified the Third Circuit about the indictments, informed the Third Circuit that they would seek leave to amend the Amended

Complaint to add new allegations relating to the indictments, and requested that the Third Circuit dismiss the appeal as moot.  On February 27, 2019, Cognizant opposed Lead Plaintiffs' request.

36.     On March 6, 2019, the Third Circuit granted Lead Plaintiffs' request and denied Cognizant's petition for an appeal, though it allowed Cognizant to renew its petition if the District Court denied Lead Plaintiffs' forthcoming motion to amend the Amended Complaint.

**H.     The Filing of the Second Amended Complaint**

37.     On April 26, 2019, Lead Plaintiffs filed their Second Amended Class Action Complaint ("SAC" or "Complaint").  ECF No. 83.  The SAC added Steven Schwartz as a Defendant, and alleged claims under Section 10(b) of the Exchange Act against Cognizant and Schwartz and claims under Section 20(a) against Coburn and Schwartz.  The SAC included additional allegations based on information obtained from (i) the Indictment and other documents in the Criminal Action; (ii) the complaint and other documents filed in an SEC action brought against Coburn and Schwartz; and (iii) an SEC administrative proceeding captioned *In re Cognizant Tech. Solutions Corp.,* Administrative Proceeding No. 3-19000.

38.     On June 10, 2019, Defendants moved to dismiss the SAC, filing three separate motions, comprising nearly 80 pages of briefing and hundreds of pages of exhibits.  ECF Nos. 92-94.

39.     In its motion to dismiss, Cognizant contended that the DOJ and SEC investigations had shown that any alleged improper payments involved only a few former employees who concealed their conduct from Cognizant itself, that these investigations did not show that any such payments were made to obtain SEZ licenses, and that scienter could not be imputed to Cognizant because Coburn and Schwartz (the defendants that Lead Plaintiffs alleged had scienter) had not made any of the allegedly misleading statements.  ECF 92-1.  Specifically, Cognizant argued:

(q)     that the Complaint did not allege facts showing that the Cognizant's statements touting the benefits of SEZ licenses were false and misleading because the DOJ and SEC investigations showed that the alleged improper payments related only to obtaining construction permits or planning permits—not to obtaining government authority to locate a facility within an SEZ;

(b)     that the Complaint failed to plead particularized facts showing that any statements in Cognizant's Sustainability Reports were materially false or misleading, because the DOJ and SEC's filings contradicted the allegations of the SAC, and because the DOJ had declined to prosecute Cognizant;

(c)     that the $3.1 million misstatement of Cognizant's net income was not material; and

(d)     that the Court should adopt the Fifth and Eleventh Circuits' standard for pleading corporate scienter, in which an individual's scienter is attributable to a corporate defendant only if that individual was responsible for issuing the allegedly false public statement, and that, under that standard, the Complaint failed to allege Cognizant's scienter.

ECF No. 92-1.

40.     In his motion, Coburn argued that the Section 20(a) claim asserted against him should be dismissed on the grounds that Lead Plaintiffs had failed to adequately allege (i) an underlying claim for violation of Section 10(b) against Cognizant; or (ii) that Coburn had control over Cognizant's financial statements or Cognizant's 2014 and 2015 Sustainability Reports.  ECF No. 93-1.

41.     Schwartz contended that (i) Lead Plaintiffs failed to allege any material misstatements or omissions in the SAC, for the same reasons advanced by Cognizant; (ii) Schwartz was not the "maker" of any of the alleged misstatements; (iii) the SAC failed to adequately allege his scienter; and (iv) the Section 20(a) claims against him failed for a variety of reasons, including that Schwartz did not control Cognizant.  ECF No. 94-1.

42.     On July 26, 2019, Lead Plaintiffs filed a 77-page omnibus opposition to Defendants' motions to dismiss the SAC.  ECF No. 109.  Lead Plaintiffs argued that:

     (a)     the Court had previously found that the Complaint pled actionable false and misleading statements, and there was no reason to depart from that conclusion;

     (b)     the Court had previously found that the Complaint adequately alleged Coburn's scienter, which was further supported by detailed allegations drawn from DOJ and SEC filings showing that Coburn orchestrated the execution and coverup of multi-million-dollar bribes made to Indian officials;

     (c)     the Complaint adequately alleged Schwartz's scienter based on, among other things, government investigative findings that Schwartz was an active participant in the bribery scheme and, as such, had actual knowledge;

     (c)     the Complaint adequately alleged Cognizant's scienter, even under the Fifth and Eleventh Circuit standard Defendants urged the Court to adopt, because Coburn and Schwartz had "participated in the making" of the alleged false statements;

     (d)     that, in any event, the *Southland* standard for corporate scienter should be rejected, and that Cognizant's corporate scienter was adequately established under the alternative standards, as the Court had previously held; and

     (e)     that control liability under Section 20(a) was adequate alleged as to Coburn and Schwartz.

ECF No. 109.

43.     On August 26, 2019, Defendants filed reply papers in further support of their motions. ECF Nos. 110-112.

44.     On July 26, 2019, while Defendants' motions to dismiss the SAC were pending, the case was transferred to the Honorable Esther Salas

45.     On May 5, 2020 Cognizant submitted a letter with additional authority in support of its motion to dismiss (ECF No. 124), and Lead Plaintiffs replied in a letter on May 8, 2020 (ECF No. 126).

46.     On May 19, 2020, the Court held oral argument on Defendants' motions to dismiss. ECF 129. On June 5, 2020, the Court entered an order denying Defendants' motions to dismiss the SAC. ECF Nos. 131-132.

47.     On July 10, 2020, Cognizant filed and served its Answer to the Complaint, denying the substantive allegations set forth therein, and asserting 39 affirmative defenses.  ECF No. 141. At the time the Settlement was reached, Coburn and Schwartz had not filed their Answers to the Complaint because the Parties stipulated that their answers to the SAC would be stayed through the disposition of the Criminal Action.  ECF Nos. 143, 147.

48.     On July 24, 2020, Cognizant filed a motion for a certificate of appealability under 28 U.S.C. § 1292(b) on the same grounds that it had previously sought—that the standard for pleading corporate scienter was a controlling question of law as to which there is substantial ground for difference of opinion.  ECF No. 146.  Lead Plaintiff opposed the motion on August 28, 2020 (ECF No. 155) and Cognizant filed its reply on September 14, 2020 (ECF No. 158).  On March 17, 2021, the Court denied Cognizant's motion.  ECF Nos. 161-162.

**I.      The Parties Conduct Discovery**

49.     Following the Court's order sustaining the SAC on June 5, 2020, discovery in the Action commenced.  Lead Plaintiffs had previously served a set of document requests and a set of interrogatories on Defendants Cognizant and Coburn in September 2018 (after the Amended Complaint was sustained in part and before the Action was staying pending the interlocutory appeal).  In June 2020, Lead Plaintiffs served a second set of document requests on Cognizant and Coburn and an initial set of document requests on Schwartz.

50.     On June 16, 2020, the United States Attorney for the District of New Jersey ("Government") notified the Court that it would seek to intervene in the Action for the purpose of seeking a stay of discovery in the Action during the pendency of the Criminal Action against Defendants Coburn and Schwartz.  ECF No. 133.

51.     Following discussions, the Parties and the Government stipulated to a partial stay of discovery in the Action, pursuant to which Cognizant would produce to Lead Plaintiffs all

documents previously produced to the Government in connection with the Criminal Action.  ECF No. 142.  The Court entered this stipulation on July 24, 2020.  ECF No. 148.

52.     The Parties also negotiated the terms of the protective order governing the treatment of documents and other information produced in discovery, which Lead Plaintiffs submitted to the Court on August 31, 2020.  ECF No. 156.  The Court entered the stipulated protective order on September 1, 2020.  ECF No. 157.

53.     On September 3, 2020, Cognizant produced to Lead Plaintiffs 124,047 documents, comprised of 660,154 pages, which it had previously produced to the Government.  Cognizant subsequently produced additional documents to the parties to the Criminal Action, which it then also produced to Lead Plaintiffs on May 21, 2021.

54.     Lead Counsel devoted extensive efforts to reviewing and analyzing the produced documents.  Lead Counsel developed a detailed process for reviewing documents produced in the litigation and sharing information among counsel and experts.  Lead Counsel developed manuals and guidelines for the review and "coding" of documents, prepared chronologies of events, lists of key players, and a deposition plan.  These materials, which were updated and refined as document discovery continued, were provided to the team of attorneys responsible for reviewing the documents.  In addition, Lead Counsel held regular training sessions to review substantive issues in the case and ensure that new developments were shared widely across the team.

55.     In reviewing the documents, attorneys were tasked with making several analytical determinations as to the documents' importance and relevance.  Specifically, they determined whether the documents were "hot," "relevant," or "irrelevant."  They also identified particular issues implicated by a document – such as tying documents to specific SEZ projects or Defendants—and created tags in the database to identify potential deponents with respect to whom

the document would be relevant so that the documents could be easily retrieved when preparing for the depositions of those employees.

56.     For documents identified as "hot," the attorneys typically explained their substantive analysis of the document's importance.  Specifically, the attorneys made electronic notations on the document review system explaining what portions of the documents were hot, how they related to the issues in the case, and why the attorney believed that information to be significant.  Lead Counsel held regular meetings, typically weekly, to discuss documents of particular significance as a group.

### J.     Interviews of Former Cognizant Employees

57.     During the stay of formal discovery, Lead Counsel also continued to interview former Cognizant employees, including former employees located abroad.  These former employees provided information that helped Lead Plaintiffs develop their theories of the case and prepare for depositions.

### K.     Work with Experts

58.     Lead Plaintiffs retained and consulted with several highly qualified experts in the areas of financial economics (including damages and loss causation), SEZs, and the FCPA.  Lead Counsel consulted with these experts throughout the litigation and believes that the development of this expert evidence was essential to the successful prosecution of the claims.  Lead Plaintiffs' expert consultants included: (i) Chad W. Coffman, of Global Economics Group, who provided Lead Plaintiffs with expert advice on damages and loss causation issues; (ii) David Tabak of the NERA Economic Consulting, who also consulted on damages issues; (iii) Anup Milani, a Professor at the University of Chicago Law School, who provided expert advice on the operation of SEZs in India and other topics; (iv) experts at the Brattle Group who provided expert financial economics advice; and (v) an expert on FCPA compliance and enforcement issues.

59.     Lead Counsel consulted with these experts throughout the litigation of the Action, including in preparing the Complaint, in reviewing documents produced in discovery, and during the settlement negotiations.   After the Settlement was reached, Lead Counsel worked with Mr. Coffman and his team at Global Economics in developing the Plan of Allocation, as discussed below.

**L.      The Parties Engage in Lengthy Arm's-Length Negotiations that Ultimately Culminate in the Proposed Settlement**

60.     On February 7, 2020, while Defendants' motions to dismiss the Second Amended Complaint were still pending, Lead Plaintiffs and Cognizant participated in an in-person mediation with the Honorable Layn R. Phillips.   In connection with this mediation, Lead Plaintiffs and Cognizant prepared and exchanged detailed mediation statements that addressed issues of liability and damages.   Despite the parties' efforts over the full-day mediation, the mediation session did not result in an agreement to settle.

61.     After the resolution of the motions to dismiss the SAC and while discovery was ongoing, Lead Plaintiffs and Cognizant renewed their settlement negotiations.   Following extensive settlement negotiations assisted by Judge Phillips, Judge Phillips issued a mediator's recommendation that the Parties settle the Action in return for a cash payment by Cognizant and its insurers on behalf of Defendants of $95,000,000 for the benefit of the Settlement Class.   On August 10, 2021, Lead Plaintiffs and Cognizant agreed to the mediator's recommendation.

62.     In the following weeks, the Parties negotiated the terms of the Settlement and drafted the settlement agreement and related papers such as the notices to be provided to the Settlement Class.   On September 2, 2021, the Parties executed the Stipulation and Agreement of Settlement (ECF No. 165-3) (the "Stipulation"), which set forth the full terms of the Parties'

agreement to settle all claims asserted in the Action for $95,000,000, subject to the approval of the Court.

### M.   The Court Grants Preliminary Approval to the Settlement

63.   On September 7, 2021, Lead Plaintiffs filed an unopposed motion for preliminary approval of the Settlement.  (ECF Nos. 165-166.)

64.   On September 9, 2021, the Court entered the Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 167) (the "Preliminary Approval Order"), which, among other things: (i) preliminarily approved the Settlement; (ii) approved the form of Notice, Summary Notice, and Claim Form, and authorized notice to be given to Settlement Class Members through mailing of the Notice and Claim Form, posting of the Notice and Claim Form on a Settlement website, and publication of the Summary Notice in *The Wall Street Journal* and over *PR Newswire*; (iii) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, or the fee and expense application; and (iv) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Application.  The Preliminary Approval Order also set a Settlement Hearing for December 20, 2021 at 2:00 p.m. to determine, among other things, whether the Settlement should be finally approved.

### III.   RISKS OF CONTINUED LITIGATION

65.   The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $95,000,000 cash payment, and represents a significant portion of the realistically recoverable damages in the Action.  Lead Plaintiffs and Lead Counsel believe that the proposed Settlement is an excellent result for the Settlement Class in light of the risks of continued litigation.

As explained below, Lead Plaintiffs faced risks with respect to proving liability and establishing loss causation and damages in this case.

### A.    Risks Concerning Liability

66.    While Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants in the Action are meritorious, they recognize that this Action presented the following risks to establishing Defendants' liability.

### 1.    Material Misrepresentations

67.    In the Complaint, Lead Plaintiffs allege that Defendants made three basic categories of misstatements: (i) false financial statements, in which Lead Plaintiffs allege that Cognizant improperly booked the costs of bribes as capital expenses; (ii) Defendants' statements touting the benefits of the SEZ licenses, which Lead Plaintiffs allege were misleading in light of the concealed bribes; and (iii) statements representing that no incidents of corruption had been reported internally.  Defendants would continue to argue that these alleged misstatements were not false and, in any event, were not material to investors because the underlying misconduct was insignificant to Cognizant's financial performance.

### (a)    Falsity

68.    Defendants would continue to argue that their statements touting the benefits of SEZ licenses were not actionable.  Specifically, Defendants have, and would continue, to argue that the evidence uncovered by the on-going criminal investigation demonstrates that the bribes at issue were not paid to secure SEZ permits, but rather routine construction permits that bear only the most tangential relationship to the Company's SEZ operations.  Neither the indictment nor the SEC complaint uses the phrase "SEZ permit," but rather refer only to "planning permits." Defendants could have persuaded the Court or a jury that there is only a tenuous connection between the licenses obtained through the bribery scheme and the Company's SEZs, which cannot

22

render Cognizant's statements about the benefits it enjoyed by virtue of its SEZ facilities false or misleading.

69.     Defendants would also continue to argue that their statements about the lack of any reported incidents of corruption were true when made.  While these arguments were rejected at the motion-to-dismiss stage, the outcome might have been different at summary judgment or trial based on the evidence adduced.

70.     Defendants Coburn and Schwartz have denied that any bribery scheme took place and would continue to do so at trial.

**(b)     Materiality**

71.     Even more potent were Defendants' arguments that the alleged misstatements, even if false, were simply not material to investors given the scope of the alleged misconduct in comparison to the overall size of Cognizant's business.

72.     For example, the size of the financial misstatements alleged was less than $6 million over five years, which Defendants asserted is far too small to be material.  To put this in perspective, over the same five-year period, Cognizant booked more than $50 billion in revenue and approximately $7 billion in net income, meaning that the alleged bribery scheme amounted to just 0.00012% of reported revenue and 0.001% of net income.

73.     Moreover, Defendants would contend that Cognizant's operations have not been impacted by the scheme, as the Company completed all the facilities at issue; its stock price swiftly recovered; and the Company has continued to report positive financial results in the quarters after the scheme was disclosed.  Based on these facts, Defendants had meaningful arguments that the scheme as a whole—and thus all the alleged misstatements—were immaterial to Cognizant's business and not actionable under the securities laws.  In further support of this argument,

Defendants would point to analyst commentary stating that the amount of bribes paid showed that the scheme was "relatively benign."

74.     Additionally, Defendants likely would argue that certain of the alleged misstatement are vague statements of corporate optimism or merely aspirational and, for this reason too, were not material.

### 2.     Scienter

75.     Even if Lead Plaintiffs succeeded in proving that Defendants' statements were both false and material, Lead Plaintiffs would have faced challenges in proving that Defendants made the alleged false statements with the intent to mislead investors or were reckless in making the statements.

76.     Cognizant would continue to argue that Lead Plaintiffs cannot establish the Company's scienter, or fraudulent intent, in making the alleged misstatements, because Cognizant's CEO and CFO had no knowledge of the bribery scheme.  Cognizant would argue that, even if Defendants Coburn and Schwartz knew of and participated in the scheme, the criminal investigation established that Cognizant's CEO and CFO were not aware.  In support of this argument, Cognizant could point to the DOJ's decision not to prosecute Cognizant, D'Souza, or McLoughlin.

77.     In addition, Cognizant would also argue that, when it discovered the scheme, it promptly self-reported to the DOJ and SEC, cooperated with their investigations, and launched an immediate internal investigation of its own—all at great cost to Cognizant.  Cognizant would use these facts to argue that the Company's most senior leadership was innocent, the scheme was carried out by certain rogue employees, and thus the Company should be found to lack scienter.  At trial, there was a risk that Cognizant might be able to persuade the jury that it would be

inappropriate to punish it with a significant judgment given that it "did the right thing" once it discovered the misconduct.

78.     Defendants Coburn and Schwartz have pleaded not guilty to the criminal charges against them and have asserted that they believe there is exculpating evidence demonstrating that they did not participate in any bribery scheme.

79.     While certain of these arguments were made unsuccessfully by Defendants on their motions to dismiss, when the Court was required to accept all allegations in the Complaint as true, there was a possibility that Defendants could have succeeded in these arguments at subsequent stages of the litigation.

80.     Moreover, on all these issues, Lead Plaintiffs would have to prevail at several stages—on a motion for summary judgment and at trial, and if they prevailed on those, on the appeals that would likely to follow—which would likely have taken years.  At each stage, there would be very significant risks attendant to the continued prosecution of the Action, as well as considerable delay.

**B.     Risks Related to Loss Causation and Damages**

81.     Even assuming that Lead Plaintiffs overcame the above risks and successfully established liability, Lead Plaintiffs would have confronted additional challenges in establishing loss causation and damages.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear the burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'").

82.     Lead Plaintiffs anticipated that Defendants would have argued that the size of the decline in Cognizant's stock price on September 30, 2016, immediately following the disclosure of the Company's internal investigation into the potential FCPA violations, was not a reasonable measure of damages caused by the alleged misstatements.  Defendants would have argued that

25

much of the decline on that day was due to the uncertainty created by the open, unresolved investigation. For example, an analyst report from Morgan Stanley on September 30, 2016 said that the "[p]otential concerns" were the "[u]nknowns" and that "the degree of potential exposure and possible penalties varies widely." Another analyst report that day, from William Blair & Company, stated that "Some investors are concerned with the ambiguity around the investigation." Defendants would also have argued that securities analysts specifically reported that the market's reaction on the alleged September 30, 2016 corrective disclosure was "overdone."

83.    In further support of this, Defendants would have argued that Cognizant's stock price swiftly recovered as the uncertainty resolved, and the complete truth about the size of the alleged bribery scheme and its limited impact on the Company's previously reported financial results was revealed to the market. For instance, on November 7, 2016, Cognizant disclosed that its internal investigation had "identified a total of approximately $5.0 million in payments that may have been recorded improperly" and that "based on the results of the investigation to date, no material adjustments, restatements or other revisions to our previously issued financial statements are required." Defendants would have argued that, in response to this news, Cognizant's stock price increased from $52.08 to $54.75 (5.1%), returning to its approximate value prior to the alleged corrective disclosure. Thus, Defendants would have emphasized that Cognizant's stock price <u>fully recovered</u> from its September 30, 2016 decline less than 40 days later.

84.    Likewise, Defendants would have pointed to the approximately 5% increase in Cognizant stock price a few months later, in February 2017, when the Company announced that its now mature investigation had uncovered only another $1 million in potentially improper payments.

85.     In further support of their contention that the stock price decline was not an accurate measure of damages, and that damages were quite limited, Defendants would argue that: (i) the impact of the alleged fraud on Cognizant's financial statements was *de minimis* (as noted above), and (ii) the impact on its overall business performance was essentially nil given that the Company completed all the facilities at issue and reported positive financial results following the Class Period.

86.     Moreover, Defendants could have pointed to a number of metrics that they asserted were more accurate barometers of the true harm (if any) caused by the alleged misstatements and omissions.  For instance, Defendants could have contended that damages should be limited to: (i) the net decline in Cognizant's share price after all information concerning the bribery scheme had been disclosed to investors, which was approximately $40 million; (ii) the total amount of Cognizant's investigation-related costs (including fines and disgorgement paid to the DOJ and SEC), which, according to Cognizant's SEC filings, was approximately $108 million; or (iii)  Cognizant's profits from the alleged bribery scheme, which the DOJ had found to be only $19.3 million and the SEC calculated as $16.3 million.  Defendants would have contended that all these metrics supported their view that the alleged misconduct was economically inconsequential and that damages were severely limited.  There was a risk that the jury could have found any one of these damages arguments persuasive, in which case the recovery after trial could have been substantially less than the Settlement Amount.

### C.     Risks and Significant Delay Related to the Criminal Action

87.     The pending Criminal Action against Coburn and Schwartz also presented hurdles to Lead Plaintiffs' ability to recover and the timing of any recovery.  Discovery was stayed in this Action pending the completion of the criminal trial, which meant that Lead Plaintiffs could not begin to conduct any further extensive discovery in this Action until after the criminal trial

finished.  At the time the Settlement was reached, the criminal trial was not scheduled to occur until March 21, 2022 and was at serious risk of being delayed even further given COVID and the need for the criminal defendants to conduct discovery in India.  These circumstances would have significant delayed the class's ability to achieve any monetary recovery through litigation and would also have increased costs incurred by the Settlement Class and increased the difficulty of ultimately succeeding on claims as memories fade over time.

### D.    Risks and Further Delays Related to Gathering Evidence in India

88.    Further, much of the underlying evidence relevant to the claims asserted and many of the potential witnesses are located in India.  These unique circumstances also presented the likelihood for significant delays and posed additional risks that are not normally present in securities class action where all evidence and witnesses can be found in the United States.

89.    Even under normal circumstances, obtaining evidence and conducting depositions in a foreign jurisdiction is a slow process without any guarantee of success, and one which requires significant cooperation from governmental bureaucracies.  Here, the discovery stay resulting from the pending Criminal Action meant that this process would be delayed even further, as the process could not begin until after the trial in the Criminal Action.  After the stay was lifted, there would be additional document discovery conducted, both in the United States and abroad.  The process of seeking depositions in India under the Hague Convention could not commence until that point. Lead Counsel estimate that the process of obtaining depositions in India would likely have added at least another year to the normal discovery process, thus significantly delaying the ability to ready the case for trial.  Lead Counsel estimated that, assuming that the Criminal Action ended in 2022, and allowing another year for the process of obtaining the depositions in India, plus sufficient time to conduct expert discovery, and to brief and argue summary judgment motions, trial would most likely not occur until the end of 2023 at the earliest and perhaps even 2024—

28

roughly 14 years after the alleged bribery schemes began and seven years after the case was brought. Moreover, because individuals in India are not necessarily subject to a duty to retain evidence, there was a significant risk that key evidence could be lost with the passage of time. All of this posed additional litigation risks to Lead Plaintiffs and the Settlement Class.

**E.      The Settlement Amount Compared to
Likely Damages that Could Be Proved at Trial**

90.      The $95 million Settlement is also a favorable result when considered in relation to the range of potential recoveries for the Settlement Class if Lead Plaintiffs prevailed at trial and on any appeals (which, as noted above, was far from certain). Assuming that Lead Plaintiffs prevailed on all liability issues at trial, the class-wide damages that Lead Plaintiffs would likely be able to prove is approximately $650 million, based on the movements in the price of Cognizant common stock on Friday September 30, 2016 and the immediately following trading day of Monday October 3, 2016. Even as measured against these likely maximum damages, the $95 million recovery represents a recovery of 14.6%, which is above the median recovery in securities fraud actions, and a favorable outcome in light of all the risks of establishing liability and delays here.

91.      Moreover, Defendants had plausible arguments that damages were far less than approximately $650 million and, indeed, less than or comparable to the Settlement Amount. As detailed above, Lead Plaintiffs anticipated that Defendants would argue that Cognizant's stock price decline was not a reasonable measure of damages because much of the decline resulted from the uncertainty created by the open investigation into the potential FCPA violations—rather than the revelation of truth of the alleged misstatements. Defendants would argue that this view was supported by the fact that (i) Cognizant's stock price increased as more information was disclosed about the size of the alleged bribery scheme and its limited impact on Cognizant's financial results;

29

(ii) Cognizant's stock price ultimately recovered completely in a relatively short time period of 40 days, and (iii) the impact of the alleged fraud on Cognizant's financial statements was *de minimis*, and the impact on its overall business performance was essentially nil.  While Lead Plaintiffs believe they had counter-arguments, if these anticipated arguments were accepted, damages could have been reduced significantly, to potentially even less than the Settlement Amount.

92.     In addition, as noted above, Defendants could have argued that several other metrics were more accurate measures of the harm (if any) caused by the alleged misstatements and omissions.  For instance, Defendants could have contended that damages should be limited to (i) the net decline in Cognizant's share price after all information concerning the bribery scheme had been disclosed to investors, which was approximately $40 million; (ii) the total amount Cognizant's investigation-related costs (including fines and disgorgement paid to the DOJ and SEC), which, according to Cognizant's SEC filings, was approximately $108 million; or (iii) Cognizant's profit from the alleged bribery scheme, which the DOJ had found to be $19.3 million and the SEC calculated as $16.3 million.  Had the jury found these arguments persuasive, the recovery after trial could have been substantially less than the Settlement Amount.

\*     \*     \*

93.     As noted above, Lead Plaintiffs and the Settlement Class still faced the substantial burdens of a litigated class certification motion, summary judgment motions, Daubert motions, and a trial—a process which could possibly extend for a number of years and might lead to a smaller recovery, or no recovery at all.  Further, even if Lead Plaintiffs were successful at trial, Defendants could have challenged the damages of each and every large class member in post-trial proceedings, substantially reducing any aggregate Settlement Class recovery.  Finally, even if Lead Plaintiffs had succeeded in proving all elements of their case at trial and in post-trial proceedings,

Defendants would almost certainly have appealed.  An appeal would not only have renewed all the risks faced by Lead Plaintiffs and the Settlement Class, as Defendants would be able to re-assert all their arguments summarized above, it would also have engendered significant additional delay and costs before Settlement Class Members could have received any recovery from this case.

94.     Given these significant litigation risks and delays, and the immediacy and amount of the $95,000,000 recovery for the Settlement Class, Lead Plaintiffs and Lead Counsel believe that the Settlement is an excellent result, and is in the best interest of the Settlement Class.

## IV.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

95.     The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to the Settlement Class.  The Preliminary Approval Order also set a November 22, 2021 deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application or to request exclusion from the Settlement Class, and set a final approval hearing date of December 20, 2021.

96.     Pursuant to the Preliminary Approval Order, Lead Counsel instructed JND Legal Administration ("JND"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice.  The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from the Settlement Class.  The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 20% of the Settlement

Fund, and for Litigation Expenses in an amount not to exceed $475,000.  To disseminate the Notice, JND obtained information from Cognizant and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members.  *See* Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Segura Decl."), attached hereto as Exhibit 4, at ¶¶ 3-8.

97.     JND began mailing copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and nominee owners on September 30, 2021.  *See* Segura Decl. ¶¶ 3-6.  As of November 4, 2021, JND had disseminated a total of 321,462 Notice Packets to potential Settlement Class Members and nominees.  *Id.* ¶ 9.

98.     On October 15, 2021, in accordance with the Preliminary Approval Order, JND caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over the *PR Newswire*.  *Id.* ¶ 10.

99.     Lead Counsel also caused JND to establish a dedicated settlement website, www.CognizantSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to downloadable copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, Amended Complaint, and Second Amended Complaint.  *See* Segura Decl. ¶ 12.  That website became operational on September 30, 2021.  *Id*.  Lead Counsel also made copies of the Notice and Claim Form and other documents available on its own website, www.blbglaw.com.

100.     As set forth above, the deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, and/or Fee and Expense Application, or to request exclusion from the Settlement Class is November 22, 2021.  To date, no requests for exclusion have been

received.  *See* Segura Decl. ¶ 13.  In addition, no objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Application have been received.  Lead Counsel will file reply papers on or before December 6, 2021, that will address any requests for exclusion and any objections that may be received.

## V.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

101.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less any (i) Taxes, (ii) Notice and Administration Costs, (iii) Litigation Expenses awarded by the Court, (iv) attorneys' fees awarded by the Court, and (v) any other costs or fees approved by the Court) must submit a valid Claim Form with all required information postmarked no later than January 28, 2022.  As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

102.    Lead Counsel consulted with Lead Plaintiffs' damages expert in developing the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation" or "Plan").  Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Complaint.

103.    The Plan of Allocation is set forth at pages 19 to 23 of the Notice.  *See* Segura Decl., Ex. A at pp. 19-23.  As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover at trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  Plan ¶ 2.  Instead, the calculations under the plan are only

a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.  *Id*.

104.    In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the estimated amount of artificial inflation in Cognizant common stock during the Class Period allegedly caused by Defendants' alleged false and misleading statements and material omissions. In calculating the estimated artificial inflation, Lead Plaintiffs' damages expert considered the price changes in Cognizant common stock on September 30, 2016, following the alleged corrective disclosure, adjusting for price changes on that day that were attributable to market or industry forces.  Plan ¶ 3.

105.    In general, the Recognized Loss Amounts calculated under the Plan of Allocation will be the lesser of:  (i) the difference between the amount of alleged artificial inflation in Cognizant common stock at the time of purchase or acquisition and the time of sale, or (ii) the difference between the purchase price and the sale price.  Plan ¶¶ 5, 7.  In addition, in accordance with the PSLRA, Recognized Loss Amounts for shares of Cognizant common stock sold during the 90-day period after the end of the Class Period are further limited to the difference between the purchase price and the average closing price of the stock from the end of the Class Period to the date of sale.  Plan ¶ 7(b)(iii).  Recognized Loss Amounts for Cognizant common stock still held as of the close of trading on December 28, 2016, the end of the 90-day period, will be the lesser of (i) the amount of artificial inflation on the date of purchase or (ii) the difference between the purchase price and $53.34, the average closing price for the stock during that 90-day period. Plan ¶ 7(c).

106.    Claimants who purchased and sold Cognizant shares before the alleged corrective disclosure on September 30, 2016, will have no Recognized Loss Amount under the Plan of

Allocation with respect to those transactions because any loss suffered on those sales would not be the result of the revelation of the alleged misstatements in the Action.  Plan ¶¶ 5, 7(a).

107.    The sum of a Claimant's Recognized Loss Amounts for all their purchases or acquisitions of Cognizant common stock during the Class Period is the Claimant's "Recognized Claim."  Plan ¶ 9.  The Plan of Allocation also limits Claimants based on whether they had an overall market loss in their transactions in Cognizant common stock during the Class Period.  A Claimant's Recognized Claim will be limited to his, her, or its market loss in common stock transactions during the Class Period.  Plan ¶¶ 15-16.  The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. Plan ¶ 17.

108.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered on purchases or acquisitions of Cognizant common stock that were attributable to the misconduct alleged in the Complaint.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

109.    As noted above, as of November 4, 2021, more than 321,000 copies of the Notice, which contains the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, had been sent to potential Settlement Class Members and nominees.  S*ee* Segura Decl. ¶ 9.  To date, no objections to the proposed Plan of Allocation have been received.

## VI.    THE FEE AND EXPENSE APPLICATION

110.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court, on behalf of all Plaintiffs' Counsel, for an award of attorneys'

fees of 20% of the Settlement Fund, net of Litigation Expenses, plus interest earned at the same rate as the Settlement Fund (the "Fee Application").  If the Court awards the $340,213.21 in Litigation Expenses sought (which are described further below), the requested 20% fee would be $18,931,957.36, plus interest.  Lead Counsel also requests payment for litigation expenses incurred by Plaintiffs' Counsel in connection with the prosecution and settlement of the Action in the amount of $271,858.21.  Lead Counsel further requests reimbursement to Lead Plaintiffs of a total of $68,355.00 in costs and expenses that Lead Plaintiffs incurred directly related to their representation of the Settlement Class, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4).  The requested attorneys' fees, litigation expenses, and PSLRA awards are to be paid from the Settlement Fund.  The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee Memorandum.  The primary factual bases for the requested fee and expenses are summarized below.

A.     The Fee Application

111.    Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Lead Plaintiffs and the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances and taking into account the litigation risks faced in a class action.  Use of the percentage method has been recognized as appropriate by the Supreme Court and Third Circuit for cases of this nature.

112.    Based on the quality of the result achieved, the extent and quality of the work performed by Plaintiffs' Counsel, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a 20% fee award is

fair and reasonable for attorneys' fees in common fund cases such as this and is within the range of percentages awarded in securities class actions in this Circuit with comparable settlements.

### 1.   Lead Plaintiffs Have Authorized and Support the Fee Application

113.    Lead Plaintiffs are sophisticated institutional investors that closely supervised and monitored the prosecution and settlement of the Action.  *See* Riechwald Decl. (Ex. 1), at ¶¶ 2-8; Silodor Decl. (Ex. 2), at ¶¶ 2-8; Lindahl Decl. (Ex. 3), at ¶¶ 2-8.  Each of the Lead Plaintiffs has evaluated the Fee Application and fully supports the fee requested.  *See* Riechwald Decl. ¶ 10; Silodor Decl. ¶ 10; Lindahl Decl. ¶ 10.  The fee requested is consistent with the retainer agreements entered into between Lead Plaintiffs and Lead Counsel at the outset of the litigation.  *Id*.  After the agreement to settle the Action was reached, Lead Plaintiffs again reviewed the proposed fee and believe it is fair and reasonable in light of the result obtained for the Settlement Class, the substantial risks in the litigation, and the work performed by Plaintiffs' Counsel.  *Id*.  Lead Plaintiffs' endorsement of Lead Counsel's fee request further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2.   The Time and Labor of Plaintiffs' Counsel

114.    The time and labor expended by Lead Counsel and the other Plaintiffs' Counsel in pursuing this Action and achieving the Settlement strongly demonstrate the reasonableness of the requested fee.  Attached as Exhibits 5A, 5B, 5C, and 5D are the declaration of each Plaintiffs' Counsel firm in support of Lead Counsel's motion for attorneys' fees and litigation expenses ("Fee and Expense Declarations").  The Fee and Expense Declarations indicate the amount of time spent by each attorney and the professional support staff employed by each firm, and the lodestar calculations based on their current hourly rates, as well as a schedule of expenses incurred by the firm, delineated by category.  These declarations were prepared from contemporaneous daily time

records and expense records regularly maintained and prepared by the respective firms, which are available at the request of the Court.

115.   As set forth in the Fee and Expense Declarations, Plaintiffs' Counsel have collectively expended 14,403.2 hours in the prosecution of this Action, with a total lodestar of $8,491,422.25.  As noted above, the requested 20% fee, net of Litigation Expenses—if the Court awards the expenses and PSLRA awards as requested—comes to $18,931,957.36, plus interest.[3] Accordingly, the requested fee results in a multiplier of approximately 2.2 of Plaintiffs' Counsel's lodestar.  As discussed in further detail in the Fee Memorandum, the requested multiplier is well within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

116.   As described above in greater detail, the work that Plaintiffs' Counsel performed in this Action included: (i) conducting an extensive investigation into the claims asserted, including through a detailed review of public documents, interviews with numerous former employees of Cognizant, and consultation with experts; (ii) researching and drafting a detailed Amended Complaint and a Second Amended Complaint, incorporating additional public information resulting from DOJ and SEC investigations; (iii) researching and briefing two rounds of motions of dismiss; (iv) opposing Cognizant's two motions for interlocutory appeal of the decisions denying their motions to dismiss; (v) conducting substantial fact discovery, including reviewing over 600,000 pages of documents produced by Cognizant; (vi) consulting extensively throughout the litigation with a variety of experts and consultants, including experts in financial economics,

---

[3] The Settlement Amount ($95,000,000) less the Litigation Expenses sought, including the PSLRA awards sought, ($340,213.21) is $94,659,786.79.  This amount is then multiplied by 0.2 to arrive at the requested fee.

SEZs, and the FCPA; and (vii) engaging in extensive arm's-length settlement negotiations to achieve the Settlement, including through an all-day, in person mediation session with Judge Phillips and substantial follow-up negotiations.

117.    As detailed above, throughout this case, Lead Counsel and the other Plaintiffs Counsel devoted substantial time to the prosecution of the Action. I maintained control of and monitored the work performed by other lawyers at BLB&G. While I personally devoted substantial time to this case, and personally reviewed and edited all pleadings, court filings, and other correspondence prepared on behalf of Lead Plaintiffs, other experienced attorneys at my firm were involved in settlement negotiations and other matters. More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

### 3.    The Skill and Experience of Plaintiffs' Counsel

118.    The skill and expertise of Lead Counsel and other Plaintiffs' Counsel also support the requested fee. As demonstrated by the firm resume attached as Exhibit 5A-3 hereto, Lead Counsel is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases. BLB&G is consistently ranked among the top plaintiffs' firms in the country. Further, BLB&G has taken complex cases such as this to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions. Liaison Counsel Lowenstein Sandler is also high skilled and extremely knowledgeable counsel. I believe Plaintiffs' Counsel's skill and their willingness and ability to prosecute the claims vigorously through trial, if necessary, added valuable leverage in the settlement negotiations.

### 4. Standing and Caliber of Defendants' Counsel

119. The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of its opposition. Defendants were represented by a number of well known, highly experienced, and highly skilled law firms who zealously represented their clients. Cognizant was represented by Goodwin Procter LLP; Coburn was represented by Jones Day; and Schwartz was represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP. In the face of this skillful and well-financed opposition, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants and their counsel to settle the case on terms that will significantly benefit the Settlement Class.

### 5. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

120. The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Plaintiffs' Counsel in bringing this Action to a successful conclusion are described above. Those risks are relevant to the Court's evaluation of an award of attorneys' fees. Here, the risks assumed by Plaintiffs' Counsel, and the time and expenses incurred without any payment, were extensive.

121. From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for the substantial investment of time and the outlay of money that vigorous prosecution of the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all of the costs necessary to pursue the case vigorously on a fully contingent basis, including funds to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically

demands.  Because complex securities litigation generally proceeds for several years before reaching a conclusion, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiffs' Counsel has received no compensation during the five-year duration of this Action and no reimbursement of out-of-pocket expenses, yet they have devoted more than 14,400 hours and incurred more than $271,000 in expenses in prosecuting this Action for the benefit of Cognizant investors.

122.    Plaintiffs' Counsel also bore the risk that no recovery would be achieved.  As discussed above, from the outset this case presented a number of significant risks and uncertainties, including challenges in proving the falsity and materiality of Defendants' statements, establishing scienter, and establishing loss causation and damages.

123.    As noted above, the Settlement was reached only after Lead Counsel had engaged in document discovery as provided under the Parties' agreement with the Government and while a stay of any further discovery was in effect.  However, had the Settlement not been reached when it was and this litigation continued, Lead Counsel would have been required to complete fact discovery (after the resolution of the Criminal Action against Coburn and Schwartz), which would have included continued document discovery and the taking of depositions of a substantial number of high-level Cognizant employees, and would have included seeking discovery and testimony of witnesses located in India under the Hague Convention.  Following the conclusion of fact discovery, Lead Counsel would have had to engage in extensive expert discovery efforts, including assisting with the preparation of opening and rebuttal reports from Lead Plaintiffs' experts; preparing for and defending their depositions; and taking the depositions of Defendants' experts. Lead Plaintiffs would have had to move for certification of a class, and it would be highly likely that Defendants would move for summary judgment.  After resolution of these motions, a pre-trial

order would have to be prepared, proposed jury instructions would have to be submitted, and motions *in limine* would have to be filed and argued. Substantial time and expense would also need to be expended in preparing the case for trial. The trial itself would be expensive and uncertain. Moreover, even if the jury returned a favorable verdict after trial, it is likely that any verdict would be the subject of post-trial motions, post-trial challenges to individual class members' damages, and appeals.

124. Lead Counsel's persistent efforts in the face of significant risks and uncertainties have resulted in a significant and certain recovery for the Settlement Class. In light of this recovery and Lead Counsel's investment of time and resources over the course of the litigation, Lead Counsel believes the requested attorneys' fee is fair and reasonable and should be approved.

### 6. The Reaction of the Settlement Class to the Fee Application

125. As noted above, as of November 4, 2021, over 321,000 Notice Packets had been sent to potential Settlement Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 20% of the Settlement Fund. *See* Segura Decl. ¶ 9 and Ex. A (Notice ¶¶ 5, 57). In addition, the Court-approved Summary Notice has been published in *The Wall Street Journal* and transmitted over the *PR Newswire*. *Id*. ¶ 10. To date, no objections to the request for attorneys' fees have been received.

126. In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that the requested fee is fair and reasonable.

### B.   The Litigation Expense Application

127.   Lead Counsel also seeks payment from the Settlement Fund of $271,858.21 for litigation expenses reasonably incurred by Plaintiffs' Counsel in connection with the prosecution of the Action (the "Expense Application").

128.   From the outset of the Action, Plaintiffs' Counsel have been aware that they might not recover any of their expenses (if the litigation was unsuccessful), and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years.  Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action.  Consequently, Plaintiffs' Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

129.   As set forth in the Fee and Expense Declarations included in Exhibit 5, Plaintiffs' Counsel has incurred a total of $271,858.21 in unreimbursed litigation expenses in connection with the prosecution of the Action.  The expenses are summarized in Exhibit 6, which identifies each category of expense, *e.g.*, expert fees, mediation fees, on-line legal and factual research, document management costs, telephone, and photocopying expenses, and the amount incurred for each category.  These expenses are reflected on the books and records maintained by Plaintiffs' Counsel, which are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred.  These expenses are recorded separately by Plaintiffs' Counsel and are not duplicated by the firm's hourly rates.

130.   Of the total amount of expenses, $106,610.00, or approximately 39%, was expended for the retention of experts.  As discussed above, Lead Counsel consulted extensively with experts in loss causation and damages, Indian SEZs, and the FCPA during its investigation

and the preparation of the Complaint and during the course of discovery. These experts' advice was instrumental in Lead Counsel's appraisal of the claims and in helping achieve the favorable result.

131. The combined costs of on-line legal and factual research were $91,700.42, or approximately 34% of the total expenses.

132. Another significant cost was the expense of document management and litigation support, which included the costs of creating and maintaining the database containing the documents produced in the Action. The document management costs in total came to $12,597.32, or approximately 5% of the total expenses.

133. Lead Plaintiffs' share of the mediation costs paid to Phillips ADR for the services of Judge Phillips were $29,290.00 or 11% of the total expenses.

134. The other expenses for which Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees, copying costs (in-house and through outside vendors), travel costs, long distance telephone charges, and postage and delivery expenses.

135. In addition, Lead Plaintiffs seek reimbursement of the reasonable costs and expenses that they incurred directly in connection with their representation of the Settlement Class. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum at 19-20. Lead Plaintiff Union seeks reimbursement of $40,375 for the 95 hours expended in connection with the Action by members of its legal department. *See* Riechwald Decl. ¶¶ 13-15. Lead Plaintiff Amalgamated seeks reimbursement of $11,250 for the time devoted to the Action by Amalgamated employees. *See* Silodor Decl. ¶¶ 13-15. Lead Plaintiff Colorado

FPPA seeks reimbursement of $16,730 for the time expended in connection with the Action by its General Counsel and Investment Counsel.  *See* Lindahl Decl. ¶¶ 13-15.

136.    The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $475,000, which may include an application for the reasonable costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Settlement Class.  Notice ¶¶ 5, 57.  The total amount requested, $340,213.21, which includes $271,858.21 for Plaintiffs' Counsel's litigation expenses and $68,355.00 for costs and expenses incurred by Lead Plaintiffs, is well below the $475,000 that Settlement Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

137.    The expenses incurred by Plaintiffs' Counsel and Lead Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement.  Accordingly, Lead Counsel respectfully submits that the application for payment of Litigation Expenses from the Settlement Fund should be approved.

138.    Attached hereto are true and correct copies of the following documents cited in the Fee Memorandum:

Exhibit 7:      *San Antonio Fire & Police Pension Fund v. Dole Food Co.*, No. 1:15-cv-1140-LPS, slip op. (D. Del. July 18, 2017), ECF No. 100

Exhibit 8:      *Alaska Elec. Pension Fund v. Pharmacia Corp.*, No. 03-1519, slip op. (D.N.J. Jan. 30, 2013), ECF No. 405

Exhibit 9:      *In re Schering-Plough Corp. Sec. Litig.*, No. 01-CV-0829 (KSH/MF), slip op. (D.N.J. Dec. 31, 2009), ECF No. 163

Exhibit 10:     *In re Snap Inc. Sec. Litig.*, Case No. 2:17-cv-03679-SVW-AGR, slip op. (C.D. Cal. Mar. 9, 2021), ECF No. 400

Exhibit 11:     *Knurr v. Orbital ATK, Inc.*, No. 1:16-cv-01031-TSE-MSN, slip op. (E.D. Va. June 7, 2019), ECF No. 462

Exhibit 12:    *N.J. Carpenters Health Fund v. DLJ Mortg. Cap., Inc.*, No. 08-cv-5653-PAC, slip op. (S.D.N.Y. May 10, 2016), ECF No. 277

Exhibit 13:    *Landmen Partners Inc. v. The Blackstone Grp. L.P.,* No. 08 Civ. 3601 (HB), slip op. (S.D.N.Y. Dec. 18, 2013), ECF No. 191

Exhibit 14:    *In re Tremont Sec. Law, State Law & Ins. Litig.*, No. 08 Civ. 11117 (TPG), slip op. (S.D.N.Y. Aug. 8, 2011), ECF Nos. 603

Exhibit 15:    *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758 (VM), slip op. (S.D.N.Y. July 18, 2011), ECF No. 117

## VII.   CONCLUSION

139.    For all the reasons set forth above, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Lead Counsel further submits that the requested fee should be approved as fair and reasonable, and the request for payment of total litigation expenses in the amount of $340,213.21, which includes Lead Plaintiffs' costs and expenses, should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct.  Executed November 8, 2021.

John Rizio-Hamilton

#3062288

**<u>CERTIFICATION OF SERVICE</u>**

I hereby certify that on November 8, 2021, I caused the foregoing Declaration of John Rizio-Hamilton in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses to be electronically filed with the Clerk of the Court using the ECF system.  Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

Dated: November 8, 2021

_s/ Michael B. Himmel_
Michael B. Himmel